# APPENDIX 3A

```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
                      RICHMOND DIVISION

-----------------------------------------

UNITED STATES OF AMERICA,


                         Plaintiff;

      v.                                    CRIMINAL ACTION
                                                92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                         Defendants.

-----------------------------------------
                      VOLUME XVIII

                   February 8, 1993
                   Richmond, Virginia
                      10:00 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
               JEFFREY B. KULL
               OFFICIAL COURT REPORTER
```

P-R-O-C-E-E-D-I-N-G-S

(In Chambers.)

MR. WHITE:  The only thing we wanted to

come back about was about our opening statements.  We were wondering if the Court would allow us to reserve our openings until we actually began our penalty phase presentations.  I know on behalf of defendant Tipton, Judge, we have no problem in telling the Court that we are going to take, we will easily be able to conclude our evidence within one day.  We plan on having four, maybe five witnesses at the most.  None should be terribly lengthy, and I think based on individualized consideration it would be helpful for the jury.  And I would also tell the Court that there are a couple of loose ends that on behalf of our case we would like to tighten up in terms of receiving reports today and later on this evening that would help us considerably.

MR. McGARVEY:  Each and every one of us, I believe all of us would join in that.

THE COURT:  To reserve your openings?

MR. McGARVEY:  Yes, sir.

THE COURT:  I have no problem with that.

MR. BAUGH:  The other thing is, I had a motion on it, but we would ask the Court before the

3275

United States commences, under 201(d), rules of evidence, the Court take judicial notice and advise the jury that Jerry Gaiters has been convicted and has pled guilty to a capital offense for which he cannot receive the death penalty.  It is my understanding that as of the time he pled, there has been no notification to seek the death penalty on behalf of the United States.  Under the statute, he can't get it.

MR. VICK:  As you just pointed out, he was never death-eligible.  He has not received a benefit.  I have no problem with it being  --  there was never the death penalty sought for him before he entered a plea of guilty.

MR. BAUGH:  The bottom line is, he pled to a statute that carried the potential for death, but for the fact the United States did not seek it.

THE COURT:  I don't care if you argue that, the fact that they didn't seek it.  But I'm not going to instruct them on anything like that.

MR. BAUGH:  We are going to have to call somebody from the United States, because the burden is on us.  It is a mitigator.  We have to put on evidence of it or the Court has to take judicial notice or we have to do it by stipulating it.

3276

THE COURT:  If you can't stipulate it, I'll explain to them the circumstances behind Gaiters.

MR. VICK:  We could probably get a written statement for publication.  I don't want it to look as if he didn't get the death penalty notice because

of his cooperation.  We didn't choose to charge him with the death penalty prior to knowing he was pleading guilty because he wasn't the triggerman.

THE COURT:  Let me resolve some motions before you all leave.  We had some motions in limine.

MR. GEARY:  Everything I have is in the other room.  We had filed more than ten, I think.

THE COURT:  You don't need anything but to hear what I resolved to do about it.

MR. GEARY:  Do you want me to waive oral argument?

THE COURT:  It is waived.  You filed plenty of information for me to rely on.  The evidence concerning Torrick Brown and Martha McCoy, that's a statutory aggravating factor, I don't think you can use it as a statutory aggravating factor.

MR. VICK:  In fact, it is a statutory aggravating factor  --  no, excuse me, it is not a specific statutory aggravating factor.  But it is a factor the United States intends to argue under the non-statutory aggravating factors that were enunciated in the death notices.

THE COURT:  That's fine.  It is not a statutory aggravating factor.  But it can be discussed as a non-statutory aggravating factor.  The evidence concerning Katrina Rozier, I tend to agree with the defendants on this.  What do you plan to do?

MR. VICK:  No more than I did in the first trial, in the penalty phase.

MR. GEARY:  Judge, the problem the government has is no appellate court has ever dealt with these aggravateds before, and they are limited to what they put in the death notice.

MR. VICK:  The death notice clearly contains that they conspired to kill people other than those listed in the indictment.

MR. GEARY:  If you tell the jury you don't know who killed somebody, how are you going to use that as an aggravator?

THE COURT:  I agree with the defense.  That murder will not be utilized as an aggravating factor.  I don't see any reason for any proffer by the government.  Defendant Tipton's motion to dismiss the non-statutory aggravator:  Substantial criminal history.

MR. VICK:  We have put most of that on.  His substantial criminal history is in front of this jury through his prior actions in Trenton and the other evidence that's been listed here.  We also intend to present his, in fact as to each defendant,

we intend to present their incarceration records from the City Jail.

MR. GEARY: That's a violation of two of your orders for them to attempt that. Tipton goes back to April '92. They have never given stuff to us until last night. You violated the order in November, violated had another order. If you don't do it timely, you can't use it.

MR. VICK: We gave that stuff, as Mr. Baugh knows, as soon as we got the stuff and everybody knew we were going to use it.

MR. GEARY: I don't care what everybody knew.

MR. VICK: Hold on, Bob.

MR. GEARY: Your lawyer says the government has to do certain things. They don't come in and say we give it to Baugh and Cooley.

MR. VICK: We handed it to Eric.

3279

MR. GEARY: Yesterday.

THE COURT: What are we talking about now, the jail records?

MR. VICK: They just show that they have assaulted other inmates, assaulted jailers. It goes to --

MR. GEARY: Not related to any aggravator.

MR. VICK: It is. It is related to the sentencing mechanism. The Supreme Court has been eminently clear on that, that any sentencer has the right to consider future dangerousness.

MR. GEARY: It's not --

MR. VICK: If I could talk; I don't interrupt you.

MR. GEARY: You have been doing all the talking. That's the problem. We don't get to talk. The future dangerousness is the biggest part of this case. They neglected to put it in the death notice.

THE COURT: Hold it.

MR. VICK: It is not a specific aggravating factor as enunciated by the law in this statute. Clearly, it was intended to be part of the sentencing process as an overall consideration by the sentencer. I need not in going to you specifically -- if this were being sentenced by the Judge, I

3280

need not say to you future dangerousness as a specific aggravating factor. It is something that should be considered by any sentencer, and clearly their actions indicate future dangerousness. And I intend to argue it, Judge. The Supreme Court has addressed it in JERIK v. TEXAS, specifically saying that. And it is not a specific aggravating factor of the sort laid out in that statute that they intentionally killed someone, that they did it after

premeditation.  Those are fact-specific things. Future dangerousness is not a fact-specific thing. It is an overall sentencing concept which the government has the right to get into, Your Honor.

THE COURT:  No, I disagree.  No, I think future dangerousness is just like any other non-statutory aggravating factor.  If you were going to utilize it, you needed to tell them.  I don't understand your logic at all.

MR. VICK:  It goes to -- Your Honor, it is the general sentencing scheme.  For instance, I can argue, unless I'm hamstrung as to my argument, as to the heinousness of this crime.  It would make no sense that I can't argue future dangerousness. Certainly I can argue without specifying that, you know, that the killing of these people was just heinous and depraved and shows an absolute disregard for life.  That's a general sentencing concept, as is future dangerousness a general sentencing concept. The fact that these people will continue to be a danger from the jail is already in evidence.  They have tried to kill people from the jail.  That's already in evidence.  They will continue to kill people from jail, and that's something this jury has the right to  --  I have the right to argue, even if I am not allowed to get into the institutional record.  I have the right under law, Your Honor, as a general sentencing scheme, and I can provide the Court with the Senate Minutes, the legislative history on this statute, where it is clear that they specified particular aggravating facts.  But it's clear, also, that future dangerousness, although not specified as an aggravating act, was considered just as importantly as the statutory framework concerning deterrence and punishment.

THE COURT:  Let me see it.

MR. VICK:  It is up in my office.

MR. BAUGH:  If you are going to let it in, we might as well ask for continuances now.  Because we were not noticed of it.  We have not investigated these jail allegations.

THE COURT:  Well, that's another point.  If you gave them notice on yesterday of the jail allegations  --

MR. VICK:  No, sir.  I told everybody, in fact I told Mr. White specifically, we talked about the scalding incident some weeks ago.

MR. BAUGH:  Scalding?

MR. VICK:  I handed to defense counsel the day we started trial the records we had gotten the day before from the jail.  Each and every one of

these.

MR. BAUGH: No, no, wait. Time out. The only record I was handed the first day of trial was my client's rap sheet, and I was not told it was the copy. I thought it was my copy. I looked through, there was nothing in there I hadn't seen before, and it went in the piles of paper we have in this case.

MR. VICK: As a matter of fact, most of the items that we will intend to offer into evidence against Mr. Baugh's client came from the materials Mr. Baugh provided us as discovery from the defendant. I would also note, Your Honor, that as I stand here today, I have yet to receive -- we got notice of a videotape to be put on by them last night.

THE COURT: We have to resolve this other issue first. You gave this stuff about what happened at the jail to Mr. Baugh?

MR. VICK: I handed it over to the defense table in a single packet.

MR. PARCELL: If I may, we gave them -- I had certified copies of all of Mr. Roane's convictions, his rap sheet, and all his jail offenses in the same folder. And we gave it to David on Monday, the first day of trial.

MR. BAUGH: I did not get a folder. What I got was stapled and it was not in a folder.

MR. VICK: We handed that over to the defense table saying, "Look at this."

MR. BAUGH: It is still on the defense table then.

MR. COOLEY: We have all been lumped together as "they." And the statute says, and the order says, that we were to receive the things for us. We haven't seen it, period. I don't know if it ended up with David --

MR. BAUGH: I know I didn't get it.

MR. VICK: As to Cory Johnson, there is almost nothing as to institutional behavior that's of any consequence. James Roane has had several assaults. Tipton has.

THE COURT: As far as I'm concerned, you can use the stuff against James Roane if you handed it to --

MR. BAUGH: I did not get it.

MR. VICK: You provided it back to me in your discovery.

MR. BAUGH: I provided it back to you?

MR. VICK: Yes. I grabbed from your discovery copies of his institutional record.

MR. BAUGH: We got his institutional records. I didn't get it from you, but I did not

know that the United States was going to -- we did not investigate allegations of his conduct in the Richmond City Jail, period. Because I did not know until this moment that it was going to be an issue and that it was going to be offered as aggravation.

MR. VICK: It was handed over to the defense table.

MR. WHITE: We would liken it to the situation with regard to the victim impact testimony. Future dangerousness is clearly a statutory predicate under the state statute.

THE COURT: It is in the state statute.

3285

MR. WHITE: But there is no notice. If they were going to use this, they have to put us on notice. It has to be a reasonable notice in advance of trial.

MR. VICK: That's not in the statute.

MR. WHITE: It is exactly in the statute.

MR. BAUGH: Don't argue person to person, gentlemen.

MR. WHITE: The statute, Subsection 8 of 21 U.S.C. 848 clearly provides that the government has to provide reasonable notice in advance of trial. And my recollection is that the Court denied the government's intention to use victim impact testimony, indicated in its order that they were not going to be allowed to do that because they did not notice it in advance of trial. And that's what I think the hallmark of the whole situation is. Statutory, official notice that satisfies due process requirements. We don't have it. And these allegations, what concerns me as much as the notice provisions, Judge, is that we are dealing with unadjudicated criminal conduct.

MR. VICK: Which they can rebut.

MR. WHITE: Precision and reliability at the capital sentencing stage, as the Supreme Court

3286

has discussed over and over again, this proffer on the part of the government simply doesn't satisfy it. I can understand where Mr. Vick is coming from, but in terms the statute, the Supreme Court case law, it doesn't cut the mustard at this stage of the proceedings.

MR. VICK: There are two issues here. The first issue is the overall issue of ability to argue future dangerousness. There is already evidence of that before this jury. They are the sentencers in this case sitting as you would sit if you were the sentencer. It is a proper consideration for the finder of fact and the sentencer in this case. Subsection B of that same problem would in essence be what defendants decry as lack of notice on the jail,

in the institutional proceedings.  Indeed, we provided that to the defense counsel the day we got those items.  And this can't be a surprise to defense counsel.  Each and every one of them has known that their clients have institutional problems.  That's well-within the scope of their knowledge.  I do not have to provide under the general rules of discovery something to them that is within their own purview and knowledge.  Mr. Baugh has proven that by handing back to me institutional records in his discovery

3287

matters.

MR. BAUGH:  I'm not talking about the records.  I'm talking about notice.

THE COURT:  Hold up.  I'm not going to allow any presentation or argument on the issue of future dangerousness, period.  I just believe if you were going to use it, you should have given notice.

MR. VICK:  Could I provide the Court with the Senate  --

THE COURT:  No.

MR. VICK:  I just tried to rely on the law here, and the law was clear as to specific aggravating factors.  A specific aggravating factor, but a general sentencing scheme, just like the heinousness of the offense is future dangerousness. I won't touch the jail records.  But I have the right to argue to this jury that these people will continue to try to kill people from the jail as the evidence is already before them.

THE COURT:  The evidence will have to speak for itself.

MR. VICK:  I'll stick to the evidence that's already before them.

MR. GEARY:  I want the Court to make sure you enforce this ruling.

3288

MR. BAUGH:  This is going to happen.  We have had several of these.

MR. VICK:  I'm so tired of my personal integrity being called into question.

THE COURT:  This is not about your personal integrity.  I believe that if you were going to use future dangerousness, it is an aggravating factor. And you did not notice it.  You are not going to be able to use it.

MR. VICK:  Judge, as I bifurcated my argument, does that mean in general or as to the jail records?  I understand it is to the jail records, but general sentencing scheme, Your Honor, that's something that's properly argued to this jury.

MR. BAUGH:  It has to be relevant to one of the notices.  The only rule of evidence that applies is relevance.  That's the only rule of evidence under

the rules.

THE COURT: I'm not going to let you do it.

MR. VICK: I respectfully -- I know I have no sanction here. There is nothing I can do. But if the Court would take the time to read the Senate Minutes concerning federal death penalty laws, it is clear that the Senate considered future

3289

dangerousness also as part of the general sentencing concept, not a specific aggravating factor.

THE COURT: I'm not going to let you do it without notice.

MR. BAUGH: Knowing the Court's position on instructions, our support people have prepared some penalty phase instructions which I would now tender to the Court, and maybe they can be of assistance.

MR. COOLEY: Ours will be filed later today.

MR. BAUGH: I think the Court will find them helpful.

THE COURT: All right.

MR. PARCELL: May I ask a question?

THE COURT: Go ahead.

MR. PARCELL: If we have witnesses who we plan to call today who will tell us that in the past six to nine months they have overheard different inmates, one of these three defendants, talking about having witnesses or police officers killed, are we prohibited from using that evidence in this phase, too?

MR. McGARVEY: Under which aggravator?

MR. VICK: Conspired to kill people other than the people named in the indictment.

3290

MR. COOLEY: Past tense phrase in the notice.

MR. GEARY: The aggravator says during this conspiracy.

MR. VICK: The conspiracy continues.

MR. BAUGH: Yes, please.

THE COURT: I don't have any problem with that kind of evidence.

MR. BAUGH: Then we would move for a continuance, because this is the first time, first -- I've never seen anything on this. I mean, there was no packet even alleged being said about this. Number two, we have no notice. Under JARRETT there is a whole new standard, and if you let that in we ask for tender and we need a continuance so we can defend it and check out the people who gave this information up. Credibility of witnesses is going to be a plea. Possibly there are GIGLIO problems.

