# APPENDIX 3D

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

------------------------------------------

UNITED STATES OF AMERICA,

                        Plaintiff;

     v.                                    CRIMINAL ACTION
                                              92CR68
RICHARD TIPTON, CORY JOHNSON,
JAMES H. ROANE, JR., AND
SANDRA REAVIS,
                        Defendants.

------------------------------------------
                    VOLUME XXI

                February 11, 1993
                Richmond, Virginia
                   10:00 a.m.

BEFORE:        HONORABLE JAMES R. SPENCER
               United States District Judge


APPEARANCES:   HOWARD C. VICK, JR., ESQ.
               WILLIAM H. PARCELL, III, ESQ.
               Office of the United States Attorney;
                   Counsel for Government;

               ROBERT P. GEARY, ESQ.
               ERIC D. WHITE, ESQ.
                   Counsel for Defendant Tipton;
               CRAIG S. COOLEY, ESQ.
               JOHN F. McGARVEY, ESQ.
                   Counsel for Defendant Johnson;
               DAVID P. BAUGH, ESQ.
               ARNOLD R. HENDERSON, V, ESQ.
                   Counsel for Defendant Roane;
               ROBERT J. WAGNER, ESQ.
                   Counsel for Defendant Reavis.
                  JEFFREY B. KULL
               OFFICIAL COURT REPORTER

                P-R-O-C-E-E-D-I-N-G-S
          THE CLERK:  Case Number 92CV68, United
States of America versus Richard Tipton, Cory

Johnson, and James H. Roane, Jr., the twenty-first day of trial. Are counsel ready to proceed?

MR. VICK: Government is ready.

MR. WHITE: Defendant Tipton is ready.

MR. McGARVEY: Defendant Johnson is ready.

MR. BAUGH: Defendant Roane is ready. May we approach?

(At Bench.)

MR. BAUGH: I didn't see it, but I've been advised that there was a special Sunday night on serial killers on CNN. It was very detailed. And in there, some death psychiatrists made light of ADD and these sort of defenses in crimes like this. It is to the point where I have been asked to ask the Court if you would inquire of the jury whether or not they saw the CNN special on murder.

MR. WHITE: It was on this past Sunday night.

MR. BAUGH: We sent for a copy of it.

MR. WHITE: The thrust of the presentation was that the defense experts should not be trusted because they are essentially hired to say whatever it

3717

takes to elicit sympathy from the jury.

MR. VICK: We are hiding the truth from this jury now?

THE COURT: CNN special. What channel?

THE CLERK: Different channel for people in different counties.

MR. WHITE: The concern, Judge, is based that after reviewing the jury questionnaires of the people who are sitting on the jury, a number of them, I think six, say that they do watch CNN. I think probably because they are not watching local newscasts and local newspapers --

THE COURT: The thrust of this thing, it was a piece on --

MR. WHITE: On the experts that are called.

MR. BAUGH: It was on serial murder.

MR. WHITE: Serial murders and expert testimony.

MR. COOLEY: I would just ask them who saw it first. If nobody saw it, we don't need to get into it.

THE COURT: Well, I have to have some kind of description.

MR. VICK: I'm going to call my mother in

3718

rebuttal to show a truly mean woman and argue that I have not committed any murders.

MR. BAUGH: But then I'll argue it is just a matter of time.

MR. PARCELL: The government will stipulate

to that.

MR. WHITE: Your Honor, the name of the show was "Murder By Number." And the focus was on neurological defenses. From 9 to 11 Sunday night.

(In Open Court.)

All right, let's bring in the jury.

MR. VICK: It is not going to make a bit of difference, this is about 150 pages we have never seen before.

MR. BAUGH: The 150 pages are a summary of the documents previously tendered. That's all.

(The jury entered the courtroom.)

THE COURT: Good morning, ladies and gentlemen. I need to ask you a question. I have been informed that there was a program that appeared on CNN this past Sunday night. It ran from 9 to 11 and it was entitled "Murder By Number." Did any of you see this program?

(Negative response.)

Fine. Mr. Baugh?

MR. BAUGH: May it please the Court. I know you are very tired of all of this. And believe me, it is drawing to an end. Today will be the last bit of evidence that will be offered in the mitigation stage of the trial. I want to remind you before I begin that the purpose here is not to offer evidence to show that James Roane should not be put to death. Because the burden is on the United States even to prove that. We are just offering some factors to consider that you can weigh in determining whether or not the United States has met its burden. I know you are tired of listening to all of this, and I am sorry that we are the third one. If I could do anything to make this not sound like the same old stuff, if I had to wear a chicken on my head, I would. But if you bear with us -- those of you who might be cynical about all of this, might be callous, you will hear it as the same old stuff. But I'm going to tell you it is not. This case has been enlightening for the lawyers involved and the people involved as to a lot of problems.

This case is about, and the evidence will indicate it is about lives. A lot of lives have been snuffed out as a consequence of this case, and there is a possibility or probability that three more are going to be. Because the decision you are about to make is whether or not these three young men are put to death or if they spend the rest of their lives, every waking moment, from now until the time they die, behind bars. Without any freedom. Without any hope of ever getting out. They will die in prison or they will die in the electric chair or whatever

method Congress comes up with.

Monday was particularly enlightening, because while the attorneys in this case have worked together and shared information, none of us knew the mitigation case that each would put forward because relative culpability, who was the most involved, was an issue. For that reason, we did not share that information. Sunday evening we got together and tantalized each other a little bit and we were amazed to find the commonality of our clients' backgrounds. They are frighteningly similar. Just like, and the evidence will indicate this, sometimes a person, a child gets born and his leg is too short, like this much too short. You take him to the doctor if you can afford to, and you put a little lift in his shoe and he is okay. And sometimes it catches up. As long as he wears the shoe he has no problem. But if you don't put that lift in there eventually he will

3721

have trouble with his hip and eventually he will have trouble with his spine and eventually he is going to have arthritis, to the point eventually it will never, ever heal. It could have been prevented with that lift put in there.

James Roane is like that. James Roane was diagnosed -- well, let me tell you a little something about James Roane before we get started. What I am going to read to you may scare you, may probably convince you of what the appropriate punishment is. I'll show it to you.

"At the present time, we are faced with a potentially dangerous situation. He cannot even use special education facilities because of danger to other people as well as himself. His thinking is becoming increasingly paranoid. There is also, because of his depression and rage and anger turned on himself, the real possibility of suicide. It has not been able to reach the mother or to convince the mother that the problem is serious. The child lives in a very high-risk neighborhood, being high-risk in his own right due to the organic brain syndrome, learning disabilities, and explosive personality. This is all worsening.

It is felt of paramount importance for medical,

3722

psychiatric, and personal danger reasons that this person be removed from this home. He does require an institutional setting. He still remains treatable, and he still remains educable, but time is passing. He is getting more sick. He is getting more entrenched, more fixated in an increasingly characterologically damaged fashion. Diagnosis: Organic brain syndrome, explosive personality with paranoid features, primary learning disability with

unsocialized aggression, or childhood with depression.  Age 11."

That was done by Dr. William Lordi 15 years ago.  He is now 26.  But that wasn't the first one.  Now, you have heard from the United States, well, the United States goes and picks these  --  you heard Dr. Cornell yesterday; "How many cases have you testified for."  We are going to offer you some experts today.  Ms. Noakes, working on her Ph.D. at VCU, never testified in a criminal case.  She was chosen because we called the Governor's Commission on Mental Health and Retardation.  We are calling Dr. Lordi.  We didn't pick him.  Dr. Lordi first examined this young man when he was six years and three months old, 20 years ago.  "Of note, James has a fairly well-defined chronic brain syndrome of at least high average

3723

intelligence.  He is going to have learning and behavioral problems."  When he is six, they know this.  By the way, his IQ at this time was 103, which is high average.  By the time he is 11, it is 87.  There are ten years of records, psychiatric records, requesting institutionalization.  And it never happened.  Ten years.  His condition continues to get worse.

I'm going to tell you the evidence is going to indicate that ADD as it applies, better yet, the neurological impairment, the thing that's wrong with the meat in the brain, he was born with it.  It isn't something he elected to do or a manifestation of some moral weakness.  Just like that kid can't help being born with one leg short, James didn't deal this to himself.  This is what he was born with.

Now, also in preparation of this case a young woman by the name of Barbara Fore, who has never done this, either, pulled about 2,000 records.  We asked her to find us everything you can about James Roane.  We want his school records, jail records, his juvenile records.  We want his father's jail records, his brother's records.  We want his sister's records, his mother's records, medical records.  Everything you can get.  We want to find out what was he born

3724

into.

The United States has argued well, everyone who is raised in Gilpin Court doesn't become a criminal.  And they don't have drug problems.  Just like everyone who is born with a neurological impairment does not go on to commit crimes.  But this young man had a severe problem and he was born into something that likewise he had no control over.  The evidence will indicate that his mother was a nice girl, went to Catholic school here in the City of Richmond, raised in foster care for awhile, but she was nice.

When she was 13 she got pregnant. Now, remember this, at that time birth control wasn't available. And she was raised in foster care. That's right. Back at that time, birth control wasn't available and when it later would become available, you could only use it with your parents' permission or your husband's permission.

By the luck of the draw, or a blessing, when she was 14 she gave birth to twins. Imagine a 14-year-old on her own with twins. The next year, when she was 15, she had another child. When she was 16, she had another child. When she was pregnant at 17, six months pregnant, she was abandoned by her husband. And when she was 17 years old, she had another set of twins. We now have a 17-year-old in a house with six children under the age of five. She has no income, and she is trying to raise them. She did try. And she tried valiantly. But for anyone who has ever raised a child, imagine six children, all who want to be held, all who want to be cleaned, all who want to spend time with their mother. And add to that where it is.

When James was a few years old he moved into a better apartment. That's what he told his social worker or the people at school, that he was moving into a better apartment, an apartment that he liked better. The apartment that he moved into, we know from his housing records that the apartment he moved into had certain damages to it that were marked on the lease. The screens didn't work. They had holes in them. There were rodents. There was vermin. There was filth. This was the apartment when they got it. And that's the one that James says was an improvement. It is in his records. You will see it. That was the improvement.

You have people sitting here who live in certain neighborhoods, say, everyone doesn't grow up to be a killer. Violence is something different. There are people on this jury who have been in combat and you know, you can take a red-blooded, clean-cut, All-American boy, put him in a combat situation, and in a week he doesn't mind walking over bodies or picking them up. James Roane knows of, himself, over 30 people who have died violent deaths during his life. And we will bring you their death certificates and you can see them.

When he was nine, a relative was shotgunned in front of him and James watched him die. And we have the records. And further, he told the doctors about it. So we have someone with a chip loose in his brain that has been put on this earth, no fault of his own. He was born to someone who cared for him,

but was simply too young and too overburdened to give the nurturing that every child needs. And by the time he is six -- better yet, by the time he is four, he is starting fires and having problems. It is understandable. This is the apartment he went to that he said was better. The screen doors are damaged, outside walls are damaged, window screens are damaged, kitchen sink is damaged, shelves, floors have stains. The stairs have stains. The bathtub is damaged. The medicine cabinet is damaged, electrical outlets are damaged. Inside walls and ceilings, shades and pull cords, windows and door glass,

3727

toilet, closet, curtain rods, and there is vermin. That was April 25th when he moved into this place. On April 28th he reported to his probation counselor that they moved and that he liked this neighborhood and the apartments much better than the old one.

Ms. Roane didn't have the time, and she certainly did not have the skills at that age. And there was no help. The record will indicate some people get in trouble, call mom and dad. The grandmother was some help, but that was it. There was no other extended family that was of assistance. The father was gone. James had -- oh, by the way, of the seven children -- oh, she eventually had another child. Of the seven children, two are boys, five are girls. There are no strong male figures in the house. James didn't even have an older brother.

Now, in answer to the United States, I say well, everyone who grows up there doesn't have troubles. The family has been very cooperative. Of the seven children, including James, five have had or have presently drug problems, and five have had trouble with the law. In fact, Kevin, James' brother, is in jail now on a drug offense.

So the question before you is, does the evidence show that all of these children decided to be bad and

3728

be born to one woman, or is there something about the environment, something out of their control, that drives them to this, or is it just moral weakness? The doctors will testify that when James was diagnosed with this, because of his IQ of 103, and because it is a fairly well-defined chronic brain syndrome, it wouldn't have taken much to make him productive at that age. He could have been -- it is like a small plant or something that just doesn't bend right. You put a stake on it and it will grow okay. He never got it. He never got it.

There are records in here where James Roane came to Social Services as a child, or came to Probation Officers, and said, "I need to be institutionalized." Yes. A child asks to be put

away. "I need the control." And we will show you those records. And he doesn't get it. There is a time when his mother and James come together and it is an emergency. And both of them realize he needs to go and they say, "Place him in residential care." And he doesn't go.

Now, there are two bright spots. When James was about 15 years old, he was  --  by the way, by the time he is 15 he has juvenile records like you wouldn't believe. By the time he is nine, he is

3729

picked up and accused of sodomy with some little six-year-old. He steals Dr. Benjamin Lambert's, the Senator, he steals his car when he is 13 and tries to drive it away with a girl and wrecks it. He does shoplifting. He is caught going into someplace or accused of going into someplace and stealing Cokes.

Now, all this is going on and some brilliant person down in probation says, "You know what this kid needs? This kid needs a big brother, a male figure, somebody who can talk to him and tell him what the Q's are." And the first ray of light, Mr. George Brunson, and he will be here, he is a Big Brother. George Brunson shows up in this young man's life. Some of the report: Oh, "The first week he, James, is still very receptive to me. This kid is starving for love and care from anyone."

Now, he is also getting in trouble at that time for trespassing. But already, a relationship is starting. A week later, Mr. Brunson says he is surprised James has suddenly started talking freely to him. Then his Probation Officer, a week later, notes there is progress. James is showing increased temper control, fewer problems in school. By the way, school: There is so much data in this case, you find yourself jumping around. James didn't go in

3730

residential treatment. He was recommended to go to Stonewall Jackson, a school for emotionally disabled children down on Cary Street. He didn't get in there. Instead, they sent him to special education. And the doctor when he was six put him on Ritalin to take the edge off, calm him down. Well, when you are six years old and you are taking pills and education, you catch a lot of stuff from your friends on the way to school. And his sister, Annette, had to walk him to school because he got picked on so much and because he had to take crazy pills. And sometimes he didn't get them because there were so many children. And sometimes he didn't want to take them because they are for crazy people. So he didn't get all his medication.

He didn't go to the school he was supposed to go to. He went to special education. He went to three

special education schools.  And when it didn't make any improvement, he kept getting worse and worse and he was sent to Adams Corner.  It only had 35 students, five to seven faculty.  It was for severely emotionally-disturbed children.  And you will hear from one of the teachers who worked up there, and he is going to talk about how James strove to be better.  And how James, with his IQ, even though it

3731

was diminishing, he knew something was wrong.  But he didn't know what to do about it.  And it frustrated him.  And he is getting worse.  And he was getting worse.  He was having more outbursts, getting in fights at school.  Why?  Because he would come to school and he would be dirty.  Sometimes he smelled like urine.  Other times he just had body odor.  And when you are 11 and 12 and you smell like that, people pick on you.  And when you are getting paranoid and people pick on you, you get in fights.  And he got in a lot of fights.

And that was all this was about.  He was parenting himself.  That is what the people will tell you.  That's what the doctors will tell you.  He was not retarded.  In fact, that's probably one of the problems he had.  He knew something was wrong and tried to do something about it, and didn't know what to do.

There are records in here  --  now, we have six of these, six different psychiatric or psychological tests that were done on James between 6 and 16.  Each of them gets progressively worse.  Each of them shows more and more turmoil developing in his life.  His report from a school counselor, now at age 11 he is in the slow learner range of intelligence.  It has

3732

dropped.  James is a multiply-handicapped youngster.  His serious learning disability in verbal areas is improving little.  He is becoming increasingly more frustrated, uncomfortable.  There is strong evidence of internalized anger that results in depression.  James remains a very troubled young man whose outlook for the future is none too bright unless he gets more intensive and extensive psychotherapeutic help such as would be afforded in a live-in residential treatment center.

Again, they are asking for residential treatment.  He doesn't get it yet.

Now he is 14.  He is referred back to Dr. Lordi on an emergency basis.  He is still on Ritalin and Mellaril.  His pictures of men and women do not show hands or feet, no warmth, no contact with reality, there is no cuddling.  He overreacts to the slightest encounters.  He blows up and explodes.  At times he comes across in a grossly paranoid fashion.  He has

serious impulse problems.  We talk about the fact that he is having trouble with his organic brain syndrome.  It is felt that in view of the fact that the recommendation has been made repeatedly over the years, he is now 14, that he does require residential treatment that can provide him rededication of this

3733

learning disability and psychotherapy for his personality problems.  Remember, the first one didn't have personality problems.  He is developing personality problems.  Because of what's different about him, he can't control it, and because he can't, he is getting pushed farther and farther away.  Now he is developing psychiatric and psychological problems, because of that little chip he was born with and because no one has treated it yet.  It is felt that this has become deeply embedded in his personality structure and time is passing.  The boy can be potentially dangerous to himself and to others and to property.  It is felt he needs a school where he can get medication such as Mellaril and Ritalin. He is developing personality problems, and the problems are becoming part of his make-up.  They are getting embedded in what is James Roane.

That's what that report says.  He is not dealing with his disorder because he is too young and he is not getting the support he needs, so now he is getting paranoid.  The paranoia is becoming a natural part of what is James Roane.  He is being reshaped. Now, all psychiatrists do not agree.  We even got a bad one.  We got one bad report.  By a bad report, someone who says, "I don't think he has an organic

3734

brain problem or I don't think it is as bad." However, in view of his dysfunctional home and the fact that his mother has no control over him, a long-term residential placement of either the orphanage or therapeutic type is indicated and highly desirable.  If he is to remain at home, and I hope he will not, he will require regular, intensive counseling on a weekly basis or outpatient psychotherapy.  His behavioral regression when such support has been withdrawn  --  it is highly significant that James is reported to have made such an excellent adjustment in a setting providing models and adequate limits.  But when the support is withdrawn, he regresses to his other conduct.  It indicates his continued needs in this regard.