MR. VICK: The Court ruled that I did not

have to give the substance of the testimony of the witnesses that we were going to bring forward.  There are no documents about this other than the documents that have already been provided them and the letter from Maurice Saunders, which was provided  --

THE COURT:  No, I would allow it and I will

3291

not grant a continuance.

MR. BAUGH:  We would ask then, before we put it on, that we be tendered enough information at this time so we can depend on it.  You are catching this cold.  We don't know what they are talking about.  And that presumption of innocence thing entitles us not to know that.  We have no idea.  We have asked for tender today.

MR. VICK:  We will proffer it right this minute.  We will call Maurice Saunders to indicate that indeed the letter which is in evidence, that that letter has a very specific threat in there that if Hussone Jones -- it was written to him by Tipton -- if Hussone Jones and "Man-Man" testify, that they will be visited; i.e., they will be killed for their testimony.  We have Rodney Tucker, who will testify that based upon being in the jail cell with "C.O.," he knows that "C.O." was conspiring to kill Valerie Butler because she gave him up, and C.T. Woody because of his testimony at the bond hearing.

MR. McGARVEY: In the jail cell?

MR. VICK:  Yes.  I can't say the exact cell, but on the same tier.

MR. McGARVEY:  I understand.

MR. VICK:  We have an individual, what's

3292

his name, Buddy  --

MR. PARCELL:  Paris Robinson, who will tell us that he was in Henrico with James Roane back in the summer, he thinks June or July of 1992, and Roane told him, he thought he was getting out of his city charge.  And Roane asked him to kill Ronita Rochelle Hollman because she was testifying against him.  He offered him between $10,000 and $15,000 He couldn't remember the exact amount.

MR. GEARY:  These are all witnesses now  --

MR. BAUGH:  They aren't even on the list.

MR. GEARY:  Ten days before this proceeding we were entitled to this.

MR. BAUGH:  We were given the death list last week.  We met in my office yesterday and went down the list of witnesses trying to figure out who he was what so we could carve out some notice, and none of these are on the list.  Tucker is on the list.

MR. VICK:  Maurice Saunders is.

MR. PARCELL: Paris Robinson is, too.

MR. GEARY: Not on mine. I only saw seven names on there, too.

MR. PARCELL: After that, Robinson wrote

3293

Rochelle Hollman a letter telling her to watch her back because she might have some problems.

MR. McGARVEY: Who wrote this?

MR. PARCELL: Paris. We got the letter last Wednesday. We finally found him and interviewed him this past Friday.

(List proffered to Court.)

MR. PARCELL: There is another one, Mr. Seward, S-E-W-A-R-D, Willie Seward.

THE COURT: When did you get Seward?

MR. VICK: He won't be testifying, Mr. Seward, I don't believe.

MR. PARCELL: Seward would tell us that he was locked up in Richmond City Jail. We talked to him last Tuesday for the first time. He will tell us that he has a girlfriend outside who has three-way phone calls. Richard Tipton used his phone to make three-way phone calls to different people. He called three people: Sandy, he gave us her home and work number; Robert, Jr., and Eric White, and had all the numbers on there and he said that he overheard Tipton wanting to have Woody killed.

MR. WHITE: What?

MR. PARCELL: And someone else.

MR. VICK: That came to us. That witness

3294

approached us last week.

MR. WHITE: Is he saying that a three-way conversation of this nature took place over my office telephone?

MR. PARCELL: No.

MR. VICK: No. That you were one of the three numbers that they used. You had nothing to do with this.

MR. WHITE: Thank you very much.

MR. PARCELL: We told you that last night.

MR. WHITE: I was not aware of the details of what the conversations were all about. Well, Judge, with respect to this kind of information, they were able to get telephone records from the jail.

MR. VICK: That's not correct.

MR. PARCELL: He wrote the numbers down and gave them to us on a piece of paper.

MR. VICK: I would also note that we have, as we stand here, received nothing from the defendants, yet. And although the Court entered its discovery order, we have not received -- Mr. Baugh handed me a packet of stuff about two or three days prior to the ending of the trial.

MR. BAUGH:  That's not true.

THE COURT:  All right.  We are going to quit tit-for-tatting.  The information I have heard this morning coming just a few minutes ago, I don't have any problem with any of that.  If you all care to interview these witnesses that aren't on the list, then fine.

MR. BAUGH:  Ten-day notice.  We don't have our ten days' notice on these witnesses.  They are not on any list.  They weren't on the first list, not on the second list.

MR. VICK:  Maurice Saunders is.

MR. BAUGH:  We are not talking about Saunders and Tucker.  We were just told that Mr. Paris is on the list, and I just showed you the list and he is not there, Your Honor.

THE COURT:  This is what?

MR. BAUGH:  Paris Robinson and Seward. They are not on the list.  There is the list right there.  We got it last week and we met on it.

(Document displayed to Court.)

THE COURT:  When did you get the list?

MR. BAUGH:  Last week.

MR. WHITE:  Faxed to us on Thursday or Friday.

MR. PARCELL:  We spent two days trying to track Robinson down through the Department of Corrections.  We didn't get his name until we talked to Ms. Hollman on Thursday.

MR. VICK:  We found him Saturday.

MR. BAUGH:  There are no faxes on my thing as of this morning, because we checked it.

MR. PARCELL:  Detective Fleming and I finally found him Friday afternoon.  We notified Pam to get him writted here.

THE COURT:  That's the best I can do for you.  If he found him on Friday, you are getting notice today.  So what would you have me do about it?

MR. BAUGH:  Move for a continuance for a week so we can investigate these allegations.  You see, because there is no Sixth Amendment notice thing in here other than what we are getting now.  We are going to have to go find the exact nature of the allegation and investigate backwards and try to get it.  What tier he was on, who else was there.  It is very difficult doing this without notice, and we need time to do it.  We are talking the death penalty phase here.

MR. GEARY:  Ronita Hollman, the government has had her for nine months.  If they wanted to get the conduct from her months ago, they could have done

3297

it and not run around and say to the defense, "We can't give it to you until today because we didn't have it until yesterday." These are people they had all along.

MR. WHITE: This is one of the reasons we filed the motion for the proffer, so we could get through all of these problems. With regard to Saunders --

MR. VICK: I got a proffer last night at 8:30.

MR. WHITE: Excuse me, please. What Mr. Vick is talking about doing is explaining a letter which, based on our objection at the trial, you sustained. In other words, they wanted Maurice Saunders to explain this letter. We objected to it and the Court sustained it saying that the letter speaks for itself. Maurice Saunders talked about this conversation about killing he had with Tipton. Anything other than that should be objectionable. He should not be allowed to go back through this at the guilt stage.

THE COURT: That objection will be overruled. We are not going to be continued. We are going forward today. These two witnesses who do not appear on the list, I'm going to require you, Mr.

3298

Vick, to wait before putting them on. Let's see, this is Monday. One day each. You are going to have to call them out of order and give them at least a few days to do whatever they can do with it. But the other folks on the list can be called and testify as they are going to testify.

MR. BAUGH: Can we have the 6's or other documents pertaining to the allegations by these guys, or somebody's notes as to what the allegations are?

THE COURT: Whatever you have, give them.

MR. VICK: The only notes we have are attorney notes.

MR. BAUGH: We will accept them.

MR. VICK: We have no obligation to give attorney notes.

MR. BAUGH: Then we would move for notice.

MR. VICK: I'll give them my witness notes.

MR. BAUGH: You are talking about investigation. Our time is sort of limited, you know? I mean, we have witnesses we have to line up. We are still working on exhibits.

THE COURT: You do the best you can. We are going to get started in a few minutes.

3299

MR. COOLEY: Can we join the motions?

MR. BAUGH: I have to object.

THE COURT: The objections are noted and overruled.

MR. WHITE: I think we had some other motions there. You stopped on the future dangerousness, Judge. I think we resolved that one.

THE COURT: You had a motion to dismiss Tipton, Non-statutory Aggravator Number 1. That motion will be denied. A motion to dismiss Non-statutory Aggravator Number 3, that defendant recruited a minor to participate with him.

MR. VICK: It is already before the jury.

THE COURT: In the murders. As it relates to the capital offenses that Tipton has been accused of, there is no recruiting of a minor involved.

MR. VICK: It would come in under Count One, the overall conspiracy, and Count Two, the CCE. "E.B." was clearly one of the people. He is the juvenile, clearly one of the people who came down from New York and took part in the murders. He took part in the murder of Peyton Maurice Johnson, and that's clearly before the jury. Now, Mr. Tipton, although not charged with that specific murder, we can properly argue to the jury that this overall conspiracy caused a number -- caused the murders that flowed from all of this activity, Your Honor, including the Peyton Maurice Johnson murder.

THE COURT: All right. What about the three individuals --

MR. WHITE: Are you going to let the minor stuff in this? There is no evidence that the minor was involved in any of these three, and it sounds like the government is proceeding on an aiding and abetting theory, which has no place.

THE COURT: It is already before the jury and I don't have any problem with it. The three individual woundings --

MR. BAUGH: Where is the evidence that any of these defendants recruited "E.B." to be in the group? Remember, it has to be recruited. Some adult must lure a juvenile into activity.

THE COURT: That's what the government has to prove. They have got a burden to prove that.

MR. BAUGH: To show recruitment. All right.

THE COURT: Motion to dismiss Non-statutory Aggravator Number 5, the defendant Tipton committed the rape, that motion will be denied. Motion to dismiss Non-statutory Aggravator Number 6, that defendant Tipton was knowingly and willfully a member of the conspiracy, et cetera, that motion will be denied.

MR. WHITE:  Your Honor, if I could just make one comment on that.  If there is something other than Katrina Rozier in that, what is it that the government -- you have already indicated that they can't mention Katrina Rozier.  What else is there that there could possibly be?  There are no other murders that have been contemplated by this conspiracy.

MR. VICK:  The murders that Tipton was not charged with, Your Honor.

THE COURT:  We don't need argument on that.  Motion to dismiss Statutory Aggravator Number 1 relating to Tipton intentionally killed the victim, et cetera, that will be denied.  All right.  That's the end of that.

MR. WHITE:  Judge, I think there was one I recall about the criminal history.  You indicated they can't use future dangerousness.  What about the unadjudicated criminal conduct in terms of his having a substantial criminal history?  Seems to me that that's unadjudicated criminal conduct.  It is not something that's ever been fully tried.

3302

THE COURT:  Mr. Vick?

MR. VICK:  It just got tried.  That's the evidence in front of the jury.  There is no  --  we have no  --

MR. GEARY:  One arrest.

MR. VICK:  He has no prior felony convictions that we will be introducing into evidence, unlike Roane and Johnson.

MR. WHITE:  What are you introducing against Mr. Tipton?  What's the evidence you offer in terms of the substantial criminal history other than that which is encompassed by this conspiracy?

MR. VICK:  That's what we will be arguing, that which is encompassed by this conspiracy, which is more than is charged in the indictment.

THE COURT:  I don't have any problem with that.

MR. WHITE:  Note our exceptions, please?

MR. BAUGH:  Yes.  Please, Your Honor.

THE COURT:  All right, let's go.

(Recess taken from 10:25 a.m. to 10:35 a.m.)

(In Open Court.)

THE CLERK:  Case Number 92CV68: United States of America versus Richard Tipton, Cory Johnson and James H. Roane, Jr., the eighteenth day of

3303

trial.  Are counsel ready to proceed?

MR. VICK:  The government is ready to proceed, Your Honor.

MR. GEARY:  Defendant Tipton is prepared, with one short matter to take up.

MR. COOLEY:  Defendant Johnson is prepared.

MR. BAUGH:  Defendant Roane would reurge his motion for continuance.  We have just been tendered another witness list with three additional people on it when we came up just now.

THE COURT:  All right.

MR. VICK:  That's what we covered in chambers.

MR. BAUGH:  Your Honor, Al Roehm, R-O-E-H-M, was not mentioned in your chambers.

MR. VICK:  He has to do with the jail records.  The Court ruled on that.

THE COURT:  Mr. Geary, you and Mr. Vick can come up if you would like.

(At Bench.)

MR. GEARY:  On behalf of Tipton, we would like to renew the severance motion filed to sever the death penalty phases from defendants Johnson and Roane for reasons previously stated, and also because

3304

of reasons given this morning in motions we filed, and also in regard to what the government plans to offer against all three this morning.  I'd like to urge the Court, the MOLINA trial is going on in Oklahoma.  That's a federal capital murder case with three defendants, also.  Preliminarily, the Judge ruled that they will be sequential until they get to the death stage.  We would ask the Court to consider sequential sentencing in this case.  Tipton first, then Johnson, and Roane.

MR. BAUGH:  In light of the information we were tendered this morning, Your Honor, and for individualized attention, we would join in that motion that we have.  One, we would reurge the motion for continuance.  Secondly, we would ask for sequential verdicts of life or death.  Yes, we would definitely.  In light of the notices, I don't know all this stuff they are going to bring out against Mr. Tipton and Johnson.  I don't think their counsel knows, and they can't tell us.  But because of the spillover effect -- this is a death penalty case in this phase -- we would strenuously reurge severance or have separate, distinct verdicts in sequential presentation.

THE COURT:  All right, the motion will be

3305

denied.

MR. BAUGH:  Also, Judy Payne, Number 8, has been added.  Lieutenant Al Roehm has been added from the Richmond City Jail.  We don't have any incident reports from Richmond City Jail.

MR. VICK:  You gave them to me.

MR. BAUGH:  If those are the only records,

no problem.  We just finished a long motion downstairs, a very emotional motion, between other counsel.  And the Court made some very specific rulings.  And they just did it again, Your Honor.  We can't defend like this.  This is a death penalty case.  This is trial by ambush.

MR. VICK:  Ms. Reid is here to authenticate the prior criminal records.  We intend to offer them without calling her.  But if we need to call her, we will.  As to Mr. Roehm, he is here to verify that the institutional records are indeed the institutional records that they keep, just a custodian witness, not to offer specific evidence.

THE COURT:  Your objection is noted.  Let's go.

MR. McGARVEY:  Defendant Johnson  --

MR. VICK:  Just so I understand, we can't get into the prior institutional conduct of Cory Johnson and Richard Tipton because of notice; is that correct?

THE COURT:  That's right.

MR. BAUGH:  James Roane?

MR. VICK:  As to Mr. Roane, we got the documents of his institutional record from Mr. Baugh.  He clearly had notice.

MR. BAUGH:  Your Honor, no, it isn't a question of whether we knew the acts occurred.  The question is had we been noticed that they were going to be issues on the death case, and we have not been.

THE COURT:  Forget about the institutional records.

All right, let's bring in the jury, please.

(The jury entered the courtroom.)

Good morning, ladies and gentlemen.  Today, we begin the second phase of this criminal trial, the sentencing or penalty phase.  As I told you when you were selected as jurors, the purpose of this hearing is to determine whether or not a sentence of death shall be imposed against any of the individual defendants: Mr. Richard Tipton, Mr. Cory Johnson, and Mr. James H. Roane, Jr., who you have convicted of the capital crime of murder while engaged in or in furtherance of a Continuing Criminal Enterprise.