James, twice in his life, once with Brunson and once with Adventure Bound in Charlottesville, he had a very stormy beginning with each of them.  When he first went to Adventure Bound he lasted 30 days and they sent him home.  But he came back, caught up, did well.  He got hundreds on his tests.  He graduated.

He was released.  Two weeks later he was dropped back in Gilpin Court and he was in trouble again.  Why?  He is no problem now.  "He is well."  He is not well.  He is working hard, striving for acceptance.

"You are well enough" to put him out, and they did.  And he wasn't ready.  As might be expected, idleness has led to misbehavior and he is again charged with an illegal act for which he will be tried next month.  James is grossly unhappy, solemn, markedly subdued, and appeared to be covertly hostile, enraged, and depressed.  16 years old.  And this is from the bad report.

Then the last report we can turn up on him -- again, these aren't people we hired -- "This is a sixteen-year-old youngster who appears eager to return to school and move into the mainstream.  He related that he has been rehabilitated because he has been to Adventure Bound and he is doing better.  Open, cooperative, concerned about his own welfare.  It appears to this worker that it is of utmost importance that James be placed in an educational setting so as not to cause regression and a decrease in his desire to do well."  He didn't get in.

The tragedy of this is it could have been fixed.  Now, I will tell you, when Dr. Lordi, back when James was six years old, they didn't have the tests they have now, and Dr. Lordi is a psychiatrist, not a psychologist.  And so he didn't have the tests that psychologists give people to determine if there is an organic brain dysfunction, if there is something wrong in the flesh, if God dealt him a bad chip.  But even then, he understood that this was going to be a problem, which brings us to our next expert; we hired Tony Semone.  And the reason we hired him, you heard Dr. Cornell and Dr. Evans talk about the Reitan test.  We were able to find an expert who studied under Dr. Reitan.  And further, after James was evaluated last month for neuropsychological deficit, the results were sent to Dr. Reitan, and he looked at them and he agreed with Dr. Semone.  And he said, "Yes, whatever James Roane had that [Dr.|doctor] Lord I said I think he had 20 years ago, he said he has got it.  It is there.  It is in his brain.  It is in his processing unit."

Processing unit, for those of you who know about computers, is where all the stuff comes together and gets organized and comes out and makes sense.  There is a problem there.  It is neurological.  It is there.  But just to be extra careful, Dr. Semone administered the MMPI, the Minnesota Multiphasic Personality Inventory.  Now you say, well, why would he do that now?  Well, let's see what has James

become from a personality standpoint.  Dr. Semone administers a test and he sends the results to Dr.

3737

Caldwell in Los Angeles.  Dr. Caldwell has never seen James Roane.  If James Roane walked up and bit him, he wouldn't know it.  What does he say?  His profile indicates now  --  now we have 20 years of trying to treat this, 20 years of his being slapped back and unable to deal with his problems.  His profile indicates a severely paranoid personality make-up, which is either an overtly psychotic state or currently borderline condition.  He is almost, clinically, paranoid schizophrenic.

It is not a weakness on his part.  It is the compensation, like the kid who didn't get that little chip in the bottom of his heel.  It has now become a part of him.  Paranoia.  This man has never seen this man.  Conflicts around his sexual needs and impulsiveness and his quickness to be jealous of sexual partners would be typical.  He knows nothing about Torrick Brown.  This guy knows nothing.  He doesn't know anything about this case.  He tests as prone to project his angry feelings and aggressive impulses on to others.  He would overreact to anger in others and would overreact especially to events that he saw as confirming of his projections.  His judgment appears uneven, with occasional lapses of for thought and breakdowns in his impulse controls.

3738

Many similar patients have proven severely vulnerable to difficulties in managing alcohol and any drug which gave him immediate relief from tension.

Now, we know that James used drugs.  A lot of people did.  The United States will make you believe, and there is going to be evidence of this, why do people do that?  The dumbest animal, if it gets hurt, will go out in the woods and chew the right bark.  If the child knows "I come to mother and get a hug," it will relieve the pain.  James doesn't know what bark to chew.  James doesn't get a hug.  James, like so many other people, has found that drugs can dull the symptoms.  And that's why he does it.  And that's why so many other people do it.  It is that simple.  And the evidence will show it.

I cannot begin to tell you all the problems that  --  I'm not excusing anybody.  All right?  Everybody says, "I'm not going to excuse anybody."  That's very popular.  My kids have a special uncle.  He has Downs' syndrome.  We don't excuse him for some of the things he does.  But we understand.  And we try to correct it.  And the kids know he is not retarded.  He is special.  James Roane was born special.  God dealt it to him.

It is not his fault.  He can't fix it.  He

3739

doesn't deserve to die.

THE COURT:  All right.  Call your first witness.

MR. BAUGH:  Dr. William Lordi.

DR. WILLIAM M. LORDI, called as a witness by and on behalf of defendant Roane, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BAUGH:

Q    Would you please state your name for the Court and for the record, spelling your last name?

A    William Michael Lordi.  L-O-R-D-I.

Q    What do you do for a living?

A    I'm a physician.  I'm board-certified in industry and child psychiatry.

Q    How long have you been doing that?

A    44 years.

Q    What is your educational background?

A    College, medical school, internship, three years residency in psychiatry, two years residency in child psychiatry, and then boarded in both of those.

MR. VICK:  We stipulate his expertise.

MR. BAUGH:  Thank you.

BY MR. BAUGH:

3740

Q    As part of your duties, did you work as a consultant for the Richmond Public Schools?

A    Yes, sir.

Q    Are there other organizations that you function as a consultant for?

A    Initially, when I came here in 1957, for about nine-plus years I was medical director at Memorial Guidance Clinic and the City of Richmond Public Schools had a contract with them to see the children. And I saw them.  After I left the clinic and started Lor-Berg 26 years ago, I also continued my contract with the City of Richmond to see children in the school, to staff them, and to offer treatment where it was indicated and where the clients were willing to go along with treatment.

Q    As a consequence, sir, were you asked to review a tremendous volume of records concerning James Roane?

A    Yes.

Q    Do you have an independent recollection of James Roane?

A    As an individual?

Q    Yes.  Do you remember him?

A    Of course, there is a picture of him as a child which helped me remember.  But I couldn't see him

3741

bounce or skip across the room as a boy or teenager.

But with the records and what not, I remember the configuration.  Not so much the face and the lad.

Q    When did you first see him?

A    He was about six-and-a-half years old at the time, and he was referred because he had difficulty in school.  And we performed a battery of psychological tests and psychiatric evaluation, and following that we prescribed both medication and treatment.

Q    All right.  What did you find wrong with him?

A    As you know, when you do a work-up, you take a history.  And I think it would perhaps be  --

Q    Certainly.

A    To the point, if I stated what the history is, this boy's mother had toxemia pregnancy the last five months.

Q    What is that?

A    Very elevated high blood pressure.  The effect of that on the child very often is to cause some cerebral problems, some brain problems.  In addition to that, he was extremely active in the uterus.  He had severe cholic for the first several months of life.  He also required a hernia repair at four.  A congenital hernia was repaired when he was a child.

3742

Q    Does a child like this require special care from the parent?

A    Yes.  He was in the then-program for the pre-school children, the children who are at risk.  And they usually started those kids at about four.  He had many problems.  He had the evidence of brain damage on the testing.  He also is a hyperkinetic kid, as was his dad.  In addition to that, though he started out functioning in the bright range, gradually over a period of time his intelligence deteriorated to the borderline.

There was, early on, he was apparently sexually abused over a period of time.  He began setting fires at four-and-a-half.  He began to act out in school.  And then he was placed on Ritalin.  Now, in those days, we used to call what is now called Attention Deficit Disorder minimum brain dysfunction.  He was so labeled.  In addition to that, there was also some evidence of some brain injury on the tests.  And this apparently over the years in the many retestings have been established.  He has about four or five batteries of tests that I evaluated in there and which I have some copies here.  The situation emerged; the first time I saw him he had severe impulse problems, he was hyperkinetic, he had

3743

evidence of brain problems, he had evidence of learning problems.  And he was coming from a severely dysfunctional family with no father figure to relate

to and a great hunger to relate to a father figure. So after the initial contact, that's essentially what we established, and then he was not given his medication with regularity. Insofar as I can tell from the records, there was a dropping out of therapy.

Q Now one, the minimal brain dysfunction: What does that mean as far as how he is going to act or what he must overcome; what is the problem? How does it manifest itself?

A As I said, there are several problems, but let me address the one you are asking me about. A minimum brain dysfunction, what we call Attention Deficit Disorder/Hyperactivity type, is an error in the metabolism of the brain. It exists in one out of ten people. Now, it makes him much more liable to pressure. He will have a shorter attention span. He will be distractable. He will have poor short-term memory. He will be impetuous, not well-organized. When he is stressed, 85 percent of these kids blow up. 15 percent shut down. He was the kind -- he was hyper. He did blow up. He would not always, when he

3744

acted, he would not think. He would just act. In other words, he short-circuits, much like a person has a seizure. They don't know that they are seizing. When a person has Attention Deficit Disorder/Hyperactivity type, during the time of the acting, may take a minute-and-a-half or two or three or five to recycle, but they do not at that time. They are reacting. They are not proactive. They are simply reactive, reacting to whatever. And the stuff that comes out, let me say it this way: You will get things expressed very nakedly. A child like this won't say, "I don't like you." He will say, "I hate you." They will say, "I want you to go away, I want you to die." You get the stuff unvarnished by civilization, just comes right up. He may apologize later, but at that moment they can react in a fight or flight fashion. That's the ADD component of it.

Added to that, when you have a person who has had some minimal brain damage growing out of profound toxemia pregnancy -- that means the mother is having an allergenic type of reaction to her own female hormones. The placenta manufactures about a hundred or so times as much female hormone as a woman ordinarily does in the ovaries. When you have this, and the woman is, say, allergic to it, her blood

3745

pressure goes up. It tends to produce kidney damage, and in the child it tends to produce mild brain damage. So that was the second factor.

The third was when you have a child with this compromised central nervous system, this compromised

personality structure, attempting to process life -- and by process now, not ordinary life, but process life of irregularity, deprivation, a lack of bonding, and a dysfunctional family -- you get a personality structure that's quite bent. You get a personality structure that, though everything alive tries to stay alive as this youngster did, but at the same time you get a faulty character structure. The danger is that unless this somehow is dealt with, that the individual goes on.

Q    How much parenting or nurturing did he need?

A    Well, it is amazing how little some kids can thrive on. But when you get below that level, he had no father figure at all. And there is a real poignant episode. At one of the treatment programs he latched on to what was a very fine father figure kind of worker. And he blossomed for the first time in his life. I just called the man up just to let him know that he was doing okay. During that time the reports are very good. As soon as that stopped, he was in trouble again. He came away with extreme hunger for fathering. He had modest bonding. Mother was overwhelmed by having a large number of kids. She herself had not had a good rearing herself, so she came to the task of being a mother rather compromised. I would say the emotional nutrition he got was not only faulty, but very negligible.

Q    We also asked you to look at some housing records. What is the importance of that?

A    One of the fattest files there is about, correct me if I am wrong, near 100 pay or quit notices. There was more attention paid to whether it should be $22 or $18 or $17 or whether her income was $2,800 or $2,000 a year. There was treatment. That's the fattest volume in there.

Q    The pay or quit notices would obviously be evidence of financial stress?

A    Yes. Apparently not enough funds to pay and then be fined for not being able to pay on time or not being able to pay.

Q    If a parent is blessed with one of these special children with ADD or impaired dysfunction or impaired brain function, what do you have to do to make that kid okay? What can you do?

A    Well, obviously such a child is going to need more than the usual accommodations, so the quality of parenting needs to be decent, predictable. These kids are creatures of habit. If they can be plugged into a decent -- a foster home or whatever, then these children can thrive. They have a greater hunger and they are more dependent. In school, you need to have additional accommodations. They need a

little more time for their work.  If they learn in an audial fashion, you teach them that.  If they need to be examined verbally, you do that.  In our time, you give them additional things like a computer or recorder.  With that, the child can grow and can come on time with his or her native ability.  We are doing that a lot.

Q    Does the child appreciate something is wrong?

A    More often than not these kids feel they are bad, stupid, unwanted, unneeded.  And so their perceptions, of course, the constant feedback, is "The other kids get it, why don't I get it?  Why does everybody irritate me, pick on me?"

As I said before, these youngsters are better one-on-one.  They can handle better one-on-one.  A lot of them are whizzes on the computer because they control their total world.  When it is a group or what not, it is like asking them to do three things

3748

at a time, and they can't.  You ask one thing at a time.  The mother says, "Look at the doctor when you talk."  She says, "If I look at him, I can't hear him."  She can do one thing, look at me or hear me.  So one-on-one.  And there has to be accommodations.  We are growing in our skill of doing it in the schools, but at the time this youngster was a youngster, it was not as well understood, not that we don't have a lot to learn.  We do.

Q    You indicated  you have also done a lot of work in prisons, haven't you?

A    Yes.

Q    In fact, you were also working for the government in mental health at one time.

A    Yes.

Q    You indicated that one out of ten children has a dysfunction like this.  What percentage of the prison population as you know it has this problem?

A    At least 50 percent.  At least 50 percent of your training school boys.  Boys have this five times as frequently as girls.  We don't entirely understand that.  But apparently it has more than one gene and some of the genes are sex-linked.  I would say I think our present understanding is about 50 percent of the boys in the training schools and about 50

3749

percent of the men in prison.  We don't have like figures for ladies.

Q    The brain dysfunction that James Roane suffered from and was diagnosed when he was six, if he had gotten into a residential program, or if he had had the fortune to be born to a different family with more money and fewer siblings and better care, could he have gotten over this or could he have controlled this?

A    Yes.  The example, I think, that sort of stands out for all time is Churchill was ADD, and he stuttered.  They used to cane him every day.  He couldn't sit still and they thought he was naughty.  He couldn't sit still.  He went on to be the most literate man who ever lived, so far as I'm aware.  He had a mother who was everything to him.  I'm not saying being a matriarch is what every child needs.  But if there is good parenting, consistent parenting -- and these children are extremely taxing.  Anyone who has one thinks they have triplets.  In addition to that, they need a school that understands them and they need an environment, because these kids are scapegoated so easily and they are vulnerable.  Kids not meaning to be mean can be cruel, tease.  They can get the goat of a special child, the hyper ones, especially.  Not the ones who shut down.  That's no fun.  They tend to ally with kids like themselves.

Q    Children with this sort of dysfunction seem to what?

A    Ally themselves with other kids.  They will have one or two, and the parents will say so often, "Why do you have to pick that kind of friend?"  Obviously, they are picking someone they are relatively comfortable with, and a kid that is about where they are.  They don't shop in the mezzanine, they shop in the basement.

Q    Do you treat adults with this problem?

A    Yes.

Q    What happens?

A    There was a literature for some period of time that said this went away.  This isn't true.  This does not go away.  We are finding more and more of the men who come to the attention of the Court, wife-beaters, the guy who has 26 jobs in two years, we put these men, after you do a work-up, the key here is that there are many things that can cause this.  Assuming one has done a decent work-up on this man, then you can put them on medications.  Some of them will respond well to a combination of Ritalin and Imipramine.  There is other new state-of-the-art medications.  Wellbutrin is working well.  I have a number of men, some are professional, some are the usual work-a-day men and some women, too.  I have worked for a number of years with the local school, Christian education, and also the seminary.  And over the years, I've seen a great many ministers through their three or four years, some of them through doctorates, with medication and support.  I'm always amazed how well they do up to that point.  When they hit graduate level and doctorate level, it is just

too taxing.

What I am saying is yes, a lot of people get through.  Obviously, not all the boys end up in school, not all the men do.  A lot of them work it through.  We have some well-established people who have ADD.

Q    If this condition is not treated or it is not resolved at an early age, or at least they teach coping mechanisms, is there a possibility of personality impact as they grow older?

A    Yes.  The personality, you know, between about 4 and 18 months, we bond to our mothers, then dad becomes much more important in and around, toward the end of that.  If they do not bond to mothers, fathers

3752

can't replace mothers but they can make a difference.  If they do not, you get an increasingly damaged personality structure, increasingly reactive personality.  Their world gets narrower and narrower.  The world is narrow to begin with because they can't stand the stress that another boy or girl or man or woman can handle.  But if they are given a lot of support and accommodations, they begin to learn, if you will excuse my poor English, but they begin to learn in what they were not born with.  Keeping them on the medication for four or five years, you begin to see that the things that they have learned they level off with.  In other words, one can teach in, if you know how to do it, what they have not gained.  One can get it from their interaction with brothers, sisters.

Q    You can train them to have patience, sit still?

A    Sure.

Q    What happens if you don't do it?

A    Well, you end up with serious character structure problems.

Q    What sort?  What's a character structure problem?

A    Well, as a result of what we have come into this world with and how that is treated, we form a

3753

predictable personality.  You know, we are predictably nice to our peers, nice to old folks.  If we don't have it, then we operate more in terms of stay alive.  We operate more in terms of what is fight or flight, and the world is a jungle.  Or we come up and say, "So everything isn't neat, I'm living in a great place."  So they do not learn as they get more and more defensive, calloused, reactive.  And a lot of them fight so hard to get up and out of there, and at times there is sort of a feeling of great joy on their part when, either through medication plus therapy and change in circumstances, they finally say, "Hey, I can be like

I want to be, like the other guys or gals." But if not, then you reach a point where you are operating on a stay alive level, whatever it takes. And therefore, you are outside of the usual and customary adjustments in life.