It is the government that bears the burden of persuading you beyond a reasonable doubt that a sentence of death is justified as to each defendant. If the government does not so persuade each and every one of you, you must return a decision against capital punishment.

The decision whether or not to impose a death sentence as to a given defendant is, by law, left

exclusively to you, the jury.  Your decision as to each defendant will be final.  I will not be able to change it.  You and you alone must resolve the question of whether each defendant lives or dies.  Obviously, it is impossible for me to overstate the importance of the decision before you or the care and thoroughness that you must give to this matter.

Now, as I mentioned earlier, the purpose of this hearing is to consider whether or not the death penalty should be imposed.  That is this hearing's only purpose.

As you recall, you also convicted these defendants of various non-capital offenses, including conspiracy, firearms charges, drug charges, and non-capital murder.  The sentence to be imposed as to these non-capital offenses is left by law to the

3308

Court; that is, to me.  You may have noticed that the fourth defendant in this case, Ms. Sandra Reavis, is not with us this morning.  Again, this is because she was convicted only of conspiracy, a non-capital crime.  She will be sentenced by the Court at a later date.

Before the parties begin their presentations, I will give you a brief overview of the applicable law.  I will, of course, give you complete instructions on the law at the conclusion of the hearing.

I remind you that at the time you were selected as jurors, each of you assured me that if this case required a capital punishment hearing, you would follow the law as I will explain it to you.  It is imperative that you do just that.  Although Congress has left to juries the decision whether a defendant convicted of a Continuing Criminal Enterprise murder should be executed, Congress also has specifically narrowed and channeled your discretion by requiring certain findings to be made before the death penalty even may be considered.  Thus, you are not free to substitute your own views about circumstances that might warrant capital punishment for those specific circumstances defined by Congress.

3309

On the other hand, you must clearly understand that even if you do make the findings required by law as prerequisites to the imposition of the death penalty, no jury is ever required to impose the death penalty.

Now, the applicable law limits consideration of the death penalty to cases in which the government can prove beyond a reasonable doubt certain aggravating factors drawn from two specific statutory categories.  Aggravating factors are circumstances about a capital crime or about the character and

background of the defendant that would tend to support the imposition of the death penalty. Only if you are unanimously persuaded beyond a reasonable doubt that at least one aggravating factor for each of the two statutory categories has been proven as to a particular defendant and a particular capital crime, can you go on to consider the possibility of imposing the death penalty on that defendant.

In this case, from the first of these two statutory categories, the government alleges as an aggravating factor, first, that each of these defendants intentionally killed the victims of each capital murder for which he has been convicted. The government also alleges in this first category that each defendant intentionally inflicted serious bodily harm which resulted in the death of his victims. Third, that each defendant intentionally engaged in conduct intending that his victim be killed or that lethal force be employed against his victims which resulted in the death of the victim. And fourth, that each defendant intentionally engaged in conduct which he knew would create a grave risk of death to a person other than one of the participants in the offense and which resulted in the death of his victims.

You may have noticed that these four factors have one element in common: That the defendant or defendants acted intentionally. I remind you, ladies and gentlemen, that you are required to find that these killings were committed intentionally as a pre-condition to your finding Mr. Tipton, Mr. Johnson, and Mr. Roane guilty of the capital crimes for which you convicted them. Thus, the aggravating factors in this first category simply duplicate an element of the crime itself, the element of intent. The factors in this category do serve, however, to distinguish defendants who intentionally commit murder from those who kill another without the specific mental state.

The second statutory category of aggravating factors -- from the second statutory category of aggravating factors, there is one factor which the government alleges as to each defendant in each capital crime for which that defendant has been convicted. That factor is that the defendant killed his victims after substantial planning and premeditation. In this second category, there are also two other factors which the government alleges as to certain defendants and certain of the capital murders, but not as to all of the defendants or all of the murders. These factors are, first, that a particular murder was committed in an especially

heinous, cruel, or depraved manner in that it involved serious physical abuse to the victim; and second, that in committing certain of these murders, a defendant knowingly created a grave risk of death to one or more persons in addition to his victims.

Now the government also alleges various other aggravating factors which do not fall within the two categories specifically provided for in the statute. You may hear these referred to as non-statutory aggravating factors. You may consider these non-statutory aggravating factors only if you are first unanimously persuaded that at least one aggravating factor in each of the two statutory categories that I just mentioned has been proven as to an individual defendant and an individual capital crime beyond a reasonable doubt. Also, again, not all of these non-statutory factors are alleged against all of these defendants. I remind you that you must consider each defendant individually.

In this case, the non-statutory aggravating factors cited by the government are as follows: First, that a defendant has committed multiple murders; second, that a defendant has a substantial criminal history; third, that a defendant seriously wounded another individual or individuals in the course of committing a murder for which he has been convicted; fourth, that a defendant recruited a minor to participate with him in a murder or murders; fifth, that a defendant was knowingly and willfully a member of a conspiracy which had as one of its goals the murder of individuals other than those for which that defendant has been convicted; and six, that a defendant committed a rape during the course of the conspiracy against the person whose home that defendant had taken over to facilitate the distribution of narcotics.

By law, you may consider only the specific aggravating factors cited by the government. You may not consider any other factor not cited by the government in aggravation of the crime. This may surprise you, but it is a specific requirement of the statutory scheme enacted by Congress. Your oath as jurors obliges you to follow the law.

Now, the sole burden for proving aggravating factors rests with the government, which must persuade you unanimously and beyond a reasonable doubt of any such factor before you can consider it. A defendant does not have to disprove the existence of an aggravating factor. Indeed, the law does not require a defendant to produce any evidence at all at this sentencing hearing. It is the government that must persuade you that the death penalty is justified

as to each individual defendant.  In short, a defendant is not required to prove that he should be allowed to live.

The defendants are, however, permitted, if they wish, to introduce evidence of any mitigating factors that may be present.  Mitigating factors are circumstances that suggest that the death penalty is not appropriate as to a particular defendant.  Mitigating factors, unlike aggravating factors, need be established only by a preponderance of the

3314

evidence.  This is a lesser standard of proof under the law than beyond a reasonable doubt.  To establish a fact by a preponderance of the evidence means simply to prove that it is more likely so than not so.  Moreover, any individual juror who is persuaded of the existence of a mitigating factor may weigh it in considering the sentence to be imposed.

Unanimity is not required.  That is, you need not all agree on the existence of a mitigating factor before it can be considered.

In seeking to establish aggravating and mitigating factors, the parties may rely on your recollection of certain evidence presented in the first phase of this trial.  And they need not present that evidence to you again.  Now they may, however, present additional evidence at this hearing specifically related to your consideration of aggravating and mitigating factors.

Now, if you do find aggravating factors to have been proven by the government, whether just the statutory ones required by law, or both statutory and non-statutory aggravating factors -- and in saying this, I am not suggesting that you will or will not so find -- you each must then weigh these aggravating factors against any mitigating factors that you

3315

individually believe have been established.  Before you can sentence a defendant to death, you must be unanimously persuaded that the aggravating factors outweigh any mitigating factors sufficiently that a sentence of death is justified.

Even if you do not find that any mitigating factors have been established as to a particular defendant, you must consider whether the aggravating factors standing alone are themselves sufficient to justify a sentence of death.  Absent a unanimous agreement that a sentence of death is justified as to a particular defendant, you cannot impose such a sentence.

I note again that although you cannot return a decision imposing the death penalty absent a unanimous finding of the existence of certain aggravating factors, no jury is ever required to

impose the death penalty, even if it does make such findings.  In such a case, the Court would sentence the defendant consistent with the law.  In this case, that sentence would be life imprisonment without the possibility of release or parole.

Ladies and gentlemen, I will now call upon the government's representative for the government to make its opening statement.  I believe that the

3316

defendants have all opted to reserve making their opening statements prior to their presentations.  I remind you that these opening statements, like any other comments by counsel, are not evidence.  They may, however, assist you in considering the evidence that will be presented at this hearing.  I also ask that during this hearing you continue to observe all of the instructions about your own conduct as jurors that I gave you at the beginning of the trial.  Mr. Vick?

MR. VICK:  Your Honor, May we approach?

(At Bench.)

MR. VICK:  There is, I believe, an incorrect statement that we need to clear up.  Each of the defendants was charged with, in the commission of the enunciated offenses in the indictment, defendant Roane created a great risk of danger to one of the persons in addition to the victim of the offense.  You said the government did not charge each to premeditation.  I'll just cover it in my opening.

THE COURT:  You can clear it up.

MR. WHITE:  It is a minor issue.

(In Open Court.)

MR. VICK:  Your Honor, we would he ask for a rule on witnesses.

3317

THE COURT:  All the people anticipating being called as witnesses in this case will have to be excluded at this time.

(Witnesses left the courtroom.)

MR. VICK:  Good morning again, ladies and gentlemen.  You are fairly used to the routine now.  This is my opportunity to give you opening statement on this phase of the trial.  And as you are well aware, I'm sure as you have done much thinking, this is that penalty portion of the trial where you will determine whether indeed the imposition of the death penalty against these three defendants is the proper penalty, the appropriate penalty, given the actions that these defendants have been found guilty of.

As the Court stated to you in its instructions to you, the government's evidence here need not be reproduced.  Indeed, we shall not reproduce the evidence that you heard over the last several weeks in this phase.  We will move that evidence all back

in front of you so that you can consider it, and indeed that is what you shall consider. The government therefore will be putting on very few witnesses in this phase. Indeed, the government's case will be finished today.

The government's seeking of the imposition of

3318

the death penalty rests primarily upon the evidence you have already heard, the evidence of the death of ten people, the evidence of the severe wounding of others, the evidence of the conspiracy to kill even more than those who were killed and those who were wounded. That evidence is before you. It is properly considered by you. And it is the basis upon which the government suggests that you should indeed render decisions that Mr. Richard Tipton, "Whitey," should be placed to death; Mr. Cory Johnson, "C.O.," should be placed to death; and Mr. James Roane, "J.R.," should be placed to death.

I'd like to outline for you in a little more detail than the Court did the specific aggravating factors that will be enunciated as to each one of the defendants, beginning with Mr. Richard Tipton. There has been filed in this case, and Mr. Tipton has received it, a notice of the government's intention to seek the death penalty here. It is much like the indictment. It provides statements of what the government will prove in order to justify the imposition of the death penalty in this case. And Mr. Tipton has received that, and indeed you will probably receive it and can render your decision based upon it.

3319

In rendering your decision, the law is clear that you must find at least two statutory aggravating factors to be in existence here. You must find one from the first set of aggravating factors and you must find one from a second set of aggravating factors that are enunciated in the statute, 21 U.S.C. Section 848. In the death notice as to each defendant, you will see --

MR. BAUGH: I hesitate to rise, but this is not painting factual allegations, which the opening is limited to. Counsel is arguing nothing but law.

THE COURT: Overruled.

MR. VICK: As to each one of the defendants in the death notice, you will notice that it has been noticed to them that the defendant intentionally killed the victim; that the defendant intentionally inflicted serious bodily injury which resulted in the death of a victim; that the defendant intentionally engaged in conduct intending the victim to be killed or that lethal force be employed against the victim which resulted in the death of the victim; and the

fourth charged under that provision, that the defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to a person other than one of the participants in the offense and which resulted in the death of a victim.

Now, when you get the death notice, understand that each one of those first four allegations in the death notice is part of that first grouping of aggravating factors that you must find as to each defendant to be in existence. The evidence before you, ladies and gentlemen, is clear and has been proven beyond a reasonable doubt, each one of those items. Remind yourself of the evidence. The evidence is clear, and you have so found that it has been proven beyond a reasonable doubt that the defendant intentionally killed a victim, each one of these respective defendants. The evidence is clear, and I will tell you that to a certain extent these provisions are duplicative. They might overlap. That doesn't matter. That's perfectly proper, and indeed the same evidence might satisfy each one of these provisions. And the evidence is abundantly clear that each of these defendants has intentionally inflicted serious bodily injury which resulted in the --

MR. WHITE: I object, because it is a misstatement of the law. I think Mr. Vick is relying on aiding and abetting, which establishes criminal liability. It does not establish proof as to a statutory aggravator.

MR. BAUGH: We reurge the objection in that he is arguing law and not facts.

MR. VICK: I'm arguing facts.

THE COURT: The objection is overruled. Let's get on to what you are going to show.

MR. VICK: This is what I am showing. This is the evidence in the case, and I am reacquainting the jury with the evidence they have heard over the last four weeks.

The third is that the defendant intentionally engaged in conduct intending that the victim be killed or that lethal force be employed. That has been proven to you as to each one of these defendants.

MR. BAUGH: Counsel is arguing conclusions. He is not asserting evidence and this is an opening.

THE COURT: Objection overruled.

MR. VICK: Again, I remind you, ladies and gentlemen, the government does not need to come forward and reprove each one of these items that we have already proven to you in the initial trial.

Those matters are matters of evidence upon which you have rendered your verdict and are matters of

3322

evidence that you can consider at this point when rendering your sentencing decision. As to the fourth, that each defendant intentionally engaged in conduct which the defendant knew would create a grave risk of death to the person other than one of the participants in the offense, each of these defendants has been shown to be guilty of such an offense. I'll remind you, for example, in the case of James Roane that he has indeed inflicted serious bodily injury upon people other than the participants in the offenses: Martha McCoy. And that's properly considered by you. As to defendant Richard Tipton and Cory Johnson, they inflicted serious bodily injury upon Gwen and Priscilla Greene.

MR. GEARY: I don't hesitate to rise. This is a closing argument.

MR. VICK: In order to satisfy the law, I must reacquaint them with how the evidence fits into the statute.

THE COURT: The objection is overruled.

MR. VICK: Those first four factors, ladies and gentlemen, you need to find the existence of at least one of those first four factors in order to render a verdict of guilty. I suggest to you that based upon the evidence that you have heard and based

3323

upon those factors, it is clear that each four of those factors have been satisfied by the evidence already presented concerning each one of the defendants.

The second set of factors the Court also read to you, and you need to find from the second set of factors, beginning with Number 5 on the death notices as to each defendant, that at least one of those factors exists in each one of the defendant's cases.

As the Court noted, each defendant has been charged with committing the offenses in the indictment after substantial planning and premeditation. We will not put on additional evidence as to substantial planning and premeditation. You heard weeks of evidence concerning substantial planning and premeditation. And the government has already satisfied its burden there, and I would remind you of the evidence that you have heard concerning substantial planning and premeditation. Remember, it began with the very first witness, who said that the New York Boyz would resort to violence in order to take over a certain area. And indeed, that came true here in the City of Richmond when the New York Boyz --

MR. GEARY: That has nothing to do with any

3324

aggravator in this case.

THE COURT:  The objection is overruled.

MR. VICK:  When the New York Boyz came here and indeed decided to take over the Newtowne area and lay bodies in the street, as Richard Tipton and James Roane told Ronita Hollman, if necessary, in order to take over the drug business in the Newtowne area.

Substantial premeditation is existing in their thought process.  Planning was existing in their thought process when they intended to take over that area.  But as to each particular murder charged in the indictment, the evidence is also clear and is already before you that they substantially planned and premeditated each one of those murders.  Remind yourself of the fact that they indeed went on January 14th and bought firearms with the aid of Pam Williams.  Why?  So they could kill people.  They were planning and premeditating.  Remind yourself that again on February 5th, 1992  --

MR. GEARY:  That's the thirteenth time he has used the word "they."