Q    There is a lot of discussion about impulse or impulsivity in this condition. When people in your profession discuss impulse, are you talking about feeling something and immediately reacting to it, or what?

A    No. You can have  --  see, we all have to learn to develop an impulse barrier that permits us, one, to recognize that I'm getting out of hand, and two, what can I do with it? And if we do not develop an impulse barrier, then we continue to act on our impulses. An impulse is not a thing of the moment alone. It becomes a way of life. It becomes a way of a personality reacting. So it is not something that just takes a split second. We ordinarily think of an impulse. I'm thinking more about you get an impulse to defend, you see the whole world as an enemy. You are on a constant dodge. And your first impulse is defend or flee.

Q    Drugs, is there a high likelihood of drug usage in untreated ADD?

A    Yes.

Q    Why?

A    There is some interesting studies that say any warm-blooded mammal seeks out in its environment, when it is ill or hurting, whatever it needs. Thus, elephants know what bark to chew. And what happens in our culture, the most common way, we try to self-medicate, whether it is sometimes through alcohol, very often with pot, coke, you name the drug. So what we are seeing really in many of these instances, depressors, for instance  --

Q    They call it blunts. They don't call it pot any more.

A    Excuse me. There are many disorders, even the schizophrenic attempts to deal with his uncomfortable feelings by boozing it. 60 percent of schizophrenics are alcoholics and smoking two packs of butts a day. Among people with ADD, they will find alcohol, they will find blunts, and cocaine or anything else that somehow will make them feel more at peace. So what they are seeking, and they are probably not knowing it, is to find some surcease from their personal discomfort. After awhile it becomes a way of life.

Q    It has been alleged and the jury has now found Mr. Roane guilty of being involved in an organization that would buy drugs, sell them, or give it to other people to be sold, and he would get the money back.

Is that a degree of organization that a person like this should not be capable of doing?

A    I think if you look closely, you will find that a lot of folks who are peddling drugs are trying to recreate the family they never had.  Even the language they use toward each other, mama, papa, brother, or son, whatever, they recreate and it tells a lot about the individuals.  You try to take a look at the structure they try to put in place.

Even severely brain-damaged persons are structured, but their structure is primitive.  To look at the sophistication of the structure is something that needs to be done to tell what a person is.  We wear our history on us.  There are two kinds of memory.  One is what we have in our left brain.  I remember my first grade teacher, Mrs. Callahan in 1929.  But the other is how we live.  How we live is a memory of that.  If you look at the behavior of these people, you say, "What are they trying to do? Trying to bring what into their lives?" Predictability.  The sophistication or lack of it with which they do it, the nakedness, the ease with one how one can see through it.  A dog is organizing his world when he is sick and staying away.

Q    Capable of premeditation?

A    At the same time, premeditation would  --  one would have to define that.  It means to idealize a plan whereby I accomplish a goal the way I want it and have it turn out the way I want it to.  So once again, I think yes, but it is the perversity of it that gives you some idea of the personality structure.  One can premeditatively make sure one's wife wakes up Sunday and there is a Valentine's card for her.  On the other hand, if someone ends up robbed, beaten, something like that, that kind of premeditation represents a real destroyed personality.

Q    You prepared some reports concerning James Roane.  We have taken the liberty of blowing up some excerpts of them.  This is the first one.  He was six years and three months.  Could you go through this and tell me what kinds of concerns were generated that caused you to make these notations?

A    Referred by Social Service Bureau.  In the clinic, we had a contract with Social Service Bureau.  "He has set fires four times.  The first one at four, and the last one a month ago."  He is six years and three months at this time.  He set fire to mattresses, well-watched, but finds well-hidden matches.  He is very afraid of fire.  He is a good child except for fires.  No behavior problems at home or school, very obedient, doesn't want to hurt

anyone.  "He is a rather independent little man, and does ask some questions about absentee father."
    One of the alarming things you have to always think of, regrettably, when you see a child, especially a boy setting fires, is whether or not he has been molested.  This child was.  You also know that that's an impulse breakthrough.  He externalizes the fire burning within.  He walks away from people not because he is afraid of him, he is afraid of her.  They are not cowardly because they have no sense of danger, so they will go ahead and do something.  But he is staying away.  Part of this, when he was a little boy he tried, I think, in his own way.  I think that's evidence there is still some growing edge to this youngster at that time.  The child tests out at high average range of intelligence,.  He has a learning problem and feels inferior.  Parents are perceived as unloving.  Air of suspiciousness.  He denies the existence of his father, wants to be a policeman.  Questions father's absenteeism.
    That's a mixture of things, of course.  The learning disability is, I feel, a spin off of his Attention Deficit Disorder.  I do not remember whether entirely it was a primary dyslexia or air of suspicion.  As you begin to see these children trusting their climate, you can find a more paranoid quality to their thinking.  He denied the existence of his father; not that he didn't know he existed, but he is just saying, "He wasn't there for me."  He wants to be a policeman.  He wants to police himself, I feel.  He wants to somehow or other be able to get ahold of a set of limits.  Blames mother for father's absenteeism.  Children always have to find a reason, and usually it is the parent who is there, whether or not that parent has stuck by him.

Q    In your relation, why did you recommend that he go to the Stonewall Jackson School; what was different about that school?
A    It was a special school for children who had multiple problems, handicaps, emotional and psychological.  Neurological, learning problems.
Q    Do you know why he didn't end up there?
A    I don't think he was entered.
Q    When he was 11, you saw him again.  He is at Westhampton, which is a special ed school.  Bottom paragraph.  "At the present time we are faced with a potentially dangerous situation.  The child cannot use even the special education facilities because of danger to other children as well as himself."
    What's happening to him since this report?
A    He is deteriorating.  He is deteriorating and

freezing as a disturbed youngster.  He had a paranoid cast to his personality.  Because realistically, I would say if 100 kids experience his experience, that would be the picture, given what he was given.

Q    Was the paranoia here when he was 11?  There is not that much evidence of it over here.

3760

A    No.  If I can explain this way, a paranoid defense is more primitive than a depressed defense. Before, he was depressed.  Now he is backing down. Paranoid defense is a more primitive.

Q    He is getting worse?

A    Yes.

Q    "Rage and anger turned on himself, the real possibility exists for suicide."  Do 11-year-olds commit suicide?

A    Yes.  They do.  They commit suicide at six.  I have had hangings at six.

Q    At this time, is James Roane still treatable?

A    Yes.

Q    What would it take to get James Roane at 11 to stop what's happening?

A    You need to have a protracted residential treatment setting with treatment, special education, involvement of the family, and it would take several years.  You can reverse this stuff.  It doesn't take as long as he had lived, it doesn't need 11 years to reverse it, but you need two or three years.  I have seen them turn around in that time.  You can't clean the wound and put a dirty bandage on.  They have to go to a clean bandage, a setting that once again can hopefully provide them with the needed parenting.

3761

That doesn't mean to drop mother or father, if he was in the picture.  Because most kids, regardless of the problem, still want a relationship with mom and dad.

Q    You mentioned at the bottom, and my eyes are getting bad, but "He is getting more sick, he is getting more entrenched, more fixated in an increasingly characterologically damaged fashion."

What does that mean?  What's happening to him?

A    Well, in the beginning you have an egg where the gelatin part is frozen, but it is partially frozen. Maybe it still can be reactivated.  There still can be a modification of his personality, a modification of his conscience.

Q    The attitude or the personality changes that are symptoms of this disorder, are they becoming part of James Roane now?

A    Yes.  They are the main modalities through which he acts and strains his world.  Yet still at that time, there is hope in him for himself.  He asked for help.

Q    In reviewing his records, did you find instances

where James Roane asked to be institutionalized?
A    Yes.  He asked his mother to, and he did respond when he did go to a residential treatment program for awhile.

3762

Q    1980, October 1st, 26 days before his fifteenth birthday, he was referred on an emergency basis.  The child and mother both felt it is an emergency.  He wants to go to a residential school.  He got physically and verbally aggressive.  Over the years this boy has been evaluated and tested a number of times.  Essentially, his intelligence from age six, which was tested at 103, has decreased to where at the present time his full scale is 87.  He still has an average native endowment.
      What's that?
A    The capacity to cope with the world depends upon genetics, primarily.  If you are bright, the apple doesn't fall far from the tree.  Your mom and dad are probably bright.  But the older we get, these tests are based on what we have learned, how we have learned it.  If we have learned in error or not been stimulated, IQ's will drop.  So that doesn't mean he has lost brain cells.  It means he has lost adaptive capacity.
Q    At age 14 is James Roane still salvageable?
A    Yes.
Q    You put down here there are central processing problems.  What does that mean?
A    Central processing means the capacity to

3763

integrate what you know with what you hear with what you see, the ability to interrupt yourself.  I mentioned before when I was talking about ADD, the fundamental deficit is that the thermostat for producing these neurotransmitters is turned back.  And you can see this very clearly in a state-of-the-art test we call positron emission tests.  You can actually see this on a screen and the colors change when you get the medication.  The individual processes better.  He is able to attend better.  His memory is longer.  He is not as distractable.  He can interrupt himself.  He can change his mind.  He knows the consequences of his behavior.  Now, when he is not getting his medication, he then has all of the negative parts of it.  So he could not process, could not pull together, especially under stress.  Under stress, they fly apart.  When they are alone doing their thing alone, they are usually pretty good.  They can function very well.
Q    In view of the fact that the recommendation has been made repeatedly over the years, he does require residential treatment that can provide him

rededication of this learning disability and psychotherapy for his personality problems.  The

3764

personality problems are not a natural consequence; I mean, he wasn't born with those, was he?

A    No.  That's the result of living and how he has been able to handle the ADD and the minimum brain dysfunction.

Q    So the personality problems are getting worse as time goes by.

A    Yes.

Q    It is felt that this has become deeply embedded into his personality structure and time is passing.  Explain, please, what has become embedded in his personality?

A    The kind of defenses he has erected against life and the losing of his flexibility.  He has become very rigid, is becoming more and more rigid and less and less capable of coping and changing direction.

Q    He is not as salvageable as he was at age six?

A    Right.

Q    The boy can be potentially dangerous to himself and to others and to property.  What kind of danger?

A    Well, because he will act in terms of stay-alive impulses, that means he will not think of the consequences of his behavior.  He will act if he is provoked, and there is a kind of fearlessness.  And interestingly enough, seldom reporting pain.  So they

3765

will act according to whatever they feel for the moment.  It is usually a maximal reaction.  They can be hurtful.  They can do very dangerous things.

Q    As an aside, this was scoffed at a few moments ago by the United States  --

MR. VICK:  I don't know what he is talking about.

THE COURT:  Mr. Baugh, please.

BY MR. BAUGH:

Q    Would you find it interesting that this group of people when they got together referred to each other as brothers or cousins, and they lived at some period of time in one house with some person to do the cooking and cleaning for them?  Would you find that odd?

A    No.  I think it is a recreation of what they never had.  The longing here is to belong, and they create a little society.  And it's one way to keep an eye on each other.  It is paranoid behavior.

Q    You have not seen James Roane since quite some time.  In fact, by the way, this is James Roane sitting here.  Is James Roane going to be  --  strike that.

Do you know if he is salvageable now?

A    Sir, without up-to-date testing and evaluation,

3766

I could only speculate.  But I think a trial of salvaging him would be important.  But I think that would have to be preceded by an in-depth evaluation.

Q    Before, you advocated that he be placed in residential treatment; am I correct that you wanted him in residential treatment so there would be predictability, structure, limits?

A    Yes.

Q    Are there other types of institutions where you can get that?

A    Yes, there are some  --  some of the programs, these wilderness programs, so-called.

Q    What about jail or prison?

A    Jail and prison with a proper program, yes.  The supervised structure, the limits, one-on-one work in terms of remediation, in terms of working on and working through, yes.

Q    In conclusion: one, the problem that led James Roane to be referred to you, was that an organic problem?

A    It was organic and biological.  I distinguish organic in that there is dead tissue.  There was some.  And the biologic, that there is the misfunctioning of his neurohormones.  That was there.

3767

Q    He was born with it.

A    That was a given, yes.

Q    All right.  And that is a problem.

A    Yes.

Q    And he had no influence on that, on his getting it.

A    No.

Q    The other situations that I surmise exacerbated it, the abject poverty, absence of father, the crowding in the home, the limited parenting skills, are these things that exacerbated the impact of birth defects?

A    Yes.  I think those are the things that went into the character formation.  His friends being shot when he was a boy, living in a community where you do go to bed with gunshots in the air, that sort of thing.  The climate, the entire environment, starts it.  There was few redeeming features about it.

Q    Was that his fault?

A    Sir?

Q    Was that his fault?

A    No.  If you will, he was a victim of it.

Q    He was born to it.

A    Yes.

Q    The passage of time with this condition

3768

untreated, did that exacerbate the problem?

A    Yes.  He was still coping with childlike skills that were flawed.

Q    And of course he asked for residential treatment, so the passage of time was not his fault.

A    Right.

Q    Am I correct?

A    Yes.

Q    James Roane could have been saved?

A    Yes, sir.

Q    The fact that he is now in trouble with the law for serious offenses, when you saw him back many years ago, did you understand or did you surmise that a young man like this, without treatment, is going to probably end up either dead or in trouble with the law?

A    Yes, sir.

        MR. BAUGH:  Thank you.  Pass the witness.

                CROSS-EXAMINATION

BY MR. VICK:

Q    You have worked with the prison system for some years; is that correct?

A    I work with the United States Public Health Service under contract.  Yes, sir.

Q    Mr. Roane, as you probably know, has been

3769

incarcerated for the last year.

A    Yes, sir.

Q    Since February 2nd of last year.  Indeed, if he wanted such treatment through the prison system, he could have gotten such treatment in the last year, couldn't he?

A    Of course I don't know the circumstances of whether he was asked or whether he asked.

Q    But it is available.

A    It is available.  Yes, sir.  I know that it is.

Q    You said that through your testing, through the years that you tested Mr. Roane, if I understand your testimony, there was a growing rigidity in his behavior.

A    Yes, sir.

Q    The impulsive violent behavior that he exhibited when he first came to you grew and became more rigid in his response to things.

A    Yes, sir.

Q    He sits here now having been convicted of murdering four people on four separate occasions. Would you say then, Doctor, based upon your knowledge and expertise, that that man has, for whatever reasons, based upon his youth and what went into making him, has grown into a very violent person who

3770

is rigid in his violence?

A    Yes, sir.  I would think that's fair.

Q    A virtual killing machine.

A    Once again, I have to say that yes, he is rigid, and yes, he has done these things.  I know it has been established in Court.  But I also think of the Birdman of Alcatraz.  He was ADD also.

Q    But he is at this point a virtual killing machine, isn't he?

        MR. BAUGH:  I object.  "Virtual killing machine --"

        THE COURT:  Sustained.

        MR. BAUGH:  Thank you.

                REDIRECT EXAMINATION

BY MR. BAUGH:

Q    You mentioned the Birdman of Alcatraz; was he a murderer?

A    Yes, sir.  Apparently, and remember, I'm no expert on that particular gentleman, but he became, as you know, a famous ornithologist when he was at Alcatraz.  But he was a poacher, and two Park Service officers went in to get him.  He killed one, and then the other came after him and he killed him.  However, over the years he was rehabilitated.  Of course, he spent all of his life in prison.  So speaking to the point of can people be rehabilitated, though they seem to be way down the road, my experience has been yes.

Q    You indicated that people like Mr. Roane react to situations.  Am I to assume that means he sees his world differently; he reacts to other things versus going out and  --  is he malevolent?

A    I don't think by plan, although some of his feelings, and by his acts, they are malevolent.  At the same time, I don't think he necessarily plans to be.  But that's the end effect.  What he does are things that are malevolent.

Q    The testimony has been that while Mr. Roane was doing these killings, he was on the street.  Do any of the supports or controls or limits that you say are necessary, as far as you know, do those things exist in the street?

A    No.

Q    If Mr. Roane were taken out of that setting, of the streets  --

        MR. VICK:  This has already been covered.  I didn't go into this.

        THE COURT:  Overruled.

BY MR. BAUGH:

Q    If Mr. Roane were taken out of the streets  -- strike that.  If you were going to prescribe something for Mr. Roane now, would it be limits, structure, predictability, and all those things you don't find in the streets?

A    Yes, sir.

MR. BAUGH: Thank you. Pass the witness.

THE COURT: All right. You may stand down, sir. We are going to take a break now.

(Witness stood aside.)

Everyone remain seated while the witness leaves the courtroom.)

(The jury left the courtroom.)

Mr. Marshal, you may remove the defendants.

(The defendants were removed from the courtroom.)

(Recess taken from 11:30 a.m. to 11:45 a.m.)

THE COURT: All right. Let's bring in the jury, please.

(The jury entered the courtroom.)

Mr. Henderson?

MR. HENDERSON: Crystal Noakes, Your Honor.

CRYSTAL NOAKES, called as a witness by and on behalf of defendant Roane, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. HENDERSON:

Q    Good morning, Ms. Noakes. Please state your name.

A    Crystal Noakes.

Q    And Ms. Noakes, are you a resident of Richmond?

A    Yes, I am.

Q    Can you tell the ladies and gentlemen of the jury what your occupation is?

A    I'm director of development for the Institute for Family Centered Services in Richmond, Virginia.

Q    Very briefly, what is that?

A    The institute is an agency that services dysfunctional families that involves children who have been adjudicated in the juvenile system: those who may be returned home from detention. Families who have children who have ongoing history of criminal record and may not be adjudicated, we work with that family in the home to prevent them from beginning going through the process of the system. So what we do is work with children and families in the home.

Q    Can you give us a brief background, your education and that sort of thing?