MR. BAUGH:  In light of the JERIK decision, we would object to this broad brush.

THE COURT:  That will be sustained.  Be specific.

3325

MR. VICK:  Remind yourself that on January 14th, defendant James Roane, along with Cory Johnson, went with Pam Williams and bought weapons, and that shortly after buying those weapons, that Mr. Richard Tipton showed up at the Norton Street house and played with those weapons along with the other people, and that those weapons were accessible only to the core members of this group: to James Roane, to "C.O.," to "Whitey," and that those weapons were used to kill a number of people.  Planning and premeditation.

Remind yourself that on February 5th, 1992, Mr. Cory Johnson and Mr. Richard Tipton got together with Charlotte Denise Moore to purchase more weapons because indeed their weapons had been seized by the police at 1212 West Moore Street on February 2nd, 1992.  Further premeditation and planning.  Indeed, those weapons purchased on February 5th were used for the killing down at Stony Run of Linwood Chiles and Curt Thorne and the wounding of Gwen and Priscilla Greene.  Clear planning and premeditation.  Remind yourself that prior to each and every one of these murders, they went and retrieved those weapons and they went back and killed the people that they intended to kill.

3326

Remind yourself of the evidence concerning the

shooting of Peyton Maurice Johnson and of Doug Moody, of the fact that they would go and retrieve weapons. In Doug Moody's case, they went and retrieved the knife to be used that "Pepsi" had stored, the same knife that they had gone and gotten to kill Doug Talley --

MR. GEARY:  Fourteenth time for "they," Judge.

MR. VICK:  -- that Richard Tipton had used to kill Doug Talley.  Remind yourself that Richard Tipton had planned and premeditated the murder of Doug Talley when he asked Hussone Jones to follow him, and he and James Roane together went over in South Richmond, got out of the car, went and talked, and went back to the car where Doug Talley was riding and stabbed him.  And Richard Tipton stabbed him 84 times.  Remind yourself, clear planning and premeditation.  Clear planning and premeditation as to the murder of Doug Moody.  Remind yourself of the testimony that James Roane came and got the knife from "Pepsi" that was used to kill Doug Moody.  Clear planning and premeditation as to the murder of Peyton Maurice Johnson.  Remind yourself of the testimony that indeed they came and got the guns, went and

3327

searched down Peyton Maurice Johnson.  James Roane searched him down, found him in the residence of Stanley Smithers, and "C.O." and "E.B.," the juvenile, came in and blew Peyton Maurice Johnson away.

Remind yourself of the planning and premeditation that went into the triple homicide that occurred in Church Hill, of the clear thinking that it was necessary to find "Mousey" Armstrong and kill her, "because the bitch knew too much," according to Cory Johnson.  And the use of Jerry Gaiters to find her and mow her down, along with the two innocent victims that were there and died only because of their presence with "Mousey" Armstrong.  Clear planning and premeditation of that murder.

Remind yourself of the testimony about the February 19th  --

MR. BAUGH:  I must object.  My client has not been charged nor found guilty.  Again by inference, he was implicated in premeditation of that offense, and I object to it.

THE COURT:  The objection is overruled. Just go on.

MR. VICK:  Remind yourself of the testimony about the February 19th, 1992 killings of Linwood

3328

Chiles and Curt Thorne, clear planning and premeditation.  Cory Johnson indeed got those people to an area that he wanted to have them in so he could

kill them.  Richard Tipton came and aided him.  Clear planning and premeditation.  Remember the testimony of Charles Townes that indeed Richard Tipton was beeped previously that day by Cory Johnson and told that he had those people with him.  Clear planning and premeditation.

Now as to other aggravating factors, and I won't enunciate them in as great detail, but they are clear here, too.  It is clear that in the commission of these offenses the defendants, each of them individually and respectively, created a grave risk of danger to one or more persons in addition to the victims of the offense.  It is clear that this conspiracy intended, which is one of the statutory non-aggravating factors that's been alleged as to each and every defendant, it is clear that this conspiracy, these men, intended and conspired to kill people other than the people that have been brought before you having shown to have been killed by these people.  It is clear that each one of them intended to kill other people to hide this conspiracy.  They intended to kill Martha McCoy and her children

3329

because they survived and were witnesses.  They intended to kill  --

MR. WHITE:  Objection to "they."

MR. VICK:  The conspiracy, ladies and gentlemen  --

MR. WHITE:  Objection to "the conspiracy," Your Honor.  This is individualized consideration.

MR. BAUGH:  That's right.

THE COURT:  The objection is overruled.

MR. VICK:  These people have been charged in the death notice with engaging in a conspiracy, one of the objects of which was to kill people other than the people enunciated in the indictment.  And you can properly consider all of those people.

Let me tell you, Torrick Brown was killed by "C.O." and by James Roane.  It is not an 848(e) murder.  Remember that.  We went through that at the initial portion of this trial.  It is not charged as a death penalty offense.  But indeed, you have found those men guilty of committing that crime, and that is perfectly permissible consideration for you to have in rendering your penalty phase decision as to whether to place those men to death or not.  It is properly before you to consider the actions that they took on February 1st, 1992 when they shot Torrick

3330

Brown and they shot Martha McCoy in front of Martha McCoy's children.  So although it is not charged as a specific death penalty offense, it is properly considered by you, as is each and every bit of other evidence that was put on from that witness stand

concerning the actions of this conspiracy, the actions of these men that have been found guilty of conspiring together.

Remember under the law of conspiracy, they are guilty of each and every one of the acts that they did together.

MR. BAUGH: Objection. You cannot use -- that is a misstatement of the law in a penalty phase on a death case.

THE COURT: Overruled.

MR. VICK: Remind yourself about that. The evidence that we will put on today will be very short-lived. We will call just a few witnesses. We will call witnesses who will establish for you that in addition to the people that they killed, the evidence that you have already heard, that they intended to kill other people. We will call witnesses who will establish that they intended to kill Valerie Butler because of her cooperation with the government. That specifically, Cory Johnson

intended to kill Valerie Butler because of her cooperation with the government. We will establish, call witnesses that will show that they intended to kill -- Cory Johnson and Richard Tipton, "Whitey," intended to kill C.T. Woody because of his testimony against them at the bond hearing in this matter. We will call witnesses that will establish, indeed, that they intended to kill Martha McCoy if she testified, and that they intended to kill, even, Martha McCoy's uncle, because they knew where he lived, if Martha McCoy happened to testify. And we will call a witness that will say that he, too, was threatened by these people with bodily harm if Martha McCoy testified, the boyfriend of Martha McCoy.

They conspired to kill people above and beyond those people killed as alleged in the indictment, and you can properly consider their actions in that regard when rendering your verdict here. You have heard a fair portion of that evidence already in the guilt phase of this trial where you heard that they were going to go back and kill Martha and the witnesses, where you heard that they were going to kill Hussone and "Man-Man." But they conspired to kill more than that, and you will hear evidence as to that.

In reaching your verdict, you must find that the government has proved the aggravating factors alleged in the notices beyond a reasonable doubt. Again I remind you, we will not represent this case to you. We have already proven to you these aggravating factors beyond a reasonable doubt, and most of the aggravating factors listed in the death notices.

Remind yourself of the testimony and you, too, will understand that that has already been shown to you beyond a reasonable doubt.

Each one of these defendants is due individual consideration in your rendering of your verdict. You must determine individually that Richard Tipton deserves to be placed to death for his actions. You must determine that Cory Johnson deserves to be placed to death because of his actions. But I remind you, you can consider, in making that individual determination, the actions and goals of the conspiracy that they willfully and knowingly joined one with each other in rendering that individual determination. You can consider the fact that that conspiracy intended to kill more people than were killed when rendering that verdict. That is proper. You are not constrained to only those specific charges against the defendant, those that are the only charges upon which a penalty of death can be rendered. But you consider all the other facts that have come before you in determining whether a verdict of death should be rendered based upon those specific statutes.

Remind yourself in this process that you are looking at three mass murderers, ladies and gentlemen. Mass murderers.

MR. BAUGH: Objection. This is not opening.

MR. GEARY: When does it stop?

THE COURT: All right, Mr. Vick, wrap this up.

MR. VICK: Yes, sir. The human cost that has been taken by these people is immeasurable.

MR. BAUGH: Again, this is not an opening. That is a summation.

THE COURT: Sustained.

MR. VICK: Ladies and gentlemen, I would suggest to you that there are three reasons that I ask you to consider throughout the rendering of evidence this week concerning the propriety of finding a person should be sentenced to death. Those three considerations are as follows: First, does the death penalty verdict act as a deterrence?

MR. BAUGH: Objection.

THE COURT: Sustained.

MR. GEARY: Outside the aggravators.

MR. VICK: Whether it is the proper punishment.

MR. BAUGH: Objection, Your Honor. Again, that does not go to a factual allegation.

THE COURT: Overruled.

MR. VICK: Whether these defendants deserve

the sentence of death as a punishment based upon what they have done is something that you should consider when listening to the evidence that will be presented here.

Ladies and gentlemen, society has prescribed a sliding rule of sorts as to criminal behavior. Certain criminal acts are charged and punished more strongly --

MR. BAUGH: Objection. Again, this is not opening.

THE COURT: Sustained, Mr. Vick.

MR. VICK: Yes, sir.

MR. VICK: In addition to the evidence of further conspiracy, you will receive other evidence today concerning the fact that Mr. James Roane has a prior criminal record. You will see his prior felony convictions placed in evidence in front of you. You will see the fact that Mr. Cory Johnson also has a prior felony record. You will see those felony records placed in evidence before you. As I said, the government's evidence today will be fairly short. It will not last long. The defense will then proceed to putting on evidence in mitigation; that is, as reasons why you should not place these men to death.

I remind you that you have taken an oath; that your oath is indeed a very strong oath; that your duty is indeed a very strong duty. But the law is clear here: that in certain cases, the death penalty is the proper verdict to render given the actions of defendants. In this case, ladies and gentlemen, given the actions that you have already heard, given the evidence that has already been presented, and the evidence that you will hear presented in the next few days, I would submit to you that the rendering of a verdict of death as to each defendant will be appropriate.

THE COURT: All right.

MR. COOLEY: On behalf of defendant Johnson, we would ask to reserve the right to defer opening statements at this time.

MR. BAUGH: We would join in that motion.

MR. GEARY: Yes, sir.

THE COURT: Mr. Vick, call your first witness.

MR. VICK: The government would call Maurice Saunders.

He is in the Witness Protection Program now. I didn't know if the Court wanted to take the jury out.

THE COURT: There is no problem. Bring him in.

(The witness entered the courtroom.)

All right, Mr. Saunders will be sworn in.

MAURICE SAUNDERS, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. VICK:

Q    Could you state your name for the Court, record, and jury, please?

A    Maurice Cornelius Saunders.

Q    You previously testified in this case; is that correct?

A    Yes.

Q    Indeed, you are currently in the Witness Protection Program based upon your testimony; is that correct?

A    Yes.

Q    Now, Mr. Saunders, you obviously, from your testimony earlier, know Mr. Richard Tipton, "Whitey." Is that correct?

A    Yes.

Q    Could the record reflect the identification? Does the Court want to go back through that?

THE COURT:  No, the record will reflect he previously identified Mr. Tipton.

BY MR. VICK:

Q    Did you ever have a conversation with Mr. Richard Tipton wherein he talked to you about the art of killing?

A    Yes.

Q    Could you tell the ladies and gentlemen of the jury about that?

MR. WHITE:  Objection, because it does not relate to any statutory or non-statutory aggravating factor.

THE COURT:  Overruled.

BY MR. VICK:

Q    You may go ahead.

A    He just said there was an art to it and one day he will teach me.

MR. BAUGH:  So I don't waive the point, in the nature of this, we would have a confrontation objection as to this witness testifying with that defendant which could be used against this man.  We cannot confront that man.

THE COURT:  Overruled.

BY MR. VICK:

Q    Exactly how did he tell you he would teach you that?

A    He just said he will show me.  That was it.

Q    Did he ever talk to you about how it felt to

kill somebody?

MR. GEARY: I object to the leading. We went through this before.

MR. VICK: The rules of evidence are suspended at this point.

MR. WHITE: Asked and answered as well.

THE COURT: Overruled.

BY MR. VICK:

Q   Did he ever talk to you about what it felt like to kill someone?

A   Sometimes he would.

Q   What would he say?

3339

A   Just was saying not too, you know.

Q   Did he describe the feeling he would get afterwards?

A   No.

Q   Did you ever hear him make a threat to his stepfather?

A   He didn't threaten him --

MR. GEARY: Objection. Not based on any aggravator the government has offered.

THE COURT: Overruled.

BY MR. VICK:

Q   Did you ever hear him make a threat to his stepfather?

A   Yeah.

Q   What was that?

A   One time he got mad because they didn't want him to stay at their house, so he was staying with us.

Q   What did he say?

A   He said  --

MR. WHITE: Objection. This is not related to any conspiracy.

MR. BAUGH: Thank you.

MR. WHITE: This is a personal matter, Judge.

THE COURT: All right, Mr. Vick, Tipton's

3340

counsel, come up.

(At Bench.)

MR. VICK: He threatened to kill his father because he put him out of the house, a personal matter like Torrick Brown was a personal matter.

THE COURT: Sustained. Go to something relevant.

(In Open Court.)

BY MR. VICK:

Q   If you would look at page three of Government Exhibit 96, please, Mr. Saunders.

A   Yes.

Q   In that, there is language that says  --

MR. WHITE: Objection. It speaks for itself.

THE COURT:  Overruled.

BY MR. VICK:

Q    "So find out if they are still hanging out together, okay, and if they are, you know what right, but tell him don't be fooled because if he was in something he will be visited, he will be visited us for good.  So don't be a dummy."  What did you understand Mr. Tipton to mean?

MR. GEARY:  Again, the prosecutor has violated this Court's order, which happened in the first part of the trial.  You sustained our objection, and he is doing it again.

THE COURT:  The objection will be sustained.

MR. VICK:  Your Honor, the language of that letter  --

THE COURT:  The language of the letter is there.  Are you asking the witness to tell you what was in the person's mind?

MR. VICK:  I'm asking, based upon his contact with Mr. Tipton, if he understood what Mr. Tipton meant there.  Yes, sir.

THE COURT:  Sustained.

MR. VICK:  No further questions of Mr. Saunders.

CROSS-EXAMINATION

BY MR. GEARY:

Q    Mr. Saunders, when did these conversations with Richard Tipton take place?

A    It took place maybe two years ago.

Q    Two years ago?  How old were you then?

A    15 going on 16, 16 years old, something like that.

Q    He was about 19 or 20?

A    I don't know his exact age.

Q    You don't know his age?

A    No, he never told me.

Q    How old do you think he is?

A    22, thereabouts, I guess.

Q    He was telling you about murders he had done two years ago, right?

A    Yes.  He would talk about them a lot.

Q    Who was the first person you told about that from the government?

A    Who was the first person?

Q    From the government, that you told about these conversations about murders.