A    I have a Bachelor's degree from the University of Richmond, from University College, and the major was human resources. I transferred there from New York where I majored in business administration. And I have a Master of Science degree in rehabilitation counseling from Virginia Commonwealth University, and that's a graduate course. And the course work there

entailed working psychiatric information, assessment, also understanding biological and neurological functions of those clients who may have been born with mental retardation or those persons who may be injured, and how to work with those particular individuals.  I have completed my course work in my Ph.D. program at Virginia Commonwealth University, and that's in the School of Education.  And that program is an interdisciplinary program where you basically choose your major.  My major concentration is mental health counseling, and the majority of my graduate courses are from the School of Social Work. So I have over 60 hours of mental health counseling graduate courses.

Q    With respect to additional on-the-job training, if you will, can you go through what it is you have in your background with respect to that area?

A    I have worked with, starting with Poplar Springs Hospital, and I've worked with them in the outpatient department as a mental health counselor doing assessments of individuals and families.  I work with them in-patient.  I developed the in-patient partial hospitalization program for substance abusers,  again working with them as an administrator as well as the clinical work.  I assessed clients, which was families, individuals, children.  I then was working as well with Metropolitan Clinic of Counseling here in Richmond, where my primary responsibilities was to conduct assessments, again with individuals and families.  Thirdly, I worked with Bosava, Ltd., which is no longer  --  the business is no longer active at this point.  That was with Dr. William Shepard and Dr. Ettigi, too, a psychiatrist in Richmond.  Again, my responsibilities was assessment in mental health counseling for individuals, families, and children.

Q    Have you additionally taught classes?

A    Yes, I have.  I did an externship with my Ph.D. program at Mary Washington College, where I taught a psychology class and developed a new course in health care policy.

Q    Have you ever testified in a criminal case?

        MR. PARCELL:  The government will stipulate her qualifications.

        MR. HENDERSON:  Thank you.

BY MR. HENDERSON:

Q    Have you ever testified in a criminal trial before?

A    Never.

Q    Neither for the prosecution nor the defense?

A    Never.

Q    How is it then, ma'am, that you came to meet with Mr. Baugh and myself; how did we come together?

A    Mr. Baugh contacted Commissioner King Davis, who is Commissioner of Mental Health and Mental Retardation and Substance Abuse Services for the State of Virginia.  He presented to Mr. Baugh three names for him to consider, and my name was one of them.

Q    As a result of that  --

A    Mr. Baugh contacted me by phone.  We met, and that's how I'm here.

Q    Okay.  Now, when we met, can you give the jurors an idea of what we asked you to do, very specifically?

A    What was asked of me was to assess James Roane and develop a treatment plan or an idea of what I would have -- the kind of services I would have provided James 20 years ago.

3777

Q    Okay.  Now, did you in fact do that assessment?

A    Yes, I did.

Q    Can you describe if you will how you went about doing that?  What sorts of things did you do?

A    An assessment is gathering history, gathering data about James and his environment, his family. What I did was, number one, I went through all of the records, pages and pages, over 2,000 pages of records, as well as reviewed some various and sundry reports.  The records I did look at were probation records, Court service records, medical records, psychological school reports, health care records of the entire family, social Services records, welfare records, Housing Authority records.  Anything pertaining to this family, I reviewed.

Q    Can you give us an idea of what period of time these records covered?

A    From James' birth to the present.

Q    In addition to records, what else did you do?

A    Then I did what we call interviews or structured interviews.  And that involved meeting with the family.  And I met with James' mother, Ms. Roane, and Annette initially, and I met with them in their home.  I also spoke with Ann, and I spoke with James Roane on two occasions.

3778

Q    Now, Ms. Noakes, did you bring with you today a chronological summary of the records that you have reviewed?

A    What I have brought with me is, yes, a summary. I'll be glad to go over it.  It is called a genogram.  And what it is  --

Q    Before we get to that, the genogram, I'm speaking of a summary of the documents that you reviewed.

A    Okay, I'm sorry.  What it is is the summary that I did review.  This summary is a summary of all of

the records, 2,000 or so records that were reviewed by me.

Q    Okay.

MR. HENDERSON:  I'd like to introduce this into evidence.

THE COURT:  Go ahead.

MR. HENDERSON:  That's Defendant's Exhibit 1.

THE COURT:  All right.

BY MR. HENDERSON:

Q    Now, can you just summarize very briefly what that particular chronological summary tells us?

A    The chronological summary gives an overview of James' history, why he was referred, some of the symptoms, his behaviors, the impulsivity.  It also describes the family's home life, what it was like to live in that particular home.  It describes certain things about deprivation, poverty.  It describes medical issues.  It describes school records.  It describes probation records.  It describes his experiences with the probation system.  It describes his experiences, positive and negative, with the educational system.  It describes some trauma that was evidenced throughout his life.  And it describes, of course, the neurological impairment that Dr. Lordi discussed.

Q    All of these things came from the documents you reviewed?

A    That's correct.

Q    You mentioned that you prepared, likewise, a genogram?

A    Yes, I did.

Q    If you will, can you briefly tell the jurors what a genogram is?

A    A genogram is a family tree.  It is a picture of the family.  And what it allows us to do in our work is to describe the communication pattern, the roles of the family, just basically what goes on with the family.  That's what this picture will show.

Q    Okay.

MR. HENDERSON:  If I can get Ms. Noakes to approach the jury?

THE COURT:  Sure.

(Witness approached the jury.)

BY MR. HENDERSON:

Q    Ms. Noakes, if you can go through this genogram with the jurors and just explain what it is you have here.

A    As I stated, it is a picture.  I would like to go through and basically describe it.  Before I do that, let me give you some definitions.  The square symbol represents the male, the circular symbol

represents the female. The solid line between the male and female relationship that we see here and here represents marriage. The dotted line here and here represents a live-in relationship. What I would like to do is start on this side. This is the paternal side of James' family starting with his paternal grandparents, and over on this side is the maternal side of James' family, starting with his maternal grandparents. I will go through and describe some of the communication styles and et cetera that I was able to assess.

Let's start on the paternal side. His paternal grandfather, William, was born in 1907. He died in 1948 of an industrial accident. What's important about William that we do not show here is that William had seven siblings, three brothers, four sisters. Of the three brothers, they were all institutionalized at Central State.

Q    For those of us who are not familiar with Central State, what is Central State?

A    That is a mental health security facility. He was married to Rosa. Rosa still is living here in Richmond, Virginia. And they had five children. Well, actually six, with James, Sr. I won't go into much about those. They were all doing well, and some are living in New York and some are living here in Richmond.

If we move to this side, the maternal side, we have Amos and Lois. Amos is presently approximately age 62. I say approximately, because Amos deserted the family. So we are not too sure right now about him. But he and Lois were married. Lois is deceased. She died in 1987 of a heart attack. Amos deserted the family. No one knows where he is at this moment. Amos and Lois had four children. Amos, Jeanette, Phyllis, and John. I'll tell you a little bit about this family. Amos and Lois had a traumatic relationship. What do I mean by traumatic? Abuse. Physical abuse by Amos on Lois. This was almost on a daily occasion. He was very volatile. Amos deserts, and Lois is now raising her children. Lois gets sick and Lois decides as a good mother at the time that "I can't care for all of my children so what am I going to do," Lois says, "I'm going to place my children in foster care until I get better because I can't take care of them by myself." What happens is, Amos stays with mom, the oldest child. Jeanette and Phyllis are sent to a foster home. John is sent to a foster home. But they are not in the same foster home. Phyllis and Jeanette are in the same foster home, and John is sent to another home. Now we have an estrangement of the family, a break. We have trauma

ongoing here until Amos deserts, mom gets sick, and now we have a split-up of the family.  I have asked Jeanette Roane to tell me about the time she spent in foster care.  That's four years.

Q    Jeanette Roane is who?

A    This is James Jr.'s mother.  She spent four years in foster care.  She refuses to tell me about it.  I asked her several times.  She stated, "I will not talk about it."  So I have no information.  She spent time in foster care, and John was in his foster family for six years.  They returned back to the home, which was with the relationship with Lois and John.  It was reported this was the only time that there was some normalcy:  quiet, good times within the family.

Now I'd like to just move down to James and Jeanette.  We have James, Sr. on this side of the family and Jeanette from this side.  Let's talk about them.  James, Sr. is presently 48.  Jeanette is presently 44.  We are going to start here and then kind of move up.  I'll be doing this type of thing.  Annette and Ann are twins.  That's this line here to here, twins, born to James and Jeanette.

Q    Can you tell us at what age that occurred?

A    Annette and Ann were born to James, Sr. when he was 19.  Jeanette was 14, 14-and-a-half.  First child.  She was pregnant at 13, first had the children born at 14.  They were twins.  They get married in 1964, and Florence is born in 1964.

Q    In 1964, Jeanette is how old?

A    She is now 15.  In 1965, James, Jr. is born.  Jeanette is now 16.  16 years old with four children.  In 1966, James, Sr. vanishes.  He goes.  He leaves the family.  So she is 16 years of age with four children and carrying a set of twins when he abandons the family.  In 1967 after his abandonment, a few months later, Kathy and Kevin were born.  Again, another set of twins.  She is now 17, 17-and-a-half, and now we have six children by the age of 17.

I'd like to describe a little bit about the relationship while James, Sr. was in the household.  Again, it is a traumatic relationship.  Daily physical abuse, daily, every single day.  He physically abused Jeanette Roane.  So what we see here is that Annette, Ann, Florence, and some of James' life, what they saw in the home was daily physical abuse by their father, James, Sr.  I'd also like to talk about when they were divorced, which was in August of 1971.  James, Sr. was incarcerated from approximately 1969 to 1977, which is in the summary, for robbery and murder.  Of course, it is reported

that he has ADD.

Q    That's James, Sr.?

A    This is James, Sr.  Jeanette has Kesha in 1971, whose father is Alfred, and they lived together from 1972 to 1976, and it is reported that this was a positive relationship.  He is no longer in the home. What else I'd like to show here is let's talk about these siblings.  First of all, she had all of these children in succession.  No birth control was allowed.  She requested birth control.  She was not able to obtain that.  She needed permission from her husband or either permission from her parents, and at the time when she was 13, she could have gotten permission from her mom.  Then she married, and she could have gotten permission from her husband.  He refused to give her permission.  He refused.

Annette and Ann, we have Annette  --  we will just do it this way.  Annette, Florence, James, Kathy, and Kevin all have negative histories with the law.  Kevin and Kesha, all of them.

If we go here in the record, Annette escaped that, but Annette has a history of substance abuse but has been clean three years and is presently employed.  She is living a solid life and is employed.  Florence has an alcohol and substance abuse history.  She is now clean one year, presently employed.  James, Jr. used all substances, negative history with the law.  Kathy has a history of substance abuse, is now clean, and she is employed. Kevin has a negative history with the law, a history of substance abuse, and is incarcerated at this time.  Kesha has a negative history with the law, is still actively using crack cocaine.

Q    You said James had a history of using all substances.

A    Cocaine, heroin, marijuana, whatever he can get his hands on.

I wanted to just show you a picture of how the impact, and when we do this, we take a look at some of the impact from the grandparents and how that all leads together into one.  So we have trauma here, we have abandonment, and then of course from all of these, the trauma and the abandonment, what we see is the ongoing themes of poverty in the family, just the inability to be able to take care of this family. Ms. Roane was a child having children.

Q    You mentioned several family members' names on that chart.  If you will, can you identify those persons in the audience today?

A    I had some of them.  I can identify Ms. Roane, Jeanette Roane.  I have to take my glasses off.  She is in the green in the back.

MR. VICK: We have no objection to their just standing up and introducing themselves. We don't need the identification.

THE COURT: She can do it.

THE WITNESS: Ann Roane is in the pink, and I'm looking for Annette. And Annette Roane is in the rear. And then I met other family members this morning.

BY MR. HENDERSON:

Q   Okay.

A   And we have John, and we have Brandy. Brandy is James, Jr.'s daughter.

Q   Okay. I take it that you interviewed most of these people, most of these persons?

A   I interviewed Ann, Jeanette Roane, James' mother, Annette Roane, and James.

Q   Okay. Now, Ms. Noakes, I guess in the assessment that you did, can you tell us what if anything you found out about James Roane?

A   In the assessment, what I found was three things. One was the neurological impairment that was mentioned earlier today by Dr. Lordi. The third theme was deprivation, and the fourth theme was trauma.

Q   I think you meant the second and third.

A   Right. I'm nervous.

Q   So name them again: the neurological impairment, deprivation, and trauma?

A   That's right.

Q   Let's talk about, if you will, the deprivation, first of all. What do you mean deprivation? Go into that for the jury.

A   When I am speaking of deprivation, let me break that down a little more for you. What we have is economic deprivation. That's just plain poverty. Financial problems. Also, we have emotional and social deprivation.

With the financial deprivation or the poverty, there is many indications in the summary, as well as through all the records and in my interviews, of continued times when this family could not, or Ms. Roane, cannot pay her rent. In fact, the summary indicates approximately 92 times where she received a pay or quit notice.

Q   For those of us not familiar with a pay or quit notice, can you tell us exactly what that is?

A   You are going to be placed out of your home. You are going to be evicted, on the street.

Q   The home that you are referring to that Ms. Roane and her family was living in, what type of home are you speaking of?

A   The type of home -- and that just leads also

into emotional and social deprivation.  The home that they lived in was sparce.  I described sparce as minimal furnishings.  They had a home that is -- it smelled of odors, which was urine odors.  They had a

3789

home that was unkempt, untidy.  They had a home that was filthy from time to time.  Ms. Roane had a lot of children at a very young age.  It is very difficult for any teenager to keep up with that many children when they are all begging for attention, crying, going to the bathroom, et cetera, to keep up a clean home.

Emotionally, they lacked the support of Ms. Roane.  We know through studies that children need emotional support or nurturing.  That's being held, cared for, being touched often.  Ms. Roane had lots of children.

Q    Did you find that there were efforts on her part to provide this?  What exactly are you saying?

A    Ms. Roane attempted, you know, to care for her children.  There are reports where she did try to get medical attention, she did obey -- I'll use the word "obey" -- or try to comply with Social Services workers when they came to the home and talked about the cleanliness of the home and gave her suggestions on how to keep the home clean.  She complied.  She tried.  There are instances in the summary where she was -- the tenth home visit relates that Ms. Roane was busy painting.  It was suggested that she needed to paint her house, to keep it clean.  That which she

3790

had painted already was dirty with fingerprints and smudges.  It was hard for her to keep that up and maintain that.

Q    Where was this home?

A    This home was in the projects.

Q    Now, continue on with the area of deprivation. Other than I guess  --  would I be fair in describing it as a chaotic home life?

A    Yes.

Q    How would you describe it?

A    As we indicated here on the genogram, the home was chaotic.  It was chaotic because of the trauma, the ongoing abuse in the family.  It is also chaotic due to the financial problems that this family had. They had no steady income.  Dad didn't make much money.  He didn't work steadily when he was there. He leaves, he is not paying child support.  It is indicated in the summary he was supposed to pay $25 a week.  That wasn't done.  Ms. Roane is not educated; she did not finish school.  So we have a type of chaotic household.  When you have poverty, when you have ongoing abuse in the home, it is stressful.

Q    Now, this is not the only family that has

experienced these types of conditions.  Why is it, or why was it, that these conditions impacted so heavily

3791

in this particular situation?

A    It is a combination of things.  It is their poverty, their living environment.  It's a combination of all of them:  the poverty, the lack of social needs and emotional needs being met, to be met for all the siblings, as well as Ms. Roane was a teenager who had not finished developing and receiving her own emotional support.  She didn't learn it.  She didn't know about it.  She hadn't finished her own growing.  She could not relate this or pass it on to her children.  So this is just instances or examples of this.

Q    Let's move, if you will, to the second area that you mentioned, trauma.  What did you find as far as trauma was concerned?

A    With trauma, I found several things.  One was the ongoing physical abuse that the family was exposed to.  I emphasize the family.  The family is exposed, the younger siblings, Annette, Ann, and Florence were exposed to this trauma on an ongoing basis.  They didn't have their needs met.  They were experiencing lack of trust, lack of understanding what was going on, insecurity.  They didn't have much to support James.  And so they all saw this abuse with mom and dad.  James was part of this for about a

3792

year, year-and-a-half.

Additional trauma was James' continued exposure to violence.  James had 30 known friends who were murdered in a time frame somewhere -- let's see, Vance Younger in 1990, Wayne Mitchell, age 19, in 1979, Wayne Ross in 1989.  We have a 14-year-old that was murdered in 1980.  I can go on and on.  But he was exposed to violence.  Additionally, at nine-and-a-half James witnessed a murder of a relative.  He was the witness.  He was there.  He was the one on the scene.  That's age nine-and-a-half.  And James was sexually abused from age four to age six on a continuous basis by a family friend.  He also had inappropriate exposure to sexual activity in his home.

Again, this is traumatic.  It was constant humiliation, constant isolation, ongoing shame, ongoing stigma.  James went to school dirty.  James had a home that was chaotic.  He couldn't invite friends in.  James had an unkempt nature about him, his clothes were unkempt.  This is stigma.  This is trauma.  Children grow up, they want to be accepted by their peers.

Q    The third area that you spoke about and which has already been spoken about earlier, the

3793

neurological impairments, what did you find in your assessment in that area?

A    In the neurological impairment, the symptoms was of course his impulsivity, lack of concentration, wasn't able to remember numbers for long periods of time.  His self-esteem decreased, he felt rejected. So this was part of the neurological impairment. These were symptoms, of course, when Dr. Lordi evaluated him.  He evaluated him with a diagnosis of, again, a brain syndrome.  ADD was stated about James.  And then various treatment modalities or treatment interventions were suggested for James.