A    I would say Buddy.  I think it was Buddy.

Q    Buddy Parcell?

A    Yes.

Q    You call him by his first name?

A    Yes.

Q    Did he come to you and say, "Maurice, did you ever hear Tipton talk about murders?"  He asked you that, didn't he?
A    Yes.
Q    When was that that he asked you?
A    He asked me that -- I'm not sure what month it was.  It was last year.
Q    Before you testified?

3343

A    Yes.
Q    Buddy told you if you helped him he would help you, didn't he?
A    No, he did not.
        MR. GEARY:  Nothing further, Judge.
        MR. McGARVEY:  No questions, Your Honor.
        MR. BAUGH:  No questions, Your Honor.
        THE COURT:  All right.  The witness may stand down.
    (The witness stood aside.)
    Call your next witness.
        MR. PARCELL:  Rodney Tucker, please?
        MR. VICK:  While we are waiting for Mr. Tucker, the government would move in all evidence that was presented in the guilt phase portion of this trial for the sentencing phase.
        MR. GEARY:  I have a motion on that, Judge.
        THE COURT:  Come up here.
    (At Bench.)
        MR. GEARY:  Judge, you had previously instructed the jury preliminarily that they are to consider individualized treatment.  The offering of the evidence based on the case in chief, the government must relate it to a specific aggravating

3344

factor.  They can't simply ask the jury to recall all of the evidence.  Most of it would not relate to a specific aggravating factor.  That's the government's burden.
        THE COURT:  Overruled.
    (In Open Court.)
        MR. VICK:  We would move in all the evidence presented by the government in its case in chief.
            RODNEY TUCKER,
called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:
            DIRECT EXAMINATION
BY MR. PARCELL:
Q    Sir, would you please state your name?
A    Rodney Tucker.
Q    Are you the same gentleman who testified in this trial about two weeks ago?

A    Yes, sir.

Q    Sir, did there come a point in time that you had occasion to be on the same cellblock or same tier with Cory Johnson?

A    Yes, sir.

Q    Do you see him in the courtroom?

3345

A    Yes, sir.

Q    Would you describe how he is dressed?

        MR. McGARVEY:  I'll stipulate.

        THE COURT:  All right,

BY MR. PARCELL:

Q    Did there come a point in time when Mr. Johnson, or "C.O.," made some statements to you about his desire to harm some people?

A    Yes, sir.

Q    Would you please tell the ladies and gentlemen of the jury what those statements were, about who?

A    He was talking one time about a girl.  I don't know her name.

Q    What did he say?

A    I just know that it was a girl that turned him in because he had left the State of Virginia and went up to New York and there was a girl that turned him in to the FBI.  He just told me that he was mad at her and that he thought he was going to, you know, get out of here, out of this case, and he said he was going to get them when he get out.

Q    Did he say he was going to kill them?

A    Sir?

Q    What word did he use?

A    He told me he was going to kill her.

3346

Q    That's the lady who caused him to be arrested in New York City?

A    Yes, sir.

Q    Did he mention any desire to harm anyone else?

A    He told me that Detective Woody had found a gun on him and tried to lie.  Ballistics said the gun was used in a bunch of murders down here.  He told me it weren't used down here.  He told me he was going to kill Detective Woody, too.

Q    Is that the reason?  That was the reason, because Detective Woody testified at a bond hearing?

A    Yes.

        MR. BAUGH:  Objection.

        MR. McGARVEY:  Does counsel wish to testify?

        THE COURT:  Sustained.

BY MR. PARCELL:

Q    Did he tell you what led him to realize --

        MR. PARCELL:  Do you need to address the Court, Mr. Geary?

        MR. BAUGH:  I object to counsel.  He is

trying to use the witness like a meat puppet.  Now they are even again going in sidebar conferences.

THE COURT:  The objection is overruled. Mr. Geary, if you have anything to say, say it openly

3347

and stop the undercurrent crap.  All right, Mr. Parcell, go ahead.

BY MR. PARCELL:

Q    Did he tell you why he was upset with Detective Woody?

A    He said he lied on him about the gun.  He said the gun weren't used in no murder down here.

Q    Did he tell you where this occurred?

A    Went to a bond hearing in front of Magistrate Lowe.  I think that's the name of the Magistrate.  He said when he went to the Magistrate, Detective Woody used the gun and he said that gun that he used for the ballistics came back with some murders on it, that he is trying to say he used it down here.  He said he lied on him and everything and that he was going to kill him if he ever got out.

MR. PARCELL:  No further questions.

THE COURT:  Mr. Geary?

MR. GEARY:  No questions.

CROSS-EXAMINATION

BY MR. McGARVEY:

Q    Mr. Tucker, you were housed at the City Jail back in August; is that correct?

A    Yes, August 25 through September 9th.

Q    September 9th.  Have you gone back over your

3348

records recently?

A    My records?

Q    Yes.

A    No.  I don't have no records.

Q    And during that period of time you were in isolation; is that correct?

A    Yes, I came in for  --

Q    Will you answer my question?

A    I was in isolation.

Q    Thank you.  And why were you  --  tell the ladies and gentlemen of the jury why you were in isolation.

A    Been in isolation on and off when I come back to jail.

Q    Isn't that because you have the reputation in the community of being a snitch?

MR. PARCELL:  Objection.

THE COURT:  Overruled.

BY MR. McGARVEY:

Q    Isn't that correct?

A    It is whatever you want to call it.

Q    When you came into the jail you asked to be put in protective custody, isolation, because you had

testified in other trials like this before, haven't
you?

3349

A    I testified in a murder trial.
Q    Russell Gray?
A    Russell Gray.
Q    As a result of that you had some charges
dismissed and suspended sentences put against you; is
that correct?
A    For that trial?
Q    Yes, sir.
A    It weren't dismissed because of the testimony.
Q    Well, let me ask it to you this way, sir:  At
the time you testified in Russell Gray's trial, you
had a number of B&E's, a robbery, and grand larcenies
pending against you; isn't that correct?
A    True.
Q    Will you tell the ladies and gentlemen of the
jury on those five felonies, how much time did you
get on that, active time; how much did you get?
A    Didn't get no time.
Q    Exactly.  That happened after you testified in
Russell Gray's trial; is that correct?  Isn't that
correct, sir?
A    Yes, that's correct.
Q    And you are telling the ladies and gentlemen of
the jury that you got no dispensation as a result of
testifying in that trial?

3350

A    It didn't happen because I testified in that
trial.
Q    Now, let's go back to isolation.  You asked to
be put in isolation because you were afraid for your
safety if you were put in general population; isn't
that correct?
A    When I first came there, I didn't ask to be put
in isolation.
Q    You went immediately  --
A    When I first came to quartermaster's down at the
jail, I asked to go somewhere besides isolation
because I knew they was going to put me on C block.
I always go to C block since I come to jail since
that trial, so it wasn't my choice.
Q    As a practical matter, you went immediately to
isolation, is that correct?
A    I went straight to isolation.
Q    Your nickname down there was "The Police"; isn't
that correct?  Weren't you known as "The Police" in
isolation?
A    I don't remember that nickname.
Q    Was it common for people to discuss their cases
with you?
A    Was it common?
Q    Was it common for other inmates in isolation to

3351
discuss their cases with you?
A    Ain't nobody down there that's discussed their
case with me.
Q    Just Cory.
A    I just was talking to them.
Q    Will you describe for the ladies and gentlemen
of the jury the layout of isolation?
A    Got two sides.  You got a left side, right
side.  You have 12 cells on each side.
Q    And you have got a hallway, is that correct, in
between?
A    A hole?
Q    A hallway.
A    You have got a hall on the outside of the bars.
Q    The bars face out; is that correct?
A    Toward the window.
Q    Towards the window?
A    True.
Q    All the cells are side by side; is that
correct?
A    Yes.
Q    Your cell was C-9, was it not?
A    It was.
Q    And Mr. Johnson's cell was C-7; isn't that
correct?

3352
A    True.
Q    And so there was one cell in between you; is
that correct?
A    Yes.
Q    So I presume these conversations took place from
one cell to your cell; is that correct?
A    Yes.
Q    I presume that he must have had to holler to do
that; isn't that correct?
A    Don't got to holler.
Q    There was a cell in between you.
A    Don't make a difference.  It ain't that much of
a gap.
Q    Was there a cell in between you?
A    It is a fact there is a cell between me, but I
can talk to you all day from right there without
screaming.
Q    Was there another individual in the cell in
between you, sir?
A    At certain times there was.  And sometimes there
weren't.  In saying that, I mean that one dude would
move out, one will come in.
Q    Isn't it a fact that during the entire period of
time that you were there, which was a total of what,
about 15 days, about 15 days, that there were other

3353
inmates along that tier; isn't that correct, sir?

Isn't that correct?

A    Yes, there was other inmates on that tier.

Q    You don't know whether they had overheard these conversations, do you?

A    I ain't asked them.

    MR. McGARVEY:  That's all I have.

    MR. BAUGH:  No questions of this man, Your Honor.

    THE COURT:  Mr. Parcell?

        REDIRECT EXAMINATION

BY MR. PARCELL:

Q    Has the government instructed you or told you of any answers to give?

    MR. BAUGH:  Objection.  That is outside the scope.

    THE COURT:  It is not necessary.  Objection sustained.

    MR. PARCELL:  Beg the Court's indulgence.

    (Counsel conferring with co-counsel.)

BY MR. PARCELL:

Q    Mr. McGarvey asked you about certain benefits that you allegedly got for testifying in another murder trial.  Has the United States Government or the Commonwealth of Virginia promised you anything

3354

for your testimony today?

A    No.

Q    Did we get in touch with you or did you get in touch with us?

A    I went back to Bland and I wrote Mr. Vick.  I didn't know his address, so I sent it to this courthouse.

Q    And we have promised or offered you nothing; isn't that correct?

A    True.

    MR. McGARVEY:  May I ask one question?

    THE COURT:  All right.

        RECROSS-EXAMINATION

BY MR. McGARVEY:

Q    Sir, in the Russell Gray trial, were you promised anything before that, either?

A    No.

    MR. McGARVEY:  Thank you.

    THE COURT:  All right.  You may stand down, sir.

    (Witness stood aside.)

    Call your next witness.

    MR. VICK:  Detective Woody.

    MR. GEARY:  May we approach?

    (At Bench.)

3355

    MR. GEARY:  It is 11:45.  His name isn't on the list.

    MR. VICK:  He is just going to testify that

he testified at the bond hearing.

MR. BAUGH:  This is the second amendment to the list of witnesses.

THE COURT:  All right.  What do you need Woody for?

MR. VICK:  To say he testified at the bond hearing.  One question.

THE COURT:  No.

MR. VICK:  Your Honor, when we came in here at 10 o'clock we had writted Doug Cunningham, the other witnesses.  As I'm sitting here, they had not gotten here at ten.  I don't know if they are here. If we could have five minutes to check?

MR. BAUGH:  No objection.

(In Open Court.)

MR. VICK:  We would call Doug Cunningham.

MR. WHITE:  We need to approach.

(At Bench.)

MR. GEARY:  I wrote you a letter.  He is presently my client on an appeal in the Virginia Court of Appeals.  I can't even find him.

MR. WHITE:  I think even though Mr. Geary

can't cross-examine him, there are very serious problems with STRICKLAND v. WASHINGTON.  These are kinds of things which are almost automatic in terms of creating error, especially in this phase.

THE COURT:  I remember it.  What are you calling him for?

MR. VICK:  He will testify that he was told down at the jail in conversations with "J.R." that they were going to kill certain people.

MR. BAUGH:  Who?

MR. VICK:  It is what I specifically went into before.  Martha McCoy's boyfriend, in March of 1992 "J.R." told him to tell Martha there was a $10,000 hit on her and anyone else who would testify.  "Whitey" and "V" came and told him that he was going to get his if and when she testified.  He and "Whitey" himself said that if Martha testified -- no, that Doug was going to get his when "V" and "Whitey" got out.  He would also testify that "V" and "Whitey" both said that if Martha testified, that he would be hurt.  "J.R." threatened him about three times.  "J.R." said they would hurt Torrick Brown's uncle.  I said it in opening.

THE COURT:  I don't have any problem with Cunningham's testimony.

(In Open Court.)

DOUGLAS W. CUNNINGHAM, called as a witness by and on behalf of the government, having been first duly sworn by the Clerk, was examined and testified as follows:

                    DIRECT EXAMINATION
BY MR. VICK:

Q    Could you state your name for the Court, record, and jury, please?

A    Douglas Waverly Cunningham.

Q    You are currently incarcerated in the Virginia penal system; is that correct?

A    Yes.

Q    And how much time are you serving and for what are you serving time?

A    Ten years for possession of cocaine with intent.

Q    You and I have had occasion to meet and talk about your testimony here today; is that correct?

A    Yes.

Q    Has the United States Government or the Commonwealth of Virginia promised you anything in return for your testimony?

A    No.

Q    Are you testifying here of your own free will?

A    Yes.

Q    Do you know Ms. Martha McCoy?

A    Yes.

Q    How do you know Martha McCoy?

A    She is my girlfriend.

Q    You went to the City Jail in March of 1992; is that correct?

A    Yes.

Q    When you were at the City Jail, did you happen to come in contact with Mr. James Roane, also known as "J.R.?"

A    Yes.

Q    Do you see him here in the courtroom today?

A    Yes.

        MR. BAUGH:  Stipulate.

BY MR. VICK:

Q    Did you talk to Mr. James Roane about Martha McCoy?

A    Yes.

Q    Could you tell the ladies and gentlemen of the jury what James Roane told you about Martha McCoy?

A    He just told me for to tell her that he would give her $10,000 if she wouldn't testify against him.

Q    Did he say what he would do if she did testify against him?

A    Yes.

Q    What was that?

A    Stated there was a $10,000 hit on her if she testified.

Q    Did you have occasion to talk to Mr. Richard Tipton, also known as "Whitey?"

A    No, I didn't talk to him.  He talked to me.
Q    Did he talk to you?
A    Yes.
Q    Do you see Mr. Richard Tipton here in the courtroom?
A    Yes.
Q    Would you point him out?
A    Right in the back.
Q    How is he dressed?
A    Got the glasses on, the blue shirt.
        MR. VICK:  May the record reflect the identification of Mr. Tipton?
        THE COURT:  The record will so reflect.
BY MR. VICK:
Q    What did he talk to you about?
A    That something was going to happen to me if I was to testify, too.
Q    Did he talk to you about Martha McCoy?

3360

A    No.
Q    Did you talk to Mr. Lance Thomas, "V?"
A    Yes.
Q    What did Lance Thomas tell you?
        MR. BAUGH:  Objection.  Confrontation. Lance Thomas is not one of these defendants facing death, and we have a serious confrontation problem with that.
        THE COURT:  Overruled.
BY MR. VICK:
Q    What did Lance Thomas tell you?
A    The same thing Tipton told me, that something was going to happen to me.
Q    Do you know, did Mr. James Roane talk to you about Martha McCoy's uncle?
A    Yes.
Q    Who is he?
A    I know his last name only.  It is Brown.
Q    Where was he working?
A    The City Jail at the time.
Q    What did James Roane tell you about Martha McCoy's uncle?
        MR. WHITE:  Objection on confrontation grounds.
        THE COURT:  Overruled.