Q    This tier, this bottom tier of individuals, James being here, as far as the problems associated with this family, would James have been  --  I know you mentioned that some of the others additionally had problems.  But would James have been the only one to have the severe problems that seem to have occurred?  What did your assessment find?

A    No, James would not be the only one that had severe problems.  Let's understand, let's look at this as a family system, a family unit.  So everyone in this family is exposed to this.  I cannot say that everyone was exposed to sexual abuse.  I do not know that.  I just know that about James.  But everyone

3794

else is exposed to the other trauma that's in the home.  The abuse, lack of financial support, lack of safety needs being met, and lack of nurturing.  So I would say it influenced the behaviors of the other siblings.  So you have the history of substance abuse, you have a history, a negative history.

Q    As a social worker in your field, having seen and having assessed a family like this, having seen and assessed an individual like James Roane, can you tell us what it is you would have done had this been your case, had this been something that you had affiliated yourself with?

A    20 years ago or so many years ago, I would have, A, recommended institutionalization.

Q    Of James?

A    Of James.  Why?  If James was placed in an institution, what he would have been provided is a behavior modification program, consistent rewards and consequences for his behavior.  He would have been taught coping mechanisms, how to deal with his impulsivity.  When we get angry, hopefully we take a deep breath and walk around awhile, but that's an example.  But certain things sound simplistic, but these things would have been taught James.  He would have had that structure.  He would have had

3795

behavioral modification within the institution.  I

also would have recommended medication support. That would have been provided at the institution. James, through the summary and the history and the records, James did not take his medication. He was stigmatized, "crazy pills." Family members didn't understand. James told me he didn't understand what was wrong with him. So he was taking "crazy pills." That type of thing could have been handled in an institution. His medication would have been monitored and ongoing for him.

Additionally, what I would recommend is educational support. That again could have been done, completed in an institution, and the education would be more individualized to accommodate whatever special needs that were identified. Lastly, but not least of importance, is family support, family education. For example, that would be, "James is not taking crazy pills, this is what James has. James is a special needs child. When you have a special needs child who has chaotic behaviors, impulsivities, just wearing mom down and all the siblings down who care about him, this is what you can do for him. This is why he is like this and this is what we can do."

Also, with the family, helping Ms. Roane be able to assist her in her parenting skills so she can copy with these numbers of children. And then when James is discharged from this institution, because it is not for long periods of time, the family would have what we call remember unification education. They would know how to work with James, how to provide support for a special needs child. "This is what we know we can do. We know we have to monitor his meds. We know we have to assist him in his impulsivity. We are aware; we are an educated family." This should have been done. This is what I would have recommended with the family. And to strengthen the family while James would be institutionalized, and when they are reunified, what you would have would hopefully be a good, strong family unit.

Q   Finally, Ms. Noakes, in the course of your interviews and discussions with family members, and especially Ms. Roane after she had been blessed with seven children, what feeling did you get or what assessment would you make with respect to their attitude now towards James?

A   It is a very loving family, very loving attitude. They care about James.

MR. HENDERSON: Pass the witness, Your Honor.

THE COURT: Any questions from the government?

CROSS-EXAMINATION

BY MR. PARCELL:

Q   As a matter of fact, in 1982, he was institutionalized by the juvenile court system and sent to the Adventure Bound program in Charlottesville; is that correct?

A   Yes.

Q   Also, he was committed to the State Department of Corrections in 1982, a year later.

A   Yes.

Q   So he was institutionalized as a child.

A   He was institutionalized as a child, at a later time than when it was initially suggested.  So you have an exacerbation of his behaviors and problems because they weren't addressed.  Immediately when it was suggested by Dr. Lordi that he be institutionalized, when James went to Adventure Bound, he caused some problems when he first got there, and it subsided.

Q   Ma'am, what you are suggesting should have been done, that should have been 20 years ago, not today?

A   Today, I would recommend something else.

Q   Have you, during the course of your preparation

3798

--

A   When I say today, let me be more specific.  I would recommend something else for James at that age today.  Not James being 26 or 27 years old as he is now.

Q   No, your recommendation was for when he was 20 years younger.

A   Right.

Q   In preparation of your testimony, did you interview Robin Cooper?

A   No.

Q   Do you know who she is?

A   Yes.

Q   Who is she?

A   She is a girlfriend of James Roane.

Q   Do you know whether or not he had any children by her?

A   Yes.

Q   How many?

A   I think it is three.

Q   Do you know Iris Smith?

A   I know the girl.

Q   Do you know whether he had any children by her?

A   Yes, and I don't have those notes with me, but I know he had approximately five children.

3799

Q   Didn't you think it was important for any of those people who had children by James Roane to interview them?

A   It was important.

Q   But you didn't do that?

A    No.

Q    Ma'am, to your knowledge, has Annette killed anyone?

A    No, she hasn't.

Q    Has Ann?

A    No.

Q    Florence?

A    No.

Q    Kathy?

A    No.

Q    Kevin?

A    No.

Q    Kesha?

A    No.

Q    You know James Roane has been convicted of four murders?

A    Yes, I do.

        MR. PARCELL:  No further questions.

        THE COURT:  Anything else?

                REDIRECT EXAMINATION

3800

BY MR. HENDERSON:

Q    With respect to the other siblings, have any of the others been diagnosed with the disorders that James has?

A    None of them have been diagnosed.

        MR. HENDERSON:  Your Honor, I have copies of the summary that I would like to publish to the jurors at this time.

        THE COURT:  Go ahead.

        MR. VICK:  We would move in also the underlying juvenile documents that were the basis of her reports.

        THE COURT:  Fine.

    (Witness stood aside.)

        MR. VICK:  The juvenile records that have been moved in are Government Exhibit P-5 and we would move them in, also.

        THE COURT:  Mr. Vick, come up here?

    (At Bench.)

        MR. BAUGH:  We have objection to these, to the juvenile records, because they contain -- there are confrontational problems.  They contain information taken from witnesses.  These are not like records of convictions or adjudications.  They are office reports.

3801

        MR. VICK:  Your Honor, all of this has been reviewed as the subject of her testimony.  If she is going to testify about the review of all the documents, it is only fair that the underlying documents come in.

        THE COURT:  The objection is sustained. While we are up here, how long is it going to take?

MR. BAUGH: I have Mr. Brunson, who will take about 25 minutes. He is the big brother.

THE COURT: We will take Mr. Brunson.

GEORGE WASHINGTON BRUNSON, SR., called as a witness by and on behalf of defendant Roane, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BAUGH:

Q    Good afternoon, sir. Please state your name for the Court and for the record, spelling your last name.

A    My name is George Washington Brunson, Sr. B-R-U-N-S-O-N.

Q    How old a man are you, sir?

A    72.

Q    And are you still working?

A    I am retired, but I am working.

Q    Where are you working?

A    At the YMCA, North Richmond branch.

Q    During your years of employment, did you ever function as a volunteer for probation services?

A    Yes, I did.

Q    How many years did you do that for?

A    I had been working as a volunteer for the juvenile court for about two to four years.

Q    And did you also work with Big Brothers of Richmond?

A    Yes.

Q    How long did you do that?

A    About eight to ten years.

Q    When you would do these things, what would you do?

A    Well, the big brother was one-on-one. And the juvenile court was assigned. We had assignments there.

Q    When you would have assignments there, what would you do with them; what was your purpose?

A    We were supposed to take the probationer out and, well, figure out what he likes, what he wants to do, and how can we help in any way to help his life.

Q    Did one of the students that was assigned to you, was that James Henry Roane, Jr.?

A    That's correct.

Q    When is the last time you saw him, do you think?

A    It was in 1980, around about March of 1980, the last part of March.

Q    Now, when you were assigned -- do you have any recollections of James without your notes? Do you remember him at all, the first time you met him?

A    Yes, I do. When I first met James, I do recall

that he was very quiet, very cautious, and I think he
was waiting to see what I was going to do, what I was
going to say.  In fact, we were both cautious towards
each other.  I wanted to bring out something in him.
Q    Did your relationship develop?
A    It did.
Q    And could you tell me some of the things?  For
instance, where would you pick him up?
A    Well, I remember our first meeting.  I think it
was just we went out for a short meeting to get to
know each other.  We just went out and had dinner and
I carried him back home, during which time we met
him.  And at that first meeting, we were still a
little slow in getting to know him because I didn't
know him and he did not know me that well.
Q    About how often would you meet with him?

3804

A    I would meet with him most likely  --  well, it
was supposed to have been at least once a week, but
sometimes it was every day or every afternoon.  If we
didn't meet personally, we would call each other.
Q    Did James, like when you would take him home,
was there something he always did after you would
drop him off at home?
A    He would always, if I would drop him off, say
about 6 o'clock in the evening, say we went to a
movie, he would call me about 6:30 or 6:45 to know if
I was at home.
Q    Did you find your relationship starting to
warm?
A    Starting to warm?
Q    You all started getting closer together?
A    It did.
Q    Did you ever take him places where he would see
his friends from the street?
A    We did go to the Coliseum, I believe at one
time, to a basketball game or some type of thing.  He
did meet his friends.
Q    During that meeting, did his friends attempt to
get James to come with them?
A    Yes.  They did attempt to.
Q    Did James stay with you?

3805

A    He stayed with me.
Q    And when he chose to do that, how did he
describe you to his friends?
A    He described me as his best friend.
Q    Did there come a time during the relationship
that you had with James that he asked you if he could
introduce you by another title?
A    Yes.
Q    What did he ask?
A    He asked me when he was with his friends at one
point there that if he could call me either his uncle

or his grandfather.

Q    Did you, as a consequence of your working with James, keep periodic notes?

A    Yes, sir, I did.

Q    Did these notes chronicle or keep track of the relationship and the progress that James made during your session?

A    They did.  These notes refer to when I met him, what we do, and at some time, how long I was with him.

Q    Did you ever notice anything about him -- when you told him that you cared about him or you wanted him to do well, did you notice a change in his attitude at all?

3806

A    Yes.  He began to open up.  He began to open up much more than he did at the beginning.

Q    Did you notice anything when you first started working with him about his clothing or his demeanor, his manners?

A    Yes.  During our first meeting, he was not quite -- he was kind of coarse.  At which time, as he began to know me and as we began to go out, I coached him a little bit and schooled him a little bit that we were going out and where we were going, like to dinner and what not.  He would begin to dress up, I would say.  But I noted that each time after that I would see him, he would always be a little cleaner. But I do believe once we got to know each other, when we were going out places, he did try to present himself with what clothes he did have.  But what he did wear, he did try to make it clean.  I even remember one time that he had me to wait while he would iron his shirt.  He didn't do a good job, but the shirt was good and it was ironed and cleaned.

Q    Did Ms. Roane seem to encourage your working with James?

A    At first, I think she didn't know me and I think -- I felt she was a little bit skeptical.  But after getting to know me, the whole family was very

3807

pleased to see me when I came around.

Q    Did you also have occasion to  --  well, was James poor?

A    Beg your pardon?

Q    Was James poor?

A    Was he poor?  To my knowledge, he was.

Q    Did you ever have an occasion to take clothing over there for James or his sisters?

A    Yes, occasionally in my job as a volunteer worker, I came in contact with other organizations that would always give us clothes, girls' and boys' clothes, and all kinds of clothes.  And at that particular time, we got three or four boxes of

clothes.  And the first person I thought of was him, whether he actually needed them or not, because I think half of some of the clothes that we had was girls' clothes, but nevertheless, we left them at his home.

Q    During the time that James was with you, did he get progressively better?

A    Did he rebel?

Q    No, did he get progressively better?

A    Yes.  Repeat that.

Q    During the time he was with you, did he get better?

3808

A    Yes, he really did get better.  I felt that he did.  Because even my sons, I have had sons in his age bracket, and we would look forward to seeing James there.  And James had begun to get almost like family with us.

Q    Now, James was referred to you because he was on juvenile probation; is that correct?

A    Right.  Yes.

Q    Did you know that he had asked to extend his probation for some extra months?

A    Yes, he did.  And I also wrote in my notes to ask if during the time they came off, going to aftercare, I made in my notes, asked if I could work with him further.

Q    Did there come a time when the probation system said, "Okay, James, you are straight, you are gone"?

A    I would assume so, because I never did know what happened.  Because it just seemed like it just went away.

Q    At the end there after it went away, did you hear from people in the neighborhood that James had gotten back with his friends and was on drugs?

A    No, I heard it at one point, that he had.  But I disregarded it because it was hearsay, I would say, and I wrote in my notes to the probation chief that I

3809

had heard this, but it was only a rumor, and I just did not pay it any mind after that.

Q    After James was officially removed from your being his volunteer, did you take another boy?

A    It seems like I had a boy for a couple of weeks, I believe it was.

Q    But that boy had been assigned to you by probation.  He was supposed to replace James; am I correct?

A    Yes.

Q    We don't have enough volunteers to go around?

A    As far as I can recall, that's right.

Q    We don't have enough volunteers to go around, do we?

A    No, we do not.

MR. BAUGH:  Thank you.

THE COURT:  Any questions?

CROSS-EXAMINATION

BY MR. VICK:

Q    Mr. Brunson, you provided James with almost a family-like environment when you were with him?

A    Yes, sir.

Q    Very loving environment?

A    Yes, sir.

Q    Treated him like a member of your family?

A    Yes, sir.

Q    And all of us take our hats off to you for that.  But Mr. Brunson, the last notation in your records show that the last contact you had with James was when his friend called and said that James was on drugs, and that was towards the end of your time with him.

A    I think that was the last -- one of the last notations I had.  That was a rumor that I had heard, that he had went to drugs.  It was probably in March of 1980.

Q    Unfortunately, despite your support and care, he went back to that environment?

A    Yes.

MR. VICK:  No further questions.

MR. BAUGH:  We would ask that the witness be excused.

THE COURT:  Thank you very much.

(At Bench.)

MR. BAUGH:  We have one other witness.  I have to drive Mr. Brunson home.  I would ask we take a break for lunch.

THE COURT:  All right.

(In Open Court.)

We will stop now for lunch.  Come back at 1:45.

Everyone remain seated while the jury leaves the courtroom.)

(The jury left the courtroom.)

All right, Mr. Marshal, you may remove the defendants.

(The defendants were removed from the courtroom.)

All right, we will be in luncheon recess until 1:45.

(Luncheon recess taken from 12:45 p.m. to 1:50 p.m.)

THE COURT:  Let's bring in the jury.

MR. WHITE:  Your Honor, if the Court please, we neglected to attach Dr. Evans' curriculum vitae to defendant Tipton's Exhibit Number 5.

THE COURT:  Fine, it will be added.

(The jury entered the courtroom.)

All right, Mr. Baugh?

MR. BAUGH:  Mr. Victor Herbert, please, and he is in the witness room.

VICTOR THOMAS HERBERT, called as a witness by and on behalf of defendant Roane, having been first duly sworn by the Clerk, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. BAUGH:

Q    Would you please state your name for the Court and for the record, spelling your last name?

A    Victor Thomas Herbert.  H-E-R-B-E-R-T.

Q    How are you employed?

A    I'm employed with the City of Richmond Public Schools.

Q    What do you do for them?

A    I'm an exceptional education teacher.

Q    Was there an occasion when you taught at Adams Corner?

A    Yes.

Q    Where was Adams Corner situated?

A    Adams Corner was located on Chamberlayne Avenue and Azalea.

Q    What was different about that school?

A    Adams Corner School was a center-based program school for those students with emotional problems, and primarily it served those students who had problems adjusting to a regular school setting.

Q    Would students from other special education courses who didn't do well be sent there?

A    Yes.

Q    What was the most number of students you had there?

A    At any given time, probably between 35 and 40. It is a small enrollment.

Q    How many teachers?

A    Approximately five teachers.

Q    While you were there, do you remember James Roane?

A    Yes, I do.

Q    Did James Roane have a hard time at Adams Corner?

A    James Roane had some problems.  He was a likeable young man who enjoyed attending school. However, he did have some problems.

Q    Did he have a lot of trouble with his peers?

A    At times, there were some problems interacting.

Q    What do you remember about him that made him the subject of ridicule, for instance?

A    Primarily his hygiene.  Hygiene drew a lot of attention.  He had a very unhealthy personal appearance.

Q    And did this cause children to mock him or make fun of him?
A    Yes, it did.
Q    What was his reaction?
A    In most cases, his behavior would escalate to the point where he had to be restrained.

3814
Q    And as a teacher there, did you restrain him?
A    I assisted on several occasions in restraining James.
Q    Was that uncommon at Adams Corner?
A    No, it wasn't.
Q    What do you do when you restrain them?
A    The primary focus of restraint is once that behavior escalates, we need to control the particular student so he will not do harm to himself or to others.
Q    Would that involve wrapping your arms around him?
A    And possibly sometimes having the kid placed on the floor.
Q    You mean sat on?
A    Not to that point.  But we do restrain them.
Q    That is not uncommon at Adams Corner with the student population you have?
A    It is not.
Q    You have been doing this how long, sir?
A    16 years.
Q    Of your students that you know at Adams Corner, how many have been murdered, to your knowledge?
A    Approximately eight.
Q    Of the students that you taught at Adams Corner,

3815
what percentage of them are now in some aspect of the criminal justice system?
A    I do not have a percentage of that.
Q    Is it safe to say that a significant number of your students eventually develop lifestyles that cause them to be misunderstood or arrested or something like that?
A    Possible.
Q    Did you get the impression while working with Mr. James Roane  --  strike that.  Did you get the impression that he was raising himself?
A    At times, I did, particularly with the difficulty that he had.  And I felt in particular his hygiene, the way he would come to school, it was causing some problems.
Q    He would be like 14 years old?
A    13 or 14.  We tried to find ways to help James to solve some of his own problems.
Q    When he wasn't being a problem like that, what was his demeanor like?
A    He was fine except to structure and positive

reinforcement.

Q    Was he loving, did he show emotion?