3361

BY MR. VICK:
Q    What did "J.R." tell you about Martha McCoy's uncle?
A    That he knew where Brown lived at, and he was going to be the next one.
Q    If what happened?  If something happened?
A    No, I think he said  --
        MR. BAUGH:  Objection to what he thinks.
        THE COURT:  Sustained.

BY MR. VICK:

Q    What did he say?

A    He said something to James Roane's brother and that's how it all started out about how he was going to do something to him.

MR. VICK:  I have no further questions.

MR. WHITE:  May I have a moment with Mr. Geary, please?

THE COURT:  Sure.

(Counsel conferring with co-counsel.)

MR. WHITE:  Defendant Tipton has no questions.

MR. COOLEY:  We have no questions.

THE COURT:  Mr. Baugh or Mr. Henderson?

CROSS-EXAMINATION

BY MR. HENDERSON:

Q    Good morning, Mr. Cunningham.

A    Good morning.

Q    Mr. Cunningham, first of all, this gentleman, Deputy Brown, he is Deputy Wayland Brown, isn't he?

A    Yes.

Q    He is no longer at the City Jail, is he?

A    No.

Q    In fact, he was removed by the Sheriff because of the fact that he threatened Mr. James Roane; isn't that correct?

A    He threatened his brother.

Q    He threatened James Roane's brother?

A    Yes.

Q    As a result of that he was moved out of the jail?

A    Yes.

Q    Now, with respect to Martha McCoy, at some point in time James Roane was dating Martha McCoy; isn't that correct?

A    Before we met.

Q    And you at that particular period of time were interested in Martha McCoy, also.  As a matter of fact, you two had somewhat of a confrontation about the fact that both of you were liking her or interested in her at the same time, correct?

A    Can you repeat that?

Q    Isn't it a fact that you and James Roane had some conversations, if you will, about the fact that the two of you were interested in her at the same time?

A    No, we didn't have no conversation about that.

Q    Did there come a point in time where you actually moved into Martha McCoy's home?

A    Yes.

Q    You in fact started selling drugs out of that home, correct?

A    No.

Q    Were you not arrested for selling cocaine?

A    I was arrested for it.

Q    And is that the conviction that you are serving now?

A    Yes.

Q    At the time of your arrest, were you living in Martha McCoy's home?

A    No.

Q    When you were arrested, were you not in Martha McCoy's home?

A    No.

Q    Okay.  Did Martha McCoy  --  let me ask you this:  After the arrest of Martha McCoy, weren't you in fact selling drugs out of that home?

A    No.

          MR. HENDERSON:  That's all I have, Judge.

          THE COURT:  All right.  You may stand down, sir.

     (Witness stood aside.)

     Government?

          MR. PARCELL:  Judy Payne, please.

     (At Bench.)

          MR. PARCELL:  This is Government Exhibit P-2 which has been labeled as a Government Exhibit, certified copies of all of James Roane's prior convictions on the state level.  The government has provided Mr. Baugh with a copy of all of these and his rap sheet and the fact that this is one of the things that was misplaced between the government and Mr. Baugh, we gave him certified copies of these things about a month ago.  We have since got another set of certified copies, I have showed them to Mr. Henderson and Mr. Baugh.  I intend to proffer them for their admission, and Ms. Payne will tell us of Mr. Roane's conduct one time.

          MR. BAUGH:  The reason we are up here, there are some misdemeanor charges in here.  We don't think that should go to significant criminal record. Additionally, this right here is the first I've heard of his conduct in the Department of Corrections, because we have attempted to subpoena those records and they have been refused us.

          THE COURT:  Sustained.  I won't allow it.

          MR. PARCELL:  Mr. Baugh subpoenaed those records.  They were sent to the Attorney General's Office for review and then sent to Mr. Baugh.  He was over there Friday viewing those records.

          THE COURT:  I'll sustain the objection.

     (In Open Court.)

          MR. PARCELL:  The government would offer Government Exhibit P-2, which are certified copies of

defendant Roane's prior state convictions collectively, Your Honor.  They are certified copies.

MR. BAUGH:  No objection.  May we inspect them before they go in?

THE COURT:  All right.

(Exhibit proffered to counsel.)

MR. VICK:  We would move into evidence Government Exhibit P-1, which is the prior criminal record of Cory Johnson.  Certified copies have been provided and are in the file.

MR. McGARVEY:  May we see them?

3366

THE COURT:  Go ahead.

(Exhibit proffered to Mr. McGarvey.)

MR. McGARVEY:  Might I approach?

(At Bench.)

MR. McGARVEY:  Your Honor, I have no problem with this part but I do have a problem with the NCIC.  There are charges in here, unadjudicated.  I believe I had attempted to do that earlier and the United States objected.

MR. BAUGH:  In a very timely and proper manner.

THE COURT:  You have got  --

MR. VICK:  I'll take it out.

MR. BAUGH:  P-4 is listed on their exhibit list.  It's whited out, but Mr. Henderson has been able to determine that's James Roane's name under there.  We would like to see those records.

MR. VICK:  That's a juvenile record we got from you.

MR. BAUGH:  No, disciplinary record from jail.

MR. PARCELL:  We had gotten copies of all three defendants' records: Johnson, Tipton and Roane, Pam put Roane down, should have been all three.

THE COURT:  That's all that is.

3367

MR. McGARVEY:  I have the same problem with this one.  There are charges, but there is no indication of disposition.

MR. VICK:  That's the way it came certified from New Jersey.

THE COURT:  There is no disposition on here.

MR. VICK:  We will take that off, too.

THE COURT:  All right.

MR. VICK:  Judge, while we are here, with the exception of the two witnesses that you said we will have to call out of order, we have got, once we move that in, we have got Belinda Davis.  We can't find her now.  I would move in her Grand Jury transcript.

MR. BAUGH: Counsel, you guys might want to hear this.

(Mr. Geary and Mr. White approached the bench.)

MR. VICK: Nobody has been able to find her since Saturday. Belinda Davis, I will proffer to the Court, is basically a street person, in and out.

THE COURT: I'm not going to allow a Grand Jury transcript to establish a factor.

MR. VICK: If we can't find her by the end of lunch, we will rest. We move Government Exhibit

3368

P-1 into evidence.

THE COURT: All right.

MR. VICK: We can't rest now anyway because we have these other people we need to get. And that's it for us, Judge.

MR. BAUGH: Are the other two people here? Because if they are, we might want to do an examination outside the presence of the jury so the Court can determine whether or not it is going to be admissible.

MR. VICK: When they came into your office at 10 o'clock they had not arrived. But they have been writted in and should be here.

THE COURT: Okay. I'm going to send them out. Let's do this. You have got these two people?

MR. VICK: Belinda Davis is on the street. We don't know where she is.

THE COURT: These two are locked up?

MR. VICK: Yes.

THE COURT: Why don't we -- I'll briefly listen to what they have to say. I'm not going to do it in here, though. I'll do it back there.

MR. BAUGH: Just do it there because of the fact they are inmates.

THE COURT: That's fine.

3369

(In Open Court.)

I'm going to send you all out. Probably when you are out, your lunch will arrive, because this is going to be along break. When we call you back, I'll let you know where we are and what we will be doing.

(The jury left the courtroom.)

MR. VICK: P-1 admitted, Your Honor?

THE COURT: It is admitted. Mr. Vick, can I have those two names?

MR. VICK: Paris Robinson and Willie Seward.

All right, Mr. Marshal, you can remove the defendants.

(The defendants were removed from the courtroom.)

All right, we will be in recess and I'll see you all in chambers.)

(Recess taken at 12:05 p.m.)

(In chambers.)

MR. VICK:  I would note in light of defense counsel's objections to my argument about the propriety of the death penalty, I assume in their opening statements none of them can argue about the impropriety of the death penalty, that that will all be resolved for closing?

MR. WHITE:  That's not what we were objecting about, Mr. Vick.

MR. COOLEY:  There are a couple issues I would ask clarification on.  I'm assuming that the Court is allowing us to adopt the objections by other counsel at this stage as we did in the last stage?

THE COURT:  Yes.

MR. COOLEY:  Additionally, this is totally unrelated to anything we have discussed so far.  We have, as the Court knows, a psychologist that was appointed under AKE as well as the statute, and it is my understanding that he would be allowed to be present in the courtroom.  In fact, I think he could be seated at counsel table.  We are not going to ask for that.  But there may be times when he will come in and out of the courtroom.

THE COURT:  I don't have any problem with that.

MR. BAUGH:  I assume you guys have experts, too?

THE COURT:  I told them to bring them individually so they can get them up here.

MR. VICK:  We still haven't received any psychiatric reports on Mr. Tipton, although I understand they have been prepared.

THE COURT:  We will deal with it as it comes up.  If you have psychiatric reports, psychological or whatever, give them to Mr. Vick.

MR. BAUGH:  There are no reports.  We handled them like Jencks material.

MR. VICK:  We have gotten them from Mr. Johnson.

MR. BAUGH:  We gave you ours.

MR. VICK:  You didn't have any.

MR. BAUGH:  There is some in there from when he was in school.

MR. WHITE:  I'm expecting something by fax transmission when I get back to my office today.  I will get it to the government.

All right, bring Mr. Robinson on in.

(Proposed witness entered chambers.)

THE COURT:  Mr. Vick, ask Mr. Robinson the questions.

BY MR. PARCELL:

Q    Would you please tell Judge Spencer your name?
A    Paris Lamont Robinson.
Q    All these gentlemen here are either attorneys or work for the Clerk's Office or the Court.  Judge Spencer is overseeing this trial.  Would you tell him, tell Judge Spencer, what if anything you know

3372

about conversations you had with James Roane?
        THE COURT:  Did you hear the question?
        THE WITNESS:  Yes.
        THE COURT:  Tell us what you know about any conversations with James Roane.
    (Witness not responding.)
BY MR. PARCELL:
Q    Did there come a point in time when you wrote Ronita Rochelle Hollman a letter?
A    Yes.
Q    Tell us why you wrote the letter.
A    I wrote the letter because I knew that she was testifying against him.
Q    Against who?
A    James Roane.  And I was telling her that I heard that somebody was going to do something to her for testifying against him.
Q    Who did you hear that from?
        THE COURT:  Answer the question.  We don't have all day.
        THE WITNESS:  Do I have to answer this question?
        THE COURT:  You don't have to.
        MR. VICK:  We ask he be led.
        MR. WHITE:  I object to that, Your Honor.

3373

        MR. VICK:  The jury is not in here.
        MR. BAUGH:  That's true.
        THE COURT:  He can be led all you need.  We are talking about what he is going to do in the courtroom.
        THE WITNESS:  I don't want no parts of this.  I don't want no parts of this.
        MR. VICK:  If I could, Mr. Robinson, you want no part of this because you don't want to be labeled as a snitch, correct?
        MR. BAUGH:  Objection to the relevance.
        THE COURT:  Don't be objecting in here.  Go ahead and ask all the questions you want.  The fact of the matter is, we will talk about it after he leaves.
BY MR. VICK:
Q    You have told Detective Fleming and Mr. Parcell that indeed James Roane asked you to kill Ronita Hollman, didn't you?
A    I refuse to answer that question.
Q    But you told Detective Fleming and Mr. Parcell

that, didn't you?

A    I refuse to answer that question.

Q    That James  --

THE COURT:  All right.  You can take Mr.

**3374**

Robinson out.

(The witness left chambers.)

MR. COOLEY:  Other than these folks, is the government finished?

MR. VICK:  We will try to find Belinda Davis, and it doesn't look like we will be able to. And that's it.  Your Honor, I'm not trying to just be obstreperous about trying to find out why my opening as to the propriety of the death penalty is objectionable, because if it is objectionable based upon the fact there was an opening statement, then it will be objectionable in their opening statements to argue the propriety of  --

THE COURT:  It was objectionable because it was argument.  It is opening statement, what you are going to demonstrate that would relate to the legal requirements that would make it appropriate, not a generalized discussion about how society has decided that in the worst cases people are going to die and all that.  You can argue that all you want in closing.  It is argument.  And it is the same for anybody else.  You don't have to ask me about that. It is the same for anybody else.  One rule, one standard.  Opening statement is not argument, and when you object, it will be sustained.

**3375**

MR. VICK:  Yes, sir.

MR. GEARY:  Did you hear that, Mr. White?

MR. WHITE:  Yes, sir.

MR. HENDERSON:  I take it you are not going to call Paris Robinson?

MR. VICK:  I think it would be a waste of everybody's time.

MR. BAUGH:  I think it would be error.

THE MARSHAL:  We don't have a prisoner by that name nor do we have a writ to produce a prisoner by that name.

MR. VICK:  There goes that one.

THE COURT:  That's quick enough.

MR. BAUGH:  Lunch until when?

MR. PARCELL:  He is in the City Jail.  We can get him here.

MR. VICK:  We can have him by 1 o'clock.

THE COURT:  Let's say 1:30.  If you don't have anything, I'll send them home.

MR. BAUGH:  You want us to do the motions at 1:30 or now?

MR. HENDERSON:  Defendants aren't here yet.

MR. BAUGH: That's right, we have to do the defendants. We will do them at 1:30.

3376

THE COURT: What are your motions?

MR. COOLEY: Motion for mistrial relating to the opening statement.

THE COURT: We can do that at 1:30.

MR. BAUGH: Thank you.

(Recess taken from 12:15 p.m. to 1:30 p.m.)

(In Open Court.)

MR. VICK: Judge, I understand from the Marshals that they are on their way to get Willie Seward. We don't have Belinda Davis. She has disappeared. So that's the only witness we have left to do. I don't know what the Court wants to do in light of its ruling this morning that we would delay and put them on later. If Mr. Seward comes and the Court wants to see him, we are ready to put him on this afternoon. But that's the government's case in aggravation.

THE COURT: All right. If they get him here shortly, we will go ahead and deal with Mr. Seward. Let me hear any motions that you all need resolved.

MR. COOLEY: Thank you, Your Honor. Respectfully, Your Honor, I would ask the Court to note that during the course of the government's opening statement or argument, depending on whose

3377

view you take, I suppose, that Mr. Vick used, by my count, the term "they" or "these people" 17 times. In addition, he talked to the actions of the conspiracy, described them as three mass murderers, and concluded with starting to mention that there were three things he wanted the jury to consider. The first of those, when he began to approach deterrence, the Court granted the objection or sustained the objection. The second one which he stated to the jury was, and I'm quoting, I believe, whether these defendants deserve the penalty of death for the acts which they have done. And I note to the Court that the statute mandates individualized consideration. And Mr. Vick gave what amounts to a closing argument during the course of his opening statement and throughout. Instead of asking the jury to consider each of these defendants individually, he continued to lump them together and to use the same terms and phrases which, instead of individualizing them, collectivized them. I would respectfully ask the Court to consider and I do hereby make a motion for, a mistrial. Thank you.

THE COURT: The motion for mistrial will be denied.

3378

MR. BAUGH:  We join in the motion as well.

MR. WHITE:  We join also.  If the Court please, there are a couple of other motions.  You may want to wait until after the government has officially rested.  It will be the functional equivalent to a Rule 29 motion.

THE COURT:  All right.  Anything else that we need to hear short of that?