A    The only time that he would show emotions was when he became angry or upset and he had to be

3816

restrained, and often he would cry.  And it was also an experience because once he loses his emotions, it would take 15 to 30 minutes for him to actually settle down.

Q    Did you get the impression that he was really trying?

A    He would try, but he wasn't consistent.

Q    During the time that he was at Adams Corner, did you see some improvement in his physical appearance, his demeanor?

A    Yes.  Because one of his teachers invested a lot of time with James and James was working toward  -- we have a behavior modification program there.  There were some things which James wanted to do like earn outings or what have you, and it motivated James to do certain things in a positive way.

Q    So part of Adams Corner is to change how James would treat his work?

A    Exactly.

Q    Is there a component of Adams Corner School that would teach James his world, such as his family or others in his family how to give him the support he needs when he is not in school?

A    We didn't have what we have now, parenting classes and things of that nature.

3817

Q    Now they do?

A    Now they do have a lot of support.

Q    Would you agree that the parenting classes, or teaching parents how to support ED children, is just as important as the education you are giving them?

A    Exactly.

Q    Is it safe to say that if you keep a kid for behavior modification eight hours a day, then for 16 hours a day he goes back to the same environment, is there a lesser likelihood that he is going to be changed or improved?

A    Probably changed, if there is not follow-up on that or support on the other end.  You talk in terms of accountability.  He performs well in the eight hours course of school.

Q    Was James any worse?  Was there anything about him that made him different from the other students there at that time?

A    You could always talk to James, even though at times he was playful.  But you could always find time to talk to him.  But you had to constantly redirect James and constantly reinforce his positive behaviors.

Q    When you say positive reinforcement -- did he have a problem with self-esteem?

3818

A    He had low self-esteem.
Q    How would the low self-esteem manifest itself?
A    He would become very impulsive.  He doesn't think before he actually reacts to certain things. And he had to be taught how to use strategies, how to respect your peers, you know, how to interact, how to respect authority.  Those particular things.
Q    Did you get the impression from the time you were with James that he was lazy, or was he really sick?
A    James needed to be motivated.  With the low self-esteem, and what happens when self-esteem is very low, it takes a lot to motivate the kid.  So we were trying to get him to a level where he could have some self-confidence in this himself.  We gave him a tremendous amount of support.
Q    Adams Corner no longer exists?
A    No.
Q    One of those that got cut.  Thank you.  Pass the witness.
        MR. PARCELL:  No questions by the government, Judge.
        THE COURT:  All right.  You may stand down.
    (Witness stood aside.)

3819

        MR. BAUGH:  Dr. Anthony Simone.
            DR ANTHONY SIMONE,
called as a witness by and on behalf of defendant Roane, having been first duly sworn by the Clerk, was examined and testified as follows:
            DIRECT EXAMINATION
BY MR. BAUGH:
Q    What is your name, please?
A    Had you witness Anthony Semone.
Q    Would you spell your last name for us?
A    S-E-M-O-N-E.
Q    And what do you do for a living?
A    I am in private practice in both York, Pennsylvania and Philadelphia, Pennsylvania as a clinical psychologist and a clinical neuropsychologist.
Q    Before I get into your qualifications, there has been a lot of talk during this trial about a Reitan, R-E-I-T-A-N test.
A    Correction, it is actually the Halstead-Reitan and that's spelled H-A-L-S-T-E-A-D, R-E-I-T-A-N.  It is named after the people who invented it.
Q    The last name, Reitan, do you know that name?
A    Yes.
Q    How do you know it?

3820

A    I am a student of his.  He taught me.
Q    And their test is considered to be the definitive test?
A    The Halstead-Reitan Battery is the most widely used test of neuropsychological ability, structure, in the world.
Q    You have testified in other criminal cases?
A    Yes, sir, I have.
         MR. VICK:  We stipulate his expertise.
BY MR. BAUGH:
Q    You have testified about ten times?
A    That's my recollection, about ten or eleven times.
Q    In most of those you testified in Florida; am I correct?
A    Actually not.  Early on, my testimony was principally in Florida, and subsequently also in Pennsylvania.
Q    In Florida, did you testify for the defense or for the prosecution, or were you called by the Court?
A    All of those are true.
Q    All right.  Approximately what split would you have between defense and prosecution?
A    I expect between defense and prosecution, three

3821

to one.
Q    Three defense cases  --
A    Three defense cases for each prosecution case.
Q    Now, what are your educational qualifications?
A    I have a Bachelor's degree from the University of Florida in Gainesville, Florida, Master's degree in rehabilitation counseling, also from the University of Florida in Gainesville.  I have a Master of Arts in psychology from Kent State University in Kent, Ohio.  And I have a Doctor of Philosophy in clinical psychology, also from Kent State University, and that was in 1968.
Q    All right.  How long have you been doing this, by the way?
A    As a clinical psychologist, I've been practicing now for 25 years.
Q    Concerning James Roane, what were you asked to do concerning James Roane?
A    Concerning James Roane, I was asked specifically to evaluate the neuropsychological condition of his brain.
Q    What is the neuropsychological condition of his brain?
A    We can understand what the basic make-up of the brain is, how well it is working, how well it is put

3822

together at many different levels, by examining the

behavior which is connected to each of those particular levels. And so if we find very good scores at certain levels of the way in which the brain supports behavior or determines behavior, then we know that that level of brain behavior is intact. And if we find certain patterns of scores which reflect poor behaviors, then we can infer or conclude that the brain system which is in charge of that particular set of behaviors is in bad shape.

Q    In order to do that, you gave this test, Halstead-Reitan test?

A    Yes, sir. I did.

Q    What is that?

A    The Halstead-Reitan neuropsychological test battery is composed of 42 separate tests. And it is organized in a way so that it reflects a model of the way the brain operates. Four levels of brain behavior relationships are able to be assessed by the use of the Halstead-Reitan neuropsychological test battery.

Q    How long does it take you to give this test?

A    Well, the time varies depending upon the severity of impairment, ranging anywhere from three-and-a-half hours for a person who is perfectly

3823

normal across the board, and in some cases, with people who have suffered very major damage, for example, in cases of aneurysms -- that's like a little balloon in one of the cerebral arteries, where that blows out -- then there is very severe impairment associated with that usually, and as a consequence to that, it takes significantly longer; in fact, up to sometimes seven or eight hours to administer.

Q    All right. You administered that test to James Roane?

A    Yes, sir, I did.

Q    Do you recognize James Roane in the courtroom?

A    Yes, sir, I sure do.

Q    Where were you when you gave him the test?

A    I think it is right through those doors. I know it is somewhere here in the courthouse in a holding cell, which the Marshals were so kind to help me get hold of. It was air-conditioned. It was sound attenuated. It was a really good room. I think it was next to Judge Williams' chambers. That's the best I can recollect.

Q    What were the results that you got with James and how were they evaluated? First, who evaluated the results besides you?

3824

A    Drs. Reitan and Wilson.

Q    All right. What were the results?

A    I'd like to characterize those results, if I

might, in terms of the answer to some very basic questions. The first question which needs to be addressed when the battery is administered is a very simple yes or no question. Is the brain impaired or is it not? And in order to make that judgment or come to that answer, what I do is I calculate the scores across all of the 42 separate tests and I come up with a summary score.

Q    The summary score would be the condition of his entire brain?

A    That's absolutely true. Across Level 1 -- and I think it would be useful if I may explain this -- Level 1 is the most basic level of brain behavior relationships. It is that part of the brain system where just basic sensory stimulation gets in. So when a light goes on, that goes to a very direct route right to the back of the brain. And so when I do that, that goes right into very basic parts of areas over here on this side, these two sides of the brain. And when I touch fingers like so or touch hands, then that similarly follows a route into the brain.

Q    That would be the lowest level?

A    Yes, sir. But even though it is lowest, it is critical, because one of the important pieces of information I need to have is, is whatever is going on outside the person getting to where it is supposed to go in the brain without any bridges being broken in the meantime? Does it get to where it is supposed to go? So that's Level 1. That level for James is perfectly normal. It gets right to where it is supposed to go, just how it is supposed to go, in terms of basic incoming stimuli: visual, auditory, and tactile.

The second level of brain behavior relationships has got to do with the specialized activity of the two sides of the brain. The left side of the brain by and large, not entirely in all folks, but for the most part, it is principally responsible for language, language processing. The right side of the brain is principally responsible for getting the lay of the land, so to speak, nonverbal ability. Folks who are pilots -- for example, my oldest son and I are both pilots -- good sides of the brain over here. Architects, exceptionally good right hemispheres.

The third level of central processing is probably the single most important part of the central processing -- of brain behavior relationships, excuse me -- because it is the overall system of the brain. It is where all of the integration and the complex memories and the frames

of reference for evaluating information, both external to the person as well as internal to the person, for evaluating what I might say to James for him to figure out the meaning and understanding of what it is that I am saying to him, as well as for him to be able to understand himself.  So the third level of central processing is the overall integrity of the brain.  It is what unites the whole thing, if you will.

And the fourth level of brain behavior relationships is motor output, or what we do with all of that stuff.  Now, as I mentioned early on, I know the information is getting to where it is supposed to go.  When it gets to the left side of the brain versus right side of the brain, it is pretty much within normal limits.  There seems to be a little bit more difficulty with the left side of the brain than the right side of the brain, but, you know, that's true for a lot of folks.  That's just true for a lot of people.

3827

When you get to the third level, that part of the brain which organizes all the information that comes in and tries to make sense out of it, that's the most seriously-impaired part of his brain.

Q    Now, am I correct when I say that the third level, that that's where you learn, like memories get stuck so you don't do things wrong again?

A    Complex memories get stuck there, long term memories get stuck there.  And the brain as a whole, ladies and gentlemen, is responsible for storing memory.  You can go in with electrodes at certain levels and you can probe it and you can get memories from the campus, which is a deep internal structure, and from some other parts of the brain.  But it oversimplifies the complexity of the brain to just localize it in those areas.  So that a more conservative approach is the one I was taught by Dr. Reitan to take, and that is to say that the overall brain is involved in memory.

Q    Your assessment of James, please, neuropsychological?

A    In terms of Levels 1, 2, 3, and 4, overall, in the primary summary statistics, which is called the general-neuropsychological deficit scale score, his score falls at 39.  Now, just so you all know, the

3828

lower the score you get, the better off you are.  So a score of zero would be absolutely perfect.  I have never evaluated anyone who has ever got a zero.

Q    What's a 40?

A    A 40 is the break-off-off point between overall mild versus moderate impairment.  25, 26 is the cut-off between normal and mild impairment.  And so

that you all can evaluate this, in the original group of 169 brain-damaged people to which this battery was administered, and to the 41 control people, the normal-brain people to which this was administered, if you chose a cut-off score of about 34 to 35, then you minimized or you reduced the likelihood of calling somebody brain-impaired who was not, and also calling them not impaired if they were.  With a score of 39, there were no normal control people in the original validation sample who had a score of higher than 35.  So 39 is a clear indication of mild impairment viewed overall.

Q    Mild impairment.  But what about the amount of impairment on a given level?

A    At Level 1, it was normal.  Level 2, it was within normal limits-minus.  But at Level 3 where the complexity of the information goes up, that was much more seriously impaired.  In fact, when you looked at

3829

the major set of tests which comprise the evaluation of that particular level, the brain behavior relationships, seven of those tests have validated sensitivity to the organic condition of the brain. What that means, basically, is that those tests are the best evidence for neurological impairment in the absence of any other evidence.

Q    Is that his brain?

A    His brain is impaired at that level far more so than at any other level.  The single most important impairment which James has is at the, technically speaking, in the diffuse heteromodal association areas.  Simply put, that means that the overall capacity of the brain to organize information as it comes in, to make rapid decisions, to be able to transfer what you learn in one situation into another situation which may be different from it, from the original learning situation, and then use it, James has a whale of a hard time.  He can learn real basic stuff at that level of central processing.  But when you increase the difficulty of it and when you ask him to give up a prior learned history in order to be able to learn how to do this new task, the prior history just jumps right in and takes over.

Q    Does it also limit the amount of focus he can

3830

put on a given issue?

A    Well, there is no question but that they are not so much focused, Attorney Baugh, as it is his ability to use that information in a constructive way to modify his behavior to fit with situations in which he doesn't find himself yet.

Q    There was a phrase used during dinner a couple of weeks ago, you, me, some other people, my associate, "bad central processor" was in that last

conversation.  Is that James' problem?

A    That certainly is one of James' problems.  What that means very basically is that he takes his signals, in order to be able to use that part of his brain, he takes his signals from the context or the situation in which he finds himself.  That's where he gets his information.  You give him the signals in those particular situations, and he will organize them in such a way so that his behavior will make some sense.  It will have some realistic fit into the situation in which he finds himself.

Q    He doesn't think way down the road, either

A    James does not think way down the road.  In fact, that's one of the major limitations imposed on people by that level of impairment at third level of central processing.

3831

Q    Now --

A    He has a real bad chip in his, as Dr. Lordi mentioned earlier on today, there is clear evidence to support that he has a bad central processor.

MR. BAUGH:  May I have a moment with counsel, please?

(Counsel conferring with co-counsel.)

BY MR. BAUGH:

Q    As part of our request, did we send you a whole bunch of paper?

A    Yes, sir.  Probably about 25 pounds.

Q    All right.  And a lot of them, you told me, you didn't even really want?

A    Yes, sir.  A lot of them I really didn't want. And it is important for me to say why.  Ladies and gentlemen, this battery was designed and validated originally not to be at all dependent upon my impressions of James.  This battery was designed to evaluate the organic condition of his brain based upon objective data only.  So the fact that all of these records came in, they came in, but they were not central to what I was doing.

Q    However, among those records that you eventually had a chance to go over  --  strike that.  You are a psychologist, a neuropsychologist, and you deal with

3832

the structure, the make-up, the meat of the brain, right?

A    I deal with the structure of the behavior in relationship to the structure of the brain, yes.

Q    A psychiatrist is different?

A    Yes, sir.

Q    All right.  Now, and part of your job is to determine if there is structural damage?

A    One of the major parts of what I do is to answer simple questions sent to me by family practice physicians, pediatricians, neurologists, pediatric

neurodevelopmental neurologists, et cetera, as to whether or not this person has a damaged brain.

Q   Does he have a damaged brain?

A   Yes, sir, he does.

Q   Did we also tender you some 20-year-old reports from Dr. William Lordi?

A   Yes, sir.

Q   Had you met Dr. Lordi before yesterday?

A   No, sir, I had not.

Q   Did you also look at reports from 1976 and 1980, James was 11, I believe, and 16?

A   Yes.

Q   Did you review those as well?

A   Yes, sir.

3833

Q   In those reports, if I might, in the first one when James is six years three months, based on what Dr. Lordi put in his report, even though it was 20 years ago, was he right?

A   He was absolutely correct.

Q   All right.  Concerning the other reports that were done by Dr. Lordi -- and you have had a chance to evaluate them -- was he right?

A   Yes, he was.

Q   Was James getting worse?

A   James was getting worse.

Q   Given the  --

A   Let me fill that out, if I may, please.  His neuropsychological condition was not deteriorating. He does not have a progressive deteriorating neurological disease.

Q   You are saying that brain cells aren't getting wiped out and going away.

A   No.  His pattern of performance is entirely consistent with those events which cause an abnormal flow of oxygen and blood to the brain.  And you get that in toxemia.  You get that in what's called anoxia at birth, for example, if the umbilical cord is wrapped around the baby's neck as it is born. Then you will see a similar kind of pattern to that.

3834

Q   The impairment that James Roane suffers, the damage to his brain --

A   That's only one of them.

Q   That's one of them.  Did he do it?

A   No, sir, he did not do it.

Q   Is he responsible for it?

A   No.  He is not responsible for it.

Q   Given the damage or damages that James Roane has in the fabric, the tissue in his head, what did he need as a child to overcome it?

A   Well, you will recall that Dr. Lordi testified to ADD, Attention Deficit Disorder.

Q   Is he ADD?

A    Oh, very clearly.  The evidence from the Halstead-Reitan Battery is entirely consistent with, and in fact, diagnostic of ADD.  Every time I see this particular sub-pattern on the Halstead-Reitan, I can diagnose Attention Deficit Disorder.

Q    What did he need?

A    Well, he got in part what he needed to have.  And what he needed depended upon how early on you took him.  Very early on, he needed significantly less than much later on.  Early on, had he been able to have a better family system, a more structured family system which held him accountable, had he had viable role models very early on, that would have helped.  Had he had a clear educational program to work with his learning disabilities, his learning disability is secondary to his brain impairments.  That would have been, in my view, what he needed to have very early on.

Q    You talk about positive role models.  Why is a positive role model so important for a young man who is in James' situation when he was six?

A    To raise up the child in the path he should go.

Q    Can you actually, with a child like this, actually get in there and mold or tend to compensate for deficiencies?

A    In point of fact, you can.  The brain even at four-and-a-half or five is still pliable.  It is not finished in its development.

Q    What if you only have negative male role models?

A    If that's what you have got, that's what you will wind up with.  You wind up with an imprint, if you will, of those environmental sources of value, in quotes.

Q    When does the brain stop becoming as pliable as you were talking about?

A    Well, the generally-held rule is around 14, 15, 16.

Q    Now, what else did he need to get that he didn't get?  Or what else did he need?  Tell me about what he didn't get later.

A    Later on as he went along, and as his behavior began to deteriorate, in response to the increasing pressures and demands of his daily living, what clearly became necessary, because his behavior was becoming much more provocative and much more socially unacceptable  --

Q    By the way, is that predictable that you will get like that without treatment?

A    Absolutely predictable.  That then set the stage for his needing to have continued residential placement, within the context of which the

specialized educational procedures would have been put in place.  The availability of appropriate role models which would have held him accountable for his behavior, particularly when it didn't transfer.  You will recall, as I said earlier on, that third level of central processing helps you bridge the gap between different situations.  And if that particular brain system is injured, then your ability to be able to go from here to over here is not going to be as good as it otherwise would.  So you expect then just

3837

exactly what was reported; that when he would move into new situations, there would be a period of time during which he would be provocative, aggressive, hostile, and so forth.