MR. VICK:  If that is concerning the aggravating factor of the Belinda Davis testimony, we understand the position we are in and we will amend the notice.

THE COURT:  Obviously, that factor will be dismissed.

MR. WHITE:  We would also respectfully submit, Your Honor, that would be the case with regard to the non-statutory aggravated relating to the juvenile as well.

MR. BAUGH:  That may be premature.

THE COURT:  We will get into discussion when we finish.  Will anybody tell me how long this is going to be?

MR. VICK:  The Marshals told me approximately five minutes ago, Mr. Newman said that they had left to go.  He said also it is usually  --

3379

I don't know how soon prior to that they had left to go.  Usually it is about a 20-minute round trip.

THE COURT:  All right.  Well, we will wait.  Hopefully they will get here shortly.  We will be in recess.

(Recess taken from 1:35 p.m. to 2 o'clock p.M.

(Witness entered chambers.)

MR. PARCELL:  This is Judge Spencer.  The rest of the folks in here are lawyers or court staff.

MR. VICK:  This is Mr. Seward.

MR. PARCELL:  All right.  We are going to ask you a couple questions and just direct your answers to Judge Spencer.  Tell him your name.

THE WITNESS:  Willie Seward.

BY MR. PARCELL:

Q    You were locked up in the City of Richmond in January of 1993; is that correct?

A    Yes.

Q    And did there come a point in time when you had occasion to meet Richard Tipton?

A    Yes, I have.

Q    And did you all use the same phone?

A    Yes, we did.

Q    Did he ever ask you to use  --

MR. WHITE:  Objection to leading.

3380

THE COURT:  Overruled.  Just go ahead.

BY MR. PARCELL:

Q    Did your girlfriend have a three-way?

A    Yes, she did.

Q    Did he ask you to use that three-way?

A    Yes.

Q    Did he make some phone calls to your girlfriend on the three-way?

A    Yes, he did.

Q    Did you make note of the names and numbers of people he called off of her three-way?

A    Yes.

Q    Is that some notes you made yourself?

     (Document proffered to witness.)

A    Yes, I did.

Q    Did you do that at our direction or  --  we didn't talk to you when you made that up, did we?

A    No.

Q    Did you overhear some conversation between Mr. Tipton and somebody named Robert?

A    Yes.  Robert Jones.

Q    Tell Judge Spencer about those conversations.

A    Before the case started on the 11th or whatever, I got down to jail, on the fourth, and I went to his tier like on the 6th of January.  And the only way I

3381

can use the phone is by letting him use it, because they had a little gang on the tier or whatever.  So I let them use the phone and he called these numbers daily before the trial.  And he was telling Robert, Jr. that he wanted Detective Woody killed.

         THE COURT:  "He," who?

         THE WITNESS:  Tipton.  And tried to find some guy named "Wild" before the prosecutors had a chance to talk with him.

BY THE COURT:

Q    Some guy named what, "Wild?"

A    Yes.  And he wanted Robert, Jr. to find an alibi for him to witness for his whereabouts during the  --  one of the murders that he was charged with.  I think it was the stabbing.

BY MR. PARCELL:

Q    After you heard  --  did we get in touch with you or did you get in touch with us?

A    I got in touch with you.

Q    Who did you call first?

A    The FBI had the case.  I called the FBI.

Q    They gave you another number to call?

A    Yes.  They gave me a number to call and I talked to Detective Barnett.

Q    Sergeant Barnett?

3382

A    Yes.

Q    Then last week, Detective Woody came to see you; is that correct?

A    Yes.

Q    That's when you told him, gave that information and gave him that piece of paper?

A    Yes.

MR. PARCELL:  Nothing further.

THE COURT:  All right.  Put him outside.

MR. BAUGH:  Your Honor, may I?  You said they had a gang up on this tier; who is "they"?

THE WITNESS:  Tipton and a few guys he just met up on the tier.

MR. BAUGH:  Do you know any other defendants in this case?  Do you know any of the other guys who are charged in this case?

THE WITNESS:  I know them, but they wasn't on my tier.

THE COURT:  Let's put him out on the stand.

(Witness left chambers.)

MR. BAUGH:  Your Honor, in light of the fact that Mr. Edward Cooke read the newspaper article about the shooting, we are going to object to this guy coming in in the joint penalty phase.

3383

THE COURT:  Overruled.  He can testify about the phone call and the conversation he overheard about the killing of Detective Woody.  All this other stuff about alibi and  --

MR. VICK:  It is over.

MR. WHITE:  What the gang?

THE COURT:  He doesn't need to talk about that, either.  Just get right to the point, the phone calls made, "Did you overhear conversation," and let him tell us.  And that's it.

MR. PARCELL:  Judge, with the Court's permission, everybody else's, if I could lead him right to that point, "Did you have some conversations on the phone  --"

THE COURT:  I don't have any problem with you leading.  Get right to that point.

MR. PARCELL:  I'll get to it so I don't have to worry about this other stuff coming in.

MR. GEARY:  Objection, due to the fact it doesn't relate to an aggravating factor.

THE COURT:  Your objection is noted.

(In Open Court.)

THE COURT:  All right, let's bring in the jury, please.

MR. PARCELL:  Judge, where is the witness?

3384

THE COURT:  They must have taken him back.

(The jury entered the courtroom.)

(The witness entered the courtroom.)

All right, the witness will be sworn.

WILLIE SEWARD,

called as a witness by and on behalf of the
government, having been first duly sworn by the
Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. PARCELL:

Q    Sir, would you please state your name?
A    Willie Seward.
Q    Where are you presently residing?
A    Richmond City Jail.
Q    How long have you been there?
A    Since January 4th, 1993.
Q    Do you know someone by the name of Richard
Tipton?
A    Yes, I do.
Q    Do you see him in Court?
A    No.
Q    You may stand up if you need to and look
around.
     (Witness perused the courtroom.)
A    Yes.

3385

Q    Would you describe how he is dressed?
A    A blue shirt on with his glasses.
     MR. PARCELL:  Let the record reflect
identification of defendant Tipton.
     THE COURT:  The record will so reflect.
BY MR. PARCELL:
Q    Did there come a point in time, sir, that you
let him use your girlfriend's three-way phone from
the jail; is that correct?
A    Yes, I did.
Q    Did you hear him talking with somebody named
Robert, Jr.?
A    Yes, I did.
Q    During the course of those phone conversations,
did you ever hear him threaten or wish any harm on
anyone?
A    Yes, I did.
Q    Would you please tell the jury about that?
A    When I first got out there, I wasn't able to use
the phone  --
Q    Go right to the conversation.
     THE COURT:  Tell us what you overheard, if
anything.
     THE WITNESS:  I overheard that he wanted
Detective Woody killed and he wanted his friend  --

3386

     THE COURT:  All right.
BY MR. PARCELL:
Q    How about harm to anyone else?
A    Some guy named "Wild," he wanted him found
before the prosecutors got to him, I guess.
Q    Did the government come to you and ask you for
this information or did you reach the government

after you heard this?

A    I reached the government after I heard this.

Q    Who did you call first?

A    I called the FBI.

Q    Did they direct you to the Richmond Bureau of Police?

A    Yes, they did, to Captain Barnett.

MR. PARCELL:  No further questions.

THE COURT:  Any questions?

CROSS-EXAMINATION

BY MR. GEARY:

Q    Have you ever been convicted of a felony?

A    Yes.

Q    How many felonies have you been convicted of?

A    One.

Q    Your time in jail?  In January, what were you serving time for in January of this year?

A    Serving time for forging an arrest warrant.

3387

Q    You forged an arrest warrant?

A    And possession of two credit cards.

Q    Somebody else's credit cards?

A    Yes.

Q    When you said "forged an arrest warrant," did you write somebody else's name down after you were arrested?

A    Yes.  He instructed me to, because that's the name I gave them once I was arrested.

Q    You gave a phony name when you were arrested?

A    Yes, sir.

Q    What tier were you on in January?

A    I was on -- what was it?  It was C, to the right.

Q    The person that you heard the name Robert, Jr., do you know who that is?

A    No, I do not.

Q    What were the exact words you claim you heard Tipton say to Robert, Jr. on the phone about Detective Woody?

A    He wanted Detective Woody killed.

Q    Don't tell the jury what he wanted.  Tell the jury what you heard him say.

A    That's what I heard.

Q    He said, "I want Detective Woody killed?"

3388

A    Yes.

Q    That was how long ago when you heard that conversation?

A    It was before the trial began.

Q    When are you going to be tried on the charges you are facing right now?

A    January 26th.  Preliminary hearings.

Q    That's Richmond General District Court?

A    Yes, I think so.

Q    You will be prosecuted by the Richmond Commonwealth's Attorney's Office?
A    I think so.
Q    Did Mr. Parcell tell you he is the number two man in the Commonwealth's office in Richmond?
A    I wasn't aware.
Q    You are aware now, aren't you?
A    I'm still not aware, no.
Q    You are now.

REDIRECT EXAMINATION

BY MR. PARCELL:
Q    Have we offered you anything for your testimony?
A    No, you didn't.
Q    Have we told you what to say?
A    No.

3389

Q    Once again, you came to us, we didn't come to you; is that correct?
A    Yes.
        THE COURT:  The witness may stand down.
    (The witness stood a aside.)
        MR. VICK:  With the introduction of all the items from the guilt phase of this trial into evidence, the government rests in the aggravation stage in this case.
        THE COURT:  All right.  Ladies and gentlemen, let me explain to you what's going to happen for the rest of the week -- if I can fight off this flu bug -- what will happen for the rest of the week.
    Each of the defendants have indicated they will be putting on evidence in mitigation.  We have given them -- they have indicated that that mitigation will take about a day as it relates to each defendant.  So we would start with Mr. Tipton on tomorrow.  He will go through the day putting on mitigation.  Then we will start the next day with Mr. Johnson, and then with Mr. Roane.  I tell you this so that you will understand that if we per chance were to finish with, say, Mr. Tipton got through at 3 o'clock, that would be the end of it for that day, because in order to

3390

give them some certainty as to when to have their witnesses here and available, they each have their day to put on mitigation.  The government had the first day, and they have completed it now.
    I'm going to release you to go home and return tomorrow at 10 o'clock in the morning.  Remember my admonitions against reviewing any newspaper or television or radio items related to this case.  Please do not discuss the case with anyone.  We will see you tomorrow at 10 o'clock a.m.  Again, thank you for your patience.

(The jury left the courtroom.)

All right, starting with Mr. Tipton, I'll hear any motions.

MR. WHITE:  May it please the Court:  Am I to understand before I begin that the non-statutory aggravator about the rape is dismissed now?

THE COURT:  It will be dismissed.  There is no evidence.

MR. WHITE:  Also, Judge, about the recruiting of the juvenile, there has been no evidence about recruitment.  Rather than belabor that point --

THE COURT:  Well, I will hear argument.  I tend to agree with you, but I'll hear you.

MR. WHITE:  Your Honor, if the Court please, regarding the non-statutory aggravating factors, we would make a motion to dismiss on Numbers 1, 2, 3, 4, and 6 on the following grounds, Your Honor.  With regard to Non-statutory Aggravators Number 1, that the defendant committed multiple murders, Number 3, that the defendant recruited a minor to participate with him in the murders, and number 4, that the defendant seriously wounded three individuals in the course of committing the murders outlined in the indictment, as a preface, Judge, we would note two things.  First of all, there is really no authority that we can find to support the proposition that aiding or abetting or the concept can be used beyond the establishment of a criminal liability for the crime.  We recognize its validity in establishing beyond a reasonable doubt that someone is guilty of an offense.  We are now talking about raising that to a different level, raising this person to death eligibility.  It is not a standard instruction for capital punishment.  It should not be allowed as a concept which this jury can use to establish criminal activity.

In its non-statutory factors the government has been very, very specific that the defendant committed multiple murders.  Giving the government its due with regard to the Talley case, we would suggest to the Court that the inference certainly can be drawn that defendant Tipton committed that murder.  With regard to Church Hill, the murders of Armstrong, Long, and Carter, they are not entitled to that same inference because the evidence shows Mr. Tipton did not have the gun, did not get out of the car, did not actually inflict any violence or kill anyone or commit those himself.

The same argument would apply, Your Honor, to Stony Run and the murders of Chiles and Thorne.  "Pepsi" Greene did not even identify him as being

there.  Gwendolyn Greene puts him there, but never in the car or with a gun, as the government conceded this morning, Mr. Tipton was there and aided, but did nothing more.  Ballistics certainly don't support the argument that he actually committed any murders on that particular night.

With regard to defendant recruiting a minor to participate, Your Honor, the same would apply.  We would also add, Judge, that where in the evidence has there been any suggestion that anyone actually had to recruit the juvenile, who we will assume to be "E.B."?  There is certainly no evidence that anyone was directing that individual, no evidence that anyone was controlling, soliciting, inviting, or otherwise, any other actions towards "E.B."

Finally, we would submit to the Court that there is no competent proof that "E.B." was in fact a juvenile.

With respect to Non-statutory Aggravator Number 2, that the defendant has a substantial criminal history, we would ask the Court to note that criminal history  --  that the Court should apply the plain meaning of the phrase "history."  That is a course of conduct or action which precedes that which we are now confronted with in the course of this case; that being a conspiracy and a Continuing Criminal Enterprise.  At best, Your Honor, we are talking about unadjudicated criminal conduct.  At best, Your Honor, we are talking about things which are outlined in the course of or in furtherance of a conspiracy or Continuing Criminal Enterprise.  There is absolutely no suggestion whatsoever that prior to the conspiracy or the Continuing Criminal Enterprise that Tipton had any kind of criminal history.  And I would also suggest to the Court that the phrase "criminal history" as it relates to a sentencing factor contemplates adjudicated criminal conduct, that which is more reliable.

When it comes to reliability and precision, the hallmarks of capital sentencing, we would suggest that the phrase "criminal history," unadjudicated criminal conduct, does not satisfy the government's burden in this case.

Finally with regard to Non-statutory Aggravator Number 6, the defendant was knowingly and willfully a member of a conspiracy which had as one of its goals the murder of individuals other than those for which defendant has been charged, we would suggest to the Court that the only evidence we have heard here today is discussion or a comment that was made by Mr. Tipton to Robert, Jr. over the telephone, that being that he wanted Detective Woody killed.  Well, on

January 4th of 1993, Judge, I think it is very clear that this conspiracy was over and done with.  That is certainly not something that was done -- the membership in the conspiracy is certainly not something that the government can prove.  And we would suggest that the government has not borne its burden of proof with regard to that.

Finally, with regard to the statutory aggravators regarding the one of substantial planning and premeditation, we would suggest to the Court that

3395

with regard to the murder scenes at Church Hill and Stony Run, there is no evidence of substantial planning and premeditation.  Certainly with regard to Church Hill, the evidence from Charles Townes was very clear; that he and Richard Tipton were out looking for drugs that night.  They simply happened by 1212 West Moore Street, happened upon two individuals making plans to go somewhere, and Mr. Tipton happened to go along for the ride.

Judge, with regard to Statutory Aggravators Number 1 and 2, that the defendant intentionally killed the victim and that the defendant intentionally inflicted serious bodily injury which resulted in the death of the victim, we would ask the Court to take our arguments of aiding and abetting, Armstrong, Bobby Long, Carter, Curtis Thorne and Linwood Chiles.