Q    Were these effects in James' personality or his personality structure, were these effects a combination of a number of things?

A    There is no question that the brain is the primary organ of human behavior, adaptive human behavior.  There isn't anything we do but what the brain isn't involved.  So my sense is that he clearly, given that level of central processing deficit, would have difficulty in multiple contexts, or in a lot of different situations.

Q    With his ailment, lack of appropriate treatment, that makes it worse?

A    Well, his personality structure would wind up after awhile beginning to show the combined effects of the deprivation, of the trauma, of the psychic numbing attributable to the violence which occurred within the context of the community in which he lived.  In addition to the physical abuse, sexual abuse, all of those factors, particularly the negative role models, I mean, that's where he got the patterns from for how to behave.  So it would have

3838

clear personality correlation to it.

Q    Based upon our conversations, you have been working with children lately who are in even worse shape than James was when he was six; am I correct?

A    I'm working with both children and adults lately, but certainly with children or adolescents who are in as bad if not worse shape than James is, yes.

Q    Are you able to fix any of them?

A    Data is coming in, and so far in one of the programs it is very positive.  In another of the programs, it is also very positive, and for the older persons, I was last September in a conference in Cherry Hill, New Jersey where I was a co-presenter with Drs. Reitan and Olson and Dr. George Nieman, CEO of Bancroft, Inc., where we have begun to develop an experimental procedure using a specific retraining

program which Dr. Reitan and Wilson have also invented, which was designed initially to work specifically with neurologically-based learning disabilities.  And we are quite surprised in this experimental phase by the fact that we are seeing positive changes in people whose brain conditions are much more serious than James', and have existed for significantly longer periods of time.  But I want to

3839

add very quickly that this is very experimental.  We do not have a lot of -- we don't have the big subject pool yet, so it is only in the early stages.

Q    But am I safe in stating that the procedures and technologies available today to address James' problem are better than they were 20 years ago?

A    Yes, sir, they are.  Much better.

Q    How good are they going to be 20 years from now?

A    We can only project.  Right now one of the things we are doing with really violent youngsters is to do what are called wrap-around services in the community, where in one family where the youngster is very, very severely brain injured and where he had already at the age of, I guess, it was eight been hospitalized for two-and-a-half years in a state hospital, not an awful lot happened there except he learned how to fight even better and he wound up on medications, which essentially zonked him out.  Right now what's happening is that the violent episodes in his home directed toward his mother are reducing significantly because what the program is, it is called the Life Program of the Child Psychiatry Center in Philadelphia, Pennsylvania, because what it is doing is it is providing mom with life skills

3840

training.  It is providing mom with parent training.  It is providing mom with a full-fledged behavioral consultant.  It is providing 24-hour-a-day, seven-day-a week in-home behavioral technicians.  It is providing the youngster with a dedicated residential  --  correction, a dedicated classroom experience in a program at what's called Wordsworth Academy for neurologically-impaired youngsters.  I used to be called two or three times a week by a mother saying, "There has been another outburst and it is real violent."  Now I'm called by mother about once a month.  And that's only been since September. That's pretty major change.

Q    In one of Dr. Lordi's reports, the 1976 report, he states, "At this time the problem is getting worse."  Here it is.  "This boy still remains treatable and is still educable.  Time is passing. He is getting more sick, he is getting more entrenched, more fixated in an increasingly

characterologically-damaged fashion."
Q    Do you agree with Dr. Lordi that even though his degree of brain damage wasn't getting any worse, his personality was?
A    Yes, I do.
Q    Was this personality becoming part of what was

3841

naturally James Roane?
A    Well, I don't know what you mean by "naturally."
Q    Was it becoming a part of him?
A    Yes.  It was becoming an integral part of him. It was becoming who he was.
Q    Would it be characterized by paranoia?
A    Yes, sir.
Q    Mistrust?
A    Suspicion, yes.  Distance from people.  The inability to form any close relationships except on the basis of immediate reward and survival.
Q    Would one of those symptoms such as paranoia be that something you said to me, if said to James Roane, he might view it more suspiciously?
A    Oh, it is even more than that.  It is something that I might say to you, he would think I was saying about him, even though I wasn't.
Q    Is that a natural consequence of this type of disorder lasting for this long?
A    It is a natural result.  It is what you predict.  It is what you in fact, as I indicated in my report, was entirely predictable on the basis of the data I had, that he would wind up this way. That's how he learned to be.

3842

Q    Two very big questions.  Would you say that over the last five years, or maybe even 20 years, that James Roane's ability to conform his conduct to the requirements of the law was significantly impaired?
A    Well, that's almost an ultimate decision, sir. I can tell you that this is a young man who had the -- the easiest thing he could do would be to conform his behavior in the context in which he found himself.  It is not possible for me to make that decision.  That's a jury decision.
Q    Now, was his ability to do what you and I would expect, was it impaired?
A    His ability to -- his ability to change his behavior so it would become more socially productive was impaired by the many different layers of difficulty he was wrestling with, ranging from the organic condition of his brain on through to the system in which he grew up.
Q    Likewise, would you say that for the last 10 or 15 years, he has been emotionally disturbed?
A    I don't have any question about that at all.

Q    Would this emotional disturbance turn off and on, or would it be something that was there all the time?
A    It would depend upon the circumstances in which

3843

he found himself.  Whether it was on or whether it was off.  One could anticipate that there would be periods of time where his behavior, from all outward purposes, perspectives, would seem to be fine.  There would be periods of time when that would be absolutely not the case.
Q    Lastly, sir, given Mr. Roane's neurological deficit as diagnosed by Dr. Lordi when he was six and confirmed by you last month, his environment, the stimuli he got as a youth, the lack of medication or sustained extensive treatment  --  wait a minute, back up.  By treatment, I also mean a period of time; not just intensity, but a period of time, several years' worth of treatment.
A    Yes, sir.
Q    Based upon all those things, is it likely or was it likely that James Roane would end up in trouble with the law?
A    Yes, it was highly probable.  In fact, it was entirely predictable, and indeed it was predicted by Dr. Lordi very early on.
Q    Is it attributable to any moral weakness on his part or the part of his family?
A    No, sir.
Q    Was it volitional?

3844

A    No, sir.
         MR. BAUGH:  Thank you.  Pass the witness.
                    CROSS-EXAMINATION
BY MR. VICK:
Q    How are you doing?
A    Doing reasonably well, sir, wrestling with a cold and antihistamines, all that kind of stuff.
Q    Dr. Semone, in preparation for your testimony here today, you were provided by Mr. Baugh extensive background records concerning James Roane, correct?
A    That's correct.
Q    Including his legal history, records concerning his legal history?
A    Well, I got most of the legal records.  There was so much, it was unclear to me whether I got all of them or whether I didn't.  But I'm satisfied that what I got was a fair representation of what was going on with him.
Q    Including his juvenile records?
A    That's the part I'm not sure about.  I think that there were a couple of pieces of material which reflected his juvenile record.  But frankly, sir, I don't remember.

Q    I'm going to show you a piece of paper and ask you if you have seen this particular piece of paper.

3845

(Document proffered to witness.)

A    No, sir.  Well, I have seen  --  I have not seen this piece of paper.  I have seen some of the -- I have seen some records which reflect some of the charges which are on this piece of paper, sir.

Q    Which ones?

A    The concealed weapon charge, shoplifting charge, breaking and entering charges.  I don't know what GL stands for.

Q    Grand larceny?

A    That was a car theft?

Q    Yes.

A    Yes, sir, I think I remember seeing something about that.

Q    Sodomy charges?

A    No, sir, I did not.

Q    All right.  You also received, did you not, a number of records concerning his institutional adjustment, his behavior in jail?

A    Yes, sir.

Q    You reviewed those?

A    Could you clarify that?

Q    In your report, it says that finally the Sheriff of the Richmond City Jail  --

A    Oh, yes.  Those were informal conversations I

3846

had with the Sheriff when I was over there.  I got no written reports from either the Marshals or the jail.

Q    But is his jail behavior something that would be of importance to you in drawing your conclusions?

MR. BAUGH:  Objection.  This is clearly outside the scope of direct.

THE COURT:  No, no, it is not outside the scope.  Go ahead.

BY MR. VICK:

Q    Is his jail behavior something that would be  --

A    It was absolutely important to me.  I wanted to find out first and foremost how well he would tolerate a period of time that would be required for him to be available to me, and the best way I figured I could get that information was by talking with the folks who were closest to him in that particular context.  They happened to be the guards.

Q    His behavior in jail is important to the assessment?

MR. BAUGH:  Objection.  He said the reason he wanted to talk was to find out how well he could administer the tests.

THE COURT:  He has indicated he didn't get

3847

any reports.  He talked to the Sheriff, he told you what it meant to him.

BY MR. VICK:

Q    You have testified here that James Roane is brain impaired.

A    Yes, sir.

Q    In essence, he is learning-disabled?

A    No, sir, not in essence.  In essence, he has serious neurological damage to the heteromodal association systems of the brain.

Q    That has resulted in his being learning disabled?

A    As a by-product of that, yes, sir.

Q    He has a fairly high IQ, doesn't he?

A    For all intents and purposes, it is in the low-average range.

Q    At one point it was 103, which was fairly high?

A    Plus or minus 15 points, so I'm okay with that. I would say he was basically in average to low average range of intelligence.

Q    Which means that he basically is a man of average intelligence as he sits here today.

MR. BAUGH:  Objection.  The last IQ of 103 was at age six.

MR. VICK:  Today.

3848

THE COURT:  He can answer.

THE WITNESS:  Repeat the question.

BY MR. VICK:

Q    As of today, he is a man of average intelligence?

A    As he sits today, he is a person of low average intelligence.

Q    He knows the difference between right and wrong?

A    Absolutely.

Q    He is able to premeditate his actions, able, for example --

A    You don't have to give me examples.  Yes, sir.

Q    He knows what he is doing when he does something?

A    Yes, sir, he does.

Q    He is not, however, able to change his behavioral pattern, is he?

A    By himself, he is not able to change his behavioral pattern.  Not without significant support.  The other thing I would need to add by way of clarification, if I may, Your Honor, it is real important for you all to understand, ladies and gentlemen, as you evaluate neuropsychological data and intelligence testing data, that there is no

3849

necessary relationship between high intelligence and

neuropsychological condition.  I have evaluated any numbers of people whose IQ's have been in superior range, and their brains have been so injured they couldn't use it.  So the key issue is, does the neuropsychological integrity of the brain set a limit on the extent to which the innate intelligence a person has can be used.  The answer is yes.

Q    Now, you have stated that his behavior, his violent behavior, was predictable.

A    Yes, sir.

Q    It is not inevitable, is it?

A    No, sir.

Q    He made the choices to do what he did.

A    Within the contexts, yes, sir.

Q    Not every person in his situation commits the crimes he has committed.

A    Absolutely not.  The brain injury, as I noted in my report, is not a sufficient condition by itself.  There is a lot of folks out there who have brains just like James'.  So it is not, standing by itself, a sufficient condition to explain the behaviors in the crimes of which he stands convicted.

Q    How many others do you know of who have committed four murders?

3850

A    How many others do I know?

Q    Right.

A    Know in what way?

Q    Have treated, or know of in the treatment, who have committed four murders.

A    I have not treated anyone who has been convicted of murders.  I have evaluated people who have been murderers.

Q    What efforts, based upon your review of his records, has James Roane -- you know he has been incarcerated since February of 1992?

A    Yes, sir.

Q    What efforts has he undertaken in that year to change his behavior in any way?

A    The only thing I'm aware of, clearly, is that in the Richmond City Jail he is involved in providing assistance to some of the other inmates in terms of drug and alcohol counseling.  He talks about being involved with Narcotics Anonymous, and that one of the ways in which one seeks to get help, a person who is a substance abuser, is to talk to other folks about, "Yo, you better watch what you are doing, because this is what it is going to lead to."

Q    That's not treatment of the underlying problem that you have testified to here today, though, is

3851

it?

A    No, sir.  I'm not sure that those services are available in the jail.

MR. VICK:  No further questions.

THE COURT:  All right.

REDIRECT EXAMINATION

BY MR. BAUGH:

Q    Is there a greater likelihood than not that everyone who suffers from the same conditions as James Roane, that was raised in the same environment, had the same stimuli and same role models, is there a greater likelihood that he would either be murdered or violate the law?

A    Make book on it.

THE COURT:  You may stand down.

(Witness stood aside.)

MR. BAUGH:  On behalf of the defendant Roane, Your Honor, the defense would rest.

MR. BAUGH:  Your Honor, we were going to reurge our issue concerning the stipulation.

THE COURT:  Come up if you want.

(At Bench.)

MR. VICK:  We have done it once.  We don't need to do it in front of the jury again.  Mr. Baugh speaks in such a manner it can be heard.  We have been around this two times.

MR. BAUGH:  Under Rule 201(d), we got a chance to look at a book last night.  We would submit that judicial notice in this instance would be mandatory because there are no facts or issues in controversy.

THE COURT:  What you want me to do is simply restate the evidence.  He was charged with a murder in the indictment, pled guilty.  That's what we are talking about.

MR. BAUGH:  And that mitigation exists.

THE COURT:  No.  I will not do it.  If there is aggravation in the record, they will have a chance to find it.

(In Open Court.)

All right, I'll let you go home now.  We will meet tomorrow morning at 10 o'clock.  I think we will finish with what we have to do this afternoon, hopefully, but if not, we will get started earlier in the morning.  But at 10 o'clock you all come in. What we have left is, we are going to have an instructions conference this afternoon and try to work out what the instructions will be.  Then argument from the parties, and then I will instruct you and you will start your deliberations.

MR. WHITE:  Excuse me, Your Honor, may Mr. Vick and I approach?

(At Bench.)

MR. WHITE:  If the Court please, I don't know if the jurors are taking home the materials

introduced through co-defendants Johnson and Roane. While we had introduced ours, the copies have not been published to the jury. If they are taking them home with them or keeping them, we would like to have them published to the jury at this time.

THE COURT: No, they are not taking them home.

MR. COOLEY: Judge, we handed out the information yesterday. I think the jury took them with them out of the courtroom.

THE COURT: They don't take them home. They go into the jury room like any other exhibit book. They can --

MR. COOLEY: But the individual ones they had left the courtroom yesterday, and I don't know what happened to them. If they took them home, we would like for them to bring them back if they are going to be sequestered. Would you inquire if they have taken them home?

THE COURT: All right.

3854

(In Open Court.)

I'm sure no one has done this, but, no one has taken any, for instance, the book they gave you to look through on yesterday, you didn't take that home, did you? You left it here, didn't you?

A JUROR: I took mine home last night and read it.

THE COURT: It is here today?

THE JUROR: Yes.

THE COURT: Just make sure it is left in the jury room. Don't take anything.

All right. Do not discuss the matter with anybody, and continue to avoid any television or radio coverage of this case. And we will see you in the morning at 10 o'clock.

There is some concern about parking tomorrow. We have been through this a couple times. I want to be sure what we are doing.

(Marshal conferring with Court.)

All right, I think this is what we are going to do with the cars. You can come down tomorrow and park as you normally would, in a lot, and when the day is over, the completion of your deliberating tomorrow, probably be 5:30 or 6, somewhere in that range, we will then have all of you bring your cars

3855

up here and we will park them in the garage for you and keep them secure until you are released.

All right. Tomorrow at 10 o'clock.

(The jury left the courtroom.)

All right, remove the defendants, please.

(The defendants were removed from the courtroom.)

All right, counsel, if you would, come by my office in about 15 minutes and pick up a copy of the instructions that I have put together, and then you all --

THE CLERK:  They are up here, Your Honor.

THE COURT:  We have them here.  In that case, pick up your copy, come by my office in about 35 minutes, let's say, and we will get  --  that will give you time to look over them.  I suspect we will have to make some changes.  You have to nail down your mitigation factors for me to put in.  So 35 minutes, my chambers.

(Recess taken from 2:55 p.m. to 3:45 p.m.)

(In Chambers.)

THE COURT:  All right.

MR. VICK:  Do you want to hear from us first, Judge?

THE COURT:  Everybody go ahead and say what you have to say.

MR. VICK:  The primary objection we have runs throughout a number of the instructions.  In the statute, 21 U.S.C. 848(k) dealing with the jury verdict, the law is clear.  It says if an aggravating factor, blah, blah, blah, and one or more of the other aggravating factors are found to exist, the jury shall then consider whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist, or in the absence of mitigating factors, whether the aggravating factors themselves are sufficient to justify a sentence of death.  It is clear from the other provisions of the law that in proving the aggravating factors, the burden is upon the government to prove those aggravating factors beyond a reasonable doubt.  And the burden is on the defendants to prove mitigating factors by a preponderance of the evidence.  But once the aggravating factors have been proven beyond a reasonable doubt, when you get to the actual jury deliberation in rendering a verdict, the law is clear that it is a weighing of aggravating versus mitigating.

Throughout the instructions it says, for example in Instruction Number 5 is the first place:  "In this phase, I instruct you that unanimity beyond a reasonable doubt is required for you to sentence the defendant to death."  And that's not entirely a correct statement of the law.  If you look back at the later instructions where you talk about weighing, under the government's understanding of the law, those are the proper instructions as to what must be done.  We have the burden to prove the mitigating

factors beyond a reasonable doubt.  But once proven, the weighing is not beyond a reasonable doubt. That's just weighing aggravating versus mitigating to come up with whatever they want.

THE COURT:  Your objection is noted.  As far as I'm concerned, my instructions are clear on the point.  What do you have to say?