Excuse me, Judge.  With regard to Non-statutory Aggravator Number 4, seriously wounding three other individuals, I think it should be very clear that at best there could be only two.  And when one considers the ballistics reports which are consistent with a gun other than the one which Mr. Tipton may have had, although no one puts a gun in his possession, consistent with the arguments about aiding and

3396

abetting we would suggest that the government has not borne its burden.

THE COURT:  All right.

MR. COOLEY:  May it please the Court:  We would have the same motion insofar as it relates to the following under our notice of the intention of the United States to seek the death penalty.  The statutory aggravator listed as Number 6 is phrased in our notice that "The defendant committed the offenses charged in the indictment after substantial planning and premeditation."  I believe that the only offense as to which that can relate are the murders in furtherance of the Continuing Criminal Enterprise.  I don't believe that that would or should include actions within the conspiracy, the act of distributing cocaine, for instance, or crack to any specific person.  Even though that might have taken

substantial planning or premeditation, that would not be properly before this jury as an aggravating factor.

Based on the opening statement or argument, it sounded as if the government was alleging that the purchasing of the firearms would in and of itself be a demonstration of substantial planning and premeditation of a murder. That may or may not flow, but if the government's intention in closing argument is to expand upon that and say, well, then if they were distributing drugs and they substantially planned or premeditated that, then it seems to me this is an inappropriate -- or that the language of that particular statutory aggravator is inappropriate, particularly as it relates to the term "offenses" charged in the indictment.

Insofar as the non-statutory aggravating factors, I would suggest to the Court that statutory -- excuse me, Non-statutory Aggravator Number 2, that being that the defendant has a substantial criminal history, the evidence before the Court is that there is a single conviction of Mr. Johnson. The only thing that is contained there shows a possession of controlled substance and a one-year sentence for that. And I don't believe even under the widest interpretation of the term "substantial" that that would be an appropriate aggravating factor for this jury to consider.

Non-statutory Aggravating Factor Number 3, that the defendant recruited a minor to participate in the murders: I believe the government has to be held to a strict construction. And at this point it seems to me that the government has had to prove to this Court's satisfaction as a matter of law that there is any evidence that someone, in particular Cory Johnson, recruited a minor. And there is no evidence that "E.B." is a juvenile, and assuming that "E.B." is the person to whom the government is relating this aggravating factor, there is no demonstration, even if you assume he participated, that there was a recruitment of him by Cory Johnson, or for that matter any of the folks who are before the Court at this point in time or by any other party, as opposed to a voluntary arrival and participation by this person who is alleged to be a juvenile. There is no evidence before the Court whatsoever of a recruitment.

Your Honor, finally, Non-statutory Aggravating Factor Number 5 in our notice says that the defendant was knowingly and willfully a member of the conspiracy, which had as one of its goals the murders of individuals other than those for which the

defendant has been charged.  In the indictment as it stands, there are two folks named for which Mr. Johnson has not been prosecuted.  They are the victim, Mr. Talley, and the victim, Mr. Moody.  While we have had allegations of Ms. Rozier, as I understand the Court's ruling at this point in time,

3399

the Rozier matters have been excluded from consideration.  And that leaves Talley and Moody. There is no evidence before the Court that any entry into this alleged conspiracy was done where folks met and said, "Well, we are going to see that Mr. Talley is killed or that Mr. Moody is killed," and that the defendant had any awareness or knowledge of those things when in fact they occurred.

There is absolutely no evidence in the trial as it has been presented which ties defendant Johnson to a participation, an awareness, or any relation whatsoever to the Talley and Moody killings.  And I would suggest to the Court that that being the case, that Non-statutory Factor Number 5 should fall and should be dismissed.  And respectfully, I move for each of those factors to be dismissed as I have outlined them.  Thank you.

THE COURT:  All right.  Mr. Baugh?

MR. BAUGH:  Your Honor, as the Court is well aware, the jury -- and the Court has already instructed the jury during the guilt or innocence phase -- must take each count separately and assess the evidence as it pertains to each individual count and each individual defendant.  We would point out, we would request that the Court direct and so find at

3400

this juncture that evidence concerning the shootings on Church Hill of Dorothy Armstrong and Anthony Carter and Mr. Long cannot be considered as aggravating factors pertaining to the trial of Mr. Roane.  Mr. Roane was in custody at that time.  There has been no evidence of conversations prior to that concerning that.  One witness said there was some discussion about it, but there is no evidence here. And even if it is, I would remind the Court that when we were downstairs a moment ago, concerning the issue of Mr. Gaiters, the United States represented they were not seeking the death penalty against Mr. Gaiters because he was not the triggerman.  There is no indication that Mr. Roane was the triggerman on these, and as such, we would ask the jury be directed they cannot consider the facts or circumstances concerning those murders as aggravating factors justifying the execution of Mr. Roane.

The same would apply, in fact would more stridently apply to Stony Run.  Because while there was some evidence of possible discussions between

people concerning the shootings in Church Hill, there is no evidence of discussions concerning Stony Run and this defendant. Nothing. As such, the jury should be instructed that all of the  --  any

3401

planning or whatever went into the killings, or the woundings that occurred at Stony Run of Mr. Thorne or Mr. Linwood Chiles, or the two young ladies, cannot be used as aggravating factors justifying the execution of Mr. Roane.

Additionally, Statutory Factor Number 1, the defendant intentionally killed the victim, we would agree with Mr. Cooley that under JERIK we now have a strict construction of these. We would submit that Aggravating Factor Number 1 as it applies to 848(n) would certainly go to the triggerman, the person who intentionally committed the actual act, and that aiding and abetting would not justify at this stage, or at least it would not justify a finding under 1 for anyone except the actual triggerman. We would submit that that could not apply to the shooting of Louis Johnson. That was the young man shot on the street. And it would also not apply to the Peyton Maurice Johnson murder, and that the jury should be instructed that this aggravating factor could not apply to those murders.

The same would apply to Number 2, should not apply to Louis Johnson, or to Peyton Maurice Johnson. Number 3, intentionally engaging in conduct intending that the victim be killed or that lethal

3402

force be used against the victim which resulted in the death of the victim, Number 4, intentionally engaging in conduct which would create a grave risk, we have no argument at this time.

Concerning substantial planning and premeditation  --  I'm sorry, as to the other mitigating factors, 2, 3, 4, 5, and 6, particularly 6, involving substantial planning and premeditation, we would also ask again that the jury be instructed that as to the killings at Church Hill or the killings at Stony Run, that they cannot find any of these aggravating factors to justify a verdict of death against defendant James Roane.

And that would also apply, of course, to the killings of Louis Johnson and Peyton Maurice Johnson. Each of those directly make reference to intentionally killed. We would submit that would go to, quote, the triggerman.

Additionally, Your Honor, we would have some objection with Non-statutory Number 3, recruiting a minor, for the same reasons that I will not waste the Court's time with. There is no indication that Mr. Roane recruited anyone. In fact, there is no

indication he even knew this person, "E.B.," until he showed up in this alleged conspiracy.

3403

Additionally, Your Honor, we have a couple things. One, the defendant has a substantial criminal history. Number two, we would submit that at this juncture, as the Court is well aware, every defendant in a criminal case has a right to be free from arbitrary application, which is why we give very definitive jury instructions. We would submit that the word "substantial" is one of those nebulous terms that gives the jury almost unfettered discretion as to what it should do. It gives no direction.

Likewise, we would submit that the term "substantial planning" and "premeditation" in Statutory Aggravator Number 6 gives none, particularly in light of the United States' argument. The United States argued that there was evidence of premeditation because the defendant went somewhere and got a gun and came back and shot someone, or went somewhere and got a knife and came back and stabbed someone. Actually, what has been argued here, and actually what's in the law, there is no difference between premeditation and intent or manifesting intent. If an idea is formulated to kill someone, and you reach for a weapon, then that is acting on that intent. And the United States has argued that's premeditation. By putting the act into

3404

effect, by going to get the weapon, that is premeditation. Under that argument, unless you kill someone with a muffin or a soda straw, if you formulate the intent to kill and then commit any act to put it into effect, then that is premeditation. As such, we would say those are unsubstantial terms and violate the defendant's right to be free from arbitrary application of law.

And you are giving the jury unfettered discretion. If they like him, they can do what they want to do. If they don't, they can do what they want to do. That's a violation of his constitutional rights.

For those reasons we would ask that Statutory Number 6 and Non-statutory Number 2 be struck in that "substantial criminal history" is entirely too nebulous on a death penalty case, and three, that Number 6, substantial planning and premeditation, we would submit that one, the evidence falls short of it. And number two, the terms as utilized in this statute are too non-specific to pass constitutional muster.

Additionally, Your Honor, and lastly, am I correct -- and the only reason I do this is because I'm getting really tired of having to stand up and

3405

object during arguments.  As I understand it, and I would like an order to this effect, there is no evidence of jail conduct which would justify aggravation against my client except an alleged conversation with Mr. Roane and some people concerning the possible death of Martha McCoy.  It is my understanding that that was the only evidence that was admitted, and that everything else was excluded.  And if it was excluded, it can't be part of it.

Additionally, there is a question here on the threat to some uncle.  I believe the government's witness testified that this Deputy Brown, the uncle of Martha McCoy, threatened the defendant's brother.  And that was the reason for some threat being made.  It wasn't in furtherance of this alleged activity.

I would ask the Court to enter the order at this time that as we stand here at this juncture, there is no evidence of jail conduct which would justify consideration as aggravation justifying death against the defendant Roane except the alleged telephone call concerning the death of Martha McCoy or conversation with Maurice Saunders concerning the death of Martha McCoy.

And that is all we have at this time.  Anything else, of course, would be outside the record, and we

3406

would have to object.  We would point out that repeatedly having to do this in face of the Court's rulings, when the Court makes these rulings the United States violates it anyway.  It is starting to impact on the position of our clients.  We will discuss that later.  But it is having a negative effect.  I would like to have an order to that effect.

(Counsel conferring with co-counsel.)

So, Your Honor, for the express statutory and non-statutory aggravating factors as I have indicated, and I can repeat them, and as to each count, we would ask that the jury be directed and limited in their application of certain aggravating factors as to certain counts.

MR. VICK:  Your Honor, as to defendant Richard Tipton's motions, clearly the evidence is sufficient to allow the jury to find that the defendant, Tipton, intentionally killed the victims that he is charged with.  Specifically, intentionally killed Doug Talley; intentionally killed the three people who he has been found guilty of killing on Church Hill; intentionally killed the two people that he was found guilty of killing on Stony Run on February 19th, 1992.  Defense counsel's arguments,

3407

all three defense counsels' arguments basically go

into semantics. Clearly, the actions engaged in by the defendants in these cases, which has been accepted by the jury given the verdict that it has rendered, shows that they have found that these defendants intentionally killed the victims.

Unless the Court has questions, I won't go through the specifics.

THE COURT: I don't have any question about that.

MR. VICK: As to the substantial criminal history, Your Honor, as I've already stated, it is clear that each of these defendants, given the evidence that's come forth in the last four weeks, it is clear that each of these defendants have substantial criminal histories over and above what was actually charged in the indictment; that they have been virtual crime sprees in and of themselves for the last -- at least for the last four or five years for Mr. Tipton and Mr. Johnson, and for Mr. Roane, since he got out of the penitentiary on his last stay in the penitentiary. They have been virtual crime sprees, and that's something this jury can take into consideration when rendering the proper punishment that should be rendered against these defendants.

As to defendant Tipton, given the construction of the evidence as we have argued it on the Non-aggravating Factor Number 4, he has indeed seriously wounded two individuals in the course of committing the murders, Gwen and "Pepsi" Greene. He was found not guilty by the jury on the Torrick Brown murder and wounding, which would be the third person, Ms. Martha McCoy.

As to Mr. Cory Johnson, unless the Court has specific questions to me, again, I think the evidence is clear from the witness stand and fits into each one of these aggravating factors. Each and every one of these factors has been proven against Mr. Cory Johnson. The same is true with Mr. Roane. I don't know what Mr. Baugh was talking about at the end there about the United States talking about jailhouse conduct other than that which the Court has allowed. We have done nothing more than what the Court told us we could do, nothing more than the jury has heard from the witness stand.

So unless the Court has any specific questions as to their arguments, it is the position of the United States that each and every aggravating factor as to each and every one of these defendants, with the exception of the three being changed to two for Mr. Tipton, has indeed been proved.

THE COURT: All right.

MR. WHITE:  We would adopt the other arguments of counsel that are applicable to ours.

THE COURT:  All right.  Dealing with  --

MR. BAUGH:  Just briefly, we would also adopt, but I would call to the Court's attention in its ruling, once again the United States said that we are talking about semantics in these cases.  The jury has already found in these cases.  At this juncture, each case and each aggravating factor must be considered independently.  Each defendant, each aggravating, as to each count.  And for those reasons, Your Honor, I agree that if you view it as a "these case" situation, we do not have a leg to stand on.  However, if the Court finds that the jury must determine whether or not a defendant gets the death penalty based upon his conduct as it pertains and applies to each count for which he is indicted and convicted, rather than his total overall, that the motion should be granted and that the jury should be directed that certain aggravating factors that have not been proven as to a specific defendant cannot be applied to a given count, and that the United States be limited in its argument as to those issues.

MR. COOLEY:  We adopt the arguments of other counsel.

THE COURT:  All right.  Starting first with Tipton:  The non-statutory aggravating factors as they appear in the notice that go to Non-statutory Aggravating Factor Number 3, that would be dismissed.  Related to 2, the defendant having recruited a minor to participate with him in the murder, Non-statutory Aggravating Factor Number 4, the word "three" will be amended to read "two" in that sentence.

As to Non-statutory Aggravating Factor Number 5, it will be dismissed.  All other motions relating to non-statutory factors will be denied.  The statutory factors, I believe arguments were made relating to 1, 2, and 6.  And those motions will be denied.

Moving on to Mr. Johnson, Statutory Factor Number 6, the language in Number 6 will be changed, that the defendant committed the CCE murders after substantial planning and premeditation. Non-statutory factors going to Number 2, that motion will be denied.  Number 3, that motion will be granted, and Number 3 will be dismissed.  The motion relating to Number 5 will be denied.

Moving on to Mr. Roane:  As a statutory factor, Number 5 will be dismissed as a statutory factor.

Moving to the non-statutory aggravating factors, Number 3 will be dismissed.  All other motions relating to the other factors, statutory and

non-statutory, will be denied.

MR. GEARY:  If I may, on behalf of Mr. Tipton, could we ask the Court to amend the Statutory Aggravator Number 6 for him, also, as you have done for Mr. Johnson?  The defendant committed the CCE murders rather than the word "offenses"?

THE COURT:  This is Tipton?

MR. GEARY:  Yes.

THE COURT:  All right.  It will be similarly amended.

MR. BAUGH:  We would ask for that for Mr. Roane, too, in light of the Torrick Brown killing, Your Honor.

THE COURT:  All right.  They will all be amended similarly.  All right, we will be in adjournment until tomorrow at 10 o'clock a.m.

(Proceedings adjourned at 2:45 p.m.)