MR. WHITE:  I have one just after that I would like to have with regard to a mitigator.  I'm sorry to give this to you at the last minute.  If I could read it into the record, it is a proposed mitigating instruction.  "If you find by a preponderance of the evidence that Douglas Talley, Douglas Moody, Louis Johnson, Peyton Maurice Johnson, Dorothy Mae Armstrong, Linwood Chiles, Curt Thorne, knowingly and voluntarily involved themselves in the sale and distribution of crack cocaine, you shall consider that involvement in criminal conduct as a mitigating factor of any defendant."

MR. VICK:  It is already in there.

THE COURT:  I've given as much as I'm going to give.

MR. VICK:  The only other thing we would note, in Instruction 25, it says, "The government called as one of its witnesses an alleged accomplice with whom the government has entered into a plea agreement providing for the dismissal of some charges."  We have not done any of that.  Both Gaiters and Hardy pled to every charge in the indictment.

MR. COOLEY:  Which instruction?

THE COURT:  25.

MR. VICK:  Clearly, we have done the 5K.

THE COURT:  Right.  I'll make a comment. Okay.

MR. HENDERSON:  With respect to instruction Number 16 --

MR. COOLEY:  Actually, wouldn't Mr. Hardy -- there was a count dismissed against him.

MR. BAUGH:  Yes, there was.

MR. COOLEY:  Yes, there was.

MR. WHITE:  The last drug count.

MR. COOLEY:  Possession with intent to distribute was dismissed.

MR. VICK:  You are right, we did that in the courtroom.  I take it back.  We did it in the courtroom because he couldn't get through the Rule 11 on that one.

THE COURT:  All right.  Back in.

THE COURT:  You said 16?

MR. HENDERSON:  With respect to 16, the paragraph that begins "Second, the defendant Roane,"

we would suggest and request that added into that sentence, "Second, the defendant Roane was subjected to emotional, physical, and sexual abuse and neglect as a child."  We think there was evidence of sexual abuse presented, and we ask that that be included.

THE COURT:  All right.

MR. HENDERSON:  Additionally, with respect to the fifth instruction, we don't think that there was any evidence of it.

THE COURT:  I know.  This is just reduced from what you all gave me originally.

MR. BAUGH:  Coming attractions.

THE COURT:  Number 5 comes out.

MR. HENDERSON:  And in the paragraph that begins six, which I guess is now fifth, we would request that the word "invariably" be removed, "that defendant Roane has invariably responded well to structured environments."  First, I just think from defendant Roane's standpoint, it is unnecessary.

MR. VICK:  We object to that.  They didn't let us get into the prison records.  Clearly flies in the face of this.  In light of their objection to us getting into that, we object to this language "and would make a reasonable adaption to prison if he were sentenced to life in prison."

THE COURT:  I will take out the word "invariably."  I have heard Mr. Vick's objection to "would likely make a reasonable adaptation" and that objection will be overruled.

MR. HENDERSON:  And further, Your Honor, with respect to the same instruction, we would request further language that the defendant James Roane, Jr. has developed a paranoid mental disorder.

(Document proffered to Court.)

(Court perusing document.)

MR. BAUGH:  If you can read it.

THE COURT:  I can read the first part.  I can't read the second part.

MR. BAUGH:  "The defendant James H. Roane, Jr. has developed a paranoid mental disorder as a result of his untreated neurological impairment and of the abuse, violence, poverty, neglect, and shame which characterized his childhood and adolescent life experience."

THE COURT:  He has already got that one.

(Court perusing document.)

I would stop -- "untreated neurological impairment" and then stop there.  You have this poverty, neglect, all of that in there.  I will give it and stop at "impairment."

MR. BAUGH:  That's fine.

MR. COOLEY:  We have a redrafted mitigating

factors on its way down here.

THE COURT: Some of yours wasn't really applicable.

MR. COOLEY: Apparently when this was printed, I didn't delete some things that should have been.

THE COURT: Anything else?

MR. COOLEY: I would ask the Court to consider in the decision forms, those that have been proposed by defendant Johnson anyway, for a decision that to impose the death penalty, I would request that if the jury is to achieve that, that all the members of the jury sign to that. It seems that's precious little to request of folks who are achieving that ultimate penalty.

THE COURT: I don't think that's necessary. I tell them "unanimous" I don't know how many times. The foreman signs, he dates, and you all can have them polled.

MR. WHITE: A few. First of all, we would like to make sure the Court understands that as far as all instructions, we are submitting them based on UNITED STATES v. PITERA and we would ask that they be given as submitted, except of course the ones with regard to specific mitigating factors.

Secondly, Judge, on our Proposed Instruction Number 14 regarding mitigating circumstance, culpability, and multiple capital defendants, our very grave concern is that when it comes to equal culpability here in the joint penalty phase situation, the jury is sort of going to turn that around on us and use 848(m)(8) as the equivalent of an aggravating factor as opposed to a mitigating factor. I think Proposed Instruction Number 14 makes sure the jury understands that those issues relate only to issues of mitigation and cannot be considered in aggravation on the part of any particular defendant.

THE COURT: Obviously, I considered it and rejected it.

MR. BAUGH: We join in that one.

MR. WHITE: Also, with regard to the verdict form on the aggravators, defendant Tipton's position is there should only be return of one N1 factors. I think the intent of the statute is to differentiate between the kinds of conduct. If we are talking about directing the jury's consideration as to exactly what these people did and how they differentiate between murderers, especially in the joint penalty phase situation, that they ought to be directed to find one particular N1 factor, or in the alternative, to have the government elect as to which

N1 factor they want to use for each individual.

THE COURT:  That will be denied.

MR. BAUGH:  We join as well.  In fact, all of us do.

MR. WHITE:  Judge, I do have some modifications as far as the specific mitigating factors on defendant Tipton.  That particular one, I believe it is your Number 14.  On the second one, the defendant Tipton was subjected to emotional and physical abuse and/or neglect as a child.  First of all, I would ask that we strike the word "or" because I think it is clear that we presented evidence that he was neglected.

THE COURT:  All right.  I'll take that out.

MR. WHITE:  I would also ask that the phrase used in both co-defendants', Johnson and Roane, the following: "and was deprived of the parental guidance and protection that he needed."  That's clear from the social history as well as the family testimony we presented.  The second one, both Mr. Johnson and Mr. Roane, that they were  --  there was a deprivation of parental guidance and protection.

THE COURT:  I'll give that.

MR. WHITE:  Also, following that one, Judge, we would ask for a specific mitigator that defendant Tipton, not only as a young child but also as a young adult, was rejected by the Tipton family here in Richmond.  If the Court will recall, we presented evidence through Tina Wilkerson as well as Brenda Williams, our first and last witnesses, that the paternal matriarch, Ruby Tipton, had directed and criticized Mr. Tipton, warned other family members in the area not to associate with him, not accept him into the family.  It was present early on in his life and it was also present when he came back.

THE COURT:  I think that falls under Number 2, neglect as a child, deprived of parental guidance with the protection that he needed.  You can argue that, but I think that would fall under 2 as a mitigator.

MR. WHITE:  Next, Judge, in addition to or after your third, that defendant Tipton suffers from Attention Deficit/Hyperactivity Disorder, we would also ask for a separate one that Richard Tipton suffers from frontal lobe brain dysfunction which went undiagnosed and untreated as a child.  It is very specific in the neuropsychological report done by Dr. Evans that he differentiated between the two diagnoses.  They are not necessarily joined together.  They are not present in all people.  And

that there are ramifications of frontal lobe brain dysfunction which are independent of Attention Deficit and Hyperactivity Disorder, and I think they should be separated for the jury. And I think they should be able to consider both.

THE COURT: All right. I'll do that. Frontal lobe brain dysfunction?

MR. WHITE: Yes, sir. Now after your six,

3866

that defendant Tipton is impulsive and impaired, et cetera, we would ask you to give one that his impulsiveness and impaired thinking about the consequences of his actions and in adjusting to change in events was worsened by his heavy marijuana use. I think the use of marijuana throughout the trial, certainly by a number of government witnesses, was clearly established. When you consider the testimony of Dr. Bright, who indicated in very clear terms that the symptoms of Attention Deficit Disorder are worsened by continued substance abuse, I think it makes for a separate mitigating factor. We are dealing with a mitigating factor at one level which is complicated by something else which is independently proven by evidence during the course of the trial.

THE COURT: I think the 6 and 5 factors take care of that.

MR. WHITE: Last, Judge, referring to co-defendant Johnson's, as well as co-defendant Roane's "Defendant has responded well to structured environments and would likely make a reasonable adaptation to prison even if he were sentenced to life imprisonment," even though Tipton hasn't had structured environments from the intervention or

3867

treatment standpoint, I think based on the testimony of Dr. Evans as well as Dr. Bright, there is certainly evidence that based on his problems, that he would likely make a reasonable adaptation to prison if he were sentenced.

THE COURT: You don't have any evidence about the other two.

MR. WHITE: I think Dr. Bright testified that a structured environment always helps these kinds of people; and with the right kind of treatment, that they could make a good adaptation.

THE COURT: Well, the other two folk have information that specifically indicates that they have, on some occasions if not most, responded to a structured environment. Unfortunately, you don't have that.

MR. WHITE: That creates a whole different problem, especially in a joint penalty phase setting, not that it is necessarily an antagonistic offense,

but the absence of that kind of mitigating factor for defendant Tipton is suggestive to the jury that, you know, incarceration is not going to help him at all. And in a sense, it is sort of a reverse argument in terms of future dangerousness and it really concerns us.

3868

THE COURT:  No.

MR. VICK:  In each one of the verdict forms, I see that the defendants -- the Court has said that if the defendants, the respective defendants, are not sentenced to death, they will be sentenced to life without parole.  I don't see that as a mitigating factor.  That's law.  That's not mitigation meaning that the defendants have done something that should be considered for them positively.  Indeed, if Congress, knowing what the law is, wanted that to be a mitigating factor it could have said it.

THE COURT:  That's ridiculous, Toby.  We have got about 15 mitigating factors that Congress didn't put down.  So that argument is ridiculous on its face.

So that's a mitigating factor.  If I can tell them, as I'm going to, you consider anything else, any other factor as a mitigator that you come up with that you can't even articulate.  Obviously I think that's mitigating.  They can consider it.  Congress clearly -- I think they had a tremendous battle, probably Kennedy on one side.  Your beef is with him.  He stacked a deck against you.  I don't think there is any question about it.  The penalty phase,

3869

the deck is stacked against the government in terms of getting the death penalty.

MR. BAUGH:  But the statute did get through.

MR. GEARY:  You are going to make us feel awfully bad tomorrow.

THE COURT:  We could go either way.  But I'm saying in terms of how this thing has to be instructed, I think clearly the bent is for the defendants.  But that's all I have to work with.

MR. COOLEY:  Judge, here is the redrafted mitigating factors from us.

(Document proffered to Court.)

(Court perusing document.)

THE COURT:  I will probably rephrase this 22-years-old stuff.  He was youthful, but over 18.

On 12, you can  --  I'm taking the second sentence out.  You can argue it all you want.

I will not give 19.  That's argumentative.

All right.

MR. HENDERSON:  Judge, I have a few more.

In the Roane special findings forms, on page six we would request that the introductory paragraph, the introductory statement to the jurors on both that page and on page seven after paragraph ten, be removed.  The language is "Consideration of the following mitigating factors is specifically provided for by statute" on page six and the language on page seven is, "The following non-statutory mitigating factors have been submitted for your consideration by defendant Roane and his counsel."  The effect of those when read together put a stamp of approval on the first portion of those and tend to relegate the second section to  --

MR. WHITE:  There is an implied differentiation.

MR. BAUGH:  I'm giving you these, and the dummies are offering these.

THE COURT:  I think that's your twist on it.  I'll take out the "submitted by," but I'll put the following in:  "Mitigating factors are non-statutory."

MR. WHITE:  We would ask on behalf of Tipton, also.

MR. COOLEY:  Johnson, also.

MR. HENDERSON:  Additionally, on page eight, paragraph D, we would ask that that be removed as there was no real evidence of that.

MR. BAUGH:  Sort of dropped the ball on that one.

THE COURT:  The addicted to drugs stuff?

MR. HENDERSON:  While still a child.

MR. BAUGH:  There was evidence of that in that Mr. Brunson said he received information, and also  --

THE COURT:  There is no evidence about this drug-selling by the father stuff.

MR. BAUGH:  Oh, no.

THE COURT:  I don't think we have anything.

MR. BAUGH:  You are right.

MR. HENDERSON:  Additionally, in paragraph E, we would again request that the word "invariably" be removed.

THE COURT:  Yes.  If we dealt with it before, it will come out over here.  Don't worry about that.

MR. HENDERSON:  In paragraph E, third line, "likely to make" and the language is "an excellent adaptation."  We would ask that "excellent" be changed to "A satisfactory adaptation or an adequate adaptation."

THE COURT:  How about just "an

adaptation."  I'll just take out any modifier.  All right.

3872

THE CLERK:  Do you want to make that "And would likely adapt to prison?"

THE COURT:  "Would likely make an adaptation to prison."

All right.  Anything else?

MR. HENDERSON:  Yes, sir, Judge.

MR. BAUGH:  One other one, Your Honor, on the Instruction Number 30, not the verdict form.  You have "In making your determination regarding the existence or nonexistence of aggravating and mitigating factors each defendant should be given separate and individual consideration."  We would also suggest that an addition:  "Likewise, in deciding whether any defendant should be sentenced to death or to life in prison without possibility of parole, you must consider each defendant as an individual.  The fact that one or more may be sentenced to death by you may never provide any reason to sentence any other defendant to death."

MR. VICK:  I believe that's already covered as to their unanimity and individual consideration as to each defendant in a number of places.

MR. McGARVEY:  But the death penalty is the ultimate decision there.

MR. BAUGH:  You are not going to convince

3873

Toby; Toby is not going to convince you.  I'll be the moderator.

THE COURT:  I'll give it or something substantially like it.  You will all see what it is in the morning.

MR. BAUGH:  Do you want me to retype it and submit it to you?

THE COURT:  I sure as hell can't read it.  Have Jean run me off a copy of that.

MR. BAUGH:  And I'll work it.  I'll do it.

THE COURT:  All right, anything else?

MR. WHITE:  Two more points, if I could.  One, on defendant Johnson and defendant Roane's list of non-statutory mitigators, "that the defendant grew up in an impoverished, violent, brutal environment, exposed to extreme violence on behalf of his life," we would ask for that on Tipton.  There is evidence he was punished by his mother.

MR. WHITE:  There is certainly ample evidence of the violence and brutality in his environment as being exposed to that same kind of behavior.

THE COURT:  Which one is it?

MR. WHITE:  That's your Number 8, for example, on defendant Johnson's list  --

3874

MR. COOLEY: On the Johnson original.

MR. WHITE: On the Johnson original, excuse me. And also original 8 on defendant Roane's original list.

MR. COOLEY: Number 13 on the one we proposed, then the new one for Johnson.

THE COURT: All right.

MR. WHITE: And one last general point, Judge. We want to make it clear that we are standing on the request to charge the jury as submitted not on PITERA, but also because the use of N1, in our opinion, is basically a violation of the Eighth Amendment as set out in the GODFREY and STRINGER line of cases. It is an overbroad aggravator and shouldn't be used in the weighing process. I think it goes to Instruction Number 19.

THE COURT: Everybody joins in it. It is all denied. You are on the record.

MR. COOLEY: Judge, does the Court anticipate submitting these instructions to the jury for them to take back?

THE COURT: Yes.

THE CLERK: Did you want to bring up the two statutory mitigators that there was no evidence about?

3875

THE COURT: Yes. Number -- it was on the original submissions, I think it was 2 and 9. Duress and something else.

THE CLERK: And consent by the victims.

THE COURT: They submitted one, so I'll keep that statutory in there, although I don't see the hope of that. But I'll keep it in. What was the other one?

MR. GEARY: Duress.

THE COURT: Number 2. Yes. Any objection to taking that out?

(No response.)

Okay, duress comes out. All right.

MR. GEARY: Judge, we filed a motion this morning that comports with the motion we made prior to the government opening its sentencing phase. The written motion this morning, what we ask the Court to do now is simply take the ruling it made before the government opened and carry it to the closing, prophylactically prohibiting the government from using any evidence that would lead to any general concept of sentencing, including future dangerousness; to limit their argument to the statutory and non-statutory aggravators.

MR. McGARVEY: Defendant Johnson, too.

3876

MR. HENDERSON: Defendant Roane, too.

THE COURT:  I've already ruled about the future dangerousness issue.  If Toby starts to argue that, you can make your objections.

MR. VICK:  I can tell you what I am going to argue so everybody knows in that regard.  It is not future dangerousness.  But we have proven there is evidence that came in that they tried to kill people and actually got people killed from jail.  I will argue it is a necessary protection.  Now, that comes awful close, but you are not going to hear me arguing that the studies have shown that they will continue to commit crimes, or anything like that, that goes to future dangerousness.  The evidence is there that they have committed crimes while in jail.

MR. COOLEY:  What aggravator does that associate with?

MR. WHITE:  Where is the evidence?

MR. VICK:  You have two people killed on February 19th because of the telephone call from "V" and Sterling Hardy to Cory Johnson and "Whitey."  Valerie Butler clearly testified about that.

MR. COOLEY:  But what aggravator?

MR. VICK:  It goes to conspiracy.

THE COURT:  I don't have any problem with

3877

him arguing that information about what happened that you brought out about jail.  But you better be very, very careful of yourself when you start talking about "The jury needs to stamp these people out because this is the kind of thing that they will do."  As far as I'm concerned, that's another way of approaching the future dangerousness issue.  But as I say, you all know how the game is played.  You can make your arguments and the objections will be made.  If I think you are across the line, I will sustain it.  It is that simple.  I can't be prophylactic, as you all want me to be.

(Proceedings adjourned at 4:13 p.m.)