# APPENDIX 4A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

**FILED**

**☐ 15 1998**

**CLERK, U.S. DISTRICT COURT
RICHMOND, VA**

| | |
|---|---|
| CORY JOHNSON, | ) |
|        Petitioner, | ) |
| v. | ) Crim. No. 3:92CR68 |
| | ) Civil No. 3:97CV895 |
| SAMUEL PRUETT, WARDEN, | ) |
|      Mecklenburg Correctional<br>     Center, Boydton, Virginia,<br>        Respondent. | ) |

## MEMORANDUM IN SUPPORT OF

## INITIAL PETITION FOR WRIT OF HABEAS CORPUS

## PURSUANT TO 28 U.S.C. SECTION 2255

BARBARA L. HARTUNG
VSB 38062
1001 East Main Street
Suite 504
Richmond, VA   23219
(804) 649-1088

EDWARD E. SCHER
VSB 23064
Thorsen Marchant &
  Scher, LLP
316 West Broad Street
Richmond, VA   23220-4219
(804) 644-0711

Counsel for Cory Johnson

June 15, 1998

719

TABLE OF CONTENTS

Page

A.  JURISDICTIONAL STATEMENT . . . . . . . . . . .    1

B.  PARTIES . . . . . . . . . . . . . . . . . .    1

C.  PROCEDURAL HISTORY . . . . . . . . . . . . . .    2

D.  OVERVIEW OF GROUNDS COMPELLING
    THE ISSUANCE OF THE WRIT  . . . . . . . . . . .    4

    1.  No Pretrial Investigation . . . . . . . . .    4

    2.  Ineffective Voir Dire and Prejudicial Publicity    5

    3.  Insufficient Proof of CCE Supervision  . .    6

    4.  Prosecutorial Misconduct . . . . . . . . .    7

    5.  Counsels' Errors At Penalty Phase . . . .    9

E.  GROUNDS FOR RELIEF . . . . . . . . . . . . . .    12

  I.  THE PROSECUTION KNOWINGLY OR NEGLIGENTLY USED
      FALSE EVIDENCE TO CREATE THE ILLUSION THAT
      JOHNSON AND HIS CO-DEFENDANTS WERE LEADERS OF
      A HIGHLY ORGANIZED CONTINUING CRIMINAL
      ENTERPRISE HAVING ITS ROOTS IN NEW YORK
      AND/OR NEW JERSEY . . . . . . . . . . . . .    12

      A.  The Government's Strategy . . . . . . . .    14

      B.  Greg Scott's Trial Testimony Linking Johnson
          And His Co-defendants To The New York Boyz Was
          False, And The Government Knew Or Should Have
          Known It Was False . . . . . . . . . . .    17

      C.  Maurice Saunders' Trial Testimony Linking
          Tipton To "Light" And To Large Sums Of Money Was
          False, And The Government Knew Or Should Have
          Known It Was False . . . . . . . . . . .    26

 II.  THE EVIDENCE WAS LEGALLY INSUFFICIENT TO CONVICT
      JOHNSON AS A SUPERVISOR OF A CONTINUING CRIMINAL
      ENTERPRISE UNDER 21 U.S.C. SECTION 848 . . . . .    31

      A.  The CCE Supervision Element: Governing
          Principles . . . . . . . . . . . . . . .    33

1.  The Fourth Circuit Does Not Require Proof Of Management By The CCE Defendant In All Cases, While Other Circuits Always Require Proof Of A Management Relationship . . .  34

2.  Proof Of A Buyer-Seller Relationship In A Drug Distribution System Does Not Establish The Supervision Element . . .  36

3.  The Government Was Required To Prove That Johnson Himself Satisfied the Supervision Element . . . . . . . . . .  38

4.  A CCE Conviction Must Be Vacated Where (As Happened Here) The Court Does Not Properly Instruct The Jury After The Government Introduces Evidence Of Individuals Who, As A Matter Of Law, Are Incapable Of Counting As "Supervisees." .  39

B.  The Government's Effort To Prove The Supervision Element . . . . . . . . . . .  42

1.  Many Of Alleged "Supervisees" Were Individuals Who, As A Matter Of Law, Were Not Capable Of Being Supervisees, And Proper Jury Instructions Were Not Given; Under *Barona* and *Jerome*, The CCE Convictions Must Be Vacated . . . . . .  43

2.  There Is No Admissible Evidence Demonstrating That Johnson Supervised Five Individuals Within The Meaning Of The CCE Statute . . . . . . . . . . .  49

    a.  The Government Relied Principally On The Conclusory Terms "Worker" and "Employee" To Prove Supervision; Such Terms Misled The Jury And Prejudiced Johnson And The Other Defendants . . .  49

    b.  The So-Called Evidence Of "Supervision" Was Largely Without A Foundation Of Personal Knowledge And Was Inadmissible Under FRE 602 . . . .  56

    c.  Even The Evidence Cited By The Government On Appeal Does Not Establish That Johnson Supervised Five Individuals . . . . . . . . . . .  56

ii

C.  Habeas Claims Related To the CCE
    Supervision Element . . . . . . . . . . . . . . . .  61

    1.  The Jury Was Not Properly Instructed As
        To The Supervision Element . . . . . . . .  61

        a.  Buyer-seller relationship . . . . . .  61

        b.  Individuals not capable of
            being CCE supervisees  . . . . . . .  61

        c.  Management requirement  . . . . . . .  62

    2.  There Was Insufficient Evidence To
        Support The Supervision Element  . . . . .  62

    3.  Prosecutorial Misconduct Relating To
        The Supervision Element . . . . . . . . .  62

        a.  Improper use of unsupported,
            ambiguous testimony . . . . . . . . .  63

        b.  Improper argument concerning the
            supervision element . . . . . . . . .  63

    4.  Ineffective Assistance Of Counsel At Trial
        And Appeal . . . . . . . . . . . . . . . . .  64

        a.  Counsel Could Have And Should Have
            Shown That Johnson Was Incapable Of
            Being A Supervisor Or At Least Not
            Likely To Be A Supervisor . . . . . .  65

        b.  Counsel Failed To Object To Repeated,
            Improper Evidence . . . . . . . . . .  66

        c.  Counsel Failed To Demonstrate That
            The Proof Against Johnson Did Not
            Establish Five Supervisees . . . . .  71

        d.  Counsel Failed To Object To The
            Prosecutor's Closing Argument On The
            Supervision Element . . . . . . . . .  71

        e.  Counsel Failed To Request Proper Jury
            Instructions On The Supervision Element
            Of The CCE Statute . . . . . . . . .  71

        f.  Trial Counsel Failed To Stop The
            Onslaught Of Prosecutorial Misconduct . 72

iii

g.   Counsel Failed To Seek Relief Available
Under *Barona* and *Jerome* . . . . . . . . 72

h.   Counsel Should Have Pursued Each Of
The CCE Supervision Issues Above . . . 72

III.  JOHNSON IS ACTUALLY INNOCENT OF THE CCE CONVICTIONS . 73

IV.  TRIAL AND APPELLATE COUNSEL PROVIDED
INEFFECTIVE ASSISTANCE IN VIOLATION
OF THE SIXTH AMENDMENT . . . . . . . . . . . . . . . . . 75

A.   GUILT PHASE INEFFECTIVENESS . . . . . . . . . . . 77

1.   Defense Counsel Failed To Request The
Appointment Of An Investigator Pursuant
To 21 U.S.C. Section 848(q) And Failed
To Conduct An Adequate Factual
Investigation . . . . . . . . . . . . . . . . 77

2.   Defense Counsel Failed To Move For A
Change Of Venue Despite Inflammatory
Media Coverage About The Charges
And The Defendants . . . . . . . . . . . . . 81

3.   Defense Counsel Failed to Request <u>Voir Dire</u>
Pursuant to *Morgan v. Illinois*,
504 U.S. 719 (1992) . . . . . . . . . . . . 88

4.   Defense Counsel Failed To Object
To The Prosecution's Strikes
Against Women Jurors . . . . . . . . . . . . 95

5.   Defense Counsel Failed To Object To
Johnson's Absence From <u>Voir Dire</u>
And Johnson Lost His Right To
Participate In Jury Selection . . . . . . . 96

6.   Defense Counsel Failed To Challenge The
Government's Evidence That Johnson Was
A Supervisor Of A CCE . . . . . . . . . . . 105

7.   Defense Counsel Failed To Object To Or
Ask For Proper Jury Instructions On The
Substantive Counts Charged . . . . . . . . . 106

a.   Defense Counsel Failed To Request A
Unanimity Instruction On The CCE
Elements . . . . . . . . . . . . . . . . 106

iv

b.    The Jury Was Not Properly Instructed
As To The Supervision Element Of
The CCE Charges . . . . . . . . . . . . . 106

8.    Defense Counsel Failed To Object To Improper
And Highly Prejudicial Conduct And Arguments
By The Prosecutors Throughout Johnson's
Capital Trial . . . . . . . . . . . . . . 107

B.    COUNSEL PROVIDED INEFFECTIVE ASSISTANCE
AT THE SENTENCE PHASE . . . . . . . . . . . . 108

1.    Defense Counsel Failed To Argue That
Johnson's Mental Ability Was Not
Accurately Reflected By His
I.Q. Test And, In Fact, Was Below 77 . . . . 108

2.    Defense Counsel Failed To Present
Evidence Of Johnson's Prison
Conditions If Sentenced To Life . . . . . . 111

C.    INEFFECTIVE ASSISTANCE ON APPEAL . . . . . . . . . 114

D.    THE CUMULATIVE EFFECT OF COUNSELS' ERRORS
PREJUDICED JOHNSON UNDER STRICKLAND . . . . . . . 116

V.    PROSECUTORIAL MISCONDUCT DEPRIVED JOHNSON OF HIS
RIGHTS TO DUE PROCESS AND A FAIR TRIAL . . . . . . . . 120

A.    The prosecutors misled the jury by vouching,
in inflammatory terms, to their personal
belief in Johnson's guilt and the veracity
of witnesses . . . . . . . . . . . . . . . . . . 121

B.    The prosecutors introduced inadmissible
evidence suggesting that Johnson and the
other defendants threatened
the lives of witnesses . . . . . . . . . . . . 125

C.    The prosecutors misled the jury into
believing it had a *duty* to convict and to
impose a death sentence . . . . . . . . . . . . 126

D.    The prosecutors misled the jury by making
misleading and inflammatory arguments to
the jury, unsupported by the evidence,
regarding the conditions Johnson would
face if given a life sentence . . . . . . . . . 128

E.   The prosecutors improperly emphasized
     that Johnson and the other defendants
     did not testify . . . . . . . . . . . . . . . . . . . . 129

F.   Prosecutors suggested that a Government
     witness had passed a polygraph test . . . . . . . 132

G.   The Government prosecutors improperly
     treated Johnson and the other defendants
     as a group, rather than as individuals . . . . . . 132

H.   The Prosecutors Improperly Argued That
     Sentencing Should Be Based On Deterrence . . . . . 135

I.   Misconduct relating to testimony
     without foundation . . . . . . . . . . . . . . . . 135

J.   The prosecutors misled the jury by suggesting
     that they had not influenced witnesses to use
     the terms "partner," "worker," and "employee." . . 141

K.   The Government Excluded Women From The Jury
     In Violation of *J.E.B. v. Alabama,*
     114 S. Ct. 1419 (1994) . . . . . . . . . . . . . . 141

L.   Misconduct relating to the CCE
     supervision element . . . . . . . . . . . . . . . . 141

VI.   THE PROSECUTION IMPROPERLY DISCRIMINATED AGAINST
      WOMEN IN SELECTING THE JURY . . . . . . . . . . . . . 142


VII.  JUROR MISCONDUCT VIOLATED JOHNSONS' RIGHTS
      TO AN IMPARTIAL JURY AND TO DUE PROCESS OF LAW . . . . 144


VIII. JOHNSON WAS DENIED HIS STATUTORY AND CONSTITUTIONAL
      RIGHT TO JUSTICE WITHOUT DISCRIMINATION . . . . . . . . 145


IX.   SECTION 848'S DELEGATION OF AUTHORITY TO
      PROSECUTORS TO CREATE NON-STATUTORY AGGRAVATORS
      IS AN UNCONSTITUTIONAL DELEGATION OF AUTHORITY
      THAT VIOLATES THE SEPARATION OF POWERS . . . . . . . . 147


X.    JOHNSON ADOPTS BY REFERENCE THOSE CLAIMS
      PRESENTED BY HIS CO-PETITIONERS, TIPTON AND ROANE,
      TO THE EXTENT THAT THEY ARE APPLICABLE TO HIM . . . . 161


RELIEF REQUESTED . . . . . . . . . . . . . . . . . . . . . . 162

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

CORY JOHNSON,                    )
                                 )
        Petitioner,              )
                                 )
    v.                           )     Crim. No. 3:92CR68
                                 )     Civil No. 3:97CV895
SAMUEL PRUETT, Warden,           )
   Mecklenburg Correctional      )
   Center, Boydton, Virginia     )
        Respondent.              )

MEMORANDUM IN SUPPORT OF
INITIAL PETITION FOR WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. SECTION 2255

Petitioner, Cory Johnson, a federal prisoner now in the custody of the United States, held at Mecklenburg Correctional Center, Boydton, Virginia, and under sentence of death, hereby petitions this Court pursuant to 28 U.S.C. Section 2255 for a writ of habeas corpus.  Johnson states that he is in custody in violation of the Constitution or laws or treaties of the United States, as more fully set forth herein.  In support of his initial petition filed June 1, 1998, Johnson submits this Memorandum and states as follows:

A.    JURISDICTIONAL STATEMENT

This petition is filed pursuant to 28 U.S.C. §§ 2241 and 2255.  Section 2255 directs that the petition be filed with this Court.

B.   PARTIES

Johnson is an individual who is in the custody of the United States, the Respondent, in violation of the Constitution or laws or treaties of the United States.  The Warden of the Mecklenburg

Correctional Center, Boydton, Virginia, has current custody of Johnson.

C.    PROCEDURAL HISTORY

In 1992, Richard Tipton, Cory Johnson and James Roane were charged with participating in a crack cocaine distribution ring in Richmond, and committing a number of violent crimes in furtherance of this activity.  The indictment charged the defendants altogether with a total of nine murders committed in furtherance of their drug activities.[1]

Johnson was indicted in the United States District Court for the Eastern District of Virginia on charges of capital murder in furtherance of a continuing criminal enterprise and various related racketeering, firearms and drug offenses.  He was convicted of seven capital murders charged under 21 U.S.C. section 848(e), conspiracy to possess cocaine base with intent to distribute (21 U.S.C. sec. 846), engaging in a continuing criminal enterprise (21 U.S.C. sec. 848(a)), eleven counts of committing acts of violence in aid of racketeering activity (18 U.S.C. sec. 1959), five counts of using a firearm in relation to a crime of violence or drug trafficking offense (18 U.S.C. sec. 924(c)), and two counts of possession of cocaine base with the intent to distribute (21 U.S.C. sec. 841(a)(1)).  JA[2] 569-72.

---

[1]    The killing of Torrick Brown was not charged as a murder "while engaged in and working in furtherance of" a criminal enterprise.  21 U.S.C. section 848(e)(1)(A).

[2]    "JA" refers to the pages of the joint appendix filed on direct appeal.  "Tr" refers to pages of the trial transcript on file in the district court clerk's office.

2

The jury recommended that Johnson be sentenced to death on all of the seven section 848(e) murders. The district court sentenced Johnson to death in accordance with the jury's recommendations pursuant to 21 U.S.C. sec. 848(l), and imposed various sentences of imprisonment for the several noncapital counts totalling life plus 85 years. JA 569-72.

Johnson's convictions[3] and death sentences were affirmed by the United States Court of Appeals for the Fourth Circuit on July 8, 1996. <u>United States v. Tipton, Johnson, et al.</u>, 90 F.3d 861 (4th Cir. 1996). Johnson's petition to the United States Supreme Court for a writ of certiorari was denied on June 2, 1997.

Pursuant to Johnson's motion, in November, 1997, this Court appointed undersigned counsel to assist Johnson in the preparation of his initial habeas corpus petition. The Court ordered that the petition be filed by June 1, 1998, and then, in view of pending motions, extended that date to June 15, 1998. On June 1, 1998, Johnson filed an initial petition on the court's 2255 petition form and stated that this Memorandum in support would be filed on June 15, 1998.

---

[3] On appeal, the Fourth Circuit vacated the convictions and sentences under section 846 (the conspiracy counts) on the grounds that these offenses were lesser included offenses within the section 848 (CCE) convictions. 90 F.3d at 891.

3

D.    OVERVIEW OF GROUNDS COMPELLING ISSUANCE OF THE WRIT

Johnson's conviction under the "drug kingpin" law and his subsequent death sentences were the result of an extraordinarily unfair trial in violation of the U.S. Constitution.

1.    No Pretrial Investigation

Johnson's defense counsel were utterly unprepared for trial. They conducted no independent investigation into the charges and made no apparent effort to investigate the alleged conspiracy's activities in New York, New Jersey, or Virginia.  That evidence would turn out to be both critical to the government's case and false.

The governments's evidence that Tipton, Johnson and Roane organized, supervised or managed a highly organized drug conspiracy, and that the murders were carried out to further that conspiracy, consisted entirely of the statements of other participants in the conspiracy.  The government blocked the defendants from any pre-testimony contact with the witnesses, by concealing witnesses allegedly placed "in protection" and defying the command of 18 U.S.C. § 3432 that they disclose the witnesses' names and addresses prior to trial.  Later, when courtroom interviews were arranged, prosecutors intimidated the witnesses to prevent them from speaking with defense counsel.

Johnson's defense counsel made no effort to develop defense witnesses or evidence.  They simply relied upon the Government to provide information through various disclosure requirements. This was particularly hurtful to Johnson because at least a

4

portion of the Government's trial evidence, as shown herein, was demonstrably fabricated. Counsel's failure was particularly egregious in view of the fact that Johnson was constitutionally and statutorily entitled to a court-appointed investigator. Defense counsel never requested this assistance.

2.    Ineffective Voir Dire And Prejudicial Publicity

Johnson's counsel continued their neglectful representation at jury selection. Voir dire lasted three days. Although the Fourth Circuit has held that a defendant's right to be present at jury selection is so fundamental it may not be waived, Johnson's court-appointed counsel purported to waive that right, even though Johnson and his co-defendants were never advised of their right to be present or asked if they waived it. Thus, Johnson was not present to hear any potential jurors answer any of the questions put to them in voir dire, or to observe them. Johnson was excluded entirely from that portion of the voir dire concerning the jurors' attitudes toward the death penalty and any racial prejudices.

Trial counsel failed to request the most fundamental voir dire question -- the Supreme Court-sanctioned "reverse-Witherspoon" question -- that would have identified jurors with a predisposition to imposing capital punishment given the facts of this case. Counsel inexplicably allowed individuals to serve on the jury who obviously were inclined towards law enforcement.

Despite pervasive prejudicial media coverage about the case and the defendants, defense counsel failed to make a change of

5

venue motion. As detailed below, press coverage tainted the jury pool. However, defense counsel failed to take appropriate steps to protect Johnson from a jury influenced by extensive inflammatory publicity concerning Johnson and the trial. Finally, they failed to object when the Government embarked on an obvious strategy to remove women from the jury. The Government used eight of its ten strikes to remove women from the jury.

3.    Insufficient Proof Of CCE Supervision

Johnson's counsel failed to demonstrate at trial and on appeal that the Government's evidence, as a matter of law, did not prove the CCE supervision element as to Johnson. No rational trier of fact could have found proof of CCE supervision beyond a reasonable doubt. Defense counsel failed to show that Johnson was incapable of or not likely to be a CCE supervisor. Ample evidence existed that Johnson was not capable of supervision and management. Counsel failed to object to repeated, improper testimony, evidence and argument allegedly demonstrating that Johnson supervised five people. Had counsel dealt with this issue properly, Johnson would not have been convicted of a CCE, and he could not be eligible for or sentenced to death.

Johnson's counsel failed to take appropriate steps that would have prevented the jury from considering as alleged CCE "supervisees" a large number of persons who, as a matter of law, could not be counted as supervises. A number of individuals testified that they received drugs from the defendants and then resold those drugs for a price determined by the seller. The

6

government's evidence <u>failed</u> to demonstrate that Johnson supervised five individuals as required under 21 U.S.C. section 848(c). Proof of a mere buyer-seller relationship is insufficient to convict under section 848 ("CCE").

Johnson's counsel also overlooked fundamental jury instructions that would have focused the jury on the proper issues and prevented his CCE convictions. Johnson's convictions and the subsequent death sentences cannot stand where the government failed to prove Johnson's role in the CCE. But for counsels' ineffectiveness, the CCE convictions would have been vacated on direct appeal. *See, e.g., United States v. Barona,* 56 F.3d 1087 (9th Cir. 1995); *United States v. Jerome,* 942 F.2d 1328 (9th Cir. 1991).

4. <u>Prosecutorial Misconduct</u>

Defense counsel took no action to protect Johnson from an onslaught of prosecutorial misconduct throughout the trial. The Government engaged in a persistent course of prosecutorial misconduct that made it impossible for Johnson to receive a fair trial. Among other things, they misled the jury with improper and inflammatory argument, expressly telling the jury -- in a total fabrication of evidence -- that Johnson would enjoy comfortable prison conditions if not executed. They repeatedly vouched to the jury, in the most inflammatory terms imaginable, as to their personal belief in Johnson's guilt and the veracity of the Government's witnesses.

7

Defense counsels' ineffectiveness was compounded by additional prosecutorial misconduct. The government adopted a strategy of trying the defendants not as individuals, but as an undifferentiated group, and of imputing all of the evidence against each of the defendants. The government successfully opposed the defendants' motions to sever, at both the guilt and penalty phases, as well as co-defendant Roane's motion for an instruction advising the jury that the New Jersey evidence - in which he concededly played no part - could not be used against him. From opening statement through closing argument, the government consistently referred to the defendants *en masse* as "these people," in a transparent effort to encourage the jury not to distinguish between the defendants. The result of this strategy was that each piece of evidence adduced by the government weighed against all of the defendants.

The prosecutors also repeatedly told the jurors that the jury had a duty to convict, improperly emphasized Johnson's failure to testify, suggested to the jury through improper evidence that Johnson was a threat to the lives of witnesses, and blurred Johnson's conduct together with that of his co-defendants. The prosecutors introduced a mountain of evidence against Johnson that was both extremely prejudicial and *inadmissible*. They made inflammatory, improper arguments to the jury that were not supported by evidence and that conflicted with the law.

8

To make matters worse, the prosecution sought throughout the penalty phase to lump the defendants together in the jury's mind, so that evidence that might bear on the intent of one would be transferred to the acts of another. The government constantly invited the jury to confuse the defendants by repeatedly referring to them as a group; dozens of times during his opening and closing arguments at the penalty phase, the prosecutor made references to "they" and "these people" in instances in which individual references were required by the facts and should have been compelled by the law. See Tr. at 3317-35, 3881-3907. Moreover, although capital sentencing focuses on the individual's acts and intent, and principles of aider-and-abettor and conspiracy liability have no place in such proceedings, the trial court permitted the prosecutor, over objection, to argue both. Tr. 3320, 3330.

Because of the prosecution's brazen attempts to convince the jury to treat the defendants as "members of a faceless, undifferentiated mass to be subjected to the blind infliction of the death penalty," Woodson, 428 U.S. at 304, the defendants sought a mistrial of the sentencing phase, or, alternatively, an instruction requiring the jury to focus on the individual intent of each defendant rather than any "collective" intent. However, the trial court denied a mistrial and refused to give the requested instruction.

5.    <u>Counsels' Errors At Penalty Phase</u>

Furthermore, Johnson's counsel provided ineffective assistance at the penalty phase.  Trial counsel failed to present what would likely have been extremely powerful evidence.  Counsel failed to argue that Johnson's mental abilities may have been lower than the test results demonstrated, placing him within the range of mental retardation.  In addition, counsel failed to present evidence to counter the claim that life imprisonment would be a soft and lenient sentence by, for example, explaining to the jury the conditions Johnson would face if imprisoned for life.

There can be no doubt that trial counsel's neglect and the prosecutor's misconduct prejudiced Johnson.  As a result, he was improperly sentenced to death.  As the jury found, he was youthful at the time of his offenses.  He had no significant prior criminal record.  The jury knew that equally culpable defendants would not be punished by death, and the victims consented to the criminal conduct that resulted in their deaths.  Moreover, Johnson was subject to emotional and physical abuse as a child.  He suffers from neurological impairments and brain dysfunction.  His I.Q. is near, and very probably below, the level of retardation.  The jury found that he was easily manipulated by others and that he suffers from brain damage that could impair his ability to exercise good judgment.  *See* Ex. 1, (special verdict form).

10

Despite a total of 18 mitigating factors found by the jury, Johnson still received seven death sentences from the jury. A review of the record makes clear the reason for this incongruity: *The jury's verdict was the end product of a series of unjust, unfair, and unlawful events that essentially rendered Johnson's death sentences a foregone conclusion.* As this Memorandum explains in detail, Johnson's CCE convictions and death sentences must be vacated, as a matter of law and fundamental fairness, as they were obtained in violation of his rights under the United States Constitution.

## E.   GROUNDS FOR RELIEF

I.   THE PROSECUTION KNOWINGLY OR NEGLIGENTLY USED FALSE
     EVIDENCE TO CREATE THE ILLUSION THAT JOHNSON AND HIS CO-
     DEFENDANTS WERE LEADERS OF A HIGHLY ORGANIZED CONTINUING
     CRIMINAL ENTERPRISE HAVING ITS ROOTS IN NEW YORK AND/OR
     NEW JERSEY.

The central theme of the government's case was that Johnson and co-defendant Tipton were part of a violent, highly-organized gang known as the "New York Boyz", who fled trouble in the North to continue their reign of criminal terror in Richmond, Virginia. Co-defendant Roane was alleged to have joined this continuing criminal enterprise after release from the Virginia prison system.

The government relied almost exclusively upon the dramatic account of cooperating witness Gregory Scott, who gave vivid testimony concerning the New York Boyz organization and its violent ways. Without Scott's testimony, the government would have had great difficulty proving that Johnson and his co-defendants were a part of a continuing criminal enterprise, and were not simply three independent crack dealers who ran in the same circles. It likely is for this reason that the Government prosecutors presented Scott's testimony despite the fact that it was totally _false_. Indeed, the government used Scott to corroborate testimony from Maurice Saunders and other "Virginia witnesses" that otherwise would not have been believable. Scott's false testimony was the linchpin to the government's CCE case.

12

A conviction obtained through the use of evidence the prosecutor knows is false violates due process. Napue v. Illinois, 360 U.S. 264, 269 (1959); Kyles v. Whitley, 115 S. Ct. 1555 (1995). Under such circumstances, the conviction must be set aside if there is any reasonable likelihood that the false evidence could have affected the judgment of the jury. United States v. Bagley, 473 U.S. 667, 678-80 & n.9 (1985). Giglio v. United States, 405 U.S. 150, 154 (1972)(citing Brady v. Maryland, 373 U.S. 83, 87 (1963); Mooney v. Holohan, 294 U.S. 103 (1935). Where it is established that the Government knowingly permitted the introduction of false testimony, reversal is "virtually automatic." United States v. Stofsky, 527 F.2d 237, 243 (2d Cir. 1975), cert. denied, 429 U.S. 819 (1976)(citing Napue, 360 U.S. at 269); see also Miller v. Pate, 386 U.S. 1, 7 (1967).

The same is true where the Government allows false evidence to go uncorrected. Giglio, 405 U.S. at 153; Napue, generally. A prosecutor may not "turn a blind eye to doubts about the veracity of testimony presented by its witnesses." United States v. English, 998 F.2d 609, 611 (8th Cir. 1993), cert. denied, 510 U.S. 1001 (1993).

Even if false testimony relates only to the credibility of a Government witness and other evidence has called that witness' credibility into question, a conviction must be reversed when "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Kelly, 35 F.3d 929, 933 (4th Cir. 1994)(quoting United States v.

13

Agurs, 427 U.S. 97, 103 (1976); see also, United States v. Wallach, 935 F.2d 445, 456-57 (2d Cir. 1991), aff'd. 979 F.2d 912 (2d Cir. 1991).

The knowing use of perjured testimony offends the due process clause of the Constitution. Any "conviction acquired through the knowing use of [such] perjured testimony . . . violates due process." Kelly, 35 F.3d at 933 (citing Napue, 360 U.S. at 269). The Government, whether it "knew, should have known . . ., or simply allowed such testimony to pass uncorrected," cannot benefit from the use of perjury and the concomitant violation of due process. Id. (emphasis added).

The importance of Scott's testimony and the resulting harm to Johnson must be assessed in the light of the Government's presentation of its case to the jury and its reliance on Scott's, as well as Saunders', testimony.

A.   The Government's Strategy

At trial, the government presented evidence of three separate and distinct drug conspiracies. It began its presentation with evidence of the 1989-91 activities of the "New York Boyz" a group in Trenton, New Jersey. This evidence included graphic testimony about acts of violence committed in Trenton, including the razor blade slashing of a rival drug dealer (who came down from the witness stand to give jurors a closer look at his facial scars), and the use of aluminum baseball bats (which did not break as easily as wood bats) to beat competitors. This evidence also included critical testimony

14

concerning the level of organization of the New York Boyz - *i.e.*, that the group met to plan violent acts, and insisted that all members participate in them.

Evidence of activities occurring in New York and New Jersey was critical to the government's case. The government relied on that evidence to "establish[] the origins and *modus operandi* of the New York Boyz." Brief of the United States at 73. As the government has noted, evidence of the events in New York and New Jersey was used to:

> [E]xplain[] the exclusive relationship among the "partners," who were considered "family" because of their common origins in New York City; the "partners[']" access to a stable source of cocaine; the "partners['] use of a network of street-level "workers" to distribute crack cocaine' the "partners'" method of pooling their money when additional supplies of cocaine were needed; the use of planned, violent retaliation in a concerted fashion to protect and expand the "partners'" drug turf; and the obligation of "partners" to participate in such retaliatory activities as an incident of membership in the New York Boyz.

Id. at 73-74. In other words, this evidence was the linchpin of the government's single conspiracy theory, as it relied on testimony about the New York/New Jersey events to graft a structure onto the Newtown activities, which structure was necessary to the convictions in this case, but which was otherwise absent from the Newtown activities.[4]

The prosecution made this link explicit in arguing that "workers" in New Jersey could be counted toward the five or more

---

[4] Even if there was structure in Newtown, the jury could have convicted on the basis of structure in New York.

15

"supervisees" required to prove a CCE, Tr. 2983, that the defendants could be found guilty of murders in furtherance of a CCE run by "Light," Tr. 2989, and that evidence that gang members in New Jersey were required to participate in acts of violence elevated the murder of Torrick Brown to a murder in furtherance of a CCE. Tr. 3004.

After its evidence of activities in New Jersey, the government moved to evidence suggesting that while Tipton was involved with the New York Boyz in Trenton, he independently began to supply drugs in the Central Gardens neighborhood of Henrico County, outside of Richmond. This group confined its activities to Central Gardens, and engaged in no drug-related violence.

The third conspiracy involved the "Newtown Gang," which was the focus of the indictment in this case. The government alleged that Johnson was involved in all three conspiracies.

The government sought the death penalty against each of the defendants. This required the prosecution to prove the murders were committed in furtherance of a "continuing criminal enterprise," which in turn required a showing that the alleged conspiracy was highly organized. 21 U.S.C. § 848(c),(e). The government argued that Tipton, Johnson and Roane were "partners" who organized, supervised and managed five or more "workers" in the conduct of their drug distribution activities, that the murders were carried out to further their drug-related business.

However, the evidence showed that the Newtown crack

16

cocaine market was not highly organized, but consisted of numerous independent "retailers" who obtained their supplies from common sources - including the defendants -- but who were free to distribute cocaine when, where, and at whatever price they wished.

Therefore, in order to foster the illusion of a high degree of "organization, supervision and management," the government grafted the alleged Newtown conspiracy to the New Jersey and Central Gardens conspiracies, and argued that the jury should impute acts of management, organization or supervision carried out by those other conspiracies to the participants in the Newtown conspiracy.

> B. Greg Scott's Trial Testimony Linking Johnson and His Co-defendants to the New York Boyz Was False, And the Government Knew or Should Have Known It Was False.

The government used the testimony of Gregory Scott to set the stage for its case in chief. During opening statements, prosecutor Vick told the jury:

> We are going to put before you first that group of witnesses that will establish that conspiracy and that Continuing Criminal Enterprise. The first witness, for example, is an individual by the name of Gregory Scott. Gregory Scott is a very articulate man, frighteningly articulate, to think he got involved in this criminal activity. He is from 155th and Amsterdam Avenue in New York. He will tell you, ladies and gentlemen, that he knows Mr. Richard Tipton and he knows Mr. Cory Johnson and he knows Mr. Lance Thomas, "V", because he grew up with Mr. Lance Thomas at 155th and Amsterdam Avenue in New York City. And that in 1989 when he lost his job with a market in New York City, he went with Mr. Lance Thomas, a lifelong friend of his, to Trenton, New Jersey, where Mr. Lance Thomas had set up business with

17

Mr. Richard Tipton, Mr. Cory Johnson, and 15 or 20 or 25 other individuals from New York City, most of them from 155th and Amsterdam Avenue.

He will tell you that they had a name for themselves, they have been given it by the police, but which they like: the New York Boyz. They were down there selling crack cocaine in Trenton, New Jersey. And they were a group organized to protect each other and to help each other distribute cocaine. And they liked the name the New York Boyz because it kept competitors away and it instilled a certain amount of fear in people who might want to cross their path.

He will testify that Mr. Richard Tipton, Mr. Lance Thomas, and Mr. Cory Johnson were members of the New York Boyz; that they actually sat around in New Jersey, in Trenton, and had meetings and discussed what physical acts of retaliation they should take against people who had wronged them and decided whether it would hurt business to hit this person or whether it would not hurt business.

He will tell you that they used to beat people regularly with baseball bats, aluminum bats that the New York Boyz used because they wouldn't break. He will tell you that Mr. Cory Johnson and Mr. Richard Tipton particularly liked razor blades and knives to carry with them. In fact, you will hear from a number of witnesses that Mr. Richard Tipton will carry a razor blade almost every day, every waking hour, inside his mouth so he can spit it out and grab it and cut you in a heartbeat with it. You will hear testimony from people who have been at the other end of that razor blade.

He will tell you that from 1989 through 1991, the New York Boyz stayed in Trenton and distributed crack cocaine on the streets of Trenton. Richard Tipton, a New York Boy, went back and forth from Richmond, Virginia, to Trenton and would talk about how much money he would make in Richmond, Virginia, how much more you could sell the cocaine for in Richmond, Virginia. There were a series of events that led them to leave Trenton, a series of busts by the police that led them—Greg Scott was busted at 491 Martin Luther King Boulevard in Trenton, and a number of the New York Boyz were arrested up there. And unfortunately, for the inhabitants of the City of Richmond, several of the New York Boyz decided to make their way south because Mr. Richard Tipton, "Whitey," said there was so much money to be made down here.

18

Richard Tipton, you will hear from a number of
witnesses, had been born in Richmond and spent some
time in Richmond, grew up in New York, and had people
here in Richmond that he knew. And he came back and
forth with his cocaine.

In 1991, Cory Johnson came down with Richard Tipton and
set up shop in Richmond selling cocaine. In December
of 1991 or early 1992, Lance Thomas and Edgar Black,
"E.B.," came down and set up shop with "Whitey" and
"C.O." selling cocaine. The New York Boyz arrived.

Gregory Scott will tell you that they didn't kill
anybody in New Jersey, not that he knows of. But for
some reason, when they came to Richmond the violence
escalated and these people were all killed or wounded
because of the presence of the New York Boyz and their
cocaine distribution operation here in the City of
Richmond.

. . .

When they came to Richmond, "Whitey" had known a number of
people in the Central Gardens area out near Highland
Springs. And he came and that's where he first set up shop.
And he recruited a number of people from Central Gardens to
sell crack cocaine with him. You will hear the testimony of
those witnesses. You will hear from Antwoine Brooks, who
was recruited by him in 1989 to sell crack cocaine. You
will hear from Charles Townes. You will hear from Maurice
Saunders. You will hear from "Studie" Green. You will hear
from a number of people in the Central Gardens area who were
recruited by these people to sell crack cocaine, and they
will tell you the same story, particularly Mr. Maurice
Saunders. He will tell you "Whitey" was awful proud of the
fact he was a New York Boy and had wreaked havoc in Trenton
and would take care of those same sorts of people that
crossed him down here and would kill anybody who got in his
way and would hurt anybody who crossed his path in a way
that offended him.

. . .

You will hear from Greg Scott, also, that "Light" was a
member of the New York Boyz and that "Light" was the main
source of cocaine for "Whitey," Richard Tipton. Charles
Townes is one of the Central Gardens people who was
recruited by "Whitey" to sell for him. And it is with
Charles Townes and the next witness, Mr. Hussone Jones, that
we begin to hear the frightening story of the murder rampage
that was foisted upon the City of Richmond from January 5th,

19

of last year until February 19th of last year, a period of 45 days, ladies and gentlemen, when there were 11 people killed by this conspiracy, by these individuals.

JA 1618-1624.

Scott testified to all of this, and more. For example, he did testify that he grew up with "V" at 155th and Amsterdam Avenue, and that he joined the "V" in New Jersey after losing his job in 1989. JA 1732. He testified that Tipton and Johnson were involved in selling drugs in New Jersey while he was there. JA 1735. According to Scott, the New York Boyz had 15-30 members. *Id.*

The government elicited testimony from Scott in support of its inflammatory theme that Tipton and Johnson were New Yorkers who brought their unique brand of violence to the sleepy South. After testifying that the name, "New York Boyz", was given to this gang by the police, he explains that they liked the name because it "let people know we were from out of town and we were taking over." JA 1736. According to Scott, the New York Boyz would meet whenever it or one of its members had a problem, to discuss it, and to decide whether to retaliate with violence. As one example, he described a meeting where the group decided to retaliate against another group of guys because one of them had stabbed New York Boy "Smooth." JA 1736-37. Tipton and Johnson participated in the discussions. *Id.*

Scott described for the jury how the New York Boyz would use bats, razor blades, or their fists to take over territory in

20

Trenton.  He claimed that co-defendant Thomas[5] taught him how to use a baseball bat for enforcement purposes, and that he was advised to use an aluminum bat instead of a wooden one because aluminum wouldn't break.  JA 1738-39.

According to Scott, the New York Boyz used Trenton locals as what would be referred to throughout the trial as "workers". They had about 20 workers in Trenton, who were expected simply to sell crack on the street.  These workers were "outsiders", and "weren't family".  According to Scott, the members of the New York Boyz referred to each other as family, and specifically as cousins and brothers.  JA 1743-44.

Concerning the New York Boyz' meetings to discuss retaliation, Scott testified that, if one of the New York Boyz refused to engage in violence "[t]hey would stop messing with him, leave him alone, because he was a traitor . . . [H]e wasn't down with the program, wasn't with the program of hurting anybody or taking over a property."  JA 1756.  Such a member would no longer be considered a member of the New York Boyz, and instead, "would be just like anybody who lived in Trenton."  JA 1757. Workers, on the other hand, were not required to engage in acts of violence.

Scott claimed that he was working during this time for Rufus Alvarez, also known as "Light."  Scott testified that he received guns from "Light", and that "Light" was Tipton and Johnson's

---

5    Lance Thomas was tried separately from Tipton and his co-defendants.

21

supplier.   Scott testified that he saw Johnson get drugs from "Light."   JA 1749.

Toward the end of his testimony, the prosecutor elicited from Scott testimony that the New York Boyz did not engage in acts of violence simply for retaliation.   Their other goal was to take over more territory.   The group conspired to engage in these violent acts to let the people in Trenton know that the New York Boyz were in town, and were going to take over the crack trade. JA 1805-06.   On cross-examination, Scott was asked to describe some of the incidents that led to meetings and violent retaliation.

Scott's testimony was a complete fabrication, and given the thorough investigation of this case, the government either knew, or was deliberately ignorant that Scott's testimony was perjured. To begin with, even his statement that he grew up at 155th and Amsterdam was a lie.   According to several individuals identified by Scott as members of the New York Boyz, Scott did not grow up at 155th and Amsterdam Avenue.   He did have relatives there, and knew some of these individuals.   Nevertheless, Scott and "V" did not grow up together at 155th and Amsterdam in New York.   See JA 1732.

All of the reputed New York Boyz interviewed by the petitioner's investigator admit that they know each other and grew up together, and do not deny that they were involved in selling drugs.   Nevertheless, they all deny that they ever were a

22

gang or were otherwise "organized," and insist that they never had meetings to discuss retaliation and acts of violence.

Scott's testimony concerning his boss, "Light," also is false. John Matthews, also known as "Light," has reviewed Scott's testimony in this case. According to him, it is "full of lies."

Matthews admits that, near the end of 1989, Greg Scott approached him concerning the selling of drugs, and that the two of them sold drugs together until Matthews' son was born in June, 1990. Moreover, he admits that he was friends with all of the individuals described by Scott as members of the New York Boyz. Nevertheless, he also maintains that this group of friends never participated in group discussions concerning retaliation, and never engaged in planned acts of violence over drugs. According to Matthews, Scott's testimony that he received guns from Matthews is false. Matthews was incarcerated during the entire term of the investigation in this case, under the name of Rufus Alvarez. Ex. 2. Nevertheless, he was never interviewed by anyone in connection with the Newtown Gang case.

During closing argument, the prosecutor relied heavily upon Scott's testimony to establish that Johnson and his co-defendants indeed were members of a CCE:

> Remind yourself in rendering your decision on Count 1
> of the testimony of Greg Scott. He told you from the
> witness stand about the existence of the New York Boyz,
> a group of people who grew up at 155th and Amsterdam
> Avenue--and others who joined them--but a group of
> people who grew up at 155th and Amsterdam Avenue in New
> York decided in 1989 to go to New Jersey and sell
> drugs. Included in that group was "Whitey" and "C.O."

23

> That because of a string of events that occurred in Trenton, New Jersey, a number of the New York Boyz got arrested. And unfortunately for the people of Richmond, and particularly unfortunately for the 11 people who died as a result of their actions, Richard Tipton chose to bring some of the New York Boyz south. He brought with him Cory Johnson, "C.O.," Lance Thomas, "V," (and) "Hess" came south with him. Paul, the Jamaican from Blackwell, came south with him. And the New York Boyz continued their actions here in the City of Richmond.

JA 3787. (Tr. 2963).

To prove the essential element that the CCE in this case involved the requisite number of people, the prosecutor asked jurors to:

> Remind yourself of the testimony of Greg Scott about the New York Boyz. There were 30 or so New York Boyz operating in Trenton, each of whom recruited to themselves workers. In Richmond, when the New York Boyz came south with "Whitey," you had the following people, at least, who were working with them in the sale or distribution of cocaine. . . .

JA 3808. (Tr. 2983).

The government indicted Tipton, Roane, and Johnson for the killing of Torrick Brown. The government knew that this murder was committed because Roane was upset with Brown for spending time with his girlfriend, and not in furtherance of the CCE. Because of Scott's perjured testimony, however, the government was able to argue at closing that the murder was committed in furtherance of the CCE:

> Why? It is clear why. Remind yourself again of the testimony of Greg Scott. Remember what he told you about the New York Boyz? They got together for protection and for going back to New York and re-upping cocaine. And when they got together for protection, each and every member of the New York Boyz had to go in on a crime of violence or they were no longer a member of the

24

New York Boyz.  1959 says that you must find that the murder was either paid for or done to maintain one's position within an organization.  And I suggest to you that's the critical language in that statute as to each one of these murders. Those murders were done to maintain the individual defendant's stature within the conspiracy.  They were done so that "C.O." and "V" could help James Roane kill Torrick Brown and prove what a macho drug dealer, what a macho, murdering drug dealer they were.  Remember, they would have been ostracized had they not.

Another little telling piece of evidence here: Greg Scott told you that the workers didn't have to go in with the crimes of violence.  Remember that?  Only the New York Boyz themselves, the bosses, the partners, had to agree and follow up on the agreements to commit violence.

That's what they did with Torrick Brown.

. . .

Remember, you mess with one of the New York Boyz, you mess with them all.  That's what Greg Scott told you. That's what Torrick Brown's murder proves to you.

JA 3829-34.  (Tr. 3004-09).

During closing arguments, prosecutor Vick also used Scott's testimony as a means of demonstrating to the jury that, contrary to the defense theory, the entire case had not been carefully orchestrated, and that witnesses had not been encouraged to lie.  As is discussed below, the irony is that, when it is considered in light of the petitioner's post-conviction investigation, Scott's testimony demonstrates that the government did very deliberately orchestrate its case in chief.

25

C.  Maurice Saunders' Trial Testimony Linking
Tipton to "Light" and to Large Sums of Money Was
False, and the Government Knew or Should Have
Known It Was False.

During the course of the trial, the prosecutor elicited from several witnesses that Tipton introduced Cory Johnson to him as his "brother," introduced Roane to them as his "cousin," and discussed his supplier, "Light", who he bought from when he went "Uptown" to buy drugs.  The government elicited this testimony to enhance the credibility of otherwise unreliable testimony, by arguing to the jury that, since none of the "Virginia witnesses" had ever met Scott, they and Scott must have been telling the truth throughout their testimony.  The petitioner's investigation has revealed that certain of Scott's perjured statements were used to create a seemingly unassailable link between Tipton, Johnson, and the New York Boyz.

During opening statements, prosecutor Vick told the jury that:

> you will hear from Greg Scott, for example, about "Light."  Then you will hear from Maurice Saunders, who doesn't know Greg Scott, about going to New York from Richmond and meeting "Light," who was one of the New York Boyz and their source of cocaine.  Your common sense will tell you that testimony meshes and shows that they are telling the truth.  How could two people who don't know each other tell the same story unless they had seen it?

JA 1648 (Tr. 818).

Maurice Saunders, who was 18 at the time of the trial, did corroborate Scott's testimony that "Light" was Tipton's

26

supplier. According to Saunders, after Christmas of 1991, he and Tipton's friend, "Hess," traveled to New York "[t]o bring back crack cocaine and some vials."[6] JA 2160. He testified that he and Hess went to 155th and Amsterdam, where he was introduced to "Light". Saunders claimed that he had heard the name "Light" from Tipton before. JA 2161-62. He and Hess traveled to New York with $18,000, which Hess used to buy a kilo of cocaine. Saunders gave dramatic testimony that he was advised by Tipton that on this trip he should "act like you don't know and forget what you see." Tr. 2162-64.

According to Saunders, he made a second trip to New York, this time with Tipton. Again, they went to 155th and Amsterdam, where he again saw "Light" and other reputed members of the New York Boyz. Tipton again told him to "act like you don't know and forget what you see." On this trip, they brought $40,000 and purchased 2 ½ or 3 kilos of cocaine.

The problem with Saunders' testimony is that John Matthews, a.k.a. Rufus Alvarez, a.k.a. "Light" was arrested for selling drugs on December 3, 1990, and remained incarcerated until he was released on April 2, 1996. Ex. 2. Saunders could not have been introduced to "Light," much less have purchased drugs for him. Moreover, petitioner's

---

6/ Hess was identified by Saunders and other government witnesses as Tipton's enforcer," who traveled to Virginia because things had gotten too hot for the New York Boyz in the North.

investigator has spoken with Jorge Delao, a.k.a. "Hess", who admits that he did travel to New York with Saunders in December, 1991. They did not make this trip, however, to purchase cocaine from "Light". Rather, they traveled to New York to buy clothing, jewelry, and vials in which to package crack. Delao admits that he knows John Matthews, and that he used to sell drugs, but he did not purchase a kilo of cocaine during his trip to New York with Saunders.

Saunders' testimony was not limited to his recount of his trips to New York. Rather, it was broad-ranging and severely damaging to all defendants, generally, and to Tipton in particular. For example, he testified that, more than once, Tipton told him that "you only deal with me if you value your life," and that "if it was to come down to that, he would do anything as far as to kill for." JA 2152-53.

As it did with other witnesses, the government elicited from Saunders testimony that Tipton introduced Cory Johnson to him as his "little brother" and introduced Roane to him as his "cousin James." JA 2171-72. The obvious reason for this was to bolster the testimony of Greg Scott.

The government relied heavily upon Maurice Saunders' testimony during closing argument. For example, concerning the requirement that the CCE generated substantial income prosecutor Vick reminded the jury of:

> Maurice Saunders' testimony . . . of ounce after
> ounce of cocaine being cooked up and sold on a

28

weekly basis here in the City of Richmond. There is absolutely no issue concerning whether there was more than 50 grams of crack cocaine sold by these people.

JA 3801. (Tr. 2976).

To convince the jury that he had not orchestrated the government's case and suborned perjury, prosecutor Vick stated:

> I will remind you of the testimony about the New York Boyz, 155th and Amsterdam Avenue, who went to Trenton, and came then south through "Whitey," and set up shop in Richmond. And I'll show you how the testimony meshes in that regard and is an example of how you should weigh the testimony that you received from the witness stand and see how it meshes. Remember what Greg Scott told you about that, 155th and Amsterdam Avenue, the New York Boyz, "Whitey", and "O" got cocaine, and this is very important, "Whitey" and "O" got cocaine. Their primary source of cocaine was from a fellow named "Light." Remember that testimony? Maurice Saunders later testified he doesn't know Greg Scott from Adam. Has never met Greg Scott. But Maurice Saunders testified to you that indeed, he went to 155th and Amsterdam Avenue in New York with "Hess" and "Whitey" to get cocaine. And who did they get cocaine from? "Light."
>
> Again, that clearly rings true, that testimony. It shows you that those people are telling you the truth, and that the only way they wouldn't be telling you the truth is if you indeed believed that we got together and orchestrated their testimony in some way, told them how to testify. If you don't believe that, then indeed that proves their testimony to be true. How could two people testify about the same thing when they have not had an opportunity to talk to each other, don't know each other? The only way they could is if that is indeed a fact.

JA 3802-03 (Tr. 2977-78).

Concerning the element that the CCE generated substantial income, prosecutor Vick urged the jurors to:

29

remind yourself of the testimony of Maurice
Saunders; that on one occasion he took $18,000 to
New York to purchase cocaine, and on the other
occasion he took $40,000 to purchase cocaine.  The
money came from "Whitey."  Forty thousand dollars
is a lot of money, ladies and gentlemen.  And from
unimpeachable sources we know that they generate
substantial money.

JA 3812.  (Tr. 2987).

Without the testimony of Scott and Saunders, the
government could not have proven that Johnson, Tipton and
their co-defendants were leaders of a long-standing, highly-
organized, violent gang having its genesis in the dreaded
"North".  Indeed, the murders that prompted the
investigation in this case were committed during a period of
weeks, and not years.  The obvious falsity of the testimony
given by Greg Scott and Maurice Saunders calls into question
the credibility of every single witness who testified in
this case.

Defense counsel for Johnson and his co-defendants were
correct--the prosecution orchestrated the testimony
presented to convince the jury that Tipton, Johnson, and
Roane managed and supervised a CCE and that they committed
the charged murders to further this enterprise.  The
government's use of this false testimony to implicate
Johnson and his co-defendants in a non-existent CCE was
fundamentally unfair and denied Johnson's rights to due
process, effective assistance of counsel, trial by an
impartial jury, and to be free of cruel and unusual
punishment, under the Fifth, Sixth, and Eighth Amendments to

30

the United States Constitution.  There can be no doubt that Johnson was prejudiced for there is a reasonable probability that the false testimony could have affected the judgment of the jury.   See Brady v. Maryland, 373 U.S. 83 (1963); United States v. Bagley, 473 U.S. 667 (1985); Kyles v. Whitley, 115 S. Ct. 1555 (1995).   Accordingly, Johnson's convictions and sentences on all counts should be vacated and a new trial ordered.

II.   THE EVIDENCE WAS LEGALLY INSUFFICIENT TO CONVICT JOHNSON AS A SUPERVISOR OF A CONTINUING CRIMINAL ENTERPRISE UNDER 21 U.S.C. SECTION 848.

Johnson's CCE conviction is based on legally insufficient evidence, improper jury instructions, prosecutorial misconduct, and ineffective assistance of counsel, all regarding the supervision element of 21 U.S.C. §848, in violation of the Fifth, Sixth, And Eighth Amendments.

Johnson's death sentence is dependent upon his conviction of engaging in a continuing criminal enterprise ("CCE") under 21 U.S.C. §848.  A careful examination of just one element of the CCE offense -- the supervision element -- reveals a series of problems that render the CCE conviction invalid.  These problems fall into three basic areas:

(1)   The jury was allowed to consider as alleged "supervisees" a large number of persons who, as a

31

matter of law, could not be counted as supervisees.  As a result, the CCE convictions must be vacated.  *See, e.g., United States v. Barona,* 56 F.3d 1087 (9th Cir. 1995); *United States v. Jerome,* 942 F.2d 1328 (9th Cir. 1991) (discussed in detail below).

(2)   In comparison to other circuits, the Fourth Circuit holds the Government to a lower burden of proof on the supervision element.  The Fourth Circuit does not require that the Government prove the element of "management" in all CCE cases, while other circuits always require proof of "management."  The Fourth Circuit standard is not the correct one, and Johnson's conduct was not evaluated under the proper standard.

(3)   A close examination of the evidence reveals that Johnson did not supervise the required five individuals, *under any standard*.  The Government misled the jury into concluding that there was supervision by presenting a huge volume of misleading evidence with no apparent foundation of personal knowledge.  Johnson is entitled to habeas corpus relief because upon the evidence adduced at trial "no rational trier of fact could have found proof of guilt beyond a reasonable doubt."

32

*Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791-2 (1979) (applying section 2254).

These three categories of problems translate into several distinct matters supporting the Petition: (1) the jury was not correctly instructed on the law; (2) there was insufficient evidence to establish a CCE; (3) prosecutorial misconduct; and (4) ineffective assistance of trial and appellate counsel.

The following subsections of the Petition analyze the relevant legal standards, and then apply those standards to the facts of this case.

A.    The CCE Supervision Element: Governing Principles

To support Johnson's CCE conviction, the Government must prove that he committed certain offenses as part of a continuing series of offenses which were undertaken by him "in concert with five or more other persons with respect to whom [he] *occupies a position of organizer, a supervisory position, or any other position of management.*" 21 U.S.C. §848(c) (emphasis added).    In order for a person to qualify as a CCE supervisee, there must be an agreement between the controlling party and the controlled person. *United States v. Ward*, 37 F.3d 243, 249 (6th Cir. 1994), citing *United States v. Jeffers*, 432 U.S. 137, 148050, 97 S.Ct. 2207, 2214-16, 53 L.Ed.2d 168 (1977) ("[Section] 848 does require proof of an agreement among the persons involved in the continuing criminal enterprise.").

33

In the context of this case, several aspects of the supervision element must be considered.

1.  The Fourth Circuit Does Not Require Proof Of Management By The CCE Defendant In All Cases, While Other Circuits *Always Require Proof Of A Management Relationship.*

The Fourth Circuit has held that the supervision element is satisfied by alternative means.  The first method is proof of a supervisory or managerial relationship, which requires a showing of some degree of control by the defendant over the other persons.  *United States v. Butler*, 885 F.2d 195,  200-1 (4th Cir. 1989).  The second method is to show that the defendant acted as an organizer, which is defined as "a person who puts together a number of people engaged in separate activities and arranges them . . . in one essentially orderly operation or enterprise."  *Id.* According to the Fourth Circuit, proof of a managerial relationship is not required of an "organizer."  *Id.*

The Fourth Circuit's view on this point has been rejected by other circuits, which hold that even an "organizer" must exercise managerial responsibility.  *See, e.g., United States v. Lindsey*, 123 F.3d 978, 987 (7th Cir. 1997) ("organizing for CCE purposes requires more than simply coordinating various players; it requires some exercise of managerial authority"); *United States v. Possick,* 849  F.2d 332, 335-6 (8th Cir. 1988) ("A defendant . . . need only occupy some managerial position....  In essence, the management element is established by

34

demonstrating that the defendant exerted some type of influence over another individual as exemplified by that individual's compliance with the defendant's directions, instructions, or terms."); *United States v. Barona,* 56 F.3d 1087, 1097 (9th Cir. 1995) ("The syntax of the statute [implies] that "organizers are counted only if they exercise some sort of managerial responsibility."); *United States v. Delgado,* 4 F.3d 780, 786 (9th Cir. 1993) ("it is not enough to be just a non-managerial organizer."); *United States v. Apodaca,* 843 F.2d 421, 426 (10th Cir. 1988) ("'organizer' and 'supervisor' are but two examples of managerial roles"); *United States v. Williams-Davis,* 90 F.3d 490, 508-9 (D.C. Cir. 1996), *cert. denied,* ___ U.S. ___, 117 S.Ct. 986 (1997).

Thus, it is clear that the Fourth Circuit approach of not requiring proof of management *frees the Government of proving what other circuits recognize to be an essential element of the CCE offense:* "management."

(Although, as discussed below, the supervision element of a CCE was not proven as to Johnson under either standard, there is no doubt that Johnson's position at trial and on appeal would have been much stronger had the Government been required to prove the management element. As discussed below, the discrepancy between the Fourth Circuit's standard and the majority rule was not raised by Johnson's trial or

35

appeal counsel, which results in ineffective assistance claims both at the trial level and on appeal.)

> 2.  Proof Of A Buyer-Seller Relationship In A Drug Distribution System Does Not Establish The Supervision Element.

It is beyond dispute that a relationship of buyer and seller of drugs, even wholesaler and retailer, is insufficient to establish the "organization, supervision or management" under Section 1848. *See United States v. Butler*, 885 F.2d at 200; *United States v. Delgado*, 4 F.3d 780, 785-86 (9th Cir. 1993); *United States v. Patrick*, 965 F.2d 1390, 1396 (6th Cir. 1992); *United States v. Jenkins*, 904 F.2d 549, 553 (10th Cir. 1990). As the Fourth Circuit recently explained, "[b]uyer-seller relationships are not characterized by 'the exercise of power or authority.'" *United States v. Hall*, 93 F.3d 126, 130-1 (4th Cir. 1996), *cert. denied* ___ U.S. ___, 117 S.Ct. 1087 (1997). Thus, "[s]elling [drugs] to people does not make one an organizer of customers, even wholesale customers. *Barona* at 1096 (citing *U.S. v. Delgado*, 4 F.3d 780, 785 (9th Cir. 1993).

This fundamental rule has a number of corollaries: Mere extensions of credit from seller to buyer or "fronting," absent other indicia of authority or control, does not establish the supervision element. *United States v. Shifflett*, 93-5693, 1995 WL 125506 (4th Cir. March 23, 1995) *(per curiam)*; *United States v. Ward*, 37 F.3d 243, 248 (6th Cir. 1994); *United States v. Possick*, 849 F.2d 332, 336 (8th

36

Cir. 1988); *United States v. Delgado*, 4 F.3d 780, 787 (9th Cir. 1993); *United States v. Witek*, 61 F.3d 819, 822 (11th Cir. 1995), *cert. denied*, 116 S.Ct. 738 (1996). The element of supervision is not satisfied when a supplier gives a buyer directions and instructions concerning where to meet for a drug purchase. *United States v. Ward*, 37 F.3d at 249. The element of supervision is not satisfied when the drug supplier changes arrangements for delivery or controls the quality of the cocaine. *United States v. Silvers*, 888 F. Supp. 1289, 1304 (D. Md. 1995). The element of supervision is not satisfied by a defendant who "simply sets up a system of supply." *Jerome* at 1331, citing *United States v. Apodava*, 843 F.2d 421, 426 (10th Cir. 1988). The seller's imposition of specifications regarding beepers and surreptitiousness for meetings and deliveries does not establish the supervision element. *Id*. The need of buyers and sellers to accommodate one another when meeting and arranging for delivery is incidental to the buyer-seller relationship and thus not proof of supervision. *United States v. Witek,* 61 F.3d at 823; cited with approval in *United States v. Lindsey*, 123 F.3d 978, 987 (7th Cir. 1997).

(As discussed in detail below, many of the alleged supervisees had nothing more than a buyer-seller relationship with one or more of the defendants. Defense counsel at trial and appeal failed to demonstrate this or address its significance, or to get a proper jury

37

instruction, which again results in ineffective assistance claims both at the trial level and on appeal.)

### 3. The Government Was Required To Prove That Johnson *Himself* Satisfied the Supervision Element.

The plain language of the CCE statute provides that the Government must prove that each defendant supervised at least five persons. *See also, e.g., See, United States v. Butler*, 885 F.2d 195, 201 (4th Cir. 1989) (focusing on control or organizational activities by the defendant);[7] *United States v. Alvarez*, 860 F.2d 801, 816-17 & n.14 (7th Cir. 1988), modified in another respect, 868 F.2d 291 (7th Cir. 1989), vacated on other grounds, 956 F.2d 1165 (7th Cir. 1992) ("other persons" supervised or controlled not by defendant, but by another member of the alleged enterprise "on the same hierarchical plane" as the defendant, could not be considered to have been organized, supervised or managed by the defendant).

(As discussed below, the Government did not prove that Johnson *himself* had a supervisory relationship to at least five people. Defense counsel at trial and appeal failed to demonstrate this or address its significance, which again results in ineffective assistance claims both at the trial level and on appeal.)

_____

[7] The Fourth Circuit, relying on cases from other Circuits, recognized in dicta that organizational authority and responsibility can be delegated. *Id*. Delegation is not an issue in this case.

4.    A CCE Conviction Must Be Vacated Where (As Happened Here) The Court Does Not Properly Instruct The Jury After The Government Introduces Evidence Of Individuals Who, As A Matter Of Law, <u>Are Incapable Of Counting As "Supervisees."</u>

When (as happened here) (1) the Government introduces evidence of a large number of individuals involved in various drug activities and argues to the jury that those individuals were supervisees, and (2) some of those persons were, as a matter of law, incapable of counting as supervisees, the law requires that special instructions be given to the jury. The failure to give those special instructions -- even if not requested by trial counsel -- requires that the CCE conviction be vacated. *See United States v. Barona*, 56 F.3d 1087, 1097 (9th Cir. 1995); *United States v. Jerome*, 942 F.2d 1328 (9th Cir. 1991).

In *United States v. Barona,* 56 F.3d 1087, 1097 (9th Cir. 1995), the government had produced at trial "an extensive list of individuals, allowing the jury to pick those it felt met the definition of supervisee." *Id.* at 1096. Some of those individuals could not legally qualify as supervisees because (it appears from the decision) the evidence showed only that they were re-sellers of drugs obtained from the defendants. *Id.* at 1096-7. The jury convicted the defendant of CCE.

On appeal, the Government argued that the conviction should stand because the evidence supported a finding that at least five of the people were supervisees of the

39

defendants, and it should be presumed that the jury chose the correct five because it was properly instructed on the law. *Id*. at 1097. The Ninth Circuit rejected the Government's contention *and vacated the convictions*. The court's analysis of the case is clear and compelling:

> *If certain individuals were, as a matter of law, incapable of counting as supervisees, the jury needed to be instructed of this.*
>
> The problem in this case is not that the jury was presented with more than five individuals, or even that the jury may have chosen different people from the list of potential supervisees to fulfill the role. The problem is that, among the list of people who the jury was told that it could choose, there existed individuals that the jury was not allowed to choose as a matter of law.
>
> The government's contention that we should presume that the jury picked the proper five supervisees has some initial appeal.... But upon closer inspection, [this presumption] cannot save the legal error that occurred here.
>
>     \* \* \* \*
>
> [Defendants] are not just contending that the evidence with respect to the list of supervisees is insufficient to support a finding by the jurors that five of them could not have played the requisite role. Rather, they are making the argument that certain persons on the list, given their role, could not have been supervisees of [defendants] as a matter of law. Based on *Delagado*, certain individuals could not be counted as supervisees, even if the jury made the precise factual findings that the government asked the jurors to make.... Where the jury is presented with a legally inadequate theory, [*Yates v. United States*, 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957)] *requires that the conviction be vacated and the case retried as to that charge.*
>
> Here, we cannot tell whether the jury selected one of the purported supervisees who was actually ineligible under *Delgado*. There were no instructions directing the jury to exclude one who is only a customer. Lacking some assurance that proper

40

differentiation could be made, the verdicts . . . must
be reversed.

*Barona*, 56 F.3d at 1097-8. [8]  As discussed further below, the
facts of this case are even more compelling than those of *Barona*.

In *United States v. Jerome*, 942 F.2d 1328 (9th Cir. 1991),
the Ninth Circuit was presented with another case just like this
one:  one where the jury was presented with potential supervisees
who were incapable of qualifying as supervisees.  There, as here,
there was no apparent objection by trial counsel.  There, as
here, the jury was not instructed that it must unanimously agree
to the identity of each of the five supervisees, and trial
counsel did not request such an instruction.  *Id*. at 1331.

The Ninth Circuit, on direct appeal, found plain error in
those circumstances, notwithstanding its general rule that "only
rarely will an improper jury instruction justify a finding of
plain error."  *Id*. at 1331.  The court went on to vacate the CCE
conviction, offering the following analysis:

> [A] genuine possibility of juror confusion exists when it is
> possible that some jurors will convict on the basis of one
> set of facts while others will convict on the basis of
> another set of facts.  *The jury in this case was presented
> with a variety of persons that the prosecution told them
> could count* in making up the five persons necessary to
> trigger the statute.  However, some of the people named by
> the prosecution could not have been organized by Jerome.  *In
> such a case the court must give the jurors a unanimity*

_____

[8]    In the very recent decision in *United States v. Lindsey,* 123
F.3d 978 (7th Cir. 1997), the  Seventh Circuit followed the Ninth
Circuit's *Barona* analysis in a direct appeal where counsel had
failed to object at trial.  The court did not vacate the CCE
conviction on direct appeal, but openly suggested ineffectiveness
of trial counsel, observing that had the defendant "objected to the
argument, and been overruled, we would have a much more difficult
problem."  *Id*. at 985.

41

*instruction* -- that is the jury had to be instructed that they must unanimously agree as to the identity of each of the five people Jerome organized, managed or supervised. *The failure of the court so to instruct was highly prejudicial, with a high probability of substantially affecting the jury verdict. Plain error, the failure calls for reversal of Jerome's [CCE] conviction.*

*Id.* at 1331 (citations omitted; emphasis added).

Thus, although in the ordinary CCE case there is no requirement in the Fourth Circuit that the jury be instructed that it must unanimously agree as to the identity of the supervisees, *see, e.g., United States v. Tipton*, 90 F.3d 861, 885-6 (4th Cir. 1996); *United States v. Hall*, 93 F.3d 126, 130 (4th Cir. 1996), it is not an ordinary case when the Government identifies for the jury individuals who were not capable of being supervisees. In such a case, as in *Jerome* and *Barona*, the failure to so instruct the jury requires that the CCE conviction be vacated.

B.    The Government's Effort To Prove The Supervision Element.

Over several weeks of trial, the Government presented a multitude of witnesses testifying about many potential supervisees. Then, during closing argument the Government argued to the jury that *each of the individuals the jury had heard about were supervisees.* Although the Government's evidence was voluminous as measured by time and number of witnesses, the evidence failed in at least two critical respects regarding the supervision element of the CCE.

42

First, many of the alleged supervisees were incapable of qualifying as supervisees, and the jury was not instructed as required in *Barona* and *Jerome*. As discussed above, this fact is fatal to the CCE conviction and requires that the writ be granted and the conviction be vacated.

Second, when the record is examined closely, it is apparent that there is simply no evidence demonstrating that Johnson supervised five individuals.

1.   Many Of Alleged "Supervisees" Were Individuals Who, As A Matter Of Law, Were Not Capable Of Being Supervisees, And Proper Jury Instructions Were Not Given; Under <u>Barona and Jerome, The CCE Convictions Must Be Vacated.</u>

In closing argument, the prosecutor argued to the jury that it could consider a huge list of specified individuals -- *as well as everyone else they heard testimony about* -- to be potential supervisees. Specifically, the prosecutor identified the following persons as potential supervisees:

> "30 or so New York Boyz"
> Denise Berkley
> Priscilla Greene
> Curt Thorne
> Linwood Chiles
> Jerry Gaiters
> Sterling Hardy
> Papoose Davis
> Hussone Jones
> Charles Townes
> "Man, Man", Maurice Saunders,
> Antwoine Brooks
> "the people from Charles City that were testified about"
> Pam Williams
> Charlotte Moore
> Greg Noble
> Sam Taylor
> "and a number of others you have heard testimony about."

43

Tr. 2983-4.    The prosecutor also told the jury (incorrectly as discussed below):

> [Y[ou need not find that each and every one of these people supervised five or more people themselves.  You need find only that as a group, there were five or more people involved. And I suggest to you it is clear from the evidence that *there were five or more people involved in the distribution of cocaine,* just here in the City of Richmond.
>
> * * * *
>
> [The evidence showed that defendants] were the people who organized the workers, who went out and recruited the workers, who supplied the workers with the cocaine, and that those workers went forth and sold their cocaine on the streets of the City of Richmond.  That's all that is required by the law.

Tr.  2984-5 (emphasis added).    Here, the Government expressly argued, contrary to law, that individuals could be CCE supervisees if they were involved in the distribution of drugs.

Apart from the improper reference to drug re-sellers generally, it is beyond dispute that the Government's list of names is overly broad, and that many of these individuals simply could not qualify as supervisees as a matter of law -- even assuming a proper foundation for the testimony about them.    (As discussed below, in many cases there is no foundation establishing personal knowledge by the witnesses.)    In the case of some of the individuals, they could not be CCE supervisees because the Government's unchallenged evidence showed only that they resold drugs obtained from the defendants.    In other cases, the Government's unchallenged evidence showed that the individuals were "partners" of the defendants, and by definition

44

not "supervisees." *See, e.g, United States v. Ward*, 37 F.3d 243, 248 (6th Cir. 1994) ("[I]f anything, her testimony indicates that Ward and Hicks were acting as partners in this transaction. Thus, we find no evidence from which the jury could reasonably infer that Ward was 'supervising' or 'organizing' . . . Hicks"). And in virtually all of the foregoing and many others, there was no evidence whatsoever of any acts of supervision or management (or even "organization" without management, under the Fourth Circuit's standard) by Johnson or any other defendant.

The following table is a *partial* list of alleged supervisees who, as a matter of law, could not have been counted as Johnson's supervisees for the foregoing reasons (note that the table assumes that each piece of evidence is based on personal knowledge and a proper foundation; in fact, as discussed below at page 56, the vast majority is not):

45

Table  1

| So-called "supervisee" argued by prosecutor: | Evidence about the individuals demonstrating that such person is not capable of being a "supervisee": |
|---|---|
| "30 or so New York Boyz" | There is no evidence that Johnson supervised "30 or so" members of this organization.  To the contrary, the only evidence about the "workers" of the New York Boyz was that there were about 20, and they would buy drugs from the New York Boyz and sell drugs to someone else.  Tr. 913. |
| "the people from Charles City that were testified about | There is no evidence that Johnson supervised anyone in Charles City County. The only evidence about Charles City County was that a government witness testified that Tipton "was selling drugs in Charles City."  Tr.1313- 4 |
| Dorothy "Mousey" Armstrong | This individual was a "partner," according to a Government witness, Tr. 1888 (testimony of Robert "Papoose" Davis)[9]; drug reseller, Tr. 1684 (testimony of Denise Berkley). |
| Swain Ball | The only evidence about this person is that he was an "employee," Tr. 2324.  According to his grand jury testimony, this individual's  only relationship with Johnson was that he obtained drugs from Johnson, sold them, and split the proceeds with him.  Ex. 3. |
| Johnny Lee Byrd | This individual distributed drugs with Doug Talley; purchased his drugs from Robert "Papoose" Davis.  Tr. 1432, 1438. |
| Antwoine Brooks | This individual was a "partner," according to two Government witness.  Tr. 1545 (testimony of Hussone Jones); Tr. 1146 (Tr. 1146).   *The Government concedes that Brooks was a partner.* Ex. 4 (excerpt of Government's brief to the Fourth Circuit, page 10.) |

---

[9]    Denise Berkley testified, without any factual basis, that Armstrong was a "worker."  Tr. 1684.

46

| | |
|---|---|
| "Damien" | This individual was involved with Tipton, in an unspecified manner, selling drugs. Tr. 1317. |
| Jerry Gaiters | This individual testified that he sold drugs obtained from Roane, and *had no relationship with Johnson.* Tr. 2324. |
| Priscilla "Pepsi" Green | According to one witness, this individual was a drug reseller. Tr. 1690. However, *Green herself denied that she had ever sold cocaine.* Tr. 2546. |
| Sterling Hardy | On a single occasion, this individual received $5 from Roane to deliver a vial of cocaine to a person named Denise. Tr. 2324. |
| Rhonda Hollman | Roane or Tipton offered this individual a drug deal but she declined. She testified that she was a partner of Peyton Johnson. Tr. 1964, 1974. |
| Peyton Maurice Johnson | This individual sold drugs to Robert Davis, Tr. 1909, and was a partner of Rhonda Hollman, Tr. 1961. |
| Charlotte Moore | This individual bought guns for "Studie"; Tipton paid her $100. Tr. 2492-5 (testimony of Charlotte Moore). |
| Greg Noble | Tipton gave this individual drugs, and he could do whatever he wanted with them. Tr. 2620. |
| Nat Rozier | This individual brought people who bought cocaine from defendants. Tr. 1892-3 (testimony of Robert "Papoose" Davis). |
| Hussone Sanders | This individual was a reseller of drugs obtained from Tipton. Tr. 1321. |
| Leroy Slater | This individual was a drug reseller, who allowed Tipton to stay at his house, where Tipton cooked cocaine twice. Tr. 2630-2. |
| Sandra Reavis | This individual was a "partner," according to a Government witness. Tr. 1888, Tr. 1950 (testimony of Robert "Papoose" Davis); "was in on it [with the defendants] with the cocaine," according to another Government witness, Tr. 1675 (testimony of Denise Berkley). |

47

| J.T. Taylor | This individual sold drugs he obtained from Tipton. Tr. 1545. |
|---|---|
| Lance Thomas | This individual was Tipton's "partner." Tr. 1559. *The Government concedes that Thomas was a partner.* Ex. 4 (excerpt of Government's brief to the Fourth Circuit, pp. 9-14.) |
| Curt Thorne | This individual was a drug reseller. Tr. 2547. |
| Charles Towns | This individual was a drug reseller who obtained drugs from Tipton. He testified that he was free to do anything he wanted with his drugs. *See* Tr. 1239-40. |

With respect to each of these individuals, there is no evidence demonstrating any act of management by Johnson; nor, even assuming that the Fourth Circuit standard were valid, is there any evidence demonstrating any act of "organization" without "management" by Johnson. Indeed, in many instances, there was not even any evidence of any relationship at all between these individuals and Johnson. As a matter of law, each one was incapable of being Johnson's supervisee.

In view of the foregoing, trial counsel should have sought instructions (1) identifying for the jury, as required in *Barona*, which individuals could not be supervisees, and (2) requiring the jury, as in *Jerome*, to unanimously agree as to the identity of each of the five supervisees. Although trial counsel failed to do so, under *Barona* and *Jerome* the CCE convictions must be vacated.

48

2.    There Is No Admissible Evidence Demonstrating That Johnson Supervised Five Individuals Within The Meaning Of The CCE Statute.

In a wide variety of respects, the supervision element as to Johnson was given no meaningful attention by anyone involved in the trial or appeal of the case -- lawyers, prosecutors, courts, and ultimately jury members.  As a threshold matter, at trial the government avoided direct proof of supervision, opting instead to introduce (1) repetitive testimony characterizing various persons with the ambiguous and misleading labels "worker" and "employee"; and (2) supplemental evidence of purported fact that was unsupported by apparent personal knowledge.

Trial counsel failed to object consistently to this improper testimony or to seek cautionary instructions to the jury when it repeatedly occurred.  On those few occasions when defense counsel did object, this Court overruled the objections, permitting the Government to steamroller Johnson with unfounded evidence.  Then appellate counsel failed to raise this issue on appeal.

The net result is simple:  the supervision element was not proven by any plausible standard, and the jury could not have properly found Johnson to be guilty of the CCE charge.

a.    The Government Relied Principally On The Conclusory Terms "Worker" And "Employee" To Prove Supervision; Such Terms Misled The Jury And Prejudiced Johnson And The Other Defendants.

As shown on the following table of transcript references, the Government repeatedly offered testimony by numerous witnesses using the terms "worker" and "employee" to establish that at least 16 individuals were CCE supervisees:

49

Table 2
Alleged Supervisees
Labeled as a "worker" or "employee"
(or words of similar import):[10]

| Individual | Transcript Reference |
|---|---|
| Dorothy "Mousey" Armstrong | Tr. 1684 (testimony of D. Berkley), Tr. 1883 (testimony of R. Davis) |
| Swain Ball | Tr. 2324 (testimony of J. Gaiters). Note, however, that this individual testified to the grand jury that his only relationship with Johnson was that he obtained drugs from Johnson, sold them, and split the proceeds with him. Ex. 3. |
| Denise Berkley | Tr. 1891 (testimony of R. Davis) |
| Linwood Chiles | Tr. 1683-4 (testimony of D. Berkley); Tr. 2708-9 (testimony of V. Butler |
| "Damien" | Tr. 1319 (testimony of M. Sanders) |
| Robert "Papoose" Davis | Tr. 1684 (testimony of D. Berkley), Tr. 2324-5 (testimony of J. Gaiters); Tr. 1883, 1888 (testimony of R. Davis) |
| Jerry Gaiters, Tr. | Tr. 2324 (testimony of J. Gaiters); Tr. 1684 (testimony of D. Berkley); Tr. 1889 (testimony of R. Davis) |
| Priscilla "Pepsi" Green | Tr. 1690 (testimony of V. Butler). Significantly, however, *Green herself denied that she had ever sold cocaine.* Tr. 2546. |
| Hussone Jones | Tr. 2708 (testimony of V. Butler) |
| Keith Ross | Tr. 2324-5 (testimony of J. Gaiters) |
| Maurice Sanders | Tr. 1545 (testimony of H. Sanders) |
| Doug Talley | Tr. 2330 |
| J. T. Taylor | Tr. 1546 (testimony of H. Sanders) |
| Curt Thorne | Tr. 1890-1 (testimony of R. Davis); Tr. 2708 (testimony of V. Butler); Tr. 2324 (testimony of J. Gaiters) |

---

[10]    This list is intended to be illustrative, not exhaustive. The undersigned believes that there are additional examples of this in the record.

50

| Charles Towns | Tr. 1147 (testimony of C. Towns) |
|---|---|
| J.T. Williams | Tr. 1546 (testimony of H. Sanders) |

At first glance, this constant use of the labels "worker" and "employee" has meaning. After all, to a jury familiar with normal employment situations, the terms "worker" and "employee" would naturally suggest an element of supervision. But as a closer examination shows, the terms as used by the Government's witnesses are utterly ambiguous and *not* probative of any aspect of supervision. Indeed, *the Government's own evidence reveals that the witnesses who used these terms gave them definitions having no connection whatsoever to the supervision element, whether under the Fourth Circuit test or the test followed in other Circuits.* For example,

- A Government witness identified several persons as "workers." He then defined that term to mean the people in the drug distribution chain who "get a little percentage of the money." Tr. 1545 (testimony of Hussone Sanders). The same witness identified several persons as "workers," only to describe them as people who sold drugs that they obtained from Tipton. *Id.*

- A Government witness used the term "partner" and "worker" interchangeably to describe her own status in the drug distribution chain, and she also suggested that the distinction between "partner" and "worker" was that the "partner" received more money. Tr. 1961, Tr. 1973 (testimony of Rhonda Hollman).

- A Government witness, during his direct examination by the Government, first testified that a particular individual was a "worker" and then testified that she was a "partner." Tr. 1883, 1888 (testimony of Robert "Papoose" Davis).

- A Government witness testified that he was a "worker" during a transaction when he merely took $300 worth of drugs from

51

Tipton for resale, and agreed to split the proceeds with him.  Tr. 1154, Tr. 1168 (testimony of Charles Towns).

- A Government witness testified that he was not a "partner" because he "had to bring money back" after he sold drugs obtained from the defendants.  Tr. 1159.

- A Government witness described another individual as a "worker," only to disclose that the person's role with the defendants was to be the "maid of the house."  Tr. 1891.

- A Government witness described Robert Davis as an "employee" of the defendants.  Tr. 2324-5.  Davis himself testified to no facts suggesting a relationship of employment or supervisee with any defendant.

- A Government witness testified Priscilla Green "worked for" the defendants.  Tr. 1690.  Green herself testified to no facts suggesting a relationship of worker or supervisee with any defendant.

- A Government witness who called himself a "worker" also testified that he received drugs from Tipton; that he was free to do anything he wanted with those drugs;  that no one was telling him what to do, where to go, or how to do it; that he was responsible for making his own money; and as long as he paid Tipton for the drugs, Tipton did not care what he did with them.  Tr. 1239-40.

- On at least one occasion, the Government engaged its witness in a series of questions that reveals the real meaning of "worker":

> Q:  As to the relationship of "Mousey" Armstrong with [Johnson], do you know what that relationship was?
>
> A:  She used to work for him.
>
> Q:  Where did you get that term, "worker?"
>
> A:  It is *a street term when somebody is selling somebody else's product.*
>
> Q:  *When you say worked for her, what do you mean?*
>
> A:  Well, *you would give somebody a percentage of what you sell.*
>
> Q:  Was there a difference between [Johnson] and "Mousey?"

52

A:    Yes.  Well, *[Johnson] is the supplier and "Mousey" was the worker.*

Q:    As to Jerry Gaiters, in his relationship with [Tipton], do you know what that relationship was?

A:    Yes.

MR. WHITE:    Objection.  Same objection.  He can say what he saw. [(This is an example of a proper objection to lack of foundation that was incorrectly overruled.)]

THE COURT:  Overruled.

BY MR. VICK:
Q:    Go ahead.

A:    He would supply  -- *[Tipton] would supply and Jerry was the worker.*

Tr. 2107-8 (emphasis added)

It is clear from the foregoing that the "worker" has been used to mean almost everything -- from a person providing maid service, to a person who gets only a small percentage of drug proceeds, to a person who obtains drugs for resale from a supplier -- *almost anything, that is, except a person who is a CCE supervisee.*

Thus, although the terms "worker" and "employee" seem to suggest supervision, in reality -- and as used by the Government's witnesses -- the terms have nothing to do with CCE supervision.

Conclusory terms that amount to opinions and personal characterizations, but do not state facts, are insufficient to establish supervision. *See, e.g., United States v.* Silvers, 888 F.Supp. 1289, 1303-4 (D. Md. 1995) (in a CCE case, rejecting witnesses' "conclusory assertions" purporting to show

53

supervision); *United States v. Becker*, 892 F.2d 265, 267 (3rd Cir. 1989) (in a CCE case, holding that a witness's characterization is not determinative of the supervision element; looking instead to the facts established by the evidence).

Moreover, in any context, conclusory opinions and characterizations by lay witnesses are inadmissible under FRE 701 unless, among other things, such testimony is "helpful to a . . . determination of a fact in issue." Given the ambiguity of the terms "worker" and "employee" in this case, such opinions and characterizations cannot possibly be helpful. Indeed, the characterization of an individual as a "worker" or "employee" is essentially a legal conclusion which should not have been presented to the jury by testimony. *See, e.g., Christiansen v. National Savings And Trust Co.*, 683 F.2d 520, 529 (D.C. Cir. 1982) (inadmissibility of conclusion that defendants held a "fiduciary" relationship).

The characterizations "employee" and "worker" were clearly intended by the Government to establish that various individuals were "supervised" as normal "employees" and "workers" are. As such, the characterizations were not admissible because they did nothing but "tell the factfinder what result to reach," *Hogan v AT&T*, 812 F.2d 409, 411 (8th Cir. 1987), and, as discussed above, in this case did so in a very misleading manner. As one court stated in circumstances similar to those presented here, but without the element of misleading terminology:

> It is not clear whether the statements [that there was a pattern of age discrimination] were intended to be the

54

> opinions of an expert or lay witness. In either event, they amounted to legal conclusions.... Neither can it be said that the opinions helped with the determination of a fact in issue. To begin with, the question of whether age discrimination existed or not was the ultimate issue, not just a fact in issue. Although testimony which embraces an ultimate issue is not objectionable (Fed. R. Evid. 704), seldom will be the case when a lay opinion on an ultimate issue will meet the test of being helpful to the trier of fact since the jury's opinion is as good as the witness' and the witness turns into little more than an "oath helper."

*Mitroff v. Xomox Corp.*, 797 F.2d 217, 276 (6th Cir. 1986).

It is obvious that the Government's repetitive use of improper and inadmissible testimony describing various individuals as "workers" and "employees" played a significant part in the jury's verdict and therefore prejudiced Johnson. For example, the prosecutor's own closing argument focused on these terms:

> Each and every witness who took that stand testified remarkably consistently concerning their relationship with one another; that "J.R.," "O," "Whitey," "V" were *partners* or bosses; that they were the people who organized the *workers*, who went out and recruited the *workers*, who supplied the workers with the cocaine, and that those workers went forth and sold their cocaine on the streets of the City of Richmond. That's all that is required by the law.

Tr. 2985 (emphasis added). This emphasis by the prosecutors demonstrates the significance and likely impact of these terms upon the jury.

This testimony was also prejudicial on appeal. When examining sufficiency of the evidence, the Fourth Circuit held:

> [The] record reveals -- certainly supports findings beyond a reasonable doubt -- that these "retailers," in more than sufficient numbers as to each of the appellants, acted as *"workers"* who were either or both organized, supervised, and managed by appellants while acting as principal *"partners...."*

55

*United States v. Tipton,* 90 F.3d 861, 891 (4th Cir. 1996). Thus, it is apparent that the Fourth Circuit relied heavily on this improper, misleading testimony.

> b.    The So-Called Evidence Of "Supervision" Was Largely Without A Foundation Of Personal Knowledge And Was Inadmissible Under FRE 602

FRE 602 states:

> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.

This rule was repeatedly ignored by the Government, defense counsel, and the Court while the Government offered voluminous testimony concerning the roles and activities of various individuals (including the characterizations of such individuals as "workers" or "employees"[11]). This occurred with such frequency that it is impossible to identify every example. A lengthy list of examples of violations of FRE 602 -- in the context of the CCE supervision element and otherwise -- is set forth below starting at page 67.

> c.    Even the evidence cited by the Government on appeal does not establish that Johnson supervised five individuals.

Presumably, the Government's strongest case for showing that Johnson supervised five individuals was made in the Government's Brief to the Fourth Circuit. There, after making a series of

---

[11]    Thus, these characterizations violated FRE 701 not only in that it was not helpful testimony, but also in that there was no basis to know whether the opinion was rationally based on the perception of the witness.

conclusory assertions unsupported by any citation to the record, the Government identified eight particular individuals who it claimed were shown by the evidence to be supervisees:  Linwood Chiles, Mousey Armstrong, "Pea Sue," "Bracey and Williams," Jerry Gaiters, Valerie Butler, and Denise Berkley.  Government's Brief at 161-3.[12]  The Government's arguments as to each alleged supervisee are addressed here in turn.

Linwood Chiles.  The record cited by the Government concerning Chiles reveals only the conclusory testimony of a witness, with no demonstrated basis of personal knowledge, that Chiles traveled out of town with defendants, and the defendants came back with cocaine.  Tr. 1690-1.  Even if this testimony had been based on personal knowledge and therefore potentially admissible, however, it would not be probative of supervision. The testimony does not show that Chiles was in any manner "supervised" by Johnson under any standard.  Indeed Chiles' true role might fall in any number of labels, assuming he had knowledge of the drug purchase:  drug supplier, supervisor, partner, conspirator.  Even if it were assumed that Johnson supervised Chiles in a general sense, absent evidence that Chiles knowingly participated in illegal activities in connection with driving Johnson to New York this supervision would not qualify as CCE supervision.  "[I]nnocent participants in a criminal activity may not be counted as part of a continuing criminal

_____

[12]    See Ex. 4 (excerpts of Government's brief to the Fourth Circuit).

enterprise." *United States v. Smith*, 24 F.3d 1230, 1234 (10th Cir. 1994), citing *Jeffers v. United States*, 432 U.S. 137, 148-50, 97 S.Ct. 2207, 2214-15 (1977). In short, given the record Chiles is incapable as a matter of law of being Johnson's CCE supervisee.

Moussey Armstrong.   The record cited by the Government concerning Moussey Armstrong reveals only the conclusory testimony of a witness, with no demonstrated basis of personal knowledge, that Johnson was selling drugs "out of a white house" belonging to Armstrong. Tr. 1583. Even if this testimony had been based on personal knowledge, it would not be probative of CCE supervision. The testimony does not show that Armstrong was in any manner "supervised" by Johnson or any other defendant under any standard; indeed, it fails even to show the threshold requirement of an agreement between Johnson and Armstrong. In short, given the record Armstrong is incapable as a matter of law of being Johnson's CCE supervisee.

"Pea Sue."   The portion of the record cited by the Government reveals only that a witness asked "Pea Sue" if the defendants "could use her house for to cook cocaine," and she said yes. Tr. 1689. The answer was rank hearsay and inadmissible. Even treating it as admissible, it did not establish that Johnson or any defendant in fact cooked cocaine at her house. The witness testified that he does not know whether that happened "because I had left." Tr. 1689. Moreover, even if there had been testimony that Johnson had actually cooked cocaine

58

at Pea Sue's house, that would not demonstrate in any manner that Pea Sue was "supervised" by Johnson or any other defendant under any standard; nor would it demonstrate the threshold requirement of agreement. Given the record, Pea Sue is incapable as a matter of law of being Johnson's CCE supervisee.

Bracey and Williams. The record cited by the Government is the testimony of Williams. She testified that Bracey introduced her to Johnson, "V" [Thomas], and Roane; that *Johnson sat in the living room* while Thomas and Roane took her upstairs to ask her to get guns in exchange for "a sixteenth"; that she, Thomas, Roane, Bracey, and another person *(not Johnson)* went to the gunshop; at the gunshop, Roane told her Bracey what kind of guns to get; she ordered the guns; *that Johnson had "stayed at the house the whole time,"* that, when they returned, *Johnson gave her "4 or 5 pieces";* that, the next day, she changed her mind and did not want to pick up the guns; that, upon her changing her mind, Roane and Thomas became violent with her, causing her to go with them to pick up the guns; that Roane gave her the $1,400 to pay for the guns; that Thomas had given Roane the money in the car; *while Johnson again remained at the house.* Tr. 1836-48. ***Thus, the only evidence against Johnson is that he gave Williams some cocaine on a single occasion.*** There is no evidence that he was involved in any manner in the managing, organizing, or supervising of the these individuals or the transaction at issue. Nor is there any evidence that Johnson had an agreement of any kind with these individuals. Given the record, these individuals

59

are incapable as a matter of law of being Johnson's CCE supervisees.

Jerry Gaiters. The record cited by the Government is merely Gaiters' testimony that Johnson said "I want you to get Mousey to bring out the house. When I shoot the bitch in the as [sic] I want you to run back to the car." Tr. 2343-4. This testimony may demonstrate a conspiracy, but it does not demonstrate supervision by Johnson over Gaiters. Moreover, any suggestion that Johnson "supervised" Gaiters is belied by Gaiters' himself, who twice testified that his so-called supervision relationship was with other defendants, but *not* with Johnson. *See* Tr. 2324 (Gaiters testifying that Tipton and Roane "was like the boss. They ran things."); Tr. 2325 (Gaiters testifying that Johnson refused to give him drugs because Gaiters "worked for" one of the other defendants). In addition, Gaiters' trial testimony conflicts with his grand jury testimony concerning Johnson's and his activities in the Mousey Armstrong murder. He testified to the grand jury that Johnson held a gun to his back and forced him to go to Armstrong's house and knock on the door and identify himself as the visitor. Ex. 5. Gaiters' actions do not qualify as the actions of a supervisee if he was under acting duress, as he testified to the grand jury.

Berkley and Butler. Johnson contends that the evidence does not show that these two individuals were supervisees. However, because these are the only two individuals left and the

60

Government must prove five, there is no need to set forth Johnson's analysis here.

C.    Habeas Claims Related To The CCE Supervision Element

Based on the foregoing analysis, Johnson's CCE conviction must be vacated and the writ granted for the following reasons:

1.    The Jury Was Not Properly Instructed As To The Supervision Element

The following list of instances of incorrect jury instructions relate only to the supervision element.

a.  Buyer-seller relationship.  As discussed above, it is beyond dispute that a relationship of buyer and seller of drugs, even wholesaler and retailer, is insufficient to establish the "organization, supervision or management" under Section 1848. *See United States v. Butler*, 885 F.2d at 200.  The jury was not instructed of this critical rule.  Where so much of the government's evidence of alleged CCE supervision was in reality evidence of a buy-seller relationship, the failure to give this instruction is plain error and denied Johnson a fair trial.

b.  Individuals not capable of being CCE supervisees.  As discussed above, when (as happened here) (1) the Government introduces evidence of a large number of individuals involved in various drug activities and argues to the jury that those individuals were supervisees, and (2) some of those persons were, as a matter of law, incapable of counting as supervisees, the jury needed to be instructed that it could not find those persons to be supervisees. *See United States v. Barona*, 56 F.3d 1087,

61

1097 (9th Cir. 1995). Likewise, the jury needed to be instructed that it must unanimously agree to the identity of each of the five supervisees. *United States v. Jerome*, 942 F.2d 1328 (9th Cir. 1991). The jury was not given either of the required instructions. As a result, the CCE convictions must be vacated. *Id.*

c. Management requirement. As discussed above, the Fourth Circuit -- unlike many other Circuits -- does not require the Government to prove the element of "management" for a so-called CCE "organizer." The Fourth Circuit rule is incorrect, and the jury should have been instructed -- as it would have been in most other circuits -- that the Government must prove the element of "management."

2. There Was Insufficient Evidence To Support The Supervision Element

As discussed at length above, there is no evidence that Johnson was a CCE supervisor of five persons. Upon the evidence adduced at trial, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791-2 (1979) (applying section 2254).

3. Prosecutorial Misconduct Relating To The Supervision Element.

The following list of instances of prosecutorial misconduct relate only to the supervision element. Other allegations of

62

such misconduct, which this Court must consider are set forth in Claim V of this Petition.

a. Improper use of unsupported, ambiguous testimony. As discussed above starting at page 42, the prosecutors built their case on CCE supervision through a combination of misleading terminology (*i.e.*, "worker" and "employee") plus evidence for which there was no apparent foundation of personal knowledge, all of which misled the jury. Then, the prosecutors emphasized it repeatedly in argument to the jury and to the Fourth Circuit. All of this was improper, and denied Johnson due process and a fair trial.

b. Improper argument concerning the supervision element. In its closing argument, the Government *misled the jury about the supervision element in several critical respects.*

First, as discussed above, the prosecutor identified numerous individuals as supervisees who simply, as a matter of law, could not count as supervisees.

Second, the prosecutor told the jury:

[Y[ou need not find that each and every one of these people supervised five or more people themselves. *You need find only that as a group, there were five or more people involved.* And I suggest to you it is clear from the evidence that *there were five or more people involved in the distribution of cocaine,* just here in the City of Richmond.

* * * *

[The evidence showed that defendants] were the people who organized the workers, *who went out and recruited the workers, who supplied the workers with the cocaine, and that those workers went forth and sold their cocaine on the streets of the City of Richmond. That's all that is required by the law.*

63

Tr. 2984-5(emphasis added).  This argument is flat wrong.  It begins by stating that the Government need only prove that, *as a* "group, there were five or more people involved."  Then, the argument urges to jury to find supervision on the ground that the "workers" were under Johnson in the chain of drug distribution. Both of these points are contrary to governing law, as discussed above.

At the conclusion of the Government's closing argument, the prosecutor made the following misleading and improper argument:

> My colleagues have told you and told you and told you how there is no organization here.  There is no management. There is no supervision. *They say all those things have to be done.  It is not true.* ...Mr. Cooley's little cute Wonder Bread-Safeway joke was interesting yesterday, but it didn't have anything to do with what we are about. *Because we are talking about illegal crack cocaine.  We are talking about killings.  And we are talking about the furtherance of that killing that was done for the furtherance of the conspiracy. The conspiracy is to distribute crack cocaine and to make money.*  It is not about the legal bread business or Safeway. It is a good analogy, but *it doesn't make any difference. We are talking about apples and oranges.  We are talking about a criminal enterprise and a criminal nature.  He is talking about a legitimate business.*

Tr. 3187-8 (emphasis added).  With this argument, the prosecutor improperly sought to evade the entire issue of supervision by focusing on inflammatory issues, suggesting that because this case involved drug distribution the ordinary concepts of supervision did not apply.

These misleading, inflammatory  arguments were improper and denied Johnson due process and a fair trial.

4.    <u>Ineffective Assistance Of Counsel At Trial And Appeal Concerning The Supervision Element</u>

64

The following list of instances of ineffective assistance of counsel relate only to the supervision element of the CCE charge.

a.    Counsel Could Have And Should Have Shown That
      Johnson Was Incapable of Being A Supervisor
      Or At Least Not Likely To Be A Supervisor

Trial counsel presented ample evidence during the sentencing phase of Johnson's severe intellectual deficiencies.  Much of this evidence should have been presented at the guilt phase of Johnson's trial to demonstrate that he was incapable of carrying out, or at least unlikely to carry out, the supervisory and management function required under section 848.

Dr. Dewey Cornell, a clinical psychologist, testified that he had found Johnson only "minimally competent to stand trial" and that his I.Q. was 77, just barely above the recognized range for mental retardation.  JA 4392, 4510. Johnson's prior IQ score at the age of 16 years was 69-74, demonstrating a history of low intellectual functioning.  JA 4425.  Cornell stated that Johnson suffered from very severe learning disabilities.  Tests conducted before trial demonstrated brain damage.  Cornell found that Johnson had impaired adaptive behavior in several areas.  JA 4515-16.  The mentally retarded and those who are borderline mentally retarded share the following characteristics: they are very susceptible to peer pressure, are suggestible, have poor judgment and rely on others.  JA. 4519-24, 4519-20.  Johnson's characteristics were consistent with mild retardation and inconsistent with Johnson's directing, organizing and supervising others as required under section 848.  In response to the

65

prosecutor's question, Cornell stated: "I don't think Cory was pulling strings and giving orders and directing people around." JA 4526.

Defense counsel failed to use this testimony and evidence to raise a reasonable doubt in the minds of the jurors about an essential element of the offense--supervision and management. During the sentencing phase, eleven jurors found that due to Johnson's eagerness to be accepted by others, he was easily manipulated. Twelve jurors found that he suffered from neurological impairments and that his severe learning disability impaired his judgment. Eight jurors found that his I.Q. was 77. Had this same evidence been presented at the guilt phase, the jurors certainly would have reached a different result on the CCE charges. Defense counsel provided ineffective assistance, and Johnson was prejudiced.

> b.    Counsel Failed To Object To Repeated,
>        Improper Evidence.

Defense counsel failed to object to improper testimony and evidence as set forth in Claims IV(A) and V and incorporated by reference here. Trial counsel permitted the government witnesses to repeatedly testify to the misleading terms of "worker" and "employee," and to give testimony that was not based on personal knowledge. Having failed to object, defense counsel should have cross-examined witnesses to establish their lack of foundation and then moved to strike that testimony.

As discussed above starting at 56, the Government's principle evidence on the CCE supervision element and other

66

elements was based largely on evidence that was introduced without any apparent basis of personal knowledge by the witness, in violation of Fed.R.Evidence 602.

Trial counsel's response to this inadmissible testimony was wholly inadequate. As a threshold matter, trial counsel objected only a few times to the testimony. Counsel should have taken the initiative and made a wholesale objection to this tactic, in the form of a motion in limine or other method that would draw the Court's attention to the problem in a clear way. Counsel failed to do this, and instead merely objected on a haphazard basis. When counsel did object, the Court's responses were inconsistent. The following is a summary of the few objections that habeas counsel has been able to locate, and the Court's responses:

| Question | Objection | Ruling |
|---|---|---|
| "Do you know . . . whether there was a business relationship of sorts between" Johnson and Tipton? Tr. 1154 | "Objection. If the Court please, that's a conclusion. He can state what he saw them do. It is up to the jury to draw their own inferences." Tr. 1154. | Sustained. |
| "Did you come . . . to understand the business relationship" between Johnson and Tipton? Tr. 1158. | "Objection. If the Court please, one objection to the business relationship has already been sustained. He can testify to what he saw." Tr. 1159. | "I'm going to sustain the objection. Just ask him what went on, if he knows, between them." Tr. 1159 |

67

| | | |
|---|---|---|
| "Do you know what went on between" the defendants? Tr. 1159. | "Your honor, objection. He can ask what he observed." Tr. 1159. | "'What went on is fine. He can answer the question." Tr. 1159. |
| "Were any of the other people that you have identified as your knowing sold cocaine with 'Whitey,' 'C.O.,' thought of as a partner? Tr. 1172. | "Objection. Thought of? That is conclusory." Tr. 1172. | "Sustained." |
| "Do you know if [Johnson] was considered to be working for [Tipton]. . . based on your knowledge and involvement?" Tr. 1565. | "Objection. How would he know that?" Tr. 1565. | "I'll sustain the objection." Tr. 1565. |
| Q:   "What do you know about 'J.R.'s' involvement with those people." A: "To me he seemed a partner." Tr. 1888 | "Objection. 'Seemed?' There is a problem." Tr. 1888. | "That's his wording." Tr. 1888. |
| "Do you know, based upon your observation, the relationship between [the defendants] in the distribution of cocaine?" Tr. 2107. | "Objection. Calls for a conclusion. He can say what he saw." Tr. 2107. | "Sustained." Tr. 2107. |

| | | |
|---|---|---|
| "As to Keith Ross, Curt Thorne, 'Moussey' and Jerry Gaiters, do you know what relationship they had, based upon your own knowledge and observation, with [defendants]." Tr. 2107. | "Same objection. He can say what he saw." Tr. 2107. | "Sustained." Tr. 2107. |
| "As to Jerry Gaiters, in his relationship with [Tipton], do you know what that relationship was?" Tr. 2108. | "Objection. Same objection. He can say what he saw." Tr. 2108. | "Overruled." Tr. 2108 |
| "Based upon your involvement, do you know what the relationship was between [defendants] in the sale of cocaine?" Tr. 2546. | "She can properly testify to what she saw and heard." Tr. 2546-7. | "Overruled." Tr. 2547. |
| Q: "Do you know what happened to Mousey Armstrong"? Tr. 2555. A: "[Johnson and another person] killed her." Tr. 2555 | "I object, unless she is testifying from her personal knowledge." Tr. 2555. | "Overruled." Tr. 2555. (Witness went on to testify that the basis for this testimony was hearsay. Then the objection was sustained, with no cautionary instruction asked for or given. Tr. 2555.) |

69

| "What did they tell you their relationship was; what did you find out that their relationship with 'J.R.' and 'V' was? .... Based upon those conversations, what did you come to know?" Tr. 2707 | "Objection. The first question was what did he tell them. [The last question is] conclusory." Tr. 2707. | "State what they told." Tr. 2707. |
|---|---|---|

In the vast majority of the times when Rule 602 was violated, counsel did not object. When counsel did object, as shown above, they did so irregularly. For example, immediately after having their objection sustained as to the relationship between Ross, Thorne, Moussey, and Gaiters, Tr. 2107, counsel did not object when essentially the identical question was asked as to Moussey alone. Tr. 2107.

Trial counsel might have been confused by the Court's inconsistent treatment of the objections. As shown above, on some occasions the Court did require first hand knowledge on the part of the witnesses, but on other occasions the Court did not.

Long after the testimony, trial counsel raised the point in post-trial motions. *See* Tr. 2769, 3035. By then, it was too late to control the evidence heard by the jury. Johnson was prejudiced by counsels' performance as the jury was permitted to consider as "evidence" testimony that was not based on personal knowledge and may have had no basis in fact.

70

c.    Counsel Failed To Demonstrate That The Proof
Against Johnson Did Not Establish Five Supervisees

Defense counsel, who were also appellate counsel, failed to focus on the supervision element in the Rule 29 motion, post-trial motions, and direct appeal. As counsel failed to marshal the facts and analyze the testimony, as discussed above and incorporated by reference here, counsel never demonstrated that the government had failed to prove that Johnson supervised five people. Counsel were ineffective and Johnson was prejudiced.

d.    Counsel Failed To Object To The Prosecutor's
Closing Argument On The Supervision Element

As set forth above and incorporated by reference here, the prosecutor made several improper arguments to the jury concerning the supervision element of the CCE statute. Defense counsel made no objection at trial and did not raise the issue on appeal. Counsel were ineffective and Johnson was prejudiced.

e.    Counsel Failed To Request Proper Jury Instructions
On The Supervision Element Of The CCE Statute

As set forth above and incorporated by reference here, defense counsel failed to object to improper jury instructions on the supervision element and failed to request that proper instructions be given. Counsel failed to pursue this issue on appeal. Counsel were ineffective and Johnson was prejudiced.

71

f.    Trial counsel failed to stop the onslaught of prosecutorial misconduct.

Trial counsel should have taken steps to resist the prosecutorial misconduct relating to the CCE supervision element, discussed above.

g.    Counsel failed to seek relief available under Barona and Jerome.

As discussed above, under Barona and Jerome the CCE convictions would have been vacated on direct appeal.  Counsel failed to pursue this relief before this Court or on appeal.

h.    Counsel should have pursued each of the CCE supervision issues set forth above.

As demonstrated by this section of the Petition, defense counsel had multiple opportunities to help Johnson avoid a CCE conviction.  Counsel failed to do so.

*       *       *

As a result of these errors, viewed individually and collectively, Johnson was convicted as a CCE supervisor under section 848 on the basis of legally insufficient evidence in violation of his Fifth and Sixth Amendment rights to due process and a fair trial.  His counsel rendered ineffective assistance at trial and on appeal when defending against the CCE charges, Johnson was prejudiced as there was a reasonable probability of a different result but for counsel's errors, and Johnson's conviction was obtained in violation of his Sixth Amendment rights.  The writ must be granted on this basis.

72

III. <u>JOHNSON IS ACTUALLY INNOCENT OF THE CCE CONVICTIONS</u>

For the reasons set forth elsewhere in this Memorandum and incorporated here by reference, Johnson is actually innocent of his convictions under sections 848 and of the death sentences imposed thereon. He did not supervise five individuals within the meaning of the CCE statute. His convictions and sentences violate the Fifth, Sixth and Eighth Amendments and must be vacated.

Concern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system. That concern is reflected, for example, in the "fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." <u>In re Winship</u>, 397 U.S. 358, 372 (1970) (Harlan, J., concurring); <u>Schlup v. Delo</u>, 513 U.S. 298, 115 S. Ct. 851 (1995).

Johnson sets forth his substantive claim first, that his conviction, sentence, and incarceration are in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution. <u>See</u> <u>Herrera v. Collins</u>, 506 U.S. 390 (1993). For this claim, Johnson must show that his conviction, sentence and incarceration were "constitutionally intolerable" because of evidence of his innocence. <u>See</u> <u>id</u>. at 419 (O'Connor, J., concurring). <u>See also</u>, <u>Schlup</u>, 115 S. Ct. at 861 (discussing the Court's holding in <u>Herrara</u>). Pursuant to this substantive, actual innocence claim, the Court must grant the writ even if the Court finds that the proceedings that resulted in the Petitioner's conviction and

73

incarceration were entirely fair and free of error. <u>See</u> <u>id</u>. at 419 (O'Connor, J., concurring).

To the extent that the Court finds that this claim or certain aspects of it, including but not limited to the newly discovered evidence (Claim I), should have been, but were not, presented or preserved by trial counsel or appellate counsel, then Johnson did not receive the effective assistance of counsel due him under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). In addition to the following claims, this section also incorporates all prior claims that indicate that Johnson was convicted and sentenced although he was actually innocent.

For Johnson's procedural actual innocence claim, his constitutional claims set forth prior to and after this claim are incorporated herein. In this case, Johnson "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial" creating a gateway through which the court must consider Johnson's constitutional claims state within this petition. <u>Schlup</u>, 115 S. Ct. at 861 (citing <u>Herrara</u>, 506 U.S. at 404). Johnson satisfies the standard applicable to procedural actual innocence claim because his was the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." <u>Schlup</u>, 115 S. Ct. at 864 (quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 477 (1986)). <u>See also</u>, <u>Smith v. Murray</u>, 477 U.S. 527, 537 (1986)(quoting same). "Petitioner must show that it is more likely than not

that no reasonable juror would have found Petitioner guilty beyond a reasonable doubt." Schlup, 115 S.Ct. at 867.

To the extent that the Court finds that other claims made by Johnson within his petition and this memorandum, including but not limited to his substantive actual innocence claim, or finds that certain aspects of any claim, should have been but were not, presented or preserved by trial counsel or appellate counsel, then Johnson relies on the "actual innocence" gateway to argue the merits of his underlying claims.

IV.   TRIAL AND APPELLATE COUNSEL PROVIDED INEFFECTIVE
      ASSISTANCE IN VIOLATION OF THE SIXTH AMENDMENT.

Johnson's court appointed counsel rendered ineffective assistance at both the guilt and sentencing phases of the trial, as well as on appeal, in violation of the Sixth and Eighth Amendments to the United States Constitution. Counsels' performance was deficient, fell outside the range of professional competent assistance, and was unreasonable under the circumstances of the case. Strickland v. Washington, 466 U. S. 668 (1984); Turner v. Williams, 35 F.3d 872 (4th Cir. 1994); Hooper v. Garraghrty, 845 F.2d 471 (4th Cir. 1988), cert. denied, 488 U. S. 833 (1988).

As a result of trial counsel's deficient performance, Johnson was prejudiced for "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the

75

outcome." Strickland v. Washington, 466 U.S. 668, 694 (1984). A trial can be rendered unfair and the result unreliable even where petitioner cannot demonstrate by a preponderance of the evidence that counsel's errors affected the outcome. Id. at 694. Where the defendant challenges a death sentence:

> [P]rejudice is established when "there is a reasonable probability that, absent [counsel's errors, the sentencer -- including an appellate court, to the extent it independently reweighs the evidence -- would have concluded that the balance of aggravating and mitigating factors did not warrant death."

Turner, 35 F.3d at 894.

Johnson easily meets the Strickland standard where the errors included counsels' failure to challenge the government's proof on elements of the CCE charge, failure to investigate the case, failure to object to highly prejudicial misconduct by the government, and failure to present compelling evidence at the sentencing phase. Counsel also waived Johnson's presence during voir dire, a critical phase of this capital trial, failed to conduct essential voir dire, and failed to object to the government's removal of women jurors.

Some errors and omissions standing alone satisfy the Strickland standard. However, the cumulative prejudice from all the errors and omissions of trial counsel created a reasonable probability that the jury would have reached a different result as to guilt and sentence. "[C]ounsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 695-96. Johnson can

76

establish both deficient performance and prejudice.

A.    <u>GUILT PHASE INEFFECTIVENESS</u>

1.    Defense Counsel Failed To Request The Appointment Of An Investigator Pursuant To 21 U.S.C. Section 848(q) And Failed To <u>Conduct An Adequate Factual Investigation.</u>

Defense counsel conducted no independent investigation of the facts or the witnesses in this capital case. Counsel relied exclusively in the government's required <u>Brady</u> and <u>Jencks</u> act disclosures and on "interviews" with government witnesses held in the presence of the prosecutors. In addition, resources were available to assist counsel but counsel never requested them.

Although Johnson was charged in a narcotics conspiracy with activities located in New York City, Trenton, New Jersey, and Richmond, Virginia, defense counsel failed to move for the appointment of an investigator pursuant to 21 U.S.C. section 848(q). That section provided (prior to the 1996 amendments):

> Upon a finding in ex parte proceedings that investigative, expert or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or sentence, the court shall authorize the defendant's attorneys to obtain such services on behalf of the defendant and shall order the payment of fees and expenses therefore, under paragraph 10. Upon a finding that timely procurement of such services could not practicably await prior authorization, the court may authorize the provision of and payment for such services nunc pro tunc.

The right to a fair trial guaranteed by the due process clause of the Fifth Amendment requires that an indigent defendant be provided access to "the basic tools of an adequate defense.' <u>Ake</u>

77

v. Oklahoma, 470 U.S. 68 (1985). Under the Sixth Amendment, a criminal defendant has the right to the assistance of those experts required to prepare and present the defendant's case at every stage of the trial, including sentencing. Ake, supra; Williams v. Martin, 618 F.2d 1021 (4th Cir. 1980). Thus, defense counsel could have requested the appointment of an investigator under section 848. Given the nature of the case, the motion would have been granted.

Even if this case involved only the Richmond area, an investigator would have been essential to Johnson's defense. An investigator is surely required where there are so many witnesses. Private investigators are far better suited than lawyers at locating and interviewing recalcitrant witnesses. Indeed, few lawyers have the time to conduct a real investigation. Moreover, a fact investigation by trial counsel is often pointless, because the lawyer cannot testify at trial as a witness to what a person told him.

A variety of factors made it obvious that Johnson's defense counsel required the services of a trained criminal investigator. Johnson was charged with membership in a narcotics conspiracy headquartered in New York City. As an alleged "partner" in the conspiracy's operation, he was charged with obtaining wholesale quantities of powdered cocaine from suppliers in New York City, transporting it to Richmond, and then converting it into crack cocaine for retail distribution. The government alleged that the conspiracy's activities were conducted in Trenton, New Jersey, for

a period of time before moving into Richmond. Given the difficulty of investigating criminal activities in cities such as New York or Trenton when counsel is located in Virginia, an investigator was essential.

Prejudice arising out of counsel's failure to investigate this case is obvious. As a general matter, the failure foreclosed the possibility that Johnson would be able to call any fact witnesses. More specifically, the failure prevented Johnson's trial counsel from learning that an essential part of the Government's case was fabricated. At trial, the government presented testimony about the New York and Trenton operations in which Johnson was allegedly involved. The government's principle witness on the New York and New Jersey activities was Greg Scott. Investigation of Scott in preparation for this petition demonstrates that much of his testimony was false. For example, Scott testified that he saw Johnson obtain drugs from an individual known as "Light." Petitioner's investigation has revealed that John Matthews was known as "Light," and that Matthews knew Greg Scott. Matthews was incarcerated during the time period at issue under the name of Rufus Alvarez. Ex. 2. Hence, Scott never saw Johnson purchase drugs from "Light" as he claimed at trial. Petitioner's investigation has revealed that Matthews and others contradict Scott's testimony and refute allegations of a New York gang centered around 155th and Amsterdam Avenue in New York. Defense counsels' failure to undertake a similar investigation before trial was objectively unreasonable.

79

Johnson was severely prejudiced by this failure. Post-trial investigation has revealed that the testimony concerning the New York events on which the government relied at trial was a tissue of lies. The government's star witness on the New York/New Jersey activities was Greg Scott. Scott identified a number of members of the New York Boyz in New Jersey, several of whom have disclosed that Scott's testimony is false in numerous respects. For example, the government relied on Scott's testimony to show that the New York Boyz met to plan acts of retaliation in furtherance of their drug activities, and that members of the gang were required to participate in such retaliatory acts. However, at least three of the New York Boyz identified by Scott have stated that this was untrue.[13]

Investigation in connection with this petition has also disclosed other false testimony. For example, in critical testimony, Maurice Saunders testified that on two occasions after Christmas of 1990, he went to New York to obtain cocaine from "Light," or John Matthews. Tr. 1330, 2977. However, as noted above, Matthews was incarcerated at the time. Ex. 2.

Even without the interstate element, defense counsel required investigative assistance on the Richmond drug conspiracy charges. The government's pretrial witness list included about 120 names. Many of these individuals were drug buyers or sellers who lived in

_____

[13] Notably, . of the four such meetings to which Scott testified, two resulted in *no* retaliation, Tr. 913, 925, and two involved retaliation for purely personal – not drug-related – matters. Tr. 966-68.

80

the Richmond area but had no fixed address. Some were witnesses held in protective custody and unavailable for direct questioning. Thus, counsel would have to approach their friends or associates for information. Defense counsel could not possibly locate and interview all relevant witnesses themselves or those associated with them while simultaneously preparing other aspects of Johnson's capital case. An investigator would have been more efficient and would have had a greater chance of success of obtaining information from those in the drug community. An investigator would have been available to testify at trial.

Counsel's failure to request this assistance was objectively unreasonable. Johnson was prejudiced as revealed by the information since uncovered about the prosecution's witnesses.

2.    Defense Counsel Failed To Move For A Change Of Venue Despite Inflammatory Media Coverage About The Charges And The Defendants.

Johnson's case was the first capital trial in the Richmond district court under the drug "kingpin" statute and the first multiple defendant capital trial in the country. As a result, it attracted extensive news media interest. Much of the news coverage contained inflammatory and prejudicial information about the case which would have been inadmissible at trial. The jurors were improperly exposed to this extrinsic information.

The Due Process Clause guarantees each defendant a trial by a fair and impartial jury "free from outside influences." Sheppard v. Maxwell, 384 U.S. 333, 362 (1966). Due process is violated when pretrial publicity results in either "identifiable prejudice" or

81

"presumed prejudice." Estes v. Texas, 381 U.S. 532, 542-543 (1965); see also Coleman v. Zant, 708 F.2d 541, 544 (11th Cir. 1983). Prejudice is presumed from pretrial publicity when the publicity is sufficiently inflammatory and has saturated the community where the trial was held. Rideau v. Louisiana, 373 U.S. 723, 726-27 (1963); Murphy v. Florida, 421 U.S. at 798-99; Sheppard, 384 U.S. at 352-53; Estes, 381 U.S. at 542-43.

The recent distribution of prejudicial publicity is a critical factor when determining whether such publicity is likely to affect an accused's right to a fair trial. See Irwin v. Dowd, 366 U.S. at 725 (vacating and remanding denial of habeas petition where "a barrage of newspaper headlines, articles, cartoons and pictures was unleashed against [the petitioner] during the six or seven months preceding his trial"); Sheppard, 384 U.S. at 333; Wansley v. Slayton, 487 F.2d 90, 93 (4th Cir. 1973), cert. denied, 416 U.S. 994 (1974).

Under the presumed prejudice test, "where a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from the community, 'prejudice is presumed and there is no further duty to establish bias." Mayola v. Alabama, 623 F.2d 992, 997 (5th Cir. 1980)(quoting in part from United States v. Capo, 595 F.2d 1086, 1090 (5th Cir. 1979), cert. denied, 444 U.S. 1012 (1980).

Johnson's case received heavy news coverage in the Richmond area and the surrounding counties. Two papers, The Richmond News

82

Leader and The Richmond Times Dispatch ("TD"), announced the indictments with front page coverage. The TD's April 29, 1992, story took up most of the front page with the headline "U.S. to seek death penalty for 3 here." See Ex. 6, pp. 1-3. The story featured photographs of the 7 defendants, a summary of the circumstances surrounding 11 homicides[14], and a city map indicating the site of each homicide. The story included the following remarks from city police:

> The gang, police say, carried out its business with almost unheard of brutality, even for a city where homicides happen on average every third day.
>
> Lt. Oscar T. Clarke of the Richmond Police Bureau said the Newtown gang easily overshadowed the notorious Johnson-Brown gang, which dominated the South Richmond drug trade in the late 1980s.
>
> "This one makes Johnson-Brown look like small potatoes," Clarke said. If police hadn't "nipped it in the bud," the gang easily could have wiped out another 10 people, he said.

U.S. Attorney Richard Cullen stated that if the defendants were convicted, "it's my opinion, without doubt" that they should be executed.

In a companion story run the same day, the police compared the defendants to the Johnson-Brown gang and the infamous Briley brothers [who were both executed by Virginia for capital murder] and stated they were "slicker and more vicious than any group of criminals ever to operate here." Ex. 6, p. 4. The news account

---

[14] The Rozier homicide was not part of the government's proof at trial but was included in all the pretrial news accounts.

83

emphasized the law enforcement view that the defendants were connected to a "Jamaican 'posse' in New York City" whose "game plan" was to takeover the Richmond drug trade. The invasion of the Richmond area by New York drug dealers was an ongoing theme in both the news accounts and in the prosecution's presentation of the case at trial.

Johnson was not arrested upon indictment. A follow-up story in the TD on May 9, 1992, reported that he had been placed on the "most-wanted" list. Ex. 6, p. 5. The story reported that Johnson had eight murder charges and that the "Newtown" gang had been responsible for "about a dozen murders early this year" in Richmond [i.e., more than charged in the indictment]. A May 30, 1992, story concerning the trial date, reported that Johnson, from New York City, "remains a fugitive." Ex. 6, p. 5-A.

On June 4, 1992, the TD's account on the upcoming trial described the defendants as "members of Richmond's ultra-violent 'Newtowne gang.'" Ex. 6, p. 6. The story reported that Johnson was still a fugitive. The news account contained the following remarks concerning the joint trial from the trial judge, the Hon. James Spencer:

> Certain government witnesses "fear for their safety," Spencer said. Many of these witnesses have been relocated for their protection, he added.

> "Accordingly, forcing these witnesses to testify at multiple trials could result in substantial additional costs and ultimately in their refusing to cooperate due to the fear for their safety," Spencer said.

Thus, prospective jurors learned from remarks of the trial judge that trial witnesses required protection from the defendants and had been relocated for their safety.

A June 13, 1992, news story on the plea agreement of co-defendant, Jerry Gaiters, reported that he pled guilty to three murders and that he would testify against the remaining defendants. The murders were those of Bobby Long, Dorothy Armstrong, and Tony Carter.  Gaiters, Tipton and Johnson were all charged with the three murders. Ex. 6, p. 7.

A lengthy profile of the federal prosecutor, Toby Vick, appeared on June 16, 1992.  The story highlighted threats on Vick's life while prosecuting defendants in prior Richmond drug cases described as similar to those of the Newtowne case.  Ex. 6, pp. 9-11.

Johnson's arrest in New York City on June 23, 1992, was reported the following day in the TD.  The story reiterated an account of the charges, including the 11 homicides.  Ex. 6, p. 12.

A lengthy editorial on July 5, 1992, in the TD was written by the U.S. Attorney Richard Cullen.  Cullen applauded the federal government's prosecution of the defendants under the federal "kingpin" statute and highlighted the advantages of federal prosecution. Ex. 6, pp. 13-15.

On July 10, 1992, the TD reported that the trial had been postponed to January, 1993, due in part to Johnson's continued detention in New York City.  Extradition proceedings were under way. Ex. 6, pp. 16-17.

Defendant Sterling Hardy entered guilty pleas in the case, and the news account appeared on July 29, 1992. Hardy admitted participation in the shooting of Torrick Brown by driving some of his co-defendants to Brown's house in southside. Hardy would testify against the defendants at the upcoming trial. Ex. 6, pp. 18-19.

The day before jury selection began, the TD ran a front page story in the metro section on the charges and the trial. Ex. 6, pp. 20-21. The story, dated January 10, 1993, recounted details of some of the 11 homicides charged and included pretrial hearing testimony from Det. Woody:

> Woody testified that two of the accused members, Tipton and Johnson decided "they were going to take care of all the weaklings that were close to them because the police were getting close."

The news account stated:

> Security precautions are expected to be elaborate around the courthouse at 10th and Main streets, as well as the courtroom itself. U.S. marshals from other cities will be on hand to bolster the force that usually provides security.

Ex. 6, p. 20.

Widespread, continuous, prejudicial and inflammatory news coverage about Johnson and the Newtowne case was published from the date of indictment up to the time of jury selection. As a result, it was impossible for Johnson to obtain a fair trial in the Richmond area. Prospective jurors were repeatedly exposed to the opinions of the police investigators (who would later be trial

86

witnesses) and the trial prosecutors about the merits of the case and the guilt of the defendants.

Prospective jurors were told by the trial judge himself via the newspaper account that the defendants were a threat to the trial witnesses. As a result, those witnesses had been placed in protective custody.

The atmosphere of violence and fear was enhanced by news stories detailing attempts on the prosecutor's life in very similar drug cases. The perception of danger was then heightened by a news report that federal marshals had been brought in from other cities to tighten the security at the courthouse.

From these facts, prejudice must be presumed. The pretrial publicity was inflammatory and saturated the community where the trial was held. Rideau v. Louisiana, 373 U.S. 723, 726-27 (1963); Murphy v. Florida, 421 U.S. at 798-99; Sheppard, 384 U.S. at 352-53; Estes, 381 U.S. at 542-43. Of the 130 prospective jurors who completed the pretrial jury questionnaire, 43 admitted reading or hearing about the case in the media.[15] Of these, **FIVE** were selected as jurors or alternate jurors. Yet defense counsel failed

---

[15] The jurors by name and number were: F. Allen (3), M. Allen (4), D. Anderson (5), K. Anderson (6), S. Armes (8), E. Attkisson (11), C. Blackwell (21), U. Brooks (33), T. Brown (35) H. Carroll (39), S. Cassady (41), M. Chappelle (44), B. Clemons (47), T. Conner (52), S. Conway (53), D. Currier (57), D. Dabney (58), P. Deane (64), E. Denton (65), E. Dobson (68), P. Douglas (71), S. Dyke (73), C. Edkert (75), L. Estep (78), B. Faircloth (79), L. Farrar (80), P. Fox (85), R. Gainsburg (86), T. Gay (87), S. Gibbs (88), F. Goodman (89), B. Grappone (91), A. Gunton (95), J. Harrison (103), C. Harvey (104), D. Hawke (105), M. Hawkins (106), D. Hayes (107), E. Hill (111), R. Hollingsworth (114), B. Holmes (116), A. Horne (118), C. Houston (119)

to move for a change of venue to a location outside the Richmond area. This omission was below the level of performance of a reasonably effective counsel. No strategic reason can support this decision. Only jurors who had not been exposed--repeatedly--to the prejudicial news accounts and who were not associated with the Richmond area could have satisfied the constitutional requirement of an impartial jury. Johnson was clearly prejudiced by counsel's omission.

3.    Defense Counsel Failed to Request <u>Voir</u> <u>Dire</u>
      <u>Pursuant to Morgan v. Illinois, 504 U.S. 719 (1992)</u>

If ever there was jury with a predisposition to the death penalty, it was Johnson's jury. As discussed below, this jury found 18 mitigating factors. Some of these factors directly contradict a finding that Johnson was so accountable for his conduct that the ultimate penalty is required. Johnson's counsel could have ferreted out those with strong predispositions to impose death by conducting appropriate voir dire.

Defense counsel rendered ineffective assistance by failing to request <u>voir</u> <u>dire</u> on the reverse-<u>Witherspoon</u> question--whether the juror would always impose the death penalty if Johnson was found guilty of the specific charges here. Under the Sixth Amendment, a capital defendant must be given an opportunity to identify a juror who may be biased and to demonstrate through questioning that the juror cannot be impartial. In <u>Witherspoon v. Illinois</u>, 391 U.S. 510, 522 (1968), the Supreme Court ruled that jurors could not be excluded for cause because they expressed general objections,

88

reservations, or even religious scruples against imposition of the death penalty. However, where a juror's views on capital punishment would "prevent or substantially impair the performance of his duties as a juror," he may be excluded for cause. Wainwright v. Witt, 469 U.S. 412, 423 (1985).

In Witt the Supreme Court emphasized that it was the responsibility of the attorney seeking to exclude a juror to "demonstrate, through questioning, that the potential juror lacks impartiality. [Citation omitted.] It is then the trial judge's duty to determine whether the challenge is proper." Id. at 423. Thus, defense counsel in a capital case has an obligation and a duty to make a thorough inquiry into a juror's views and beliefs in order to uncover bias and partiality.

After Witt, the Supreme Court held that the state may challenge for cause those jurors whose opposition to the death penalty would compromise their impartiality. The court recognized that such jurors must be discovered through voir dire:

> [T]he State may challenge for cause prospective jurors whose opposition to the death penalty is so strong that it would prevent them from impartially determining a capital defendant's guilt or innocence. Ipso facto, the State must be given the opportunity to identify such prospective jurors by questioning them at voir dire about their views on the death penalty.

Lockhard v. McCree, 476 U.S. 162, 170 n.7 (1986).

Building on Lockhard in Morgan v. Illinois, 504 U.S. 719 (1992), the Supreme Court concluded that the trial court had improperly restricted the defendant's voir dire and reversed the death sentence. As in Johnson's trial, the trial judge had

89

conducted the questioning and posed general questions concerning fairness, impartiality, and an ability to "follow the law." In response to the prosecutor's request, the trial court asked whether any juror would in all cases refuse to impose the death penalty, whether any juror had moral or religious principles so strong that he could not impose the death penalty regardless of the facts, and whether any juror would automatically vote against the death penalty regardless of the facts. Each juror was asked if he could be fair and impartial.

However, the court refused to ask the specific question requested by petitioner: "If you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?" The Supreme Court reversed the death sentence stating that a juror may well believe that he can be impartial and follow the law, yet at the same time believe that death must be imposed upon conviction in the case at trial. A capital defendant must have an opportunity to probe for a juror's inconsistent beliefs. Id. at 735-36 and n. 9. The Court explained:

> Surely if . . . the judge, who imposes sentence should the defendant waive his right to jury sentencing under the statute . . . was to announce that, to him or her, mitigating evidence is beside the point and that he or she intends to impose the death penalty without regard to the nature or extent of mitigating evidence if the defendant is found guilty of a capital offense, that judge is refusing in advance to follow the statutory direction to consider that evidence and should disqualify himself or herself. Any juror to whom mitigating factors are likewise irrelevant should be disqualified for cause, for that juror has formed an opinion concerning the merits of the case without

90

> basis in the evidence developed at trial.
> Accordingly, the defendant in this case was
> entitled to have the inquiry made that he
> proposed to the trial judge.

Id. at 738-39.

Johnson's defense counsel never requested, and the trial judge never asked, the specific reverse-Witherspoon question required in Johnson's case:

> If you found Johnson guilty of the intentional, premeditated murder of seven individuals in the course of an ongoing drug enterprise, would you automatically vote to impose the death penalty no matter what the facts are?

The right to this question depends on defense counsel's request. Morgan at 879. And the court must permit the question if defense counsel asks for it. Defense counsel never did.

The voir dire conducted by the trial court did not include the reverse- Witherspoon question. The court asked only the following general questions:

> -- Do you have any strong feelings in favor of the death penalty?
>
> -- Do you have any strong feelings against the death penalty?
>
> -- Do you feel that you can be fair at this first stage [guilt phase] of the proceedings that I talked about. Can you be fair to both sides at the first stage of this trial?

JA. 1172 (emphasis added).

Where a juror indicated support for the death penalty, the court posed follow-up questions. For example:

> -- Understanding that you are in favor of the death penalty, are your feelings such that you would always vote to impose the death penalty against anyone convicted of a capital offense?

91

This general question was not the equivalent of the reverse-Witherspoon question as the Fourth Circuit properly recognized in deciding a related issue on direct appeal. Tipton, 90 F.3d 861 at 879 ("An inquiry which more explicitly embodies the 'reverse-Witherspoon' question might give greater assurance--might in some cases be more prudent--but that is not the question for us."(emphasis added)). Defense counsel and the court had to determine that the juror would not always vote for death in a case with facts like Johnson's. The harm to Johnson from counsel's omission was clearly demonstrated by the jury verdict at the sentencing phase. The jurors collectively found eighteen mitigating factors yet sentenced Johnson to death for each of the seven murders. Analysis of the jury's sentencing verdicts as to all three defendants demonstrates that the jury employed a "triggerman" rule[16] and gave no effect to any mitigating evidence presented by any defendant.

As to Johnson, the jury found the following statutory aggravating factors: Johnson had intentionally killed seven people, after substantial planning and premeditation, and created a grave risk of death to others in addition to the victims. The jury found the following nonstatutory aggravating factors: Johnson had committed multiple murders, had a substantial criminal history, had seriously wounded two individuals in the course of the CCE murders, and was a knowing and willing member of the conspiracy

---

[16] Several states limit eligibility for the death penalty to the individual who actually commits the murder, i.e., the triggerman rule.

92

whose goals included the murder of individuals other than those charged against Johnson. JA 425-435.

The jurors collectively found a total of eighteen mitigating factors. Ex. 1. The jurors found the following statutory mitigating factors:

-- Johnson was youthful (9 jurors);

-- Johnson did not have a significant prior criminal record (9 jurors);

-- Another defendant or defendants, equally culpable in the crimes will not be punished by death (12 jurors);

-- The victims consented to the criminal conduct that resulted in their deaths (12 jurors).

The jurors found the following nonstatutory mitigating factors:

-- Johnson was subjected to emotional and physical abuse, abandonment and neglect as a child, and was deprived of the parental guidance and protection that he needed (12 jurors);

-- Johnson suffers from neurological impairments which were identified and which were not adequately treated or addressed when he was a child or adolescent (12 jurors);

-- Johnson suffers from brain dysfunction which has gravely impaired his ability to function in the absence of strong support or guidance (8 jurors);

-- Johnson was introduced to addictive drugs and alcohol while still a child (12 jurors);

-- Johnson has responded well to structured environments, and would likely make a reasonable adaptation to prison if he were sentenced to life imprisonment (7 jurors);

-- Johnson's full scale I.Q. is 77 (8 jurors);

-- Johnson grew up in an impoverished and violent environment, and was exposed to extreme violence as a child and throughout his life (12 jurors);

93

-- Johnson suffers from a neurological impairment (brain damage) that impairs his ability to exercise good judgment, to control his behavior and to understand and foresee the consequences of his actions (2 jurors);

-- Johnson was brought up in an extremely unstable, abusive and neglectful family (12 jurors);

-- Johnson's severe learning disability affected his intelligence, his speech, and his ability to read, write and learn. Those limitations impaired his ability to exercise good judgment and to control his behavior (5 jurors);

-- Johnson had no parental involvement or support from or by his father (12 jurors);

-- Johnson, if not sentenced to death, will be sentenced to life in prison without any possibility of parole (12 jurors);

-- The defendant's eagerness to be accepted by others; he was easily manipulated (11 jurors);

-- That the defendant's severe learning disability based on neurological impairment (brain damage) could impair his ability to exercise good judgment (12 jurors).

Given the jury's findings that substantial mitigating factors had been proven and the jury's imposition of the death sentence on each count despite this overwhelming mitigation evidence, it is highly probable that the reverse-<u>Witherspoon</u> question would have revealed one or more jurors who would automatically impose death given the facts of Johnson's case. As the Supreme Court held in <u>Morgan</u>, the presence of even one such juror requires that the death sentence be vacated.

Defense counsels' failure to ask the reverse-<u>Witherspoon</u> question was compounded by the trial court's refusal to permit <u>voir dire</u> on the jurors' attitudes about potential mitigating factors,

94

such as emotional and physical abuse, limited intelligence, and brain dysfunction. The voir dire conducted and requested by defense counsel was inadequate to reveal juror bias. Johnson was demonstrably prejudiced by counsels' performance. The death sentences must be vacated.

4.    Defense Counsel Failed To Object To The Prosecution's Strikes Against Women Jurors

The government discriminated in its peremptory strikes against women as set forth in Point VI, infra. The government used eight of its ten peremptory strikes to remove women although equal numbers of men and women were in the final panel. This was an open attempt to remove jurors based on the common assumption that women would be less likely to impose a death sentence. Defense counsel raised no objection to this readily apparent violation of the equal protection clause.

Although J.E.B. v. Alabama ex rel. T.B., 114 S. Ct. 1419 (1994), prohibiting the discriminatory use of gender-based peremptory strikes was decided within a year of Johnson's trial, the issue was being raised in the courts prior to Johnson's trial. In fact, Supreme Court review of J.E.B. was granted in May, 1993, before this Court imposed Johnson's sentence. The constitutional principles supporting the decision in J.E.B. are set forth in Batson v. Kentucky, 476 U.S. 79 (1986), decided well below Johnson's trial. In failing to challenge the blatant removal of women jurors by the government and in failing to require the government to state its reasons for each strike, defense counsel rendered ineffective assistance.

95

While counsels' objections at the trial level might have been overruled, counsel would have preserved an important constitutional issue for appellate review. One function of trial counsel is to preserve legal errors for appellate review. Accord Claudio v. Scully, 982 F.2d 798, 803-05 (2d Cir. 1992), cert. denied, 113 S. Ct. 2347 (1993)(ineffective assistance on appeal where omitted claim involved right not yet explicitly recognized by state's highest court). Counsels' failure to make timely objections here deprived Johnson of his right to equal protection as well as his right to challenge the government's actions on appeal. Counsel's omission was clearly prejudicial.

5.    Defense Counsel Failed To Object To Johnson's
      Absence From Voir Dire And Johnson Lost His
      Right To Participate In Jury Selection

Based on ignorance of the relevant law, defense counsel failed to object to Johnson's absence from the voir dire proceedings in his capital case and, in fact, invited the error. As a result, Johnson lost his constitutional right to be present during jury selection at his capital trial.

In the Fourth Circuit, a capital defendant cannot waive his right to be present at his trial. Near v. Cunningham, 313 F.2d 929, 931 (4th Cir. 1963)(right to presence in capital trial so fundamental it cannot be waived); see also, Diaz v. United States, 223 U.S. 442, 445 (1912)("one who is charged with a capital offense [is] incapable to waiving the right" to presence)(dictum); United States v. Gregorio, 497 F.2d 1253, 1257 n.2 (4th Cir. 1974)(same). On appeal of Johnson's case, the Fourth Circuit acknowledged that

96

<u>Near</u> has never been expressly overruled by the Fourth Circuit or the Supreme Court and reserved decision on the issue. <u>Tipton</u>, 90 F.3d 861, 873 n.3. Reviewing the facts, the Court concluded that no formal waiver by Johnson was reflected by the trial record and that defense counsel had in fact invited the district court to conduct <u>voir dire</u> outside Johnson's presence.[17]  Given the importance of the entire jury selection process in a federal capital case where the jury determines both guilt and sentence, defense counsel provided ineffective assistance at this critical stage of the proceedings.

The Court conducted voir dire in two stages. In the first, roughly one-half of the venire was asked a series of questions concerning "generally non-sensitive" sources of possible disqualifying bias such as knowledge of the case, the parties, witness or counsel. Jurors who responded affirmatively to any question were called to the bench individually, where they were questioned by the Court in the presence of counsel. <u>See, e.g.</u>, Tr. at 37-41; 90 F.3d at 871. This stage was conducted in open court,

---

[17]  The Fourth Circuit found Johnson's exclusion from voir dire to be harmless error. 90 F.3d at 875. It ruled that under <u>United States v. Olano</u>, 507 U.S. 725 (1993), there may be a "category of plain errors as to which prejudice should be presumed," but that this "could only involve absences throughout the entire [voir dire] process," 90 F.3d at 875 n.6, and that Johnson's absence was "of the intermittent sort, not approaching the voir dire that might warrant a presumption of prejudice." 90 F.3d at 875. However, as in <u>Camacho</u>, where the defendant's conviction was reversed because of his exclusion from voir dire, Johnson heard not a single response to the court's questions "to the jurors, and was denied the opportunity to participate meaningfully in peremptory challenges." 955 F.2d at 956. Johnson was absent from all substantive aspects of the <u>voir dire</u> as was the defendant in <u>Camacho.</u>  Thus, Johnson was prejudiced.

97

with the defendants at counsel table, but the defendants were not present at the questioning of individual jurors at the bench.

After twelve members of the venire had been questioned in this fashion, counsel for co-defendant Roane stated that a waiver of defendants' right to presence was required. Tr. 53 (JA 885); see Rogers v. United States, 853 F.2d 249 (4th Cir. 1988). After summarily conferring with Johnson, defense counsel stated that their client waived the right of presence. Id.

The second stage of voir dire was conducted over the course of three days in chambers. In that stage, each potential juror was questioned as to his or her feelings toward the death penalty and racial prejudices. See, e.g., Tr. at 175-77. Counsel for the prosecution and defense were present, but the defendants were taken to the courthouse lock-up, where they were unable to hear the jurors' responses or to communicate with their attorneys. Tr. 174-75. Thus, Johnson was entirely precluded from observing potential jurors as they responded to voir dire questioning, or to hear them answer any of the questions posed during voir dire.

"An accused 'has a [constitutional] right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings.'"[18] United States v. Camacho, 955 F.2d at 952-53 (quoting Faretta v. California, 422 U.S. 806, 819 n. 15

_____

[18] The right to presence is largely rooted in the Confrontation Clause, Illinois v. Allen, 397 U.S. 337 (1970), but is also "protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him." United States v. Gagnon, 470 U.S. 522, 526 (1985) (per curiam).

(1975)). Federal Rule of Criminal Procedure 43(a) confers an even broader right to presence. Camacho, 955 F.2d at 953; United States v. Alessandrello, 637 F.2d 131, 138 (3d Cir. 1980). The impaneling of the jury is a stage of the trial in which the defendant's absence frustrates the fairness of the proceedings, because the defendant is unable to give suggestions to his attorney concerning potential jurors or effectively exercise his peremptory challenges, "a process that is essential to an impartial trial." United States v. Hanno, 21 F.3d 42, 28 (4th Cir. 1994) (quoting Camacho, supra, 955 F.2d at 953); see also Camacho, supra, 955 F.2d at 953 ("[a] defendant's absence during the impaneling of the jury certainly frustrates the fairness of the trial"). The Constitution and Rule 43(a) therefore guarantee criminal defendants the right to presence during voir dire. United States v. Tipton, 90 F.3d 861, 872 (4th Cir. 1996); United States v. Ford, 88 F.3d 1350, 1369 (4th Cir. 1996); Camacho, supra, 955 F.2d at 953; United States v. Gordon, 829 F.2d 119, 123-24 (D.C. Cir. 1987); see also Diaz v. United States, 223 U.S. 442, 455 (1912).

The right to presence is particularly critical in a capital case. In fact, a capital defendant cannot waive his right to presence. Near v. Cunningham, 313 F.2d 929, 931 (4th Cir. 1963) (right to presence in capital trial so fundamental it cannot be waived); see also Diaz v. United States, 223 U.S. 442, 455 (1912) ("one who is charged with a capital offense [is] incapable of waiving the right" to presence) (dictum); United States v. Gregorio, 497 F.2d 1253, 1257 n.2 (4th Cir. 1974) (same).

99

"[T]he defendant's presence [at voir dire] is fundamental to the basic legitimacy of the criminal process." United States v. Washington, 705 F.2d 489, 497 (D.C. Cir. 1983). "Convening a criminal tribunal without the presence of the defendant treads precariously close to the concept of trial *in absentia*, which our system has long disdained." Hanno, supra, 21 F.3d at 47.

The right to be present at voir dire is rooted in the notion that an accused is entitled to meaningful input into the selection of the "jury of his peers" that will judge him. Camacho, supra, 955 F.2d at 953. In Camacho, the Fourth Circuit wrote that:

> It is of the utmost importance that the defendant be present when the jury is being selected. . . . [T]he defendant has unique knowledge which is important at all stages of the trial, including *voir dire*. At the *voir dire* he may identify prospective jurors that he knows. He may also have knowledge of facts about himself or the alleged crime which may not have seemed relevant to him in the tranquility of his lawyer's office, but which may become important as the individual prejudices or inclinations of the jurors are revealed. He may also be a member of the community in which he will be tried and might be sensitive to particular local prejudices his lawyer does not know about.

955 F.2d at 956. In addition, jurors may draw a negative inference about a defendant absent from voir dire. Camacho, supra, 955 F.2d at 957; United States v. Alikpo, 944 F.2d 206, 210-11 (5th Cir. 1991). For example, in this case, the jurors may have concluded that the defendants were excluded because they were dangerous or likely to retaliate against jurors.[19]

---

[19] In fact, the government argued at trial that while incarcerated, the defendants ordered that witnesses against them, and detectives investigating the case, be killed. Tr. 3385-86 One juror, who read a newspaper article speculating about such orders, was excused from service when she told the Court that she was too frightened of the defendants to serve. Tr. 2094-05.

A defendant's right to a say in the selection of the jury is particularly urgent where the jury will decide whether he lives or dies. Nevertheless, despite the importance of Johnson's presence, and despite the clear law requiring that presence and precluding any waiver of the right, Johnson's counsel failed to object to his exclusion, and even purported to waive that right. This fell outside the range of professionally competent assistance, and there is a reasonable probability that, absent this error, the result of Johnson's trial would have been different.

Johnson did not know, and was never told by his counsel or the trial court, that he had a right to be present during voir dire and that he could not waive attendance at voir dire during a capital trial. He was never asked whether he wished to hear the questioning at the bench during the first stage of voir dire and was told by counsel simply that he was not required at voir dire. Johnson did not know, and was never advised, what would occur during the in-chambers portion of the voir dire and was never asked whether he consented to be excluded from it. Finally, Johnson's counsel never solicited or received his input regarding the exercise of challenges, never advised him of his right to object to a potential juror, and never asked if he was satisfied with the composition of the jury panel. Because Johnson did not know who the jurors were or their backgrounds, he could not assist his attorneys in formulating defense strategy during trial. Had Johnson known of his right to be present, of the role he could play

in jury selection, and of his right to object to jurors, he would not have consented to be excluded.

Counsel did not explain to Johnson the implications of the waiver or the fact that counsel might select as jurors individuals whom Johnson might find objectionable. If Johnson had been present, trial counsel would have been forced to explain the reasons for keeping or striking individual jurors. Thus, Johnson's very presence might have prevented the selection of unsuitable jurors. Counsels' retention of three jurors, for example, cannot be justified and is evidence of ineffectiveness.

Bonita Faircloth disclosed that she "believe[d] in" the death penalty." Tr. 541. She stated that her best friend's mother was recently raped and murdered and that the death penalty was not imposed in that case. Tr. 541-42. These statements suggested that Faircloth would have a personal reaction to alleged crimes of violence and would be strongly predisposed towards the death penalty.

A second juror, Jerome Harrison, had a brother who was a patrolman on the Richmond police force. Tr. 635. This created a real risk that Harrison would be exposed to extrinsic information about the case if he had not been already. He was also likely to be sympathetic to law enforcement. This became important during the trial when evidence was presented of planned retaliation against police officers.

A third juror, Frances Hodson, stated that her ex-husband had killed her son and himself. Tr. 666. She became emotional

102

during voir dire, and the prosecutor questioned whether she would be able to sit through the trial. Tr. 667. At one point it appeared that the Court intended to dismiss here. Tr. 667. Like Faircloth, an abnormal personal reaction to crimes of violence should have been foreseen by defense counsel.

Because trial counsel failed to object to the defendants' exclusion from voir dire, the Fourth Circuit on direct appeal reviewed the exclusion for plain error, and held that it could be corrected on appeal only upon a "specific showing" of prejudice by Johnson. 90 F.3d at 871, 874. This, the Fourth Circuit found, required a showing that his presence at voir dire would have resulted in a different outcome, for example, by showing that one of the jurors he would have insisted on striking was "demonstrably biased." Id. at 876. At the same time, the Fourth Circuit acknowledged the practical impossibility of such a showing.[20] Id.

Had Johnson's counsel objected to his exclusion, either (1) Johnson would have been allowed to be present for voir dire, the jurors discussed above would have been excused, and there would be no possibility of prejudice; or (2) the standard of review on appeal would have been de novo, and the impossible "specific showing" of prejudice would not have been required. In

---

[20] The task is made even more difficult by this Court's Rule 83.5, which prohibits a defendant or his counsel from interviewing jurors after the completion of trial. Johnson, along with his co-petitioners, has moved the Court for permission to interview the jurors.

103

those circumstances, the clear error of excluding Johnson from voir dire would have required reversal.

Even if waiver were possible, no valid waiver occurred here as Johnson was never questioned by the Court on the record about his decision to absent himself from critical portions of the trial. See Johnson v. Zerbst, 304 U.S. 458, 464 (1938)(proceeding required to insure "intentional relinquishment or abandonment of a known right"). Defense counsel's purported waiver was invalid and a nullity. Moreover, defense counsels' recommendation that Johnson waive his presence at this critical juncture constitutes ineffective assistance given the critical role jurors' play in a capital trial.

Thus, defense counsel committed serious and prejudicial legal error when he consented to the district court's voir dire of prospective jurors in a capital case without Johnson. His performance fell below that of a reasonably competent attorney.

Johnson was prejudiced by counsel's error as he was deprived of an opportunity to consult with counsel about the prospective jurors as they were questioned, to suggest further inquiry, and to form his own opinions about the prospective jurors based on their demeanor and responses. As a result, Johnson was unable to make knowing and informed decisions during the jury selection process.

Counsels' failure to object to Johnson's absence and to the absence of an on-the-record waiver prejudiced Johnson on appeal as well. Since defense counsel made no objection, the

104

issue was reviewed on appeal under the plain error standard. Under this more onerous standard, Johnson would have to demonstrate that the voir dire procedure followed by the trial court resulted in actual prejudice. <u>Tipton</u>, 90 F.3d at 875. As the Fourth Circuit observed, that is a stringent standard "near if not beyond the limits of practical possibility given the variables in the process and evidentiary restrictions." <u>Id.</u> at 876. As counsel on appeal had argued presumed prejudice and not actual prejudice, the Court concluded that plain error had not been demonstrated.

Given the clear legal error presented here, defense counsel assistance fell below that of a reasonably competent attorney. Johnson was prejudiced where his ability to participate in the jury selection process was irreparably impaired as was his right to review of the issue on appeal.

    6.    Defense Counsel Failed To Challenge The Government's
           <u>Evidence That Johnson Was A Supervisor Of A CCE.</u>

Defense counsel provided ineffective assistance at trial and on appeal when they failed in multiple respects to challenge the Government's evidence and argument that Johnson was a supervisor of five or more individuals as required under the CCE statute. (As discussed elsewhere, this includes failing to object or act upon the Government's inclusion of individuals who, as a matter of law, could not qualify as CCE supervisees; failing to object to the prosecution's improper and inadmissible evidence, testimony, and arguments concerning supervision;

failing to demonstrate that the Government's appeal arguments were insufficient; failing to introduce evidence tending to show that Johnson was incapable of being a supervisor, or not likely to be a supervisor.) The substantive discussion in Claim II is realleged and incorporated here by reference. As a result, Johnson was prejudiced for there was a reasonable probability of a different result both at the guilt phase and on appeal but for counsels' unreasonable performance.

### 7. Defense Counsel Failed To Object To Or Ask For Proper Jury Instructions On The Substantive Counts Charged.

### a. Defense Counsel Failed To Request A Unanimity Instruction On The CCE Elements

As discussed in Claim II, defense counsel failed to request a unanimity charge, which under the unique circumstances of this case (as in *United States v. Jerome)* was required. Defense counsel failed on appeal to even attempt to explain to the Fourth Circuit why *Jerome* dictates a unanimity instruction and the vacating of a CCE conviction when such an instruction is not given in circumstances like those present here.

### b. The Jury Was Not Properly Instructed As To The Supervision Element Of The CCE Charges.

Trial counsel failed to request proper instructions on the CCE supervision elements. The argument set forth in Claim II is reasserted and incorporated by reference here. Johnson was

prejudiced as there was a reasonable probability of a different result at the guilt phase.

8.  Defense Counsel Failed To Object To Improper And Highly Prejudicial Conduct And Arguments By The Prosecutors Throughout Johnson's Capital Trial

During the course of Johnson's trial, the prosecutors engaged in a variety of improper and highly prejudicial conduct. The prosecutors misled the jury by vouching, in inflammatory terms, as to their personal belief in Johnson's guilt and the veracity of witnesses. They introduced inadmissible evidence suggesting that Johnson and the other defends had threatened the lives of witnesses. The prosecutors misled the jury into believing it had a duty to convict and to impose death sentences. The prosecutors misled the jury by making misleading and inflammatory arguments, unsupported by the evidence, regarding the conditions Johnson would face if given a life sentence. The prosecutors improperly emphasized that Johnson and the other defendants did not testify. They suggested that a Government witness passed a polygraph test. The prosecutors improperly treated Johnson and the other defendants as a group, rather than as individuals. They improperly argued that sentencing should be based on deterrence. The prosecutors presented testimony lacking proper foundation. They presented improper testimony about the CCE supervision element and the use of key terms. The prosecutors excluded women from the jury. This misconduct is set forth in detail at Claim V, infra, and is incorporated by

107

reference herein. With few exceptions, defense counsel failed to object to the prosecutors' repeated, improper behavior. Defense counsel's performance in this regard was well below that of a reasonably competent counsel, and Johnson was prejudiced, for the reasons set forth in Claim V, as there was a reasonable probability of a different result at the guilt and sentence phases.

   B.   COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT
        THE SENTENCE PHASE

   1.   DEFENSE COUNSEL FAILED TO ARGUE THAT JOHNSON'S
        MENTAL ABILITY WAS NOT ACCURATELY REFLECTED BY
        HIS I.Q. TEST AND, IN FACT, WAS BELOW 77.

   Johnson's scores during his teen years placed him within the mentally retarded range, and he scored only slightly higher in tests prior to his capital trial. Under federal law, a mentally retarded defendant cannot be executed. 21 U.S.C. sec. 848(1); 18 U.S.C. sec. 3596(c)[Added 9/13/94]. In his opening statement at the sentencing phase, defense counsel harmed Johnson's mitigation case by conceding that Johnson was not mentally retarded. Counsel stated:

> The law states that mentally retarded persons cannot be executed. And the reasons that they are excluded is because the law recognizes that mentally retarded persons are not totally and completely blameworthy. They are not fully responsible for their actions.
>
> Now, I'm not intending to suggest at this juncture or any other juncture that Cory Johnson is mentally retarded.

JA. at 4372.

> In this case, Cory Johnson, as I said is not mentally retarded. But he has substantial mental, intellectual deficits that he has been plagued with his entire life.

108

> His IQ is within two points of being classified by the law [as] mentally retarded, and therefore, legally not executable. . . . He has an IQ of 77.

JA. at 4374.

Contrary to counsel's concessions to the jury, Johnson's intelligence was probably lower than his test scores indicated. Studies demonstrate that IQ determination has significant variables. Defense counsel and his expert could have and should have used widely accepted studies to argue that Johnson in fact had a lower IQ than the pretrial testing revealed. Such evidence and argument would have created a reasonable doubt in the minds of the jurors. This argument would likely have persuaded one or more jurors that a life sentence, not death, was the appropriate punishment where the execution of the mentally retarded is prohibited under federal law. Instead, counsel wrongly conceded a critical fact issue.

The Wechler Adult Intelligence Scale Revised (WAIS-R) is one of the most widely used IQ tests. This was the test given to Johnson. Studies reveal that IQ measurement on this test increases over time. The phenomenon of "IQ inflation" is explained as follows:

> Work by James Flynn (1984, 1988) has indicated that there is a real phenomenon of IQ gains over time. Individuals appear to gain approximately 3-5 IQ points over a 10 year period. Since the WAIS-R was published in 1981 and the data was collected a year prior to the publication, this inflation factor could mean that the average IQ could be as high as 105-107 points rather than the accepted value of 100.

See Ex. 7 at 2.

Dr. Dewey Cornell, an expert assigned by the court, administered the WAIS-R to Johnson on October 1992. Johnson's overall IQ score was 77 which placed him in the 6th percentile and in the borderline mentally retarded range. The test Johnson took was published in 1981 and was based on data collected one year before. Thus, the normative data was twelve years old when Johnson took the test in 1992. Johnson's score of 77 was therefore inflated by at least 3-5 points and possibly more. Allowing for the inflation effect, Johnson's score was actually in the 72-74 range or lower, placing him within the recognized range of mental retardation. JA at 4515, 4517 (Dr. Cornell: 70-75 I.Q. can be considered in the range of mental retardation). This adjusted score would be consistent with his prior, lower test results during his teens.

Low intelligence was a mitigating factor found by the jurors. Eight jurors found that Johnson's IQ was 77. JA. 433. This was one of eighteen mitigating factors found by the jurors. Given the wealth of mitigating evidence found by the jurors, defense counsel missed a critical chance to create reasonable doubt in the minds of the jurors concerning Johnson's mental capabilities. If only one juror concluded that Johnson was in fact mentally retarded, then that juror may well have concluded that a sentence of life rather than death was appropriate. Counsel was ineffective for failing to present this evidence. See Emerson v. Gramley, 91 F.3d 898 (7th Cir. 1996)(counsel ineffective for failing to present mitigation evidence, including

110

fact that defendant had diminished IQ); <u>Henricks v. Calderon</u>, 70 F.3d 1032 (9th Cir. 1995), <u>cert. denied</u>, 116 S. Ct. 1335 (1996)(counsel ineffective for failure to adequately prepare and present statutory mitigation evidence even where defense expert was presented); <u>Jones v. Thigpen</u>, 788 F.2d 1101 (5th Cir. 1986), <u>cert. denied</u>, 479 U.S. 1087 (1987)(counsel ineffective during sentencing phase where he failed to present evidence that defendant was mentally retarded).

Johnson was certainly prejudiced given the wealth of mitigation evidence found by the jurors. There was a reasonable probability of a different result at sentencing if the jurors had heard this additional evidence. <u>See</u> <u>Blanco v. Singletary</u>, 943 F.2d 1477, 1505 (11th Cir. 1991)(where some jurors inclined to mercy absent any mitigating evidence and such evidence was available but not presented, there was a reasonable probability of a life sentence); <u>Jackson v. Herring</u>, 42 F.3d 1350 (11th Cir. 1995)(counsel failed to present persuasive mitigation evidence). The writ should be granted on the sentence.

    2.    DEFENSE COUNSEL FAILED TO PRESENT EVIDENCE OF <u>JOHNSON'S PRISON CONDITIONS IF SENTENCED TO LIFE</u>

The public, and jurors, assume that prison conditions are unduly comfortable for inmates. Effective capital counsel must provide jurors with accurate information. The jurors were presented with two alternative punishments -- death or life without parole. While the jurors clearly understood the first alternative, they received no evidence concerning the second.

Defense counsel failed to portray the bleak existence facing Johnson if the jurors sentenced him to life imprisonment. Counsels' omission was particularly harmful in light of the prosecutor's summation at the sentencing phase. Accurate information is essential in any capital case. It was especially so here as the prosecutor argued without any basis in fact:

> Ask yourself, should they be punished beyond incarceration? I'm not telling you incarceration is nice and a lifetime of incarceration is not punishment. But think about each and every day of their existence in jail. They will wake up, bathe, be fed. They will be able to watch TV, read books. They will be able to use the telephone to talk to their loved ones.

JA. 4729 (Tr. 3904). Johnson's counsel objected on the grounds that these facts were not in the record, and the Court sustained the objection. Id. However, the jury was never told about the realities of a life sentence.

Trial counsel should have demonstrated this point in at least two different ways. First, they should have called an inmate who was serving a life sentence in a maximum security prison to testify about the day to day living conditions. See Ex. 8. That inmate could have described the small cell used to house two inmates, and the minimal furnishings. Jurors would have learned that inmates spend much of their time locked in their cell, that "lockdowns" can last for days, that searches (including strip searches) occur at random, and that inmates have no privacy in any aspect of prison life. Ordinary events such as bathing are strictly limited and regulated, and many prisons have no air conditioning. Access to television is restricted. Some

112

reading materials are prohibited. The jurors would have heard about prison violence, gangs, and the constant threats to personal safety.

Second, counsel should have called a corrections expert, such as a former or current warden or prison administrator. Ex. 9. A corrections expert could describe the conditions in a maximum security prison including the limitations on recreation, personal visits, medical care, and personal correspondence. In some "super" maximum prisons, inmates spend 23 hours a day in their cells and never see the outside.

Testimony on life in a maximum security prison would have refuted the prosecution's argument that Johnson would be facing a relatively easy life if given a life sentence. The jurors should have heard about the realities of prison life. Where only one vote could defeat a death sentence, counsels' failure to present testimony about actual prison conditions constituted ineffective assistance of counsel and Johnson was prejudiced. In any event, after the prosecutor made his improper statements to the jury, trial counsel should have sought leave to introduce evidence that would correct the false impression created by the prosecutor.

Johnson was prejudiced by these omissions as there was a reasonable probability of a different result on sentencing if this testimony had been presented.

113

C.  INEFFECTIVE ASSISTANCE ON APPEAL

Johnson's counsel failed to properly appeal a series of meritorious issues.  As discussed in Claim II above, Johnson's counsel could easily have demonstrated a series of defects in Johnson's CCE convictions, ranging from the abject failure to prove supervision to the need for vacating the convictions on direct appeal because of the Government's evidence and arguments concerning individuals who, as a matter of law, could not be CCE supervisees.

Defense counsel simply failed to focus on key aspects of the CCE evidence, failed to marshal the facts, and failed to analyze the testimony.  Counsel never demonstrated that the government had failed to prove that Johnson supervised five people, or that the Government had attempted to include persons who, as a matter of law, could not be supervisees.  Instead, counsel merely argued in a general sense, *utterly without regard to specifics*, that the government had demonstrated no more than a buyer-seller relationship.  Had counsel dealt with this issue properly, and presented a detailed analysis of the facts and the law, Johnson's conviction on the CCE counts, and his resulting death sentence, would not have been affirmed.  At minimum, the CCE convictions would have been vacated.  *See United States v. Jerome; United States v. Barona* (discussed in Claim II).

A defendant has a constitutional right to the effective assistance of counsel on his first appeal as to right.  Evitts v. Lucey, 469 U.S. 387 (1985).  To satisfy this right, the appellate

114

attorney must embrace the role of an active advocate in presenting the appellant's claims. Anders v. California, 386 U.S. 738 (1967). Where counsel has failed to raise an arguably meritorious claim on direct appeal in favor of other issues, petitioner must demonstrate that appellate counsel's performance was deficient under the standards set forth in Strickland. See Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir.), cert. denied, 115 S. Ct. 81 (1994), United States v. Cook, 45 F.3d 388, 395 (10th Cir. 1995). A petitioner must demonstrate that his appellate attorney's performance "fell below an objective standard of reasonableness [Strickland at 688] and that, but for counsel's error, there is a "reasonable probability" that the outcome would have been different [Strickland at 694].

There is no dispute that the omission of an obviously winning issue from an appellate brief constitutes ineffective assistance on appeal. See, Banks v. Reynolds, 54 F.3d 1508, 1515 (10th Cir. 1995)(failure to raise Brady claim); United States v. Cook, 45 F.3d 388, 395 (10th Cir. 1995)(failure to raise conflict of interest issue); Mayo v. Henderson, 13 F. 3d 538, 533-34 (2d Cir.)(failure to raise state law violation requiring automatic reversal), cert. denied, 115 S. Ct. 81 (1994); Matire v. Wainwright, 811 F.2d 1430, 1438 (11th Cir. 1987)(failure to raise Fifth Amendment claim while raising "single, weak issue").

However, Johnson is not required to demonstrate that the omitted claim would have resulted in reversal on appeal. He must only demonstrate that a reasonably competent attorney would have

115

presented the claim on appeal.  In <u>Claudio v. Scully</u>, 982 F.2d 798, 803-05 (2d Cir. 1992), <u>cert. denied</u>, 113 S. Ct. 2347 (1993), the Second Circuit Court of Appeals held that ineffective assistance had been provided on appeal where the omitted claim involved a right that had not yet been explicitly recognized by the state's highest court.  <u>Strickland</u> requires only a "reasonable probability" of success.  <u>Ibid.</u>  Given the weakness of the government's evidence of the CCE supervision element, Johnson has demonstrated a reasonable probability of success if only appellate counsel had properly briefed and argued the issue.

### D. <u>The Cumulative Effect Of Counsels' Errors Prejudiced Johnson Under Strickland.</u>

As set forth above, defense counsel made a variety of individual errors or omissions which, standing alone, satisfy the <u>Strickland</u> standard, and the writ must be granted for those reasons.  In addition, there can be no doubt that the cumulative effect of counsel's errors and omissions satisfies the <u>Strickland</u> standard.  None of these errors can be attributed to strategic decisions on the part of counsel.[21]  Viewing counsel's performance as a whole, "counsel's <u>errors</u> were so serious as to deprive the defendant of a fair trial."  <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984)(emphasis added).

---

[21]  <u>See</u> Ex. 10, Declaration of Craig S. Cooley, lead trial and appellate counsel for Mr. Johnson.

116

Strickland requires that counsel's performance be considered as a whole and that the effect of his deficient performance be considered as a whole in evaluating prejudice. With respect to the performance prong, the Strickland court said, "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. The use of the plural indicates that while an individual error may sometimes be sufficiently egregious to satisfy the performance prong on its own, it is also appropriate for courts to consider whether counsel's errors collectively caused his performance to fall below the threshold of professional competence. See also id. at 688 ("In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances."); id. at 690 ("A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts of omissions were outside the range of professionally competent assistance.")

With respect to prejudice, the Supreme Court again used the plural: "Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that

117

counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. In short:

> [A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury . . . . Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated trivial effect.

Id. at 695-96.

At least eight other circuits have held that courts must look at the cumulative effect of counsel's errors in assessing performance and/or prejudice. See, e.g., Wise v. Smith, 735 F.2d 735, 739 (2d Cir. 1984); McNeil v. Cuyler, 782 F.2d 443, 451 (3d Cir.), cert. denied, 479 U.S. 1010 (1986); Derden v. McNeel, 978 F.2d 1453, 1456-59 (5th Cir. 1992), cert. denied, 113 S. Ct. 2928 (1993); King v. Beto, 429 221, 225 (5th Cir. 1970), cert. denied, 401 U.S. 936 (1971); United States v. Swidan, 888 F.2d 1076, 1080-81 (6th Cir. 1989); Williams v. Washington, 59 F.3d 673, 682 (7th Cir. 1995); Galowski v. Murphy, 891 F.2d 629 (7th Cir. 1989), cert. denied, 495 U.S. 921 (1990); Drake v. Clark, 14 F.3d 351, 356 (7th Cir. 1994); Kellogg v. Scurr, 741 F.2d 1099, 1105 (8th Cir. 1984); Ramseyer v. Wood, 64 F.3d 1432 (9th Cir. 1995); Cooper v. Fitzharris, 586 F.2d 1325, 1333 (9th Cir. 1978); United States v. Hammonds, 425 F.2d 597, 604 (D.C. Cir. 1970).

Moreover, the Fourth Circuit has held, in effect, that the cumulative effect of defense counsel's errors must be considered in determining if counsel was ineffective. In Washington v. Murray, 4 F.3d 1285 (4th Cir. 1993), the court stated "[w]e turn

118

first to the district court's findings on trial counsel's performance, and then will take up the court's holdings as to prejudice and overall ineffectiveness." Id. at 1288 (emphasis added). Recently the Fourth Circuit endorsed the appropriateness of an inquiry into the cumulative effect of counsel's errors in Middleton v. Evatt, 77 F.3d 469, 1996 WL 63038 (4th Cir. 1996)(unpublished). The court recognized the need, especially in light of Kyles v. Whitley, 115 S. Ct. 1555 (1995), to review errors cumulatively when determining whether counsel rendered ineffective assistance. In affirming the district court's denial of habeas relief, the court held, "[O]ur review of the entire record on appeal compels us to conclude that [trial counsel's] alleged errors, whether viewed singularly or cumulatively, did not fall outside the purview of the objective standard of reasonableness." Id. See also, Whitley v. Blair, 802 F.2d 1487, 1493 (4th Cir. 1986); Roach v. Martin, 757 F.2d 1463, 1480 (4th Cir. 1985); Lankford v. Foster, 546 F. Supp. 241, 253 (W.D. Va. 1982)(in assessing whether counsel rendered ineffective assistance, the record as a whole and the cumulative effect of the acts and omissions should be considered), aff'd, 716 F.2d 896 (4th Cir. 1983), cert. denied, 467 U.S. 1214 (1984).

This Court must conclude, after viewing the record as a whole, that counsel's performance was objectively unreasonable, was prejudicial to Johnson as there was a probability of a different result both as to guilt and sentence, and deprived Johnson of his Fifth and Sixth Amendment guarantees to effective

119

assistance of counsel and a fair trial.  The writ must be granted on this basis.


V.    PROSECUTORIAL MISCONDUCT DEPRIVED JOHNSON OF HIS
      RIGHTS TO DUE PROCESS AND A FAIR TRIAL.

A prosecutor has a special duty to refrain from using improper methods and improper argument at trial to secure a conviction.  Berger v. United States, 295 U.S. 78, 88 (1935); United States v. Hall, 989 F.2d 711, 717-18 (4th Cir. 1993); see also United States v. Carroll, 678 F.2d 1208, 1210 (4th Cir. 1982).  As shown in the following sections, the Government prosecutors repeatedly engaged in improper behavior that prejudiced Johnson and resulted in a fundamentally unfair trial and a verdict unsupported by the evidence in violation of his Fifth and Sixth Amendment rights.

Notwithstanding counsel's failure to object to the prosecutor's improper actions, or to request cautionary instructions in response thereto, the trial court erred by allowing the Government to engage in this pattern of improper conduct.  "The Judge . . . is not a passive by-stander in the arena of justice, a spectator at a 'sporting event;' rather he or she has the most pressing affirmative responsibility to see that justice is done in every case."  United States v. McCord, 509 F.2d 334 (D.C. Cir. 1974), cert. denied, 95 S. Ct. 1656 (1975).  "[T]he function of a federal trial judge is not that of an umpire or a moderator at a town meeting.  He sits to see that justice is done in the cases heard before him; and it is his duty to see

120

that a case on trial is presented in such a way as to be understood by the jury, as well as himself." Simon v. United States, 123 F.2d 80 (4th Cir.), cert. denied, 314 U.S. 694 (1941).

As discussed herein, the prosecutors engaged in a persistent course of misconduct, covering the gamut of improper tactics. These acts, whether considered individually or in the aggregate, tainted the proceedings and denied Johnson his constitutional rights to a fair trial and due process. It is well established that false, misleading, and inflammatory statements by prosecutors are improper, and that the need for reliable sentencing in capital cases requires new sentencing proceedings where such misconduct "created an unacceptable risk that the death penalty may have been meted out arbitrarily or capriciously." *Sawyer v. Smith*, 497 U.S. 231, 235, 110 S.Ct. 2822, 2827 (1990) (internal quotation marks and brackets deleted). In Johnson's case, prosecutorial misconduct created such a risk.

A.     The prosecutors misled the jury by vouching, in inflammatory terms, to their personal belief in Johnson's guilt and the veracity of witnesses.

A prosecutor may not vouch for or bolster the testimony of his witnesses. He may not express his personal opinion concerning the testimony and evidence. United States v. Young, 105 S.Ct. 1038 (1985); United States v. Lewis, 10 F.3d 1086 (4th Cir. 1993); United States v. Taylor, 900 F.2d 779 (4th Cir. 1990); Newlon v. Armontrout, 885 F.2d 1328 (8th Cir. 1989). The

121

Government prosecutors violated this fundamental rule repeatedly.

In closing argument on the guilt phase, for example, the prosecutor began by vouching, as a general matter, for his personal belief as to ultimate issues in the case:

> Closing statement is . . . to give us an opportunity to argue to you what *we believe, what inferences we believe* you should draw from the evidence."

Tr. 2956-7 (emphasis added).   He then vouched for the Government's evidence as a whole, telling the jury: "[a]ll the Government wants is to present truthful testimony."   Tr. 3020.

Later, the prosecutor *openly stated his belief that Johnson and the other defendants were murderers* and that the Government's witnesses were innocent:

> [A]gain I remind you, you cannot penetrate a conspiracy without some of the participants in the conspiracy cooperating with you.  Use-immunity agreements had to be given.  *We feel like we gave use-immunity to only those people who were not murderers in this case.*

Tr. 2968 (emphasis added).

The prosecutor went on to tell the jury of his knowledge of what happened in certain murders in the case:

> There is no 848 murder charged here, no murder in furtherance of the Continuing Criminal Enterprise charged here, because *we know* it was a murder over a woman. *We know* that Robin Cooper was the cause of that murder of Torrick Brown....[W]e *also know* that despite the fact that that murder occurred . . . other members of the conspiracy joined him to help that murder.

Tr. 3004 (emphasis added).

Finally, the prosecutor told the jury, in no uncertain terms, of his belief that Johnson and the other defendants were guilty of murder:

> The only thing they haven't done yet is bring Ray Charles and his chorus line and say, "You've Got The Wrong One, Baby." That's the only thing they haven't done. That's not going to happen, because *the government does have the right ones*.

Tr. 3173.

Other instances of this are more subtle, but still prejudicial and improper. At various points, the prosecutor argued that Government witnesses should be believed because witnesses have to be truthful to get a 5K motion. *See, e.g,* Tr. 3192. He also told the jury that "We have told these witnesses that if you come in and if you tell us the truth, each and every one of them predicated their testimony upon telling the truth." Tr. 2968. In a particularly subtle tactic, the prosecutor twice asked questions, over objections, trying to establish that a detective had determined the truth of a government witness's testimony. 2442-3. Similarly, the prosecutor had another detective testify that certain charges were dismissed against the Government's key witness Jerry Gaiters because "the evidence showed it was not him." Tr. 2855. Implicitly, in asking these questions and eliciting this testimony, the prosecutor was suggesting to the jury that he believes the witness is knowledgeable and truthful -- and that the Government is the arbiter of whether its witnesses are telling the truth.

Government prosecutors also repeatedly vouched for the facts -- indeed, the prosecutors actually gave unsworn testimony under the guise of making objections. For example, when defense counsel cross-examined a witness about making a deal with the

123

prosecutors, the prosecutor interrupted and testified to the jury: "That's factually incorrect. We could not get one if we wanted to." Tr. 1983. When another defense counsel cross-examined a witness about what the prosecutors offered the witness that day, the prosecutor interrupted and testified for the jury: "Asked and answered. The Witness Protection Program. Asked and answered." Tr. 2054.

The unfairness inherent in prosecutors vouching for their case and witnesses was exacerbated in this case because of the inflammatory language the prosecutors used at various times. For example, during the prosecutor's opening statement at sentencing, he repeatedly called Johnson and the other defendants "mass murderers." Tr. 3330, Tr. 3333. The prosecutor repeated this during closing argument on sentencing. Tr. 3882. Similarly, during the cross-examination of an expert, the Government prosecutor called a defendant a "virtual killing machine." Tr. 3770. These terms were used only to inflame the jury; obviously, under any appropriate definition of the terms, the defendants were not "mass murderers" or "virtual killing machines." Such inflammatory language in itself violated Johnson's right to a fair trial. *Martin v. Parker*, 11 F.3d 613, 615-7 (6th Cir. 1993) (*per curiam*) (due process right to fair trial violated by prosecutor comparing defendant to Hitler in closing argument); *Miller v. Lockhart*, 65 F.3d 676, 682-4 (8th Cir. 1995) (due process right to fair trial violated by prosecutor calling defendant a "mad dog"). The government's

124

argument prejudiced Johnson and violated his due process and fair trial rights.

B.    The prosecutors introduced inadmissible evidence suggesting that Johnson and the other defendants threatened the lives of witnesses.

It is beyond dispute that evidence of the Government's decision to place a witness in the Witness Protection Program, or that the witness or the Government otherwise fears that a defendant will harm a witness, is not admissible. Such evidence is not relevant under FRE 401. Even if it were theoretically relevant, it would be excluded under FRE 403, especially in a capital case where such evidence is particularly prejudicial. Such evidence serves only to inflame the jury. It would not be relevant in any proper manner.

Nevertheless, the Government repeatedly elicited evidence that its witnesses were in danger of physical harm from Johnson and the other defendants. Many witnesses, for example, testified that they were in the Witness Protection Program. *See, e.g.,* Tr. 1428 (testimony of Johnny Byrd; Tr. 1777 (testimony of Denise Berkley); Tr. 2030 (testimony of Moody); Tr. 2686 (testimony of Valerie Butler). At least one witness testified directly that he feared that the defendants would kill him. *See, e.g.,* Tr. 1903-7 (testimony of Robert Davis). On yet another occasion, the Government questioned a witness as follows:

> Q:    Why has the United States Government paid your rent? [(Of course, this question should have been objected to because it called upon the

125

witness to testify as to the Government's motivations.)]

A:    My well-being and safety.

* * * *

Q:    And how did that come to pass; why is it for your safety?

A:    Because I'm in so much danger.

Tr. 1650.

There was no legitimate purpose to this type of evidence. It served only to further inflame the jury against Johnson and the other defendants.

C.    The prosecutors misled the jury into believing it had a duty to convict and to impose death sentence.

The prosecutors compounded the problem of their personal vouching by telling the jurors that they had a legal duty to convict and impose a death sentence. For example, during closing statement on the guilt phase, the prosecutor told the jury:

> *You have taken an oath and you can't shirk from that oath. That oath says you will truly render the facts to a verdict. When you do that, you have no choice but to find these defendants guilty* of each and every count in that indictment.

Tr. 3021 (emphasis added).

During closing argument at sentencing, the prosecutor told the jury:

> Now it is the time for you to go back and do your *duty*. . . . *Your duty,* . . . ., given the evidence you have heard, *requires no less verdict than death.*
> * * * *
>
> I began this by saying that this is an awesome *duty* that you have undertaken, and indeed it is an awesome *duty* that you have undertaken. *But the law is clear that in certain*

126

> *cases, the death penalty should be imposed. It is the will of Congress. It is the law that you must follow.*
>
> \* \* \* \*
>
> Ladies and gentlemen, *it is a strong duty you have. But it is just that. It is a duty.* This case warrants the imposition of the maximum punishment possible, the imposition of the death penalty as to each defendant.

Tr. 3881-2, 3905-6 (emphasis added).

Some of these statements -- *e.g.*, that *the law is clear that in certain cases, the death penalty should be imposed* -- are flat wrong. Neither Congress nor any other legal authority makes it clear that the death penalty ever "should" be imposed. The prosecutors plainly followed an improper strategy of trying to convince the jury that the law *required* a death penalty -- nay, that the death penalty is *the will of Congress*. It is well established that arguments such as this "wrapped in the cloak of state authority have a heightened impact on the jury." *Drake v. Kemp,* 762 F.2d 1449, 1459 (11th Cir. 1985) *(en banc),* cert. *denied,* 476 U.S. 1020 (1986). Arguments such as these are improper because they suggest that the law does not countenance mercy toward the defendant. "To state that mercy towards a defendant in a capital case contravenes the law . . . strikes at the core of the jury's role in sentencing." *Id.* at 1460. *See also Potts v. Kemp,* 814 F.2d 1512, 1516 (11th Cir. 1987) (reinstating in pertinent part, *Potts v. Zant,* 734 F.2d 526, 535-6 (11th Cir. 1984) (prosecutor violated due process by "plainly attempting to suggest to the jury that prior decisions of the

127

state supreme court mandated the imposition of the death penalty in this case").

Along that same line, in closing argument the prosecutors made the inflammatory statement that "no longer should the innocent suffer a punishment greater than the person who caused the injury." Tr. 3951. As an argument of personal belief, this was improper. Newlon v. Armontrout, 885 F.2d 1328 (8th Cir. 1989), cert. denied, 497 U.S. 1038 (1990).

D.     The prosecutors misled the jury by making misleading and inflammatory arguments to the jury, unsupported by the evidence, regarding the conditions Johnson would face if given a life sentence.

It is axiomatic that a prosecutor may not argue facts not in evidence. United States v. Samad, 754 F.2d 1091 (4th Cir. 1984). The prosecutor violated this principle in the most inflammatory, prejudicial way possible, regarding the most critical issue in this case: sentencing. He did this by concocting for the jury, during closing argument, an absolute fabrication of what Johnson's life would be like in prison:

> But think about each and every day of their existence in jail. They will wake up, bathe, be fed. They will be able to watch TV, read books. They will be able to use the telephone to talk to their loved ones.

Tr. 3904. Defense counsel objected to this, and the objection was sustained -- *but no cautionary instruction was given to the jury*. The prosecutor's false statement to the jury feeds on every juror's worst assumptions: that if a killer is not executed, he will enjoy a life of relative comfort in prison. At

128

minimum, the prosecutor's statement reinforced this false assumption.  More likely, in view of the fact that no cautionary instruction was given, the jury perceived this as a true statement from someone -- a government attorney, after all -- in a position to know.

In a less dramatic way, but nevertheless very prejudicial to Johnson, the prosecutor suggested to Johnson's mitigation witness  -- *over a sustained objection* -- that Johnson will face peer pressure toward violence if he spends his life in prison. Tr. 3710.  These tactics rendered the sentencing phase fundamentally unfair.

E.    The prosecutors improperly emphasized that Johnson and the other defendants did not testify.

The Fifth Amendment "forbids comment by the prosecution on the accused's silence" at trial.  *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233 (1965) (reversing conviction because prosecutor commented on defendant's silence).  The prosecutors flouted this fundamental principle, repeatedly emphasizing to the jury that Johnson and the other defendants had not testified, both during the guilt phase and at sentencing.

For example, during closing argument at sentencing, the prosecutor asked the jury rhetorically:  "Have you seen once from the witness stand an iota of remorsefulness from that man?"  Tr. 3897.  This statement to the jury was very prejudicial because it suggested that, by not testifying, the defendants were not

129

remorseful -- a factor the jury would very likely consider with regard to punishment.

The outrageousness of this statement is apparent from the record. The Court, upon trial counsel's objection, stated: "Mr. Vick, don't get stupid in the end of this, please." Tr. 3897. After hearing the prosecutor's explanation of why he made the statement, the Court said, "Let me make it crystal clear, Mr. Vick, that I do not buy your argument at all. It was astonishing to me that you would even come close to making this kind of fundamental error." Tr. 3957. Even more outrageously, it is apparent that this statement was a deliberate, planned argument by the prosecutor, as opposed to a mere slip of the tongue in the heat of battle. See Tr. 3956-7 (prosecutor prepared with case authority for the Court in support of his improper statement).

The prosecutor also drew the jury's attention to Johnson in particular for not testifying. Immediately after being instructed by the Court to not "get stupid," Tr. 3897, the next thing out of his mouth to the jury was:

> As to *Cory Johnson, he, too, says* "I've had a bad youth. I've got a learning disability. I should therefore be excused from blameworthiness for what I have done."

Tr. 3897 (emphasis added). By sarcastically asserting that Johnson "said" anything, the Government merely emphasized Johnson's failure to testify. Then, to reinforce the point to the jury after the Court gave the jury a cautionary instruction concerning the defendant's right not to testify, during the closing argument of a non-capital defendant, the prosecutor

130

interrupted to remind the jury: *"I don't remember Johnson testifying."* Tr. 3163 (emphasis added).

Significantly, the prosecutors did more than just emphasize the defendant's failure to testify. *They converted that failure into substantive concessions as to elements of the CCE offense.* For example, during closing on the guilt phase, the prosecutor told the jury:

> *[The defendants] have implicitly conceded* that indeed they have sold drugs, that indeed they sold drugs together. Count One in this case *has been implicitly conceded* by defendants.

Tr. 2960 (emphasis added). He then went on to tell the jury:

> *Each of them has admitted tacitly, if not implicitly,* that they sold drugs. *Each of them has admitted tacitly, if not implicitly,* that they sold those drugs together in concert one with each other.

Tr. 2960-1. The only basis for such tacit admissions or implicit concessions was Johnson's silence.

The case law is clear that this prosecutorial misconduct violated Johnson's due process rights. *See, e.g, Miller v. Lockhart*, 65 F.3d 676, 682-5 (8th Cir. 1995) (prosecutor's closing argument commented on petitioner's decision not to testify, violated due process); *Lesko v. Lehman,* 925 F.2d 1527, 1546-7 (3rd Cir.), *cert. denied,* 112 S.Ct. 273 (1991) (prosecutor's closing argument violated rule of *Griffin v. California,* 380 U.S. 609 (1965), by referring to petitioner's failure to express remorse in penalty phase testimony).

131

F.    Prosecutors suggested that a Government witness
      passed a polygraph test.

Evidence that a witness has taken a polygraph test is inadmissible. *United States v. Brevardi,* 739 F.2d 180, 182 (4th Cir. 1984). Notwithstanding this clear rule, the prosecutor bolstered the credibility of a witness by leading her to testify to the fact that she had taken a polygraph test:

> Q: As to the murder of Katrina Rozier, did you fully cooperate with the police officials concerning that?
>
> A: Yes, I did.
>
> Q: Did everything that was requested of you?
>
> A: Yes sir.
>
> Q: Including taking a test, is that correct?

Tr. 2428. There could be no purpose to this question other than to lead the witness to testify to prejudicial, inadmissible evidence -- that she had taken a polygraph examination. Although the Court sustained defense counsel's objection, Tr. 2428, no cautionary instruction was given to the jury, and the jury was left with the definite impression that the witness had taken and passed the test.

G.    The Government prosecutors improperly treated Johnson
      and the other defendants as a group, rather than as
      individuals.

The Government was required to prove the charged offenses against each defendant individually beyond a reasonable doubt. The Government routinely ignored this principle while introducing evidence and when conducting argument. In some instances,

defense counsel objected.  In some instances, the Court sustained the objections.  But as a general matter, the Government was permitted to treat the defendants collectively, with the result that differences among defendants were glossed over in a very prejudicial way.

Counsel is without the resources to provide an exhaustive list of the occasions when this happened, but here are some of the more extreme examples:

i)  During closing argument on guilt concerning the CCE elements, the prosecutor failed to address the defendants individually, choosing instead to treat them as a group.  Indeed, the prosecutor ignored governing CCE law (discussed above starting at page 33) and asserted to the jury that "you need not find that each and every one of these people supervised five or more people themselves.  You need find only that as a group, there were five or more people involved."  Tr. 2984.  Also, when overstating the potential supervisees, as discussed above, the prosecutor argued: "[y]ou had the following people, at least, who were working with *them* in the sale or distribution of cocaine." He went on to assert "Well in excess of five people just here in the City of Richmond who *these people* recruited to sell crack cocaine with *them*."  Tr. 2984-5 (emphasis added).

ii)  During opening statement on the sentencing phase, the prosecutor told the jury that "under law of conspiracy they are guilty of each act they did together."  3330-2.  This is misleading and wrong at sentencing.  This is flat wrong and

133

terribly misleading and prejudicial. *See, e.g., Francis v. Franklin*, 471 U.S. 307 (1985) (instruction that a person "is presumed to intend the natural and probable consequences of his acts" unconstitutionally gave defendant burden of proof on element of intent to kill).

iii)  During closing argument, the prosecutor told the jury that "James Roane, Cory Johnson, and Richard Tipton and 'V' Mack get Pam Williams to go buy [handguns]." Tr. 3176.  This lumping together of the defendants is demonstrably improper.  As discussed at page 59, there is no evidence whatsoever that Johnson was involved in Williams' purchase of guns. Nevertheless, the prosecutor repeated this misstatement of evidence and improper grouping of the defendants:  "[T]hey . . . bought firearms with the aid of Pam Williams.  Why?  So *they* could kill people."  Tr. 3324 (emphasis added).

iv)  During closing argument at sentencing, the prosecutor repeatedly lumped the defendants together in a prejudicial manner.  His statements include: "*They* deserve the maximum punishment . . . because . . . *they* chose to kill ten people," Tr. 3903; "We have been together in this trial for five weeks, the same length of time within a week that *these three people killed ten*," Tr. 3945; "*They* made seven decisions [(*i.e.,* to kill)] in [Louis Johnson's] life," Tr. 3946;  "*They* knew how to do these crimes," Tr. 3948.

134

As a result of the government's efforts to treat Johnson not as an individual but as part of a group, his fair trial and due process rights were violated.

**H.     The Prosecutors Improperly Argued That Sentencing Should Be Based On Deterrence**

A death sentence requires individual consideration. The prosecutor violated this principle by improperly appealing to deterrence as a justification for the death penalty. Specifically, he said to the jury: "[t]he death penalty is an appropriate sanction for three reasons. The first reason is that our laws act as a deterrence." Tr. 3902. He also told the jury: "A sentence of life in the penitentiary by you will in essence tell [other drug dealers] that you can sell drugs and kill people and you will get punished no more severely . . . than if you sell drugs only." Tr. 3903.

**I.   Misconduct relating to testimony without foundation.**

As discussed above, most of the Government's testimony concerning the CCE supervision element was without a foundation of personal knowledge. Significantly, however, the Government's misuse of unsupported testimony was not limited to the supervision element. It extended to all areas of the trial, including areas extremely prejudicial to Johnson.

The use of testimony unsupported by personal knowledge violates FRE 602, which states:

> A witness may not testify to a matter unless evidence is introduced sufficient to support a

135

finding that the witness has personal knowledge of the matter.

This rule of evidence was repeatedly ignored by the Government, defense counsel, and the Court while the Government offered voluminous testimony concerning a variety of issues (including the roles of various individuals in the alleged CCE) which was not supported by personal knowledge.

This fundamental problem of testimony without foundation runs through every aspect of the case.  It was constant and denied Johnson a fair trial.  Here are 38 examples, which surely represent only a partial list of the times it actually occurred:

> 1.     Priscilla Green, one of the Government's most sympathetic and essential witness, testified that Johnson and "V" killed Mousy Armstrong. Defense counsel objected, and the objection was overruled.  Then, the witness volunteered that the basis for her testimony was that someone else (Chiles) had told her this information.   Then the objection was sustained -- but no cautionary instruction regarding Green's improper testimony was given or asked for.  Tr.   2555.

> 2.     Stanley Smithers testified that Gaiters "got the cocaine that he was selling" from Tipton. Trial counsel objected; the Court overruled the objection.  The witness went on to testify that the reason he knows this is that "I've loaned him money to get it."  Tr.   2104.   No further objection was made, but Smithers' testimony reveals that he simply had no basis in personal knowledge for his testimony.

> 3.     Smithers also testified that Curt Thorne was selling cocaine that he obtained from Tipton. Tr. 2105-6.  Trial counsel did not object; but when the Government asked Smithers how he knew this, Smithers revealed that it was based on hearsay. Then, trial counsel made an objection, the objection was sustained, but no cautionary instruction to the jury was requested or given.

136

4.    Denise Berkley testified, without any basis
of personal knowledge,  that Green "was selling"
crack for the defendants.   Tr. 1690.   Later,
however, *Green herself denied that she had ever
sold cocaine.*   Tr. 2546.

Examples 1 through 4 are very important because they

demonstrate an essential point: *when there was no apparent*

*personal knowledge supporting Government testimony, a challenge*

*to the basis of the testimony would have revealed that the*

*witness in reality had no personal knowledge.*   And this problem

occurred constantly during the trial: typically, no objection was

stated; usually, when one was stated, the objection was

overruled; and when the objections were granted, clarifying

instructions to the jury were neither asked for nor given.   Other

examples include:

5.    Priscilla Green, one of the Government's most
sympathetic and essential witnesses, testified, without
any basis of personal knowledge, that Johnson "was the
head man." Tr. 2552.   Given that a supervisory role in
the alleged CCE is a critical element of the case, this
testimony was some of the most damaging, prejudicial
evidence against Johnson.

6.    Ms. Green also testified, without any basis of
personal knowledge,  that Moody was killed because
Johnson and Whitey didn't want Maurice and him to work
in that area, Tr. 2553 (no objection by trial counsel).
This testimony was extremely damaging to Johnson
because it connected Moody's murder to the alleged CCE.

7.    Ms. Green also testified, without any basis of
personal knowledge, that Johnson, Tipton, and Roane
were "partners."  (Here, trial counsel objected to lack
of foundation; the Court overruled the objection.)   Tr.
2546-7.

8.    Regarding Ms. Green, whose physical injuries
were obvious and whose mental faculties and memory were
in question, Detective Fleming testified that her
memory had improved over time.  Tr. 2585 (Trial counsel
objected to this testimony, but the Court overruled

137

it.) Detective Fleming could not possibly know whether her memory was improving unless he tested her memory in an appropriate manner. All he really could know is his observation: that her recollections changed with the passage of time. By giving the testimony he did, he was able to improperly bolster and validate the accuracy of Green's recollection in an improper manner.

9. Valerie Butler testified, without any basis of personal knowledge, that Johnson wanted to kill Charles and Hussone because "he had messed up their money." Tr. 2710 (No objection by trial counsel.) This improper testimony was particularly damaging to Johnson because it connected the murders to the alleged CCE.

10. Stanley Smithers testified, without any basis of personal knowledge, that Keith Ross was selling cocaine, and that Ross was getting his cocaine from Johnson. 2105. (No objection to lack of foundation.)

11. Smithers testified, without any basis of personal knowledge, that Mousey Armstrong sold cocaine that she received from Johnson. 2106-7.

12. Smithers testified, without any basis of personal knowledge, that Gaiters worked for Tipton. (Trial counsel's objection as to lack of foundation was overruled.) Tr. 2108.

13. Smithers testified, without any basis of personal knowledge, that Tipton, Roane, and Johnson used to leave, go pick up the drugs, and come back. Tr. 2109. There is no basis demonstrated for how he could know what the three men did when they were out of his presence.

14. Denise Berkley testified, without any basis of personal knowledge, that each defendant "supported himself by cocaine." Tr. 1674. There is no foundation for personal knowledge of this critical fact. This was especially prejudicial to Johnson because of the CCE element of substantial income.

15. Berkley testified, without any basis of personal knowledge, that Papoose sold for "them." Tr. 1680. Even after Court admonished the Government with "let's get specific," no foundation was given for this testimony.

138

16.    Berkley testified, without any basis of personal knowledge, to what defendants would do with cocaine after they came back from New York, and how they allocated it.  Tr. 1681-3.

17.    Valerie Butler testified, without any basis of personal knowledge, that Tipton had forced "Nita" to have oral sex with him over a drug debt.  2731.  This testimony was not only without foundation, but it was also irrelevant and inflammatory.

18.    Multiple witnesses testified, without any basis of personal knowledge, that the defendants were "partners."  *See, e.g.,* Tr. 1158 (testimony of Charles Towns); Tr. 1888 (testimony of R. Davis) (objection overruled); Tr. 2546 (testimony of Priscilla Green) (objection overruled); Tr. 1172 (testimony of Charles Towns).  (Counsel believes that this is an incomplete list of examples.)

19.    Detective Woody was allowed to testify that certain charges were dismissed against the Government's key witness Jerry Gaiters because "the evidence showed it was not him." Tr. 2855.

20.    Berkeley testified, without any basis of personal knowledge, that Armstrong was a "worker," and that Armstrong was "selling [cocaine] for them."  Tr. 1684.

21.    Davis testified, without any basis of personal knowledge, that Armstrong "worked for O." Tr. 1883.

22.    Gaiters testified, without any basis of personal knowledge,  that he thought Armstrong was an "employee" of the defendants.  Tr. 2324.

23.    Gaiters testified, without any basis of personal knowledge,  that he thought Ball was an "employee." Tr. 2324.

24.    Sanders testified, without any basis of personal knowledge,  Damien "was dealing with" Tipton in the Central Gardens area.  Tr. 1317.

25.    Sanders testified, without any basis of personal knowledge,  that Damien was a "worker." Tr. 1319.

26.    Berkley testified, without any basis of personal knowledge,  that "the people like me, Moussey, and the rest of them,  the workers." Tr. 1684.

139

27.    Butler testified, without any basis of personal knowledge, that Jones "work[ed] for them." Tr. 2708.

28.    Gaiters testified, without any basis of personal knowledge, that Ross "was involved in the sale or distribution of cocaine" and that he got his cocaine from the defendants. Tr. 2317.

29.    Gaiters testified, without any basis of personal knowledge, that he thought Ross was an "employee." Tr. 2324-5.

30.    Davis testified, without any basis of personal knowledge, that Rozier "used to bring people to come and get some rock cocaine. She knew the people who wanted to buy it." Tr. 1892-3.

31.    Green testified, without any basis of personal knowledge, that Talley "used to take them to New York before Linwood did . . [t]o pick up drugs." Tr. 2548.

32.    Towns testified that, without any basis of personal knowledge, Talley "used to take them back and forth to New York . . . to get coke." Tr. 1165.

33.    Sanders testified, without any basis of personal knowledge, that Taylor was "selling drugs for" Tipton. Tr. 1545.

34.    Green testified, without any basis of personal knowledge, that Thorne "wasn't really a partner. He was just selling drugs." Tr. 2547.

35.    Green testified, without any basis of personal knowledge, that "they would tell him a certain time they would need their money, and when he was to come pick up the drugs." Tr. 2548

36.    Townes testified, without any basis of personal knowledge, that Thorne "sold drugs." Tr. 1161.

37.    Berkley testified, without any basis of personal knowledge, that Thorne was "selling" drugs "every day." Tr. 1683, Tr. 1689.

38.    Gaiters testified, without any basis of personal knowledge, that he thought Thorne was an "employee." Tr. 2324-5.

Thus, much of the government's "proof" concerning the charged offenses was not based on any actual knowledge of the witnesses.

140

As a result, Johnson was prejudiced.  The trial was fundamentally unfair.

J.    The prosecutors misled the jury by suggesting that they had not influenced witnesses to use the terms "partner," "worker," and "employee."

During the trial, the prosecutors repeatedly had witnesses establish that the terms "partner," "worker," and "employee" had not been suggested by the prosecutors.  In fact, documents produced by the Government under *Jencks* reveal that in many cases it was the Government, not the witnesses, who first used the terms "partner," "worker," and "employee,"  For example, during grand jury testimony, the Government led Hussone Jones to testify that Johnson and Tipton were, in the prosecutor's words, "partners."  Ex. 11.  Similarly, the Government led Charles Towns to testify that the defendants were, in the prosecutor's words, "partners."  Ex. 12.

K.    The Government Excluded Women From The Jury In Violation Of *J.E.B. v. Alabama, 114 S. Ct. 1419 (1994)*

As discussed in Claim VI, <u>infra</u>, the Government excluded women from the jury in violation of *J.E.B. v. Alabama*, 114 S.Ct. 1419 (1994), and the Equal Protection Clause.

L.    Misconduct relating to the CCE supervision element.

As discussed above in Claim II, <u>supra</u>, the Government prosecutors engaged in repeated misconduct with regard to their presentation of evidence and argument as to the CCE supervision element.

141

*    *    *

In sum, the Government prosecutors engaged in a wide variety of improper and prejudicial behavior throughout the guilt and sentence phases of Johnson's trial. The Government's improper conduct had a substantial and very prejudicial effect on the jury's verdict. Brecht v. Abramson, 509 U.S. 619 (1993). There is a reasonable probability that but for this misconduct, Johnson would not have been convicted of the CCE offenses and would not have been sentenced to death. As a result, Johnson's rights under the Fifth, Sixth and Eighth Amendments were violated.

VI.    THE PROSECUTION IMPROPERLY DISCRIMINATED
       AGAINST WOMEN IN SELECTING THE JURY

The discriminatory use of gender-based peremptory strikes is forbidden. J.E.B. v. Alabama ex rel. T.B., 114 S. Ct. 1419, 1430 (1994).[22] The government's discriminatory use of peremptory challenges against women in this case requires that Johnson's convictions and sentences be set aside.

After voir dire, the jury was selected by a process in which twelve venirepersons were called to the box, after which the government and the defense exercised their peremptory

---

[22] Although J.E.B., involved application of the Fourteenth Amendment, as did Batson v. Kentucky, 476 U.S. 79 (1986), its holding is applicable to this federal prosecution by operation of the Fifth Amendment. E.g., United States v. Lane, 866 F.2d 103, 104 n.1 (4th Cir. 1989). In addition, although J.E.B. was decided after Johnson was convicted and sentenced, the rule applies in this case. Griffith v. Kentucky, 479 U.S. 314, 328 (1987).

142

challenges.   Those venirepersons struck were then replaced with additional venirepersons, after which the parties again exercised peremptory challenges.   This process was repeated until twelve jurors were seated.   See Tr. 749-57.

The government struck eight of twenty women who were ultimately seated in the box, as compared to only two of the twenty-one men seated in the box.   All told, the government used eight of its ten peremptory challenges to strike women.   The government's disproportionate use of peremptory strikes against women raises an inference that the strikes were used for the discriminatory purpose of excluding women from the jury in violation of the Equal Protection Clause.

However, the Fourth Circuit held on appeal that the "bare showing of gender discrimination" Johnson was able to make on appeal was insufficient to allow the Fourth Circuit to consider the issue or to remand the case for consideration of it.   90 F.3d at 881.   To further support his claim, Johnson and his co-petitioners will be filing a motion for discovery predicated, inter alia, on their need for information regarding the prosecution's motivations in striking a disproportionate number of women.   Thus, Johnson requires discovery and an evidentiary hearing to prove this claim for relief.

143

VII.   JUROR MISCONDUCT VIOLATED JOHNSON'S RIGHTS TO AN
       IMPARTIAL JURY AND TO DUE PROCESS OF LAW.

Johnson has strong reason to believe the jury in this case was tainted by outside influences.  This case was widely and sensationally publicized, both before and during the trial.  On at least one occasion, this publicity reached the jury.  On January 23, 1993, the Richmond Times-Dispatch published a front-page article suggesting that the defendants - who were then incarcerated - had caused a car carrying Richmond police detectives to be shot at.  Ex. 6, p. 22.  At least two jurors read the article, and one was so frightened by the article that she asked to be, and was, excused.  Tr. 2094-05.  The other indicated that the article would not affect his consideration of the case, and was allowed to remain on the jury.  Tr. 2092-94. The Court, however, did not instruct him not to consider the article in deliberations or to discuss it with other jurors. Later, the Court refused defense counsel's request for additional voir dire when a witness testified in the penalty phase that he overheard Tipton ordering the shooting referred to in the article.  Tr. 3385-86.

Then, on February 9, 1993, as the penalty phase was about to begin, the Richmond *Style Weekly* magazine featured on its cover distorted photographs of Messrs. Tipton, Johnson and Roane. Ex. 13.  Inside was an extended article describing the trial and the underlying facts, and including information not in evidence, such as a detective's statement that:

144

> The 11 [murders] they did in 45 days are the ones we can prove. . . . We know they did others, but we can't prove it.

No statement could have been more prejudicial at this juncture in the trial, but the Court did not even inquire of the jurors whether they had seen the article.

Johnson has been unable to develop this claim fully because the Rules of this Court prohibit him from interviewing the trial jurors. E.D. Va. Rule 83.5. Prior to the filing of this petition, Roane, Tipton and Johnson moved the Court for permission to interview the jurors, to determine whether the jury was in fact tainted by extraneous factors, including but not limited to media coverage of the case. After receiving the government response and before petitioners could file their reply, this Court denied the motion by Order dated June 10, 1998. Petitioners will be filing a motion for reconsidered shortly. It is essential that Johnson be granted an opportunity to discover facts supporting this claim at this time.

VIII. JOHNSON WAS DENIED HIS STATUTORY AND CONSTITUTIONAL
      RIGHT TO JUSTICE WITHOUT DISCRIMINATION

The Supreme Court has recognized that systematic discrepancies in the implementation of the death sentence "appear[] to correlate with race," but has held that those discrepancies are "best presented to the legislative bodies." McCleskey v. Kemp, 481 U.S. 279, 312, 319 (1987). In the Continuing Criminal Enterprise statute under which Johnson was convicted and sentenced to death, Congress expressly granted defendants the "right . . . to justice without discrimination."

145

A study required by the statute, 21 U.S.C. § 848(o)(2), unequivocally found "a pattern of evidence indicating racial disparities in the charging, sentencing, and imposition of the death penalty." GAO REPORT TO THE SENATE AND HOUSE COMMITTEES ON THE JUDICIARY, DEATH PENALTY SENTENCING: RESEARCH INDICATES PATTERN OF RACIAL DISPARITIES at 5 (Feb. 1990). Relying on this and other studies showing racial discrimination in the criminal justice system, see J. A. 152 (Attachments), defendants moved to dismiss the § 848(e) counts of the indictment. J. A. 148, 167, 225. However, the district court denied these motions, and the Fourth Circuit affirmed that denial without comment. United States v. Tipton, 90 F.3d 861, 891 n.16 (4th Cir. 1996).

Since Johnson's conviction, and its affirmance on appeal, it has only become clearer that the federal death penalty is infected with racism. According to the Federal Death Penalty Resource Counsel Project, the Attorney General has authorized prosecutors to seek the death penalty in 119 cases since 1988. More than three-quarters of these - 94 cases - involved minority defendants. Nine of the twelve individuals to receive federal death sentences since 1994 have been African-American.

The statute and the death penalty have been applied in an arbitrary, disproportionate, and discriminatory manner in violation of the Fifth and Eighth Amendments of the United States Constitution. The death penalty has been imposed disporportionately on individuals like Johnson who are male,

146

African-American, and indigent.  As a result, his death sentence was unconstitutional.


IX.    THE UNBRIDLED DISCRETION TO FASHION NON-STATUTORY
       AGGRAVATING FACTORS GIVEN TO PROSECUTORS BY
       § 848 IS AN UNCONSTITUTIONAL DELEGATION OF
       LEGISLATIVE AUTHORITY.

When seeking the death penalty under § 848, the Government must file notice of its intention "setting forth the aggravating factors enumerated in [the statute] and any other aggravating factors which the Government will seek to prove as the basis for the death penalty".  21 U.S.C. § 848(h)(1)(B) (emphasis added). On direct appeal, counsel challenged § 848(h) as an unconstitutional delegation of legislative authority to the executive branch, because it gives individual prosecutors unbridled discretion to create non-statutory aggravators to be weighed at sentencing.

The Fourth Circuit's entire analysis of this issue consisted of the following:

> Assuming, without deciding, that by specifically authorizing consideration of non-statutory aggravating factors noticed by prosecutors, Congress actually delegated a legislative function to the executive branch, as opposed to merely recognizing a traditionally shared function with that branch.  See United States v. Pretlow, 779 F.Supp. 758, 765-67(D)(N)(J) (1991).  Any delegation involved was sufficiently circumscribed by "intelligible principles" to avoid violating separation of power principles.  See Mistretta v. United States, 448 U.S. 361 (1989); accord United States v. McCullah, 76 F.3d 1087, 1106-07 (10th Cir. 1996).

United States v. Tipton, 90 F.3d 861, 895 (4th Cir. 1996).

147

Appellate counsel briefed this issue without benefit of the United States Supreme Court's decision in <u>Loving v. United States</u>, 116 S.Ct. 1737 (1996). Similarly, the Fourth Circuit failed to consider the impact of the <u>Loving</u> decision on the analysis of this claim, because <u>Loving</u> was decided just weeks before the Court handed down its decision. The analysis of this issue, in light of the <u>Loving</u> decision, reveals that this delegation of authority is unconstitutional, and that Johnson's death sentences must be vacated.

Non-statutory aggravating factors play a specialized role in the jury's decision-making process at the penalty trial. The first decision a jury must make as it progresses toward a death verdict is whether any of the four statutory aggravating factors set forth in § 848(n)(1) are present. These (n)(1) aggravating factors essentially are state-of-mind determinations that require the sentencer to find again that the killing at issue was intentional. If the Government succeeds in establishing an (n)(1) factor, the jury proceeds to its second decision-making point--whether one or more of the specified aggravating factors set forth in § 848(n)(2) through (n)(12) have been established.

If the Government establishes, in sequence, both the existence of an (n)(1) factor and one or more of the (n)(2) through (n)(12) factors, the jury may then make special findings identifying non-statutory aggravating factors.[23] The jury must

---

[23] If the Government fails to establish a factor from either category of statutory aggravating factors, the jury cannot recommend, and the judge cannot impose, a death sentence, and the

148

then weigh the aggravating factors (statutory and non-statutory) against the mitigating factors and determine if the aggravating factors outweigh the mitigating factors.

Article I, § I, of the United States Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States". Section 848(h)(1)(B) constitutes an unconstitutional delegation of legislative power to the executive branch because it gives prosecutors unbridled discretion to create and rely upon non-statutory aggravators, without setting forth any intelligible principle to guide that discretion.

The Supreme Court has held that Congress may not constitutionally delegate its legislative power to another branch of Government. In Mistretta v. United States, 488 U.S. 361 (1989), the Court observed that "the non-delegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government". Id. at 371. Although Congress may obtain assistance from its coordinate branches through delegations of enforcement and policy-making authority, it also must "'lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform . . .'". Mistretta, 488 U.S. at 372 (quoting J. W. Hampton, Jr. & Co. v. United States, 276 U.S. 394, 406 (1928)); Panama Refining Co. v. Ryan,

---

jury need not reach the issue of non-statutory aggravating factors.

149

293 U.S. 388, 432 (1935) (Congress, in order "to prevent its being a pure delegation of legislative power, must enjoin upon [the delegate entity] a certain course of procedure and certain rules of decision in the performance of its function").

The federal courts have split on whether Congress has delegated legislative power by conferring upon prosecutors the limitless discretion to designate any evidence or circumstance as a non-statutory aggravating factor. For example, in United States v. Pretlow, 779 F.Supp. 758, 767 (D.N.J. 1991), the Court held that § 848(h)(1)(D) does constitute a delegation of legislative authority. Nevertheless, the Court also held that the delegation was proper and not unconstitutional, because the prosecutor's broad discretion to allege non-statutory aggravating factors necessarily is guided and constrained by Supreme Court precedent limiting the scope of aggravating factors and the fact that these alleged circumstances must be relevant. Id. at 767.

In contrast, the Court in United States v. Pitera, 795 F.Supp. 546 (E.D.N.Y. 1992), aff'd., 986 F.2d 499 (2nd Cir. 1992), held that § 848(h)(1)(B) did not constitute a delegation of legislative authority to the prosecutor:

> In identifying non-statutory aggravating factors pursuant to § 848 (j), the prosecution plays virtually the same role in a capital sentencing procedure as it does in a non-capital one. See Fed.R.Crim.P. 32 (a) (prosecution is entitled to be heard at sentence). It brings relevant facts to the sentencer's attention and urges it to reach a particular result. In a capital case this advocacy will, in no small part, reflect the prosecution's considered judgment as to why the case was a "proper occasion" for serving a death penalty notice in the first place: an enforcement, not a legislative decision . . . such advocacy does not,

150

> however, involve the prosecution in the fixing of
> sentence.  That remains exclusively the jury's
> function.  Indeed, the jury remains free to reject
> imposition of the death penalty, even if fully
> persuaded about the prosecution's position.  The Court
> thus finds no delegation of legislative authority to
> the prosecutor in § 848(j).

Id. at 562.  (citations omitted).  The Pitera Court also held

that the prosecutor's discretion under § 848 is not unlimited but

rather is constrained by the fact that non-statutory factors must

be "more probative than prejudicial to exploration of a

defendant's character and the charged crime".  Id.

The Pretlow and Pitera decisions were handed down prior to

the Supreme Court's decision in Loving v. United States, 116

S.Ct. 1737 (1996).  In that case, the Supreme Court addressed the

separation of powers argument raised by a death-sentenced Army

private, holding that it was not unconstitutional for Congress to

delegate to the President its constitutional authority to define

aggravating factors that permit imposition of the statutory

penalty of death in military capital cases.  Although this

holding, standing alone, might appear to validate the delegation

made by § 848, application of the Loving Court's separation of

powers analysis reveals that this delegation of extraordinary

power to individual prosecutors is unconstitutional.

Loving was convicted of capital murder under Article 118 of

the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 918(1),

(4).  In the sentencing phase of the trial, the court-martial

found three aggravating factors to exist, from the 11 categories

151

of aggravating factors enumerated in Rule 1004(c) of the Rules

for Courts-Martial (RCM).

Loving based his separation of powers argument  upon the

fact that the President of the United States, and not Congress,

had promulgated the aggravating factors set forth in RCM 1004(c).

Article 118 of the UCMJ was enacted in 1950, and it describes

four types of murder subject to court-martial jurisdiction, two

of which are punishable by death:

> Any person subject to this chapter who, without
> justification or excuse, unlawfully kills a human
> being, when he--
>
> (1)   has a premeditated design to kill;
> (2)   intends to kill or inflict great bodily harm;
> (3)   is engaged in an act which is inherently dangerous to
>        another and evinces a wanton disregard of human life;
> or
> (4)   is engaged in the perpetration or attempted
> perpetration of burglary, sodomy, rape, robbery or
> aggravated arson;
>
> is guilty of murder and shall suffer such punishment as
> a court-martial may direct, except that if found guilty
> under Clause (1) or (4), he shall suffer death or
> imprisonment for life as a court-martial may direct.

10 U.S.C. § 918.

Prior to Loving, in 1983 the United States Court of Military

Appeals confronted a challenge to the constitutionality of the

military capital punishment scheme in light of Furman v. Georgia,

408 U.S. 238 (1972), and the Supreme Court's ensuing death

penalty jurisprudence.  The Court held valid most of the death

penalty procedures followed in courts-martial, but it found one

fundamental defect:  the failure of either the UCMJ or the RCM to

require that court-martial members "specifically identify the

aggravating factors upon which they have ruled in choosing to impose the death penalty". <u>United States v. Matthews</u>, 16 M.J. 354, 379 (CMA 1983). The Court reversed the death sentence before it, but ruled that either Congress or the President could remedy the defect and that the new procedures could be applied retroactively. 16 M.J. at 380-82.

The President, and not Congress, responded to <u>Matthews</u>, issuing in 1984 an Executive Order promulgating RCM 1004. This Rule, as amended, requires a unanimous finding that the accused was guilty of a capital offense before a death sentence may be imposed. RCM 1004(a)(2). The Rule also requires unanimous findings that at least one aggravating factor exists, and that any extenuating or mitigating circumstances are substantially outweighed by any proven aggravating factors. RCM 1004(b). RCM 1004(c) enumerates 11 categories of aggravating factors. Loving attacked this scheme as unconstitutional, contending that the Eighth Amendment and the doctrine of separation of powers require that Congress, and not the President, make fundamental policy determinations respecting the factors that warrant the death penalty. 116 S.Ct. at 1742.

The Court first rejected Loving's argument that Congress cannot delegate to the President the authority to prescribe aggravating factors in capital murder cases. Loving argued that, even though Congress may delegate certain authority under certain circumstances, the delegation at issue was inconsistent with the Framers' decision to vest in Congress the power "to make Rules

153

for the Government and Regulation of the land and naval forces".
United States Constitution, Article I, § 8, cl. 14.  After a
lengthy analysis of the history of this constitutional clause,
the Supreme Court held that, under Clause 14, Congress exercises
a power of precedence over, not exclusion of, Executive
authority.  The Supreme Court:

> discern[ed] no reasons why Congress should have less
> capacity to make measured and appropriate delegations
> of this power than of any other . . . .  Indeed, it
> would be contrary to precedent and tradition for us to
> impose a special limitation on this particular Article
> I power, for we give Congress the highest deference in
> ordering military affairs . . . .  And it would be
> contrary to the respect owed the President as
> Commander-in-Chief to hold that he may not be given
> wide discretion and authority.  We decline to import
> into Clause 14 a restrictive non-delegation principle
> that the Framers left out.

116 S.Ct. at 1748.  (citations omitted).

Next, the Court rejected Loving's argument that even if
Congress can delegate this authority, it did not do so by
implicit or explicit action.  The Court found a proper
delegation of this authority in Articles 18 and 56 of the
UCMJ.  Article 56 specifies that "[t]he punishment which a
court-martial may direct for an offense may not exceed such
limits as the President may prescribe for that offense".  10
U.S.C. § 856.  Article 18 states that a court-martial "may,
under such limitations as the President may prescribe,
adjudge any punishment not forbidden by [the UCMJ],
including the penalty of death when specifically authorized
by" 10 U.S.C.

154

§ 818. 116 S.Ct. at 1749. When read together with Articles 18 and 56, the Court also found a delegation of sufficient authority in Article 36 of the UCMJ, which gives the President the power to make procedural rules for courts-martial, applying "the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts . . . .". Id.; (quoting 10 U.S.C. § 836(a)).

Finally, the Court rejected Loving's argument that, even if these statutory provisions are delegations, they lack an intelligible principle to guide the President's discretion. In United States v. Curtis, 32 M.J. 252, cert denied, 502 U.S. 952 (1991), the Court of Military Appeals expressed its belief that the President's discretion to define aggravating factors for capital crimes was limited by Article 36's directive that regulations the President prescribes must "apply the principles of law . . . generally recognized in the trial of criminal cases in the United States district courts, but which may not be contrary to or inconsistent with this chapter". 10 U.S.C. § 836(a). The Supreme Court, however, analyzed this issue differently.

The Court chose to focus not on whether there are any explicit principles given to guide the President, but rather:

> whether any such guidance was needed, given the nature of the delegation and the officer who is to exercise the delegated authority. First, the delegation is set within boundaries the President

155

may not exceed. Second, the delegation here was to the President in his role as Commander in Chief. Perhaps more explicit guidance as to how to select aggravating factors would be necessary if delegation were made to a newly-created entity without independent authority in the area. Cf. Mistretta, 488 U.S. at 374, 379 (upholding delegation to the United States Sentencing Commission because of detailed congressional directives channeling agency discretion). The President's duties as Commander in Chief, however, require him to take responsibility and continuing action to superintend the military, including the courts-martial. The delegated duty, then, is interlinked with duties already assigned to the President by express terms of the Constitution, and the same limitations on delegations do not apply "where the entity exercising the delegated authority itself possesses independent authority over the subject matter", United States v. Mazurie, 419 U.S. 544, 556-57 ( 1975). . . . [W]e need not decide whether the President would have inherent power as Commander in Chief to prescribe aggravating factors in capital cases. Once delegated that power by Congress, the President, acting in his constitutional office of Commander in Chief, had undoubted competency to prescribe these factors without further guidance. "The military constitutes a specialized community governed by a separate discipline from that of the civilian", Orloff v. Willoughby, 345 U.S. 83, 94 (1953), and the President can be entrusted to determine what limitations and conditions on punishments are best suited to preserve that special discipline.

116 S.Ct. at 1750-51. (emphasis added and citations omitted).

In his concurring opinion, Justice Scalia sought to define further the Court's holding. He noted first that there is no such thing as a "lawful delegation of legislative authority", because legislative power is non-delegable. Id. at 1752. Although Congress may not delegate some of its Article I power to the Executive, it may assign

156

responsibilities to the Executive.  Id. at 1753.  When the Executive carries out those assigned responsibilities, it serves, not as the "delegate" of Congress, but as an agent of the people.  Id.

Justice Scalia concluded by noting that:

> [a]t some point the responsibilities assigned can become so extensive and so unconstrained that Congress has, in fact, delegated its legislative powers; but until that point of excess is reached there exists, not a "lawful" delegation, but no delegation at all.

Id. at 1753 (Scalia and O'Connor, J. J., concurring in part and concurring in the judgment).

Section 848 reaches the point of excess, because it gives extensive and unconstrained power to individual Government prosecutors to determine what the law will be in a particular capital case by declaring on an ad hoc basis what factors will increase the likelihood that a capital defendant is sentenced to death.

Article I, § I, of the United States Constitution provides:  "All legislative Powers herein granted shall be vested in a Congress of the United States".  Legislative functions include defining criminal conduct and setting appropriate punishments for such conduct.  The Supreme Court has long recognized that the responsibility for establishing criminal punishment belongs to the legislature.  Bell v. United States, 349 U.S. 81, 82 (1954); Ex parte United States, 242 U.S. 27 (1916).  More specifically, the Court has held that it is the responsibility of Congress to define

157

federal crimes and their appropriate punishments. Whalen v.
United States, 445 U.S. 684, 689 (1980) ("[T]he power to
define criminal offenses and to prescribe the punishments to
be imposed upon those found guilty of them, resides wholly
with the Congress".)

There is, however, no absolute rule against Congress'
delegation of authority to define criminal punishments. As
is noted in Loving, the Court has upheld delegations
allowing the executive or an independent agency to define by
regulation what conduct will be criminal, so long as
Congress makes the violation of regulations a criminal
offense and fixes the punishment, and the regulations
"confin[e] themselves within the field covered by the
statute". Loving, 116 S.Ct. at 1748 (quoting United States
v. Grimaud, 220 U.S. 506 (1911)). The Court also noted that
the exercise of a delegated authority to define crimes may
be sufficient in certain circumstances to supply the notice
to defendants the Constitution requires. Id.

When Congress enacted § 848, however, it did not
delegate to the Executive or an independent agency the
authority to define by regulation what specific conduct will
be criminal. By requiring a jury to weigh the aggravating
and mitigating factors in a case before a defendant is
death-eligible, but then giving prosecutors unbridled
discretion to create on a case-by-case basis non-statutory
aggravating factors that will be weighed in this process,

158

Congress improperly delegated to individual Government prosecutors the power to determine who is eligible for the death penalty by defining non-statutory aggravating factors that may be weighed against the mitigating factors. Thus, while a particular defendant's statutory aggravating factors may be outweighed by mitigating factors, the Government could expand the class of death-eligible defendants to include a particular defendant by adding non-statutory factors that tip the balance in favor of the aggravating factors.

Stated another way, in <u>Loving</u> the Court upheld the delegation of authority to define aggravating circumstances for the military death penalty because it was within the scope of authority traditionally given to the President, because the President, as Commander in Chief, is uniquely suited to perform this duty, and because the aggravating circumstances promulgated by him would apply across-the-board to all military capital cases. Section 848, however, constitutes an abdication of Congress' duty to define the crimes that will make a defendant eligible for the death penalty, and not a mere delegation of limited authority to define by regulation what conduct will be criminal. Congress, and not individual prosecutors, has the duty to declare what behavior will make one eligible for the federal death penalty.

159

Even if Congress does have the power to delegate to the President or some other agency of the executive branch, such as the Department of Justice, the authority to determine the aggravating factors for federal capital crimes, the § 848 delegation to individual prosecutors is constitutionally infirm because it fails to place limiting principles or give any guidance concerning the scope of non-statutory aggravating factors. The Loving Court dealt with a delegation of authority to the President, questioning whether, under those unusual circumstances, explicit guidance was needed, and concluding that it was unnecessary. The delegation made in § 848, however, is made to individual prosecutors, and the Loving Court noted that "[p]erhaps more explicit guidance as to how to select aggravating factors would be necessary if delegation were made to a newly created entity without independent authority in the area." 116 S.Ct. at 1750. See, e.g., Mistretta, 488 U.S. at 377 (delegation to United States Sentencing Commission is constitutional where "[t]he statute outlines the policies which prompted establishment of the Commission, explains what the Commission should do and how it should do it, and sets out specific directives to govern particular situations.") (citing U.S. v. Chambless, 680 F.Supp. 793, 796 (E.D.La. 1988)). Certainly, if explicit guidance is needed when delegation is made to an entity to promulgate across-the-board regulations, even more guidance is needed

160

when a delegation is made to a multitude of individuals. Section 848 provides no guidance at all to the individual prosecutors trying capital cases.

In this case, the government gave notice that it would seek to prove at sentencing four non-statutory aggravators, including commission of multiple murders, substantial criminal history, the serious wounding of others in the course of the CCE murders, and the knowing and willful membership in a conspiracy which sought to murder persons not charged at trial. Of these, the jury found all four against Johnson. It was unconstitutional for the Court to permit the jury to consider these non-statutory aggravators, because Congress' delegation of this authority to individual prosecutors is unconstitutional. Consequently, Johnson's death sentences must be vacated.

X.    JOHNSON ADOPTS BY REFERENCE THOSE CLAIMS PRESENTED BY HIS CO-PETITIONERS, TIPTON AND ROANE, TO THE EXTENT THAT THEY ARE APPLICABLE TO HIM.

To the extent applicable to him and not inconsistent with anything herein, Johnson adopts the claims and arguments of his co-petitioners, Roane and Tipton.

**WHEREFORE**, for the reasons set forth above Johnson prays that this Court grant the following relief:

a.    Issue a writ of habeas corpus commanding Respondent to bring Johnson before the Court to the end that he may be discharged from his unconstitutional confinement and/or be relieved of his unconstitutional sentence of death;

b.    Conduct a hearing on this Petition and accord Johnson the right to present witnesses, exhibits, and argument of counsel;

c.    Grant Johnson the authority to obtain subpoenas in forma pauperis for witnesses and documents necessary to prove the facts as alleged in this Petition, and to permit any other discovery allowed by law;

d.    Grant Johnson leave to amend this Petition in light of any facts uncovered through further investigation, discovery, or testimony; and

e.    Grant Johnson such other relief to which he may be entitled or which the Court deems just and proper.

Respectfully submitted,

CORY JOHNSON

June 15, 1998                BY: _____
                            Counsel

Edward E. Scher             Barbara L. Hartung, VSB 38062
VSB 23064                   1001 E. Main Street, #504
Thorsen Marchant            Richmond, VA   23219
 & Scher, LLP               (804) 649-1088
316 West Broad Street
Richmond, VA  23220-4219
(804) 644-0711

162

E X H I B I T   1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**



FEB 1 6 1993

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>CORY JOHNSON )<br>  a.k.a. "O," a.k.a. "CO" )<br> ) | Criminal Case No. 3:92CR68-02 |

**SPECIAL FINDINGS**

**I.  Statutory Aggravating Factors:**

**Category One:**  (21 U.S.C. § 848(n)(1))

WE, THE JURY, FIND as follows:

1A.  That defendant CORY JOHNSON intentionally killed the victim of the capital crime.

Proven to the jury's unanimous satisfaction, beyond a reasonable doubt:

As to Peyton Maurice Johnson ......... _Yes_
                                        (Yes or No)

As to Louis J. Johnson, Jr. .......... _Yes_
                                        (Yes or No)

As to Bobby Long ..................... _Yes_
                                        (Yes or No)

As to Anthony Carter ................. _Yes_
                                        (Yes or No)

As to Dorothy Mae Armstrong .......... _Yes_
                                        (Yes or No)

As to Curtis Thorne .................. _Yes_
                                        (Yes or No)

As to Linwood Chiles ................. _Yes_
                                        (Yes or No)

425

1B. That defendant CORY JOHNSON intentionally inflicted serious bodily injury which resulted in the death of the victim of the capital crime.

Proven to the jury's unanimous satisfaction,
      beyond a reasonable doubt:

As to Peyton Maurice Johnson ......... _____Yes_____
                                          (Yes or No)

As to Louis J. Johnson, Jr. .......... _____Yes_____
                                          (Yes or No)

As to Bobby Long ..................... _____Yes_____
                                          (Yes or No)

As to Anthony Carter ................. _____Yes_____
                                          (Yes or No)

As to Dorothy Mae Armstrong .......... _____Yes_____
                                          (Yes or No)

As to Curtis Thorne .................. _____Yes_____
                                          (Yes or No)

As to Linwood Chiles ................. _____Yes_____
                                          (Yes or No)

1C. That defendant CORY JOHNSON intentionally engaged in conduct intending that the victim of the capital crime be killed, or that lethal force be employed against the victim, which resulted in the death of the victim.

Proven to the jury's unanimous satisfaction,
      beyond a reasonable doubt:

As to Peyton Maurice Johnson ......... _____Yes_____
                                          (Yes or No)

As to Louis J. Johnson, Jr. .......... _____Yes_____
                                          (Yes or No)

As to Bobby Long ..................... _____Yes_____
                                          (Yes or No)

As to Anthony Carter ................. _____Yes_____
                                          (Yes or No)

As to Dorothy Mae Armstrong .......... _____Yes_____
                                          (Yes or No)

As to Curtis Thorne .................. _____Yes_____
                                          (Yes or No)

As to Linwood Chiles ................. _____Yes_____
                                          (Yes or No)

426

2

1D.  That defendant CORY JOHNSON intentionally engaged in conduct which defendant JOHNSON knew would create a grave risk of death to a person, other than one of the participants in the offense, and that such conduct resulted in the death of the victim of the capital crime.

Proven to the jury's unanimous satisfaction,
    beyond a reasonable doubt:

As to Peyton Maurice Johnson .........  ___Yes___
                                         (Yes or No)

As to Louis J. Johnson, Jr. ..........  ___Yes___
                                         (Yes or No)

As to Bobby Long ....................  ___Yes___
                                         (Yes or No)

As to Anthony Carter ................  ___Yes___
                                         (Yes or No)

As to Dorothy Mae Armstrong ..........  ___Yes___
                                         (Yes or No)

As to Curtis Thorne .................  ___Yes___
                                         (Yes or No)

As to Linwood Chiles ................  ___Yes___
                                         (Yes or No)


Jurors:   At this point, review your findings on the Category One aggravating factors as to each individual victim. Each victim represents a separate capital crime. If, as to any victim, you have **not** found one of the Category One aggravating factors proven to your unanimous satisfaction, beyond a reasonable doubt, you must now complete Section A of the Decision Form for defendant CORY JOHNSON that relates to that victim.

          If, as to one or more victims, you **have** found a Category One aggravating factor proven to your unanimous satisfaction, continue to the Category Two factors on the following page.


3


427

**Category Two:**   (21 U.S.C. §§ 848(n)(2)-(12))

WE, THE JURY, find as follows:

2A.   That defendant CORY JOHNSON committed the killing of the victim of the capital crime after substantial planning and premeditation.

Proven to the jury's unanimous satisfaction,
   beyond a reasonable doubt:

As to Peyton Maurice Johnson .........   Yes
                                         (Yes or No)

As to Louis J. Johnson, Jr. ..........   Yes
                                         (Yes or No)

As to Bobby Long .....................   Yes
                                         (Yes or No)

As to Anthony Carter .................   Yes
                                         (Yes or No)

As to Dorothy Mae Armstrong ..........   Yes
                                         (Yes or No)

As to Curtis Thorne ..................   Yes
                                         (Yes or No)

As to Linwood Chiles .................   Yes
                                         (Yes or No)

2B.   That, in the commission of the capital crime, defendant CORY JOHNSON knowingly created a grave risk of death to one or more persons in addition to the victim of the capital crime.

Proven to the jury's unanimous satisfaction,
   beyond a reasonable doubt:

As to Curtis Thorne ..................   Yes
                                         (Yes or No)

As to Linwood Chiles .................   Yes
                                         (Yes or No)

4

428

**Jurors:**    At this point, again review your findings as to each individual victim. If, as to any victim, you now have not found proven, to your unanimous satisfaction, both one of the Category One factors _and_ one of the Category Two factors, you must complete Section A of the Decision Form for defendant CORY JOHNSON that relates to that victim, if you have not already done so.

If, however, you have found both a Category One factor and a Category Two factor proven to your unanimous satisfaction as to one or more victims (i.e., one or more capital crimes), continue your deliberations with regard to those particular capital crimes by proceeding to the section on the next page dealing with nonstatutory aggravating factors.

5

429

## II.  Nonstatutory Aggravating Factors:

WE, THE JURY, FIND as follows:

1.  That defendant CORY JOHNSON committed multiple murders.

    Proven to the jury's unanimous satisfaction,
        beyond a reasonable doubt:

    _____Yes_____
    (Yes or No)

2.  That defendant CORY JOHNSON has a substantial criminal history.

    Proven to the jury's unanimous satisfaction,
        beyond a reasonable doubt:

    _____Yes_____
    (Yes or No)

3.  That defendant CORY JOHNSON seriously wounded two individuals in the course of committing the CCE murders for which he has been convicted.

    Proven to the jury's unanimous satisfaction,
        beyond a reasonable doubt:

    _____Yes_____
    (Yes or No)

4.  That defendant CORY JOHNSON was knowingly and willfully a member of a conspiracy which had as one of its goals the murder of individuals other than those for which the defendant was charged.

    Proven to the jury's unanimous satisfaction,
        beyond a reasonable doubt:

    _____Yes_____
    (Yes or No)

Jurors:  Regardless of your findings as to these nonstatutory aggravating factors, proceed to the next section concerning mitigating factors.

6

430

## III.  Mitigating Factors:

WE, THE JURY, FIND as follows:

Jurors:    Consideration of the following mitigating factors is specifically provided for by statute.

1. That defendant CORY JOHNSON's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge(s).

   Number of jurors who so find, by a preponderance of the evidence:
   (Number)

2. That defendant CORY JOHNSON is punishable as a principal (as defined in section 2 of Title 18 of the United States Code) in the offense(s), which was (were) committed by another, but defendant CORY JOHNSON's participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge(s).

   Number of jurors who so find, by a preponderance of the evidence:
   (Number)

3. That defendant CORY JOHNSON could not reasonably have foreseen that his conduct in the course of the commission of the murder(s) would cause, or would create a grave risk of causing, death to any person.

   Number of jurors who so find, by a preponderance of the evidence:
   (Number)

4. That defendant CORY JOHNSON was youthful, although not under the age of 18.

   Number of jurors who so find, by a preponderance of the evidence:
   (Number)

7

431

5. That defendant CORY JOHNSON did not have a significant prior criminal record.

Number of jurors who so find,
by a preponderance of the evidence: _____9_____
(Number)

6. That defendant CORY JOHNSON committed the offense(s) under severe mental or emotional disturbance.

Number of jurors who so find,
by a preponderance of the evidence: _____⊘_____
(Number)

7. That another defendant or defendants, equally culpable in the crime(s), will not be punished by death.

Number of jurors who so find,
by a preponderance of the evidence: _____12_____
(Number)

8. That the victim(s) consented to the criminal conduct that resulted in his (her) (their) deaths.

Number of jurors who so find,
by a preponderance of the evidence: _____12_____
(Number)

9. That the following other factors in the defendant's background or character mitigate against imposition of a death sentence:

Jurors: The following are nonstatutory mitigating factors.

a) That defendant CORY JOHNSON was subjected to emotional and physical abuse, abandonment and neglect as a child, and was deprived of the parental guidance and protection that he needed.

Number of jurors who so find,
by a preponderance of the evidence: _____12_____
(Number)

b) That defendant CORY JOHNSON suffers from neurological impairments which were identified and which were not adequately treated or addressed when he was a child or adolescent.

Number of jurors who so find,
by a preponderance of the evidence: _____12_____
(Number)

8

432

c)   That defendant CORY JOHNSON suffers from brain dysfunction which has gravely impaired his ability to function in the absence of strong support or guidance.

Number of jurors who so find,
by a preponderance of the evidence:     _____8_____
                                         (Number)

d)   That defendant CORY JOHNSON was introduced to addictive drugs and alcohol while still a child.

Number of jurors who so find,
by a preponderance of the evidence:     _____12_____
                                         (Number)

e)   That defendant CORY JOHNSON has responded well to structured environments, and would likely make a reasonable adaptation to prison if he were sentenced to life imprisonment.

Number of jurors who so find,
by a preponderance of the evidence:     _____7_____
                                         (Number)

f)   That defendant CORY JOHNSON's full scale I.Q. is 77.

Number of jurors who so find,
by a preponderance of the evidence:     _____8_____
                                         (Number)

g)   That defendant CORY JOHNSON grew up in an impoverished and violent environment, and was exposed to extreme violence as a child and throughout his life.

Number of jurors who so find,
by a preponderance of the evidence:     _____12_____
                                         (Number)

h)   That defendant CORY JOHNSON suffers from an extremely severe learning disability which impairs his ability to use good judgment to control his behavior, and to understand and foresee the consequences of his actions.

Number of jurors who so find,
by a preponderance of the evidence:     _____0_____
                                         (Number)

9

433

i)   That defendant CORY JOHNSON suffers from a neurological impairment (brain damage) that impairs his ability to exercise good judgment, to control his behavior and to understand and foresee the consequences of his actions.

Number of jurors who so find,
by a preponderance of the evidence:     ___2___
(Number)

j)   That defendant CORY JOHNSON was brought up in an extremely unstable, abusive and neglectful family.

Number of jurors who so find,
by a preponderance of the evidence:     ___12___
(Number)

k)   That defendant CORY JOHNSON's severe learning disability affected his intelligence, his speech, and his ability to read, write and learn.  Those limitations impaired his ability to exercise good judgment and to control his behavior.

Number of jurors who so find,
by a preponderance of the evidence:     ___5___
(Number)

l)   That defendant CORY JOHNSON had no parental involvement or support from or by his father.

Number of jurors who so find,
by a preponderance of the evidence:     ___12___
(Number)

m)   That defendant CORY JOHNSON, if not sentenced to death, will be sentenced to life in prison without any possibility of parole.

Number of jurors who so find,
by a preponderance of the evidence:     ___12___
(Number)

Jurors:   If any juror or jurors find(s) that a mitigating factor not listed above has been proven to exist by a preponderance of the evidence, please identify that mitigating factor on the following page, together with the number of jurors who so find. Remember, however, that you need not be able to articulate a mitigating factor with specificity to consider it in your deliberations.

10

434

If additional space is needed, use the back of this page.

Factor: ~~XXXX~~ ~~XX~~ The defendants eagerness to be accepted by ~~his~~ others ~~XXX~~ he was easily manipulated.

Number of jurors who so find,
by a preponderance of the evidence:  _____11_____
(Number)

Factor: That the defendant's severe Leaning Disability, based on neurological impairment (brain damage) Could impair his ability to exercise good judgeme

Number of jurors who so find,
by a preponderance of the evidence:  _____12_____
(Number)

Factor: _____

_____

Number of jurors who so find,
by a preponderance of the evidence:  _____
(Number)

Factor: _____

_____

Number of jurors who so find,
by a preponderance of the evidence:  _____
(Number)

Jurors:   You have completed the Special Findings as to defendant CORY JOHNSON, and must now begin the process of weighing the aggravating and mitigating factors to determine if the death penalty is justified as to each capital crime for which this defendant has been convicted. Remember, you are now considering only those capital crimes for which you have not already completed Section A of the Decision Form. Upon completing your deliberations as to the remaining capital crimes charged to this defendant, complete Section B, C or D of the Decision Form for each crime as appropriate.

11

435

The date and your foreperson's signature should appear
below, certifying that these are your Special Findings as
to defendant CORY JOHNSON.


_____    ___2/15/93_____
FOREPERSON'S SIGNATURE                              DATE

12

436

E X H I B I T   2



# State of New Jersey

## County of Mercer



# Office of the Clerk of Mercer County

I, Albert E. Driver, Jr. Clerk of the County of Mercer, and also Clerk of the Mercer County Court—Law Division and also Deputy Clerk of Superior Court— Law Chancery Division in and for said County, the same being courts of record, holden therein, **Do hereby Certify** that the foregoing is a true and correct copy of a certain Judgement in re: State of New Jersey vs. Rufus Alvarez, Indictment Number 91-05-0540 as the same remains of record and on file in my said office.

**In Testimony Whereof,** I have hereunto set my hand and affixed my Official Seal at Trenton, this ____13th.____ day of ____July____ A. D. 19 94



_Albert E. Driver, Jr._ Clerk

**ALBERT E. DRIVER, JR.**
Deputy Clerk of Superior Court       CC-2

State of New Jersey

v.

New Jersey Superior Court
MERCER County
Law Division – Criminal

☐ Judgment of Conviction
☐ Change of Judgment
xxxx Order for Commitment
☐ Indictment/Accusation Dismissed
☐ Judgment of Acquittal

Rufus Alvarez
................................................................
Defendant (Specify Complete Name)

8/21/68 ............................... DATE OF BIRTH
4537.66B ............................. S.B.I. #
12/3/90 .............................. DATE OF ARREST
5/1/91 ............................... DATE IND / ACC FILED
5/30/91 .............................. DATE OF ORIGINAL PLEA
☒ NOT GUILTY ☐ GUILTY    ORIGINAL PLEA

| ADJUDICATION BY: | DATE |
|---|---|
| ☒ GUILTY PLEA | 12/8/93 |
| ☐ JURY TRIAL | |
| ☐ NON-JURY TRIAL | |
| ☐ Dismissed/Acquitted | |

**ORIGINAL CHARGES**

| IND / ACC No. | Count  Description | Degree  Statute |
|---|---|---|

Ind. 91-05-0540  Ct 1 Conspicary 2C:35-10a(1)
90-2430-01 Cts 2&7 Poss of CDS 2C:35-10a(1) Cocaine
Ct 3 Poss of CDS W/I Dist. 2C:35-5a(1)
Ct 4 Poss of CDS W/I Dist. O/O Nr. Sch. Prop. 2C:35-7
Ct 5 Maint. or Operation A CDS Production Facility 2C:35-4
Cts 6 & 8 Maint. a Narcotics Nuisance 2C:35-1- 24:21-21(a)(6)

**FINAL CHARGES**

| Count | Description | Degree  Statute |
|---|---|---|

Ct 1 Conspiracy 2C:35-10a(1)
Ct 3 Poss of CDS W/I Dist. 2C:35-5a(1)
Ct 5 Maintaining or Operating a CDS Production Facility 2C:35-4

It is, therefore, on    1/21/94    ORDERED and ADJUDGED that the defendant is sentenced as follows

Court merged Count 1 into count 3 for sentence.

Under Ct 3 -2C:35-5b(1) 1st. Deg. offense - Custody of the Commissioner Department of Corrections for the term of fifteen (15) years.  Minimimum parole five (5) year DEDR $3,000  Lab fee $50.00  VCCB: $30.00  License revoked for 6 mos.

Under Ct 5 - 1st. deg. 2C:35-4  Custody of the Commissioner Department of Correction for the term of fifteen (15) years.  Minimum parole ineligibility of five (5) years Sentence is to run concurrent with each other.

DDR $3,000 Lab fee $50.00 VCCB: $30.00  License revoked 6 mos.

Counts 2,4,6,7,8 dismissed.

☒ It is further ORDERED that the sheriff deliver the defendant to the appropriate correctional authority.
☒ Defendant is to receive credit for time spent in custody (R. 3:21-8).

12/3/90 to present

| TOTAL NO DAYS | DATES (From / To) |
|---|---|
| | |
| | DATES (From / To) |

☐ Defendant is to receive gap time credit for time spent in custody [N.J.S.A. 2C:44-5b(2)].

| TOTAL NO DAYS | DATES (From / To) |
|---|---|

Total Custodial Term  15 yrs     Institution    CCDC     Total Probation Term _____
Mpe 5 yrs.

State of New Jersey v. _____   S.B.I. # _____   IND / ACC # _____

Total FINE $ _____

Total RESTITUTION $ _____

If the offense occurred on or after December 23, 1991, an assessment of $50 is imposed on each count on which the defendant was convicted unless the box below indicates a higher assessment pursuant to N.J.S.A 2C:43-3.1. (Assessment is $30 if offense is on or after January 9, 1986 but before December 23, 1991, unless a higher penalty is noted. Assessment is $25 if offense is before January 9, 1986.)

☐ Assessment imposed on

count(s) _____

is $ __30.00__ each.

Total VCCB Assessment $ 60.00

☐ Installment payments are due at the rate

of $ _____ per _____,

beginning _____
                    (DATE)

If any of the offenses occurred on or after July 9, 1987, and is for a violation of Chapter 35 or 36 of Title 2C.

1) A mandatory Drug Enforcement and Demand Reduction (D.E.D.R.) penalty is imposed for each count. (Write in # times for each.)

____ 1st Degree @ $3000     ____ 4th Degree @ $750
____ 2nd Degree @ $2000     ____ Disorderly Persons or Petty
____ 3rd Degree @ $1000     ____ Disorderly Persons @ $500

Total D.E.D.R. Penalty $ __6,000__

☐ Court further ORDERS that collection of the D.E.D.R. penalty be suspended upon defendant's entry into a residential drug program for the term of the program.

2) A forensic laboratory fee of $50 per offense is ORDERED. ____ Offenses @ $50.

Total LAB FEE $ __100.00__

3) Name of Drugs Involved ~~Cocaine~~

4) A mandatory driver's license suspension of __12 mos__ months is ORDERED.

The suspension shall begin today, _____ and end _____

Driver's License Number _____unk_____

(IF THE COURT IS UNABLE TO COLLECT THE LICENSE, PLEASE ALSO COMPLETE THE FOLLOWING.)

Defendant's Address __206 Farnsorth Ave, Bordentown NJ 08505__

Eye Color _____ Sex _____ Date of Birth _____

☐ The defendant is the holder of an out-of-state driver's license from the following jurisdiction _____. Driver's License # _____.

☐ Your non-resident driving privileges are hereby revoked for _____ Months.

If the offense occurred on or after February 1, 1993 and the sentence is to probation or to a State Correctional facility, a transaction fee of up to $1.00 is ordered for each occasion when a payment or installment payment is made. (P.L. 1992, c. 169)

| NAME (Court Clerk or Person who prepares this form) | TELEPHONE NUMBER | NAME (Attorney for Defendant at Sentencing) |
|---|---|---|
| Blanca M. Diaz, Court Clerk | | Lisa Granger, Esq. |

STATEMENT OF REASONS

~~The defendant, Rufus Alvarez, is sentenced within parameters of~~ plea agreement.

Aggravating Factors:    Defendant's prior conviction for drug activity; need to deter.

Mitigating Factor:    Hardship to defendant's family.

The aggravating factors outweigh the mitigating factors and warrant the imposition of an enhanced term. He is sentenced under Count 5 – Maintaining or Operating a CDS Production Facility, first degree, to a term of 15 years with a 5 year minimum parole ineligibility (discretionary) term.
The sentences are to run concurrently so that the aggregate sentence is to a term of 15 years with 5 years minimum parole ineligibility.

| JUDGE (Name) | JUDGE (Signature) | DATE |
|---|---|---|
| Charles A. Delehey JSC | *[signature]* | 1/21/94 |

E X H I B I T   3

Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

MAY 0 4 1992

19 PAGES

UNITED STATES OF AMERICA

V.

RICHARD TIPTON AKA WHITEY

NEWTOWN GANG                          GRAND JURY 92-1


TESTIMONY OF SWANE HENDERSON BALL

before a full quorum of the grand jury

on April 20, 1992, at 4:35 p.m.


Foreman:   CHRISTOPHER F. SNEAD

Assistant Foreman:   MARY A. McNULTY


Assistant U. S. Attorney:

Toby Vick, AUSA

Buddy Parcell, Assistant Commonwealth's Attorney

City of Richmond


Reporter:   Barbara D. Watts, RPR


ACCU-BETA Depositions, Videos & Images, Inc.

April 20, 1992                    4:35 p.m.

SWANE HENDERSON BALL, called by the government, first being duly sworn, testifies and says, viz:

EXAMINATION BY MR. PARCELL:

Q    Please talk loud.  Your name, please?

A    Swane Henderson Ball.

Q    How old a fellow are you, sir?

A    23.

Q    Where are you presently residing?

A    Where I'm at, Richmond city jail.

Q    Why?

A    A violation.

Q    Probation violation?

A    Yes.

Q    What have you been convicted of?

A    Burglary.

Q    B&E.  What else?

A    That is it.

Q    What violated your probation?

A    I stopped going to see my PO.

Q    When were you locked up on the probation violation?  When were you locked up for the violation?  How long have you been in jail?

A      Four months.

Q      Prior to going to jail where did you live?

A      1619 Glenfield.

Q      Did you know someone by the name of Whitey?

A      Yes, I did.

Q      Who is this person?

A      Yes, that is Whitey.

Q      Let the record show he has identified Mr. Tipton, Richard Tipton. How did you know him?

A      I used to associate with him.

Q      Who is this person?

A      √Carter Brown.

Q      How did you have associated with those two men?

A      Drug related.

Q      I mean Cory Johnson. Sorry.

       What do you mean drug association?

A      I used to sell drugs for him.

Q      Sell drugs for them?

A      Yes, sir.

Q      For both of them?

A      INDICATING YES.

ACCU-BETA Depositions, Videos & Images, Inc.

Page 4

Q    How did the arrangement first begin?

A    It came around in the west end.

Q    They asked you to do what?

A    They asked me what time of day it was.

Q    What did that mean to you?

A    What was going on in the neighborhood?

Q    What did you tell him?

A    I said, won't too much going around.

Q    Did they ultimately ask you to help sell their cocaine?

A    Yes, it came to that point.

Q    What exactly did they ask you?

A    They said what could I move around the neighborhood, stuff like that.

Q    Who asked you that?

A    At the time both of them was present.

Q    Anybody else present?

A    No.

Q    Was that the first time they had a drug conversation with you?

A    Yes.

Q    What did you tell them?

ACCU-BETA Depositions, Videos & Images, Inc.

A        I said I would move anything they gave me around to move.

Q        What agreement did you end up with that day?

A        Gave me like 30 sack.

Q        Sorry.

A        A 30 sack, $300 worth.

Q        A little bag, a 30 sack?

A        Yes.

Q        When they gave you that 30 sack, what form was that?  Cook'em up or powder?

A        Cook'em up.

Q        Do you know who cooked it up?

A        No, I don't.

Q        Who actually gave you the cocaine?

A        O.

Q        What was your agreement as far as the selling of drugs and what happened to the money?

A        60-40.

Q        Who got 60?

A        They did.

Q        Who got 40?

A        I did.

Q        Did you sell the 30 bag?

A        Yes, sir.

Page 6

Q    You gave them the $60.  You kept the $40?

A    I gave them $200.  I kept $100.

Q    After that, who did you sell your cook'em up to?

A    People around the neighborhood.

Q    What neighborhood?  Newtown?

A    Yes, Newtown.

Q    That is--

A    Central.

Q    In Jackson Ward section of the city?

A    Clay Street, Clay Street, Hancock, all up in there.

Q    Did there come a point in time you had occasion to get some more cocaine from them?

A    Yes. I did.

Q    Approximately what month of what year did you get the first 30 bag from them?

A    September I guess.

Q    What year?

A    Around October, 1991.

Q    How long did it take you to sell that 30 bag?

A    No time.

Q    Day, two days?

ACCU-BETA Depositions, Videos & Images, Inc.

E X H I B I T   4

Anthony Carter, Curtis Thorne, and Linwood Chiles.[6]  With the exception of the Brown murder, all of the murders were committed in furtherance of appellants' continuing criminal enterprise.  The victims were killed because they were suspected of cooperating with the police (JA 2021-2022, 2396-2397, 3021), because they "messed up" money owed to appellants (JA 2545-2546, 2735-2736, 2751), because they were potential witnesses, or because they were viewed as rivals in the drug trade (JA 3166-3167, 3382).

B.  Appellants' Drug Trafficking Activities.  Richard "Whitey" Tipton, Cory "C.O." or "O" Johnson, and Vernon Lance "V" Thomas were members of the "New York Boyz," a group of 15-30 persons who continuously distributed "large amounts" of crack cocaine in Trenton, New Jersey, from 1989 to June 4, 1991.  JA 1730-1732, 1734-1736, 1748-1751, 1802-1803, 1808.[7]  As part of their mode of operation, members of the New York Boyz -- including Tipton and Johnson -- used intimidation and violence to further their drug

---

[6]  Evidence pertaining to an eleventh murder -- that of Katrina Rozier -- was introduced, but the murder was not charged as a substantive offense.  In sum, the evidence showed that Rozier was fatally shot (JA 3426-3428, 3435-3437) by use of a pistol that was later seized from Tipton's possession and with structurally distinctive ammunition that was similar to ammunition later seized at a house from which appellants ran their drug operation.  JA 3508-3510; GX 80, 124.  Rozier owed a drug debt to Johnson (JA 2544), and Roane stated his belief that Rozier "was police" and, therefore, "we had to get rid of her" (JA 3161-3162).

[7]  Members of the New York Boyz all came from New York City and considered fellow members to be "brothers" and "cousins."  JA 1744.  Although the name "New York Boyz" originated with the Trenton police, the group adopted it because it "let people know we were from out of town and were taking over."  JA 1736.

9

trade (JA 1736-1739, 1746, 1826-1833, 1858-1861)[8] and employed a network of local residents as workers in their drug trafficking business. When the members of the New York Boyz had sold their available stock of crack cocaine (their total sales averaged 200-300 grams per day and one and one half kilos per week -- JA 1748, 1750, 1802-03), the members would pool their resources, and Johnson and Thomas would travel to New York City to purchase a new supply of cocaine. JA 1737, 1771, 1809. The Trenton-based operation continued in existence until June 4, 1991, when Trenton police raided a house where Johnson, Thomas, and other members lived and seized crack cocaine and guns. JA 1752-53, 1813-20; GX 131.

While the Trenton-based operation was still under way, Tipton stated that there was "big money" to be made selling crack cocaine in Richmond, Virginia, since the market was larger and the mark-up on crack cocaine greater than in Trenton. JA 1751-1752. In August 1990, Tipton formed a partnership with Antwoine Brooks to distribute crack cocaine in the Central Gardens area of Richmond. JA 1886-1887. Starting with four ounces of crack cocaine that Tipton obtained from his supplier in New York City, Tipton and Brooks recruited several workers (including Hussone Jones and Maurice Saunders) and sold their initial stock of crack cocaine for approximately $11,000. JA 1887-1891, 1975-1978, 2147-2149, 2157,

---

[8] According to Greg Scott, members of the New York Boyz "got together whenever we had a problem. We would discuss it, to retaliate or not to retaliate"; thereafter, members "would get together and retaliate." JA 1736-1737. Scott participated in several such discussions with Tipton, Johnson, and Thomas. JA 1737. A member who did not engage in acts of retaliation was regarded as "a traitor" and dropped from membership. JA 1756-1757.

2374-2376. From then until Brooks' arrest in February 1991, Tipton and Brooks continuously distributed crack cocaine -- they averaged between 2-3 ounces per week and a kilogram per month -- from which they each realized weekly profits of $3,000 to $5,000. JA 1893-1895, 1922, 1979-1980, 2139-2141, 2149, 2156. When they needed to "re-up" their supplies, Tipton took $5,000 to $6,000 in cash and obtained more crack cocaine from suppliers in Richmond or Norfolk. JA 1892, 1896, 1921.

Tipton told Brooks that "Hess" and his other friends in New York would take care of anything that they needed done. JA 1901-1902.[9] In late 1990, "Hess" arrived in Richmond, where Tipton introduced him as an "enforcer" and a member of the "New York Boyz." JA 2157-2159. Thereafter, in December 1990, Saunders accompanied "Hess" to New York, where they obtained a kilogram of crack cocaine from "Light" and "E.B." with $18,000 that had been provided by Tipton. JA 2160-2165, 2380-2281.[10] A month later, Saunders accompanied Tipton to the same locale in New York City, where Tipton bought nearly three kilograms of cocaine for $40,000. JA 2165-2168. Tipton identified "Light" and "E.B." as part of the New York crew. JA 2161-2162.

In the summer of 1991, Johnson -- whom Tipton introduced as his "brother" (JA 1899-1900, 1983-1984) -- arrived in Richmond "to

---

[9] As Saunders testified, Tipton "always talked about his New York Boyz * * *, the crew he had," and stated that if anything ever happened to him, the crew members "would come down and just shoot everything." JA 2153.

[10] "Light" had been Tipton's principal source of cocaine during the Trenton operation. JA 1748-1749.

11

make sure that we don't take no losses this time." JA 2170-71, 2382-83. Johnson began selling crack cocaine with Tipton in the Central Gardens area. JA 2382-83. In late 1991, James "J.R." Roane and Thomas -- who were both introduced as Tipton's "cousins" (JA 2000, 2172-73, 2385, 2387) -- joined Tipton and Johnson in Richmond as partners in their crack cocaine distribution enterprise. As Tipton stated, he had selected an area in Newtowne that he "was going to lock down" and "sew * * * up" in terms of controlling its drug trade once his "cousin" Roane was released from jail in November 1991. JA 1986-87, 2005-07, 2172-73. See also, JA 3159-60. Thus, by November 1991, appellants had moved their drug operation to a house located on West Moore Street in Newtowne (JA 2496-99, 2502-03), although they continued to supply crack cocaine to Central Gardens, Southside Richmond, and other parts of the city (JA 2724).

From November 1991 until the time of their arrests in the spring of 1992, appellants supported themselves by selling crack cocaine "[e]very day." JA 2504-05, 2933-34. During this time, appellants, Thomas, and "E.B." were "like * * * one family" and "the boss[es]" who "ran things." JA 2514, 3154. Tipton, Johnson, and Thomas -- often accompanied by Douglas Talley, "Studie" Green, or Linwood Chiles -- travelled to New York City every other day to purchase "half a key" of powdered cocaine from their suppliers. JA 1994-98, 2083, 2145, 2149, 2390, 2394, 2506-07, 2520-22, 3377. Once the cocaine was transported to Richmond, either Tipton (JA

1979, 2146-47, 2508-09, 2517-19, 2715-17, 2749)[11] or Roane (JA 2229-2231, 2248-2249) cooked it into crack cocaine.

Appellants, Thomas, and "E.B." then divided the processed cocaine among themselves (JA 2510-2511, 2773-2777, 2939-2940) and distributed it through a network of "workers" (JA 2002-2003, 2513-2514) that included codefendant Sandra Reavis (JA 1991-1992, 1999, 2513, 2721, 3147-3148, 3535), Curtis Thorne (JA 1990-1991, 1999, 2065-2066, 2068, 2513, 2519-2520, 2936-2937, 3153-3155, 3535 Jerry Gaiters (JA 1992-1993, 1199, 2512-2513, 2720, 2934-2935, 2939, 3143-3145), Hussone Jones (JA 1999, 3535-3536), Dorothy "Mousey" Armstrong (JA 2512, 2722-2723, 2937-2939, 3145-3146, 3154), Douglas Talley (JA 2267-2270, 3160), Nina Bracey (JA 3535), Charles "Man-Man" Townes (JA 1982-1985, 1988, 1990, 1998-1999, 3535), Robert "Papoose" Davis (JA 2509-2510, 2519, 2712-2713, 3146-3147, 3155), Linwood Chiles (JA 2513, 3536), Priscilla "Pepsi" Greene (JA 2520, 3373-3374, 3535), Douglas Moody (JA 2530-2531), Katrina "Nat" Rozier (JA 2542-2543), Keith Ross (JA 2936, 3155), and Swain Ball (JA 3155).[12]

For example, Townes continuously sold crack cocaine during a four-month period, receiving a "300 sack" (i.e., $300 worth of crack cocaine) from Tipton every other day. JA 1984-1990, 1998. During that period, Townes realized $10,000 in proceeds, of which $6,000 was given to Tipton. JA 1998-1999. So too, "Mousey"

---

[11] Johnson described Tipton as "a master cook, master chef." JA 2712.

[12] "Studie" Green (JA 2376-2377) and Denise Berkley (JA 2496-2500, 2721-2722) ran errands for appellants.

Armstrong "[e]very day" sold crack cocaine that she received from Johnson to between 50-100 customers, realizing at least $400 per day in proceeds from her drug sales. JA 2514-2515, 3151-3152.

Appellants realized a "tremendous" amount of money from selling crack cocaine. JA 2573. Tipton stated, in December 1991, that he was making more money selling drugs in Newtowne than he had previously made selling drugs in Central Gardens. JA 2384-2385. Tipton further predicted that "eventually he was going to have the city sewed up because they were making big bucks" selling crack cocaine. JA 2941-2942. Appellants, Thomas, and "E.B." pooled the money they made from distributing drugs (JA 2776-2777) and used the proceeds to purchase more cocaine (JA 2610).

C. The Murders and Related Conduct.

1. The Talley Murder (Counts 3-4). On January 3, 1992, Johnny Lee Byrd helped Talley distribute approximately $1,000 worth of crack cocaine that Talley had received from "Papoose" Davis in installments (JA 2262-2263, 2268); however, Byrd had "messed up the drugs and the money" by smoking some of the crack cocaine himself and by spending the proceeds realized from his sales. JA 2269-2271. The next morning, Byrd saw Talley in a car parked outside Byrd's house, along with Tipton, Johnson, and Roane. While Tipton remained in the car with Talley, Johnson and Roane went to Byrd's house and knocked on the door. Learning that Byrd was not at home, Johnson and Roane returned to the car, where Roane struck Talley in the face with his fist. JA 2271-2272, 2283. The four men then drove off together.

Late on the night of January 4, 1992, Roane arrived at the

distributed through a network of street-level distributors working on commission. Johnson (see JA 3155-3157) and his "partners" exercised the right to determine whether a street-level distributor would receive cocaine to sell; controlled the quantity of cocaine provided to each distributor (usually a "300 sack" containing 30 rocks of crack cocaine that could be sold for $10 per rock); and dictated the commission (the "partners" would usually receive a profit of $200 from the sale of a "300 sack," and the distributors were allowed to retain $100). In light of their regularity and their nature, these consignment transactions went "far beyond a simple buyer-seller arrangement." United States v. Apodaca, 843 F.2d at 426-427.[96]

Even apart from the supervisory relationship that can be inferred from Johnson's role in supplying cocaine to "workers" in the drug distribution network, the record is replete with examples of Johnson's exercise of control over five or more persons. Thus, Butler stored weapons for Johnson (JA 3528); rented automobiles that Johnson and Tipton used on drug runs (Tr. 3528-3529, 3543-3544) (see United States v. Possick, 849 F.2d at 337); delivered crack cocaine for Johnson (JA 3536); facilitated the three-way telephone calls; and, along with Reavis (JA 3545-3549), collected

---

[96] See also, United States v. Becker, 892 F.2d 265, 267 (3d Cir. 1989); United States v. Butler, 885 F.2d at 201 (relationship analogous "to an exclusive franchise dealership"); United States v. Moya-Gomez, 860 F.2d 706, 748-749 (7th Cir.), cert. denied, 492 U.S. 908 (1988); United States v. Possick, 849 F.2d at 336; United States v. Cruz, 785 F.2d 399, 407 (2d Cir. 1986) ("franchise distributors earning commissions on consignments of [drugs] prepared and distributed by the Cruz organization").

and wired the bail money after Johnson was arrested (cf., United States v. Losada, 674 F.2d 167, 174 (2d Cir.), cert. denied, 457 U.S. 1125 (1982). Chiles drove Johnson to New York City to replenish the "partners'" cocaine supply (JA 2520-2523) *1690-1693* (see United States v. Chalkias, 971 F.2d 1206, 1214 (6th Cir.), cert. denied, 113 S.Ct. 351 (1992); United States v. Butler, 885 F.2d at 201; United States v. Moya-Gomez, 860 F.2d at 748). Armstrong regularly allowed Johnson to distribute cocaine out of her house (Tr. 1583) (see United States v. Chalkias, 971 F.2d at 1214; United States v. Possick, 849 F.2d at 337). Berkley ran a variety of drug-related errands, including delivering crack to Johnson's street-level distributors (JA 2519-2520) *1689-90*, acting as a "look-out" while Johnson and his "partners" cooked and packaged crack cocaine for distribution (JA 2512) *1682*, and hiding firearms that had been used in drug-related murders (JA 2541) *1711*. In addition, Johnson offered Berkley the option of either killing Armstrong or being killed herself (JA 2549-2550) *1719-20* (see United States v. Moya-Gomez, 860 F.2d at 748; United States v. Possick, 849 F.2d at 336; United States v. Jones, 801 F.2d 304, 308-309 (8th Cir. 1986)). Pea Sue allowed Johnson to use her house to cook crack cocaine (JA 2518-2519) *1688-9*. Davis allowed Johnson to stay at his apartment and deal drugs from it (JA 2710) *1879*. Bracey (JA 2666-2670) *1836-40* and Williams (JA 2674-2675) *1844-5* facilitated the purchase of firearms for Johnson for use in drug-related violence. Finally, Gaiters agreed to aid Johnson in the drug-related murder of Armstrong. Given this substantial evidence of five or more persons working under Johnson's control, he was

162

properly convicted of engaging in a continuing criminal enterprise. See <u>United States</u> v. <u>Butler</u>, 885 F.2d at 201.

2. Appellant Tipton similarly argues (Tipton Br. 22-29) that the evidence was insufficient to prove that he was an organizer, manager, or supervisor in the drug trafficking enterprise.[97] His claim fails for exactly the same reasons that Johnson's claim failed. The evidence was overwhelming that Tipton was the prime organizer of the enterprise. The evidence further showed that Tipton's relationship with the various "workers" was far more than a mere buyer-seller relationship.

Thus, there was evidence that Townes, Jones, Saunders, and Thorne all sold cocaine "for" Tipton; indeed, Townes and Jones specifically stated that they solicited positions with Tipton as distributors. JA 1973-1974, 1979-1980, 1984-1985, 1990-1991, 1999, 2025-2027, 2372, 2384, 2395. And, Tipton told Saunders that "[y]ou only deal with me if you value your life." JA 2152. Saunders further accompanied Tipton on drug runs to New York City (JA 2160-2168), packaged drugs, and delivered them to the street-level distributors (JA 2155). Talley likewise drove for Tipton on his resupply trips (JA 1995-1998). Jones drove the getaway car for Tipton during the Talley murder (JA 2398-2400, 2435-2436),

---

[97] Tipton argues at length (Tipton Br. 24-26) that there was no evidence indicating that he occupied a managerial or supervisory role during the time that he distributed drugs in New Jersey. That fact -- which we do not dispute -- is immaterial: Count 2 alleged that the charged continuing criminal enterprise existed "from at least January 1991," until the return of the second superseding indictment. JA 77. Thus, the alleged continuing criminal enterprise entirely post-dated Tipton's activities in New Jersey.

163

E X H I B I T   5

Page 1

IN THE UNITED STATES DISTRICT COURT FOR

THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

-------------------------)

UNITED STATES OF AMERICA )            11 PAGES

v.                       )

RICHARD TIPTON,          )

aka Whittey, et al.      )            GRAND JURY 92-1

-------------------------)


     The testimony of JERRY GAITERS, taken on the 21st day of April, 1992, commencing at approximately 9:30 a.m.


FOREMAN:  CHRISTOPHER F. SNEAD

DEPUTY FOREPERSON: MARY A. McNULTY


ASSISTANT UNITED STATES ATTORNEY:

HOWARD C. VICK, AUSA


Reported By:  Debra L. Johnson


ACCU-BETA DEPOSITIONS, VIDEOS, & IMAGES, INC.
(804) 746-0746

Q    You knew at some point they were going to kill her?

A    Yes

Q    You knew they were upset with her over a drug debt?

A    I went there and picked money up.  I didn't know she was even hiding from him.

Q    You knew according to Whittey and "O" she owed them money for drugs?

A    Well, Whittey didn't say anything about it.  "O" said he was going to pick them up some money.

Q    They brought you along because they wanted you to get them in the house.  Right?

A    Yes..

Q    They knew they'd open the door for you?

A    Right.

Q    They had guns with them?

A    "O" had a gun.

Q    You did, indeed, go up to that house and knock on the door and they said who is it.  Bobby Long said that?

A    Bobby asked who was it.

Q    You said Jerry?

ACCU-BETA DEPOSITIONS, VIDEOS, & IMAGES, INC.
(804) 746-0746

Page 8

A        I went forcefully.

Q        They threatened you?

A        He had a gun in my back.

Q        Who did?

A        "O".

Q        You thought if you didn't go along with them they were going to-- -

A        Yes.

Q        And Whittey and "O" were there present with you?

A        Well, Whittey wasn't.

Q        Where was Whittey?

A        Whittey let us off at the corner.

Q        He was there--went over to Church Hill with you?

A        Yes.

Q        With "O"?

A        Yes.

Q        You knocked on the door.  Bobby Long said who is it?

A        Yes.

Q        You said it's Jerry?

A        Yes

Q        Or you said it's Gaiters?

A        I said "G".

ACCU-BETA DEPOSITIONS, VIDEOS, & IMAGES, INC.
(804) 746-0746

<u>E X H I B I T   6</u>

# U.S. to seek death penalty fo

## Eleven killed in 45 days

### The accused

      

**Jerry R. Gaiters**
Murder

**Sterling Hardy**
Murder

**Sandra B. Reavis**
Conspiracy

**James Roane Jr.**
Murder
(faces death)

**Lance Thomas**
Murder

**Richard R. Tipton**
Murder
(faces death)

**Cory Johnso**
(still at large
Murder
(faces death)



### The victims

**1** **Douglas A. Talley**, 37, of the 2600 block of Third Avenue, was f stabbed more than 80 times inside a parked car in the 200 block c 13th Street Jan. 5. Authorities say his assailant may have thought was a police officer. Murder indictment: Richard R. Tipton.

**2** **Douglas Moody**, 36, of the 1300 block of West Catherine Street, shot and stabbed in a driveway outside a house in the 800 block c North Harrison Street just after midnight Jan. 13. Murder indictmer Richard R. Tipton and James Roane Jr.

**3** **Peyton Maurice Johnson**, 27, of the 1100 block of St. John Stree shot in the head in an apartment in the 1200 block of West Clay S: Jan. 14. Murder indictment: James Roane Jr. and Cory Johnson.

**4** **Katrina A. Rozier**, 26, of the 400 block of North Hancock Street, found lying in a pool of blood near an Interstate 95 overpass at N Lombardy Street Jan. 21. She had been shot in the head. Chargec murder (in state court): Jerry R. Gaiters.

**5** **Louis Julius Johnson Jr.**, 29, of the 1400 block of West Clay Stre was shot several times in the head at point-blank range in the 900 block of Kinney Street around 11:10 p.m. Jan. 29. Murder indictm Richard R. Tipton, James Roane Jr., Cory Johnson and Lance Thor

**6** **Torrick Brown**, 26, of the 2600 block of Lynhaven Avenue, was at his apartment at 7 p.m. Feb. 1. His sister, Martha McCoy, was wounded, as her three children watched the shootings. Murder indictment: Richard R. Tipton, James Roane Jr., Cory Johnson, Lar Thomas and Sterling Hardy.

**7** **Bobby Long**, 34, of the 2800 block of East Clay Street, was shot . head during a triple homicide at his residence Feb. 1. Murder indictment: Richard R. Tipton, Cory Johnson and Jerry R. Gaiters.

**8** **Tony Carter**, 42, of the 600 block of North 31st Street, was shot ir head and neck during the triple homicide at Long's house Feb. 1. Murder indictment: Richard R. Tipton, Cory Johnson and Jerry R. Gc

**9** **Dorothy Mae Armstrong**, 23, of an unknown address, was shot least eight times in the back during the triple homicide at Long's hc Feb. 1. She died at the hospital the next day. Murder indictment: Richard R. Tipton, Cory Johnson and Jerry R. Gaiters.

**10** **Linwood Chiles**, 34, of the 1000 block of West Clay Street, was f shot at the wheel of a car in the 1200 block of Stoney Run Drive ar 10:30 p.m. Feb. 19 in a double homicide. Murder indictment: Rich Tipton and Cory Johnson.

**11** **Curtis Lee Thorne**, 38, of the 1000 block of West Catherine Stree shot Feb. 19 in Chiles' car. Two sisters in the car were critically inju Murder indictment: Richard R. Tipton and Cory Johnson.

Staff graphic by Luther L.N. T

**1**

# Clinton, Bush roll along in Penn

# k death penalty for 3 here

## 5 days

    

**ra B. Reavis**
**biracy**

**James Roane Jr.**
Murder
(faces death)

**Lance Thomas**
Murder

**Richard R. Tipton**
Murder
(faces death)

**Cory Johnson**
(*still at large*)
Murder
(faces death)



## The victims

**1 Douglas A. Talley**, 37, of the 2600 block of Third Avenue, was found stabbed more than 80 times inside a parked car in the 200 block of East 13th Street Jan. 5. Authorities say his assailant may have thought he was a police officer. Murder indictment: Richard R. Tipton.

**2 Douglas Moody**, 36, of the 1300 block of West Catherine Street, was shot and stabbed in a driveway outside a house in the 800 block of North Harrison Street just after midnight Jan. 13. Murder indictment: Richard R. Tipton and James Roane Jr.

**3 Peyton Maurice Johnson**, 27, of the 1100 block of St. John Street, was shot in the head in an apartment in the 1200 block of West Clay Street Jan. 14. Murder indictment: James Roane Jr. and Cory Johnson.

**4 Katrina A. Rozier**, 26, of the 400 block of North Hancock Street, was found lying in a pool of blood near an Interstate 95 overpass at North Lombardy Street Jan. 21. She had been shot in the head. Charged with murder (in state court): Jerry R. Gaiters.

**5 Louis Julius Johnson Jr.**, 29, of the 1400 block of West Clay Street, was shot several times in the head at point-blank range in the 900 block of Kinney Street around 11:10 p.m. Jan. 29. Murder indictment: Richard R. Tipton, James Roane Jr., Cory Johnson and Lance Thomas.

**6 Torrick Brown**, 26, of the 2600 block of Lynhaven Avenue, was shot at his apartment at 7 p.m. Feb. 1. His sister, Martha McCoy, was wounded, as her three children watched the shootings. Murder indictment: Richard R. Tipton, James Roane Jr., Cory Johnson, Lance Thomas and Sterling Hardy.

**7 Bobby Long**, 34, of the 2800 block of East Clay Street, was shot in the head during a triple homicide at his residence Feb. 1. Murder indictment: Richard R. Tipton, Cory Johnson and Jerry R. Gaiters.

**8 Tony Carter**, 42, of the 600 block of North 31st Street, was shot in the head and neck during the triple homicide at Long's house Feb. 1. Murder indictment: Richard R. Tipton, Cory Johnson and Jerry R. Gaiters.

**9 Dorothy Mae Armstrong**, 23, of an unknown address, was shot at least eight times in the back during the triple homicide at Long's house Feb. 1. She died at the hospital the next day. Murder indictment: Richard R. Tipton, Cory Johnson and Jerry R. Gaiters.

**10 Linwood Chiles**, 34, of the 1000 block of West Clay Street, was found shot at the wheel of a car in the 1200 block of Stoney Run Drive around 10:30 p.m. Feb. 19 in a double homicide. Murder indictment: Richard R. Tipton and Cory Johnson.

**11 Curtis Lee Thorne**, 38, of the 1000 block of West Catherine Street, was shot Feb. 19 in Chiles' car. Two sisters in the car were critically injured. Murder indictment: Richard R. Tipton and Cory Johnson.

Staff graphic by Luther L.N. Trower Jr.

**By Frank Green
and Arthur Hodges**
Staff writers

Prosecutors will seek the death penalty for three alleged members of a Richmond cocaine gang that bloodied the early days of the year with a furious killing campaign that left 11 dead — nearly a quarter of the city's pace-setting 1992 murder toll.

One murder charge pending in state court against an accused gang member was not included in the extraordinary federal indictment unsealed yesterday that takes aim at a gang that police said could act with "reptilian coldness."

But it was not so much the number of homicides police believe were committed by the "Newtown gang" in January and February that authorities said prompted the largest federal death penalty case of its kind ever attempted in the country.

Instead, the ultimate sanction is being sought because of: the swiftness with which the gang acted — 11 murders in 45 days; its vicious overkill, one victim was stabbed 87 times, another shot 16 times; and the mindlessness of the violence — some of the killings were over small amounts of cash or cocaine.

The gang, police say, carried out its business with almost unheard of brutality, even for a city where homicides happen on average every third day.

Lt. Oscar T. Clarke of the Richmond Police Bureau said the Newtown gang easily overshadowed the notorious Johnson-Brown gang, which dominated the South Richmond drug trade in the late 1980s.

"This one makes Johnson-Brown look like small potatoes," Clarke said. If police hadn't "nipped it in the bud," the gang easily could have wiped out another 10 people, he said.

U.S. Attorney Richard C. Cullen said the acts charged against Richard R. Tipton, Cory Johnson, and James Roane Jr., if proven, "are so violent and so aggravated to warrant the death penalty."

Cullen said that the death penalty is "something that nobody takes any joy in." But, he said, "it's my opinion, without doubt, that it's the

Continued on page 6, col. 1

2

A-6  Richmond Times-Dispatch, Wednesday, April 29, 1992

# U.S. to seek death penalty for 3 here

## Alleged gang seen as killers of 11

Continued from first page

appropriate sanction for the three individuals."

"Somebody said this is the first time in the country that this will be done and we believe this is the right case for that," he added.

Cullen said he met yesterday morning with U.S. Attorney General William P. Barr in Washington, who authorized him "to seek the death penalty should these individuals be convicted of the counts as charged."

The death penalty will be sought for the three if they are convicted of committing a murder that was carried out to further the operation of a continuing criminal enterprise — the so-called kingpin statute.

"We go out and do business with dollars and cents," said Cullen. "We're alleging in this indictment that they go out and do business with guns and bullets" and murder.

"This is a good example, I think, of swift justice. It's highly unusual that investigators are able to put together a case of this nature in so swift a a time," Cullen said.

"Some of the charges occurred in April, just a few days ago. And the violent acts, the murders, took place over a 45-day period from January the 5th of this year until February 19th," he said.

Richmond Police Chief Marty Tapscott said, "If you can get people off the street swiftly, I'm sure you're saving some lives."

Assistant U.S. Attorney Howard C. Vick said he could not comment on why the 11th murder was not included in the federal indictment. Cullen and Richmond Commonwealth's Attorney Joseph D. Morrissey said they expected the pending state murder charges against gang members would be dropped in light of the federal indictment.

Clarke, head of the police bureau's violent crime unit, said the city mounted an "intense investiga-



Staff pho

**CRIME SPREE** — U.S. Attorney Richard Cullen, flanked by Police Chief Marty M. Tapscott and City Manager Robert C. Bobb, po outlining the crimes of the Newtown

# Gang avoided flashy ways but was unutterably ruth

By Battinto Batts Jr.
Staff writer

Richmond has had some ruthless bad guys, but nothing like the Newtown gang, slicker and more vicious than any group of criminals ever to operate here, authorities say.

"The Johnson-Brown gang was bad, looking back, the Briley brothers were pretty bad, but these guys were crazy," said William H. Parcell III, a Richmond prosecutor. "They're nuts."

Parcell said the Newtown gang was so violent that one homicide victim, an alleged gang member who was thought to be an undercover police officer, was stabbed 87 times in the face and head.

Others were slain because they were rival drug dealers, or because of money owed on cocaine debts or

range on Jan. 29 on a street in the Carver neighborhood.

A drug debt and a domestic situation resulted in one of Richmond's bloodiest nights in recent history. Four people were killed in a span of three hours on Feb. 1.

Torrick Brown, 26, of the 2600 block of N. Lynhaven Avenue was shot to death at his apartment at 7 p.m. Brown's sister Martha McCoy was wounded in the hail of gunfire while her children were in the next room eating.

"If those kids had been in the same room, they probably would have shot them, too," said Howard Vick, a federal prosecutor.

According to police, Brown was killed because he had been involved with the girlfriend of James H. Roane Jr., who has been indicted in

damage, according

Chiles' car, an ol wagon, was the ga Parcell said. Chile have driven the Brown's murder, p

"They would ge them to homicide forth to New York

After the Fulton the gang leaders let a few weeks later base of operations

"They wanted to ganization," said V residence on East Blackwell. "They 'we are going to s Parcell said.

Police re the leaders arrested key

# Gang avoided flashy ways but was unutterably ruthless

**By Battinto Batts Jr.**
Staff writer

Richmond has had some ruthless bad guys, but nothing like the Newtown gang, slicker and more vicious than any group of criminals ever to operate here, authorities say.

"The Johnson-Brown gang was bad, looking back, the Briley brothers were pretty bad, but these guys were crazy," said William H. Parcell III, a Richmond prosecutor. "They're nuts."

Parcell said the Newtown gang was so violent that one homicide victim, an alleged gang member who was thought to be an undercover police officer, was stabbed 87 times in the face and head.

Others were slain because they were rival drug dealers, or because of money owed on cocaine debts or as a result of domestic situations, authorities say.

Although they commanded attention with brutal violence, the gang members kept a low profile, Parcell said.

Gang members avoided flashy items such as thick gold chains and customized cars often associated with the drug trade.

Instead, they poured most of their earnings back into their business, hoping to increase their standing with a Jamaican "posse" in New York City, Parcell said.

The Newtown gang took root in the Richmond area roughly three years ago, according to sources interviewed by authorities.

The group's activities reached a peak late last year and the bloodshed began Jan. 5 with the murder of Douglas Talley, the alleged gang member who was stabbed to death.

As the group fought to secure a portion of the city's crack cocaine trade, rival dealers were also killed, police said.

Such victims include: Peyton Johnson, 27, shot in the head inside a house in Jackson Ward on Jan. 14 and Louis Johnson, 29, found shot several times in the head at close range on Jan. 29 on a street in the Carver neighborhood.

A drug debt and a domestic situation resulted in one of Richmond's bloodiest nights in recent history. Four people were killed in a span of three hours on Feb. 1.

Torrick Brown, 26, of the 2600 block of N. Lynhaven Avenue was shot to death at his apartment at 7 p.m. Brown's sister Martha McCoy was wounded in the hail of gunfire while her children were in the next room eating.

"If those kids had been in the same room, they probably would have shot them, too," said Howard Vick, a federal prosecutor.

According to police, Brown was killed because he had been involved with the girlfriend of James H. Roane Jr., who has been indicted in four of the slayings.

A few hours later, Dorothy Armstrong, Tony Carter and Bobby Long, were slain in a house in the 2800 block of East Clay Street.

Ms. Armstrong was killed over an $800 drug debt, according to Vick. Police believe Carter and Long were killed just because they were there.

The next day, a Richmond police SWAT team executed a search warrant at a residence in the 1200 block of West Moore Street in the Newtown neighborhood, seizing 120 bags of cocaine, three automatic weapons and arresting a number of alleged gang members.

The gang leaders, sensing that their business had begun to unravel, sought to kill any members with vital knowledge, said Vick.

So a hit list was compiled. One name that might have been on the list was that of Linwood Chiles. Chiles, 34, was arrested during the raid on West Moore Street and charged with possession of cocaine and illegal use of a firearm.

On Feb. 19, Chiles, who was free on a $2,000 bond, and Curtis Lee Thorne were shot to death inside Chiles' car on Stoney Run Drive in Fulton Bottom in the East End.

Two sisters, Gwendolyn and Priscilla Green, were wounded. One is paralyzed and the other has brain damage, according to police.

Chiles' car, an older model st wagon, was the gang's "coke Parcell said. Chiles is believ have driven the getaway c Brown's murder, police said.

"They would get Chiles to them to homicides and bac! forth to New York," Parcell :

After the Fulton Bottom sla the gang leaders left town, retu a few weeks later, seeking : base of operations, Parcell sa

"They wanted to start a ne ganization," said Vick. They cl residence on East 15th Stre Blackwell. "They went in an 'we are going to sell drugs he Parcell said.

Police received informatior the leaders were back in tow arrested a key player, Richard field Tipton, also known as " tey" on April 8.

Tipton, 21, was arreste charges stemming from the Moore Street search.

Tipton, described on warra "armed and dangerous," was lo the alleged members authoritie been seeking to establish their

City officials praised the Bu of Police yesterday for qu breaking up the gang that c: such an uproar.

But authorities say the arres have little effect on the major back in New York.

"These people are insignific the game plan back in New ? Parcell said. "All this hasn't [fazed] the people : : in New That's how insignificant they w them."

## Taipei policeman killed in explosic

TAIPEI, Taiwan (AP) — A exploded at a McDonald's rant yesterday, killing a poli who was trying to defuse it news reports said.

There was no immediate cl responsibility for the bomb.

---

Some of the charges occurred in ril, just a few days ago. And the ient acts, the murders, took place r a 45-day period from January 5th of this year until February h," he said.

Richmond Police Chief Marty scott said, "If you can get people the street swiftly, I'm sure you're ing some lives."

Assistant U.S. Attorney Howard Vick said he could not comment why the 11th murder was not luded in the federal indictment. llen and Richmond Commonalth's Attorney Joseph D. Morris- / said they expected the pending te murder charges against gang imbers would be dropped in light the federal indictment.

Clarke, head of the police bu- iu's violent crime unit, said the y mounted an "intense investiga- n" that culminated in the arrest of iny alleged gang members in Feb- iry.

"The biggest challenge was there re no witnesses to [most of] these mes," he said. "Everybody they me into contact with — they'd kill em."

Several investigators singled out pton — indicted for nine of the 11 llings — as the most murderous of e group. All but Johnson are in istody.

Those charged yesterday are:

● Tipton, also known as "Whit- y," pronounced whitey, 21; con- iiracy to distribute crack cocaine; iperating a continuing criminal en- irprise; murder in the furtherance f the criminal enterprise; use of a rearm; violent crime in the aid of icketeering; distribution of crack icaine; and possession with the in- nt to distribute crack cocaine.

● Johnson, also known as "O," 23; onspiracy; operating a continuing riminal enterprise; murder in the urtherance of the criminal enter- irise; use of a firearm; violent crime n the aid of racketeering; distribu- ion of crack cocaine; and possession if crack cocaine with the intent to iistribute.

● Roane, also known as "J.R.," 26, conspiracy; operating a continu- ing criminal enterprise; murder in the furtherance of the criminal en- terprise; use of a firearm; violent crime in the aid of racketeering; and possession of crack cocaine with the intent to distribute.

● Lance Thomas, also known as "V," 21, conspiracy; operating a continuing criminal enterprise; use

(top left fragment) ... they go out and do homicides n guns and bullets" and murder. This is a good example, I think, swift justice. It's highly unusual t investigators are able to put ether a case of this nature in so ft a a time," Cullen said.

## Alleged chiefs of drug cartel are arrested

MIAMI (AP) — Agents have ar- rested U.S. managers of Colombia's ... Cali drug cartel and linked ...

**CORRECTION**

There are a number of errors appearing in our ad which publishes i April 29/30 edition of the Tri-Cities PLUS. The errors and correctior as follows:

The ad's headline reads:
SALE STARTS NOON WEDNESDAY APRIL 29
It should have read:
LAST 3 DAYS TO SAVE!

LADIES! FASHIONS category

**4**

=======================  =======================  =======================

THE RICHMOND NEWS LEADER
Copyright (c) 1992, Richmond Times-Dispatch

DATE: Saturday, May 9, 1992          TAG: 9201210290
PAGE: 24                             EDITION: Metro
SECTION: Area/State                  LENGTH:   29 lines
ILLUSTRATION: PHOTO
MEMO: (lcf)

### TWO SUSPECTS ARE ADDED TO WANTED LIST

The only member of the so-called "Newtowne" gang who is not in custody has been added to the Richmond police most-wanted list.

Police have said the drug-dealing gang was responsible for about a dozen murders early this year.

The suspect, Cory Johnson, 23, whose last known address was 1212 W. Moore St., also has homes in Trenton, N.J., and on Amsterdam Avenue in New York City.

Johnson also is known as O, C.O., Cary James Johnson, John Wood and James Johnson. He recently was indicted in U.S. District Court here on eight murder charges. He faces the death penalty if convicted.

Johnson is described as 6 feet tall and weighing 160 pounds. He is considered armed and extremely dangerous, police said.

Also added to the most-wanted list today was Shawn Christian Thackston, 19, whose last known address was in the 300 block W. Grace St.

Thackston is charged with grand larceny and robbery, though details about those cases were not available.

He is described as white, 6 feet 2 inches tall, weighing 150 pounds with blond hair and blue eyes.

KEYWORDS: RICHMOND    POLICE    CRIME    LIST
ENHANCER: 00130084

=======================================================================

79 of 82, 2 Terms

05/30/92

```
==========================   ==========================   ==========================
```

RICHMOND TIMES-DISPATCH
Copyright (c) 1992, Richmond Times-Dispatch

DATE: Saturday, May 30, 1992                    TAG: 9201240217
PAGE: B-4                                        EDITION: City
SECTION: Area/State                              LENGTH:   57 lines
SOURCE: By Randolph Goode
        Staff writer
MEMO: (lcs)

## JUDGE HESITANT TO CONTINUE TRIAL

A federal judge here indicated strongly yesterday that he is not in favor of granting a continuance in the Sept. 16 trial of two Richmond men facing the death penalty for suspected drug-related slayings.

Defense lawyers for the two men, Richard R. Tipton III, 21, and James H. Roane Jr., 26, requested the delay during a hearing on technical matters before U.S. District Judge James R. Spencer.

The men are alleged members of a cocaine-dealing organization known to police as the "Newtowne gang." Police say the gang is responsible for at least 10 city slayings during a 45-day period in January and February. Tipton was named in nine of the slayings and Roane in two shootings; both also were indicted on drug and firearms counts.

"You all have plenty of time" to prepare for the trial, Spencer said to the defense lawyers.

Originally the trial was set for Sept. 14, but recently it was moved back two days by Spencer.

Two of the lawyers, Eric D. White and David P. Baugh, said they planned to file a motion seeking the continuance of the trial.

A third man indicted in April with Tipton and Roane also is facing the death penalty if convicted, but he remains a fugitive. He is Cory Johnson, 23, of New York City.

The case here would be the first in the nation in which the federal death penalty has been sought against three defendants in a single trial.

Four other people also were indicted for their alleged roles in the gang.

"I know you all have your job to do and I know this is a new statute. But there is nothing unusual about a continuing criminal enterprise and homicides," Spencer said in  response to the attorneys' suggestion for an extension.

"As far as I'm concerned, you all have enough time," the judge added.

Federal law, as amended in 1989 by Congress, allows prosecutors to seek the death penalty against people who are convicted of operating a continuing criminal enterprise and who kill or order a killing.

The law often is called the "drug kingpin" statute.

While the amended statute has been used a few times since 1989, the Richmond case is the first time it has implemented against multiple defendants.

Yesterday's hearing before Spencer was scheduled for two reasons.

First, Tipton and Roane were arraigned again because the original indictment contained some technical errors in the language of the charges. The individual charges, though, against the defendants remained the same.

Tipton and Roane both pleaded not guilty and asked for a jury trial.

The other four individuals being held pending trial also will have to be rearraigned. They are Lance Thomas, also known as Anthony Mack, 21; Jerry R. Gaiters, 38; Sterling Hardy, 27; and Sandra Reavis, 34.

Also yesterday, Spencer discussed with lawyers technical aspects of the pending trial.

KEYWORDS: DRUG    CRIME    MURDER
ENHANCER: 00151068

```
=============================================================================
```
77 of 82, 2 Terms

RICHMOND TIMES-DISPATCH
Copyright (c) 1992, Richmond Times-Dispatch

DATE: Thursday, June 4, 1992                 TAG: 9201240809
PAGE: B-7                                     EDITION: City
SECTION: Area/State                           LENGTH:   45 lines
SOURCE: BY RANDOLPH GOODE
        Times-Dispatch Staff Writer
MEMO: (ljc)

### JUDGE: GANG TO BE TRIED TOGETHER

U.S. District Judge James R. Spencer ruled yesterday that six people authorities say are members of Richmond's ultra-violent "Newtowne gang" must stand trial together on September 16.

Originally, two of the defendants -- Sandra Reavis, 34, and Lance Thomas, 26 -- refused to waive the federal Speedy Trial Act provisions and a July 6 trial date was set for them.

But Spencer warned them that he might be persuaded by Assistant U.S. Attorney Howard C. Vick Jr. to consolidate the defendants into one proceeding.

Under the Speedy Trial Act, a defendant must be tried within 70 days from the time of indictment unless the statute is waived.

Richard R. Tipton, 21; James H. Roane Jr., 26; Jerry R. Gaiters, 38; and Sterling Hardy, 27, told Spencer when they were arraigned May 5 that they intended to waive that right.

Tipton and Roane face the death penalty if convicted on a charge of murder while operating a continuing criminal enterprise. The other four could receive a maximum term of life without parole.

A seventh defendant, Cory Johnson, 23, of New York City, remains a fugitive. He also faces the death penalty if convicted.

Richmond police say the crack-dealing organization was responsible for at least 10 murders in the city during a 45-day period in January and February.

In yesterday's ruling, Spencer said the Newtowne case "is unique and complex (and) is fraught with complexities and logistical problems."

Certain government witnesses "fear for their safety," Spencer said. Many of these witnesses have been relocated for their protection, he added.

"Accordingly, forcing these witnesses to testify at multiple trials could result in substantial additional costs and ultimately in their refusing to cooperate due to the fear for their safety," Spencer said.

"In conclusion, the court has carefully weighed and balanced the interests of society and the defendants in a speedy trial, and based upon the facts of this case, the court finds that society's interest in meeting the ends of justice outweighs the interest of defendants and of society in achieving a speedy trial."

The trial is scheduled to last three weeks in federal court here.

KEYWORDS: DRUG     CRIME     MURDER     RICHMOND
ENHANCER: 00156024

*6*

MAN HOPES PLEA AGREEMENT WILL HELP AVOID LIFE IN PRISON    06/13/92

===========================    ===========================    ===========================

RICHMOND TIMES-DISPATCH
Copyright (c) 1992, Richmond Times-Dispatch

DATE: Saturday, June 13, 1992        TAG: 9201250798
PAGE: B-3                            EDITION: City
SECTION: Area/State                  LENGTH:   68 lines
SOURCE: BY RANDOLPH GOODE
        Times-Dispatch Staff Writer
MEMO: (lgw)

### MAN HOPES PLEA AGREEMENT WILL HELP AVOID LIFE IN PRISON

A man police say was a member of Richmond's death-and-drug-dealing "Newtowne gang" pleaded guilty in U.S. District Court yesterday to charges -- including three murders -- that could put him in prison for life without parole.

Jerry R. Gaiters Jr., 38, of the 1000 block of Kinney St., is betting on a much lighter sentence, though.

As part of an agreement with Assistant U.S. Attorney Howard C. Vick Jr., Gaiters will testify against other alleged members of the cocaine organization when their trial begins in federal court Sept. 16.

In return for Gaiters' cooperation, Vick may seek a much lighter prison term.

Judge James R. Spencer accepted Gaiters' guilty pleas but did not set a sentencing date.

Gaiters' decision to plead guilty and cooperate with the government leaves five defendants facing trial in September. All were indicted in late April.

They are James H. Roane Jr., 26, of the 2600 block Lynhaven Ave.; Richard R. Tipton, 21, no address available; Lance Thomas, also known as Anthony Mack, 21, of the 800 block Nelson St.; Sterling Hardy, 27, of the 800 block N. 21st St., and Sandra Reavis, 34, whose address was not available.

Roane and Tipton are facing the death penalty under a federal statute aimed at individuals who kill or order a killing while operating a continuing criminal enterprise.

A seventh person, Cory Johnson, 23, of New York City, was indicted but has not been arrested. He also is facing the death penalty.

Gaiters appeared in court yesterday wearing a burgundy-colored double-breasted suit over a gray shirt open at the collar.  Horn-rimmed glasses gave Gaiters a studious look as he chatted with his lawyer, Christopher J. Collins, before court convened.

He responded with polite, "yes, sir" answers to all questions asked by Spencer.

Vick then summarized the government's case against Gaiters. The prosecutor began by saying Gaiters began distributing cocaine for the "Newtowne gang" in January.

During a 45-day period in January and February, Richmond police assert at least 10 slayings were attributed directly to the gang's violence.

Vick described three of them, ones in which Gaiters was involved.

On Feb. 1, Gaiters and two co-defendants went to the home of Bobby Long in the 2800 block of East Clay St. on the city's East End. Vick said the object of the visit was Dorothy Mae Armstrong, 23, whom gang members felt knew too much about their cocaine operation.

Gaiters was admitted into the residence because he was Long's cousin, Vick said.  As Gaiters entered, one of the other men with him burst into the house and fired at least eight shots into Ms. Armstrong.  She died the following day.

Long was shot by the man as he tried to escape. A third person in the house, Tony Carter, also was killed by the assailant.

Gaiters, Tipton and Johnson were indicted in connection with the slayings.

Long and Carter apparently were killed because they were in the wrong place at the wrong time, authorities say.

After Vick's summary, Judge James R. Spencer asked Gaiters, "Is that what

===========================    ===========================    ===========================

=========================  =========================  =========================

you did?"

    "Yes, sir," Gaiters responded.

    Besides the three murders, Gaiters pleaded guilty to conspiring to possess crack cocaine with the intent to distribute it, use of a firearm during a drug trafficking crime, violent crime in aid of racketeering and possessing crack with the intent to distribute it.

KEYWORDS: RICHMOND     DRUG     CRIME     MURDER     COURT     VERDICT
ENHANCER: 00165046

================================  ==========================  =========================

RICHMOND TIMES-DISPATCH
Copyright (c) 1992, Richmond Times-Dispatch

DATE: Tuesday, June 16, 1992          TAG: 9201260107
PAGE: B-1                             EDITION: City
SECTION: Area/State                   LENGTH:  163 lines
ILLUSTRATION: PHOTO
SOURCE: BY RANDOLPH GOODE
        Times-Dispatch Staff Writer
MEMO: (ljc) PROFILE

## PROSECUTOR SHRUGS OFF PERILS TO GET DEALERS OFF THE STREET

His office resembles a large eagle's nest, nestled in a high-rise cliff 18 floors above downtown Richmond. The space, though, is comfortable with legal documents, books and the usual clutter -- the domain of a busy man.

A large framed print of an unyielding Winston Churchill dominates one wall of the office at 600 E. Main St. Stuck in the frame of the Churchill print is a still-glossy black-and-white photograph of a World War II fighter pilot. The handsome young pilot is smiling. He looks supremely confident.

Seated below the photo at an overflowing desk is the pilot's son -- Howard C. Vick Jr., high-profile federal prosecutor.

He's not looking quite as comfortable as the man in the photograph.

First, he fidgets with his green-striped tie that hangs neatly against a crisp white shirt. Then he smoothes down his dark hair at the sides and crosses his legs. He stares out the window, looking east across the busy Richmond skyline toward the Capitol. He turns back to his visitor.

"I find all this embarrassing," he admits.

Vick does not particularly like interviews or talking about himself.

He would much rather be working on one of the many drug cases that have brought him cheers and jeers.

Since February 1990, Vick has been an assistant U.S. attorney here. He has prosecuted Richmond's biggest drug figures -- the fast-talking but cold Eugene Johnson, the hard-eyed Carlton Brown, the weird James Butler, the smooth Daryl Carpenter and others.

Johnson and Brown are doing life terms without parole.  Butler, too, is serving a life term, also without parole. Carpenter was sentenced to 32 years, and he likely will serve virtually all but a year or two.

Prosecuting drug dealers is not a job recommended for the faint-hearted or the thin-skinned, especially with the strict federal sentencing guidelines that mandate minimum sentences.

Vick's life has been threatened.

He's been called the feds' legal thug.

And, he's been called a racist by families of black defendants he has prosecuted.

During the Johnson trial it was  disclosed that a "contract" was on Vick's head.

"I've had prices on my head before," Vick said slowly, recalling the sanguinolent facts of the Johnson case.  Johnson's feud with a rival drug gang left at least 30 people dead.

Once several years ago, while prosecuting a case in the Virgin Islands, someone fired a bullet that went through a chair in Vick's office.

"Obviously, they didn't like me. But you can't let dogs like Eugene Johnson run you out of the business," Vick said, looking as defiant as Churchill in the framed print.

Vick is preparing for another big trial that begins here in September. Two of the five defendants are facing the death sentence for slayings reportedly committed during drug deals. A sixth defendant, who also faces the death penalty, remains a fugitive.

The defendants are members of what Richmond police call the "Newtowne gang," named after the tiny Carver neighborhood in which some of the defendants and the victims lived.

===============================================================================

74 of 82, 2 Terms                                              Pg 1 of 3

USCA4 Appeal: 16-13    Doc: 2.11    Filed: 06/17/2016    Pg: 220 of 299

================================================================
    "Eugene Johnson was a pretty significant case. But that gang had pretty much shot its wad by the time we got to them.
    "Newtowne is different because of the turnaround -- we took them off the streets in a hurry," Vick said.
    During a 45-day period in January and February this year, Richmond police say members of the crack-dealing gang killed at least 10 people.
    "We indicted them in April," Vick said, recalling the joint investigation by city police and federal drug agents. "That's moving fast."
    Preparing for the prosecution of the case takes up most of Vick's time these days. Until the trial begins, Vick will make few appearances in U.S. District Court here.
    "I've never handled a death case and I find I am working on it constantly. I would find it hard to devote time to another case during this period."


                            ***

    Vick was raised in the Richmond area, but left to attend Georgetown University, where he received his undergraduate degree in business administration.
    Before joining a Washington law firm in 1983, he was an assistant attorney general here and later an assistant commonwealth's attorney in Arlington.
    Then he moved to New Orleans in 1985, where he was a member of the Justice Department's Organized Crime Strike Force. Later, he opened a strike force office in Houston.
    Vick will be 40 on July 15.    Big drug cases, though, are now routine to him.
    A 1979 graduate of the University of Richmond's T.C. Williams School of Law, Vick worked in the federal prosecutor's office in Miami from 1987 to 1990. There he was in charge of the Organized Crime Drug Enforcement Task Force for the Florida-Caribbean region.
    He supervised 18 attorneys who worked on large narcotics conspiracy cases. Vick tried several multidefendant, multiweek trials, including the case of one of the leaders of Colombia's Cali cartel.
    "To the Colombians, drugs are a business, but surprisingly the trials are that way, too. I mean by that, to them, I am just doing my job. Nothing personal.
    "During a trial in Miami, you'd end up talking to the defendants. It is all business to them.
    "Here in Richmond, the problem is the violence. In Miami, it is the suppliers. Here it is the real users of the drugs and the problem, therefore, is really out in the community."
    After those three years in Miami, Vick was ready to return home.
    "I love being back in Richmond. I really do. This is home," he states quietly.


                            ***

    Vick's job is taking the street dealers off the pavement and taking the problem out of the community.
    "The Johnson case cleared up the Blackwell area, at least for a period of time," the prosecutor believes.
    But Vick refuses to get philosophical about the continuing problem with drugs, even with an all-out federal war being waged against the dealers.
    "All I can do is continue to do what I do.  There are a lot of factors involved in the drug problem and many of them will take more than prosecution," he said.
    "Toby" -- the nickname Vick was given at birth by his mother -- is an outgoing, friendly man who likes a good laugh and an occasional  cold beer outside the courtroom.
    Inside the courtroom, Vick puts on his game face and becomes a thorough, well-prepared and penetrating prosecutor. There is a tightness around his
================================================================

=======================================================================

mouth that is not there when he is chatting in the corridors of the federal courthouse here.

So, how does he relax?

"I try to run 5 miles every other day. I exercise. Play golf. Hang around with my family. But I have no hobby to speak of. I do like reading about World War II.

"Basically, I love my family and my friends." He has a wife and two children.

Vick has no plans other than to continue what he does now -- put drug dealers behind bars.

"Sure, it is tough sometimes. But I love my job. I'm drained at the end of a trial, usually. But a new case comes along like Newtowne and you get the adrenalin flowing again.

"In fact, a couple days after a trial, I'm fine. I will say this, you lose a case and it kills you."

Vick has lost two cases in his career, both of them in Richmond. Typically, he continues to second-guess himself about the losses.

Vick describes himself as "happy-go-lucky" and makes references to not being considered "a serious student" in law school.

But Vick finished in the upper half of his class at T.C. Williams. He has a quick mind in legal matters, associates say.

Says U.S. Attorney Richard Cullen: "Toby is all you want in a prosecutor. He's quite bright, he's hard-working and he's fearless," Cullen said.

David P. Baugh, a well-known defense lawyer, is not as appreciative, and called Vick a creature of "the Ronald Reagan school of prosecution." Baugh has clashed with Vick in the courtroom.

"His plea bargain procedure is very suspect along racial lines," said Baugh.


***


The visitor to the eagle's nest is leaving, but Vick is relaxed now, joking and recalling old cases.

He calls attention to several photographs and objects in his office. Clearly, he is having a good time at the end of a long day.

Why did he decide to make the law his career?

It is a softball question and Vick swings at it.

"Ahhh, painting houses was hard," he responds.

KEYWORDS: GOVERNMENT     LAW     OFFICIAL     CAREER     BIOGRAPHY
          INTERVIEW
ENHANCER: 00168002

=======================================================================

```
========================  =========================  =========================
```

RICHMOND TIMES-DISPATCH
Copyright (c) 1992, Richmond Times-Dispatch

DATE: Wednesday, June 24, 1992          TAG: 9201270065
PAGE: B-3                               EDITION: City
SECTION: Area/State                     LENGTH:   39 lines
SOURCE: BY BATTINTO BATTS JR.
        Times-Dispatch Staff Writer
MEMO: (lka)

### RICHMOND SUSPECT ARRESTED IN NEW YORK

A tip enabled authorities to capture a suspect last night who had been sought by Richmond police for two months.

Cory Johnson, an alleged member of the Newtowne Gang that police broke up in April, was arrested in New York City, Richmond prosecutor William H. Parcell III said.

The tip, which came from a confidential source in New York, led authorities to Manhattan, where Johnson was arrested at 8:45 p.m. without major incident, according to Parcell.

Johnson, 23, was indicted on April 28, along with six other people police say composed the violent drug gang. Authorities have blamed the gang for 11 of Richmond's homicides early this year.

Johnson was the only suspect not in police custody when the 33-count indictment was handed up. He was being held without bond last night in Manhattan pending an extradition hearing in a few days, said Parcell.

A joint investigation by the U.S. Attorney's office, the Drug Enforcement Administration, the Richmond Bureau of Police and the city commonwealth attorney's office swiftly secured the federal indictments against the gang.

Johnson, also known as "O", has been charged with conspiracy, operating a continuing criminal enterprise, murder in the furtherance of the criminal enterprise; use of a firearm, violent crime in the aid of racketeering, distribution of crack cocaine, and possession of crack cocaine with the intent to distribute.

Prosecutors will seek the death penalty against Johnson and two other alleged gang members when the federal trial, scheduled for Sept. 16, gets under way.

James Roane Jr., 26, and Richard R. Tipton, 21, also could face the death penalties for their alleged involvement in the gang.

KEYWORDS: DRUG    CRIME    MURDER    RICHMOND    NEW YORK
ENHANCER: 00176093

12

```
==============================================================================
```

73 of 82, 2 Terms

===================================================      ===========================

RICHMOND TIMES-DISPATCH
Copyright (c) 1992, Richmond Times-Dispatch

DATE: Sunday, July 5, 1992                TAG: 9201280293
PAGE: F-7                                 EDITION: City
SECTION: Editorial                        LENGTH: 139 lines
ILLUSTRATION: DRAWING
SOURCE: By Richard Cullen
        * Mr. Cullen is the United States Attorney for the Eastern District
        of Virginia.
MEMO: (ljc)

## FEDERAL CRIME-FIGHTING ARSENAL HAS WEAPONS VIRGINIA NEEDS

The indictment of the Newtowne Gang in federal court in Rich mond a couple of weeks ago raised some eyebrows.

"Isn't murder a local problem better suited for state court?" a Washington Times editorial pointedly asked. "There is no reason why Richmond or Virginia or any other state or local jurisdiction shouldn't be able to enforce its own laws and protect its citizens," the editorial asserted.

The editorial really missed its mark. The federal government has a vital role in combatting drug-related violence. It is no coincidence that cities like Richmond, Alexandria, Norfolk, and Roanoke are seeing record murder rates year after year. The common denominator in this carnage is the violent gangs. The drug gangs are violent and they are organized. Many have the sophistication of successful small businesses. Most are mean as snakes.

The violent drug trade and the skyrocketing murder rates are a national problem crying out for a federal solution. Attorney General William Barr has targeted violent drug dealers as the Department of Justice's No. 1 priority, and we reject out-of-hand the Washington Times' hypothesis that the federal government should take a back seat.

FEDERAL LAW enforcement has several new weapons in our arsenal to combat interstate and international drug dealers, especially those whose calling card is violence and intimidation.

The federal drug kingpin statute is my favorite. It enables prosecutors to target entire drug organizations -- indict and prosecute them en masse and mete out tough sentences without parole. Under the statute, we are able to convict the top-level management of the drug organization -- the bosses who never get their victims' blood on their hands, but who nevertheless orchestrate and order the murders performed by their low- and mid-level subordinates. Every member of the drug organization who is convicted faces at a minimum 10 years without parole. The kingpins themselves face a minimum sentence of 20 years without parole. Often the penalties are even more severe.

The sentences are enhanced tremendously when a drug-related homicide occurs, or when large quantities of illegal drugs are involved.

THREE MEMBERS of the Newtowne Gang, for example, have been indicted under the kingpin statute and, if they are convicted, could face the death penalty. The grand jury has charged the three with being responsible for several murders in Richmond in furtherance of their alleged drug-running organization. If their jury believes the allegations and convicts, each of the three defendants faces the death penalty or life in federal prison without parole. These federal statutes have teeth and are geared to target gang-related drug dealers who act in violence.

Many state legislatures, including Virginia's, lag behind Congress in passing up-to-date criminal statutes to assist in the war on drugs.

We are blessed in Virginia with the spirit of co-operation in law enforcement. Governor Wilder's newly appointed Secretary of Public Safety, Randolph Rollins; William Corvello, superintendent of the Virginia State Police; and most Commonwealth's Attorneys, local chiefs of police, and sheriffs work every day in joint law enforcement operations with the Federal Bureau of Investigation, Drug Enforcement Administration, Internal Revenue

===============================================================================

========================================================================

Service, Alcohol Tobacco, and Firearms investigators, Customs, and other federal agencies involved against violent drug dealers.

Governor Wilder's new commission to study violent crime in Virginia is being chaired by Secretary Rollins, and as a member of that commission, I will ask that it examine existing state law to see if it should be amended to give Virginia's judges and prosecutors four of the tools that the federal government has given its prosecutors and courts.

* First, federal statutes permit entire gangs to be indicted and tried together. There are enormous benefits to law enforcement in being able to try an entire gang at one trial, where the facts are presented one time and both verdicts and sentences for all defendants can take all related circumstances into account. Virginia law requires a separate (and expensive) trial for each member of the alleged drug gang. This benefits the defendants.

* Second, the Federal Sentencing Guidelines are a tremendously effective law-enforcement tool. They enable judges to mete out sentences uniformly and fairly throughout the country. Race, education, and economic standing play no role. Rather, the sentences are determined by the crime. For example, in a drug case the amount of the illegal drugs involved in the crime determines the sentencing level. The sentence is enhanced if the defendant has a prior record.

In many instances, mandatory minimum sentences are built into the Guidelines. In these cases the defendant cannot be given probation. He must do prison time. There are no exceptions. In crimes of violence and drug-related felonies there are mandatory minimum sentences ranging from five, 10, to 20 years. In drug-conspiracy cases, every member of an indicted gang faces the potential mandatory life sentences under the Guidelines when the gang is found guilty of dealing more than 50 grams of crack cocaine.

In Alexandria, our office has been involved in dismantling an entire drug gang called Bush-Davis. We have alleged that the Bush-Davis gang is responsible for at least 36 homicides in the Washington, Northern Virginia, and New York metropolitan areas. Under the Guidelines and the mandatory minimum sentence requirements, each defendant in the Bush-Davis organization was facing a possible life sentence without parole because of the amount of crack cocaine involved in the drug dealings.

THE ONLY HOPE for a defendant under the Federal Sentencing Guidelines is to co-operate with the government, become a prosecution witness, and help the government dismantle the drug organization by providing testimony in federal court. When the defendant recognizes that he faces a life sentence without parole if he does not co-operate, his choice becomes easy.

Bush-Davis is an example of how lower-level drug dealers were able to provide compelling testimony against their higher-ups who in turn were effectively forced to plead guilty and also cooperate. This is not to say that the cooperating witnesses ultimately receive lenient sentences. To date, 25 defendants in Bush-Davis have pled guilty, five defendants have received life without parole, and the average sentence has been about 14 years without parole.

* Third, there is no parole under federal law. In Virginia and other states mandatory and discretionary parole can result in significantly reduced sentences. The problem is compounded in Virginia where a defendant is sentenced not by the judge but by a jury that has no information about the defendant's criminal background. And he will serve only a fraction of the time the jury imposes.

* Fourth, federal law has strict pretrial detention provisions. When a defendant in a federal indictment is charged with a serious drug-related crime or a crime of violence, he is taken off the street and placed in jail where he stays until his trial. This pretrial detention provision has reduced the fear in many communities that those charged will be released on bail and return to harass or harm law-abiding citizens who are otherwise willing to testify against them in court. In addition, the federal witness protection service is available to protect co-operating witnesses at no cost to them.

* Finally, under federal law, the use of a firearm during or in relation to a crime of violence or a drug-trafficking crime will expose the

========================================================================

================================================  ==============================

offender to a mandatory five-year prison sentence. That sentence is increased to a 10-year mandatory sentence if a sawed-off rifle or shotgun is used, and to a 30-year mandatory sentence if a machine gun is used or if the firearm is equipped with a silencer.

As with other federal penalties, no part of these sentences may be suspended and there is no parole.

I AM HOPEFUL that we on the Commission will be able to address these federal programs to determine whether something similar can be recommended to the General Assembly for adoption in Virginia. But I am a realist. I recognize that the Assembly, for one reason or another, will be slow to move unless the public demands swift changes in the criminal justice system. The public must demonstrate its willingness to support the need for more prison space and more funds for state and local police and prosecutors. It is time for the public to make its views known.

KEYWORDS: OPINION   DRUG    CRIME     MURDER    LAW     OFFICIAL
          POLICE    COURT   SENTENCE
ENHANCER: 00187153

===========================================================================
RICHMOND TIMES-DISPATCH
Copyright (c) 1992, Richmond Times-Dispatch

DATE: Friday, July 10, 1992              TAG: 9201280717
PAGE: B-8                                EDITION: City
SECTION: Area/State                      LENGTH:   81 lines
SOURCE: By Randolph Goode
        Times-Dispatch Staff Writer
MEMO: (ljb)

## JUDGE POSTPONES GANG TRIAL
## PROSECUTORS MAY SEEK DEATH PENALTY FOR 4

    A federal judge's "suggestion" yesterday in a ground-breaking capital
punishment case brought smiles to the faces of defense lawyers, but the chief
prosecutor said he is not worried.
    U.S. District Judge James R. Spencer's suggestion ended up continuing
until Jan. 11 the trial of six alleged members of Richmond's often-violent,
crack-dealing "Newtowne gang." The trial had been set for Sept. 16.
    "All defense counsel are very relieved we don't have to go forward until
January with what is a very complicated case," said lawyer Robert P. Geary,
who is representing one of perhaps four defendants facing death if convicted.
    Assistant U.S. Attorney Howard C. Vick Jr. said the later  date makes no
difference to him.
    "We were ready to go to trial on Sept. 16. We will be ready for trial on
Jan. 11," Vick said.
    Until yesterday, prosecutors were seeking the seldom-used federal death
penalty statute against three defendants -- Richard R. Tipton, 21, James H.
Roane Jr., 26, and Cory Johnson, 23.
    However, defense lawyer Reginald M. Barley said yesterday that he
understands Vick will seek the death penalty against his client, Lance Thomas,
26, who also is known as Anthony Mack.
    Vick would only say such a move "is under consideration."
    Already the case has been billed as the largest capital punishment
proceeding to go to trial in the United States. The addition of  a fourth
defendant facing  the death penalty is likely to set precedent in trial law,
according to an informed legal source.
    Vick must receive permission from the U.S. Department of Justice before
adding the capital punishment charge against Thomas.
    Other defendants set for trial in January are Sterling Hardy, 27, and
Sandra Reavis, 34. All of the accused live in Richmond except for Johnson, a
resident of New York City.
    Another person charged in the case, Jerry R. Gaiters, 38, pleaded guilty
last month to seven counts, including three of murder. Gaiters will cooperate
with the government in the prosecution of the others.
    Johnson had been a fugitive until last week, when he was arrested in New
York. Johnson and the others were indicted in late April by a federal grand
jury here.
    When Johnson will arrive in Richmond is not known. His "removal hearing"
from New York has been continued until at least July 22, according to Vick.
    Thus, the indefinite status of Johnson and the possibility of death
penalty charges being filed against Thomas left the judge with little
alternative but continue the case.
    Spencer made his decision after a brief hearing yesterday to hear defense
counsel's motions for a continuance.
    "It seems clear the case will have to be continued," the judge said.
"The question is, when?"
    Saying he was "trying to be fair to all parties," the judge said he had
a suggestion for a new trial date:  Jan. 11.
    Defense lawyers quickly agreed. Vick did not oppose the new date. The
trial is expected to last a month.
    When Johnson arrives in Richmond, he will be represented by Richmond
===========================================================================

=========================  =========================  =========================

lawyers Craig Cooley and John McGarvey.

Geary and Eric White are representing Tipton; David Baugh and Arnold Henderson are Roane's defense lawyers. If Thomas is charged with a capital crime, it is likely that a second lawyer will be named to assist Barley.

Before Spencer's decision to continue the trial, Vick told the court that he would not object to a short delay in the proceedings.

"I'd rather have a short continuance and . . . try all the defendants together," the prosecutor said.

"The case is severe in sanctions, your honor, but it is not a complicated matter," Vick added.

Although murder usually is a state crime, a federal law that took effect in 1989 permits prosecutors to seek the death penalty against people who are convicted of operating a continuing criminal enterprise and who kill or order a killing.

Richmond police say members of the Newtowne gang are responsible for at least 10 slayings during a 45-day period this year.

All of the defendants in the case are charged with conspiring to distribute crack. But the main charge for Tipton, Roane, Johnson and possibly Thomas is murder in furtherance of a continuing criminal enterprise.

KEYWORDS: DRUG    CRIME    MURDER    COURT    CAPITAL PUNISHMENT
ENHANCER: 00192011

**17**

=========================================================================

GUILTY PLEA COULD LEAD TO LIFE SENTENCE          07/29/92

========================================================================

## RICHMOND TIMES-DISPATCH
Copyright (c) 1992, Richmond Times-Dispatch

DATE: Wednesday, July 29, 1992          TAG: 9201300827
PAGE: B-6                                EDITION: City
SECTION: Area/State                      LENGTH:   68 lines
SOURCE: BY RANDOLPH GOODE
        Times-Dispatch Staff Writer
MEMO: (lcs)

### GUILTY PLEA COULD LEAD TO LIFE SENTENCE

A second man accused of being a member of an often-violent drug gang pleaded guilty in U.S. District Court yesterday to charges that could put him into a federal prison for the rest of his life.

But a plea bargain with federal prosecutors could reduce the possibility of Sterling Hardy receiving life in prison without parole.

Hardy, 27, entered pleas of guilty to one count of conspiracy, two counts of violent crime in aid of a racketeering activity and one count of use of a firearm in a violent or drug trafficking crime.

A charge of possession of crack with the intent to distribute it was dismissed yesterday.

In return for Hardy's admission of guilt and his cooperation during an upcoming trial, Assistant U.S. Attorney Howard C. Vick Jr. may seek to have any sentence Hardy receives reduced.

Judge James R.  Spencer accepted Hardy's guilty pleas and said a sentencing date will be set later.

Last month, another defendant -- Jerry R. Gaiters, 38 -- accused of being a member of the so-called Newtowne gang pleaded guilty to nine counts, including conspiracy, murder in furtherance of a continuing criminal enterprise, violent crime in aid of racketeering and possession with intent to distribute crack.

Gaiters also is facing life in prison without parole.

But the government may seek to have any sentence Gaiters receives reduced if he cooperates with the prosecution against five other alleged gang members.

The others are Richard Tipton, 21, Cory Johnson, 23, James H. Roane Jr., 26, Vernon Lance Thomas, 26, and Sandra Reavis, 34.

Tipton, Johnson and Roane are facing charges that, if they are convicted, could bring them the death penalty.  The government also may seek the death penalty against Thomas.

Ms. Reavis is charged with one count of possessing crack cocaine with the intent to distribute it.

A Jan. 11 jury trial is set for the five. The trial is expected to continue at least a month.

Richmond police say  the alleged gang members distributed large amounts of cocaine and killed at least 10 people during a 45-day period in January and February.

One of the counts against Hardy charged him with taking part in the Feb. 1 slaying of Torrick Brown at his sister's apartment on Lynhaven Avenue in South Richmond. The sister was wounded in the attack.

Vick said Hardy picked up three men with guns and drove them to the scene of the shootings. Hardy waited outside in case he was needed to drive a car after the shooting.

Spencer questioned Hardy closely about his role.

At one point, Hardy responded to a question from the judge by saying, "I didn't know nothing about the killing."

Hardy related how one of the co-defendants phoned him and said he was having trouble. Hardy said he was told to pick up the others.

As he waited outside the Lynhaven Avenue house, Hardy said he "heard them put clips into the guns."

"What did you think was going to happen when you went to South Side?" Spencer asked.

========================================================================

========================== ========================== ==========================

"I didn't know," Hardy answered.

"Did you know someone was going to be harmed?" the judge asked. "What was in your mind?"

Hardy responded by saying "I'm thinking something was going to happen. That James was going to do something. That he was going to kill somebody or hurt somebody."

KEYWORDS: DRUG   CRIME   VERDICT

ENHANCER: 00211017

**19**

======================================================================
70 of 82, 2 Terms

td                                                                    01/10/93
==============================  ==========================  ==========================
                          RICHMOND TIMES-DISPATCH
                  Copyright (c) 1993, Richmond Times-Dispatch

DATE: Sunday, January 10, 1993          TAG: 9301010894
PAGE: B-1                                EDITION: City
SECTION: Area/State                      LENGTH: 106 lines
SOURCE: BY RANDOLPH GOODE
        Times-Dispatch Staff Writer
MEMO: (ljc)

                    DRUG TRIAL HERE TO SET PRECEDENT
                DEATH PENALTY SOUGHT AGAINST 3 DEFENDANTS

     Jury selection begins tomorrow in U.S. District Court to pick a panel
that will decide whether three young men -- alleged members of a murderous
drug gang -- should live or die.
     Scheduled to last six weeks, the precedent-setting trial will mark the
first time the death penalty has been sought against more than one defendant.
     Jury selection is expected to last at least two days and possibly three,
according to court officials.
     Richard Tipton, 22; Cory Johnson, 23; and James H. Roane Jr., 26, are
accused of being members of a cocaine-dealing organization known to police as
the "Newtowne gang."
     Police contend the gang was responsible for 11 murders during a 45-day
period early last year -- slayings that helped set a homicide record in 1992.
     Prosecutors also are seeking the death penalty against a fourth alleged
gang member, Vernon Lance Thomas, 26. Thomas' trial, though, will be later
this year.
     Federal law that became effective in 1989 permits prosecutors to seek the
death penalty against people who are convicted of murder while operating a
continuing criminal enterprise.
     Should the jury find a defendant guilty of the capital punishment charge,
then a second phase of the trial will be held to determine punishment -- death
or life in prison without parole.
     Normally in federal courts, a jury determines only guilt or innocence.
Sentencing is left solely to the judge.
     In this case, if the jury fails to reach a decision as to the sentence,
the judge will impose it. But the judge cannot impose the death sentence under
such circumstances.
     During the past four years, the federal death penalty has been sought
against about 24 defendants. Only one person has been sentenced to death and
his case is now on appeal.
     About 250 potential jurors have been ordered to appear for the selection
process. Half will appear tomorrow and the rest on Tuesday.
     By the time opening arguments begin later this week, 12 jurors and at
least four alternates will be in the jury box located in the third-floor
courtroom at the U.S. Courthouse here.
     Security precautions are expected to be elaborate around the courthouse at
10th and Main streets, as well as in the courtroom itself. U.S. marshals from
other cities will be on hand to bolster the force that usually provides
security..
     In addition to Tipton, Johnson and Roane, a fourth defendant -- Sandra
Reavis, 35 -- also will be at the defense table tomorrow. Unlike her co-
defendants, however, Ms. Reavis is charged with one count: Conspiracy to
distribute crack cocaine.
     In addition to the murder charge, Tipton, Johnson and Roane face a number
of other counts, including conspiracy, use of a firearm in a violent or drug-
trafficking crime and possession of crack cocaine with the intent to
distribute it.
     Each of the three men facing the death penalty will be defended by two
lawyers. Robert P. Geary and Eric D. White are representing Tipton; Craig S.
Cooley and John McGarvey are Johnson's counsel; David P. Baugh and Arnold
==========================================================================

td                          DRUG  IAL HERE TO SEE PRECEDENT                    01/10/93
===================================== ========================= ==============================
Henderson are Roane's lawyers.

The case is being prosecuted by Assistant U.S. Attorney Howard C. Vick Jr. and William H. Parcell, Richmond's deputy commonwealth's attorney.

Vick and Parcell are expected to call more than 100 witnesses, many of them people once involved in drug trafficking. About 130 prosecution exhibits are expected to be introduced into evidence.

Included among the government's witnesses are two men -- Jerry R. Gaiters and Sterling Hardy -- who were indicted with the defendants last April.

As part of an agreement with the government, Gaiters and Hardy pleaded guilty to various charges in hopes that prosecutors will file a motion for a reduction in any sentence they receive later.

At a hearing last May, city homicide Detective C.T. Woody testified that several of the 11 victims were gang members who were slain because it was feared they had -- or would -- talk to police.

Woody testified that two of the accused members, Tipton and Johnson, decided "they were going to take care of all the weaklings that were close to them because the police were getting close."

The veteran detective also testified that one victim, Dorothy Mae Armstrong, was killed because of her knowledge of gang operations.

She was shot at least eight times in the back last Feb. 1 during a triple homicide in a Church Hill home. The other two victims, Bobby Long and Tony Carter, happened to be in the wrong place at the wrong time, Woody testified.

A Richmond police officer said last spring that the gang would kill "everybody they came in contact with."

In another shooting, Torrick Brown, 26, was shot in his sister's apartment on Lynhaven Avenue. The sister, Martha McCoy, also was shot but survived. Her three children witnessed the shootings.

U.S. Attorney Richard Cullen contends that the alleged gang members brought a large amount of cocaine into the city from New York.

"They went out and did business with guns and bullets," Cullen said.

But the defense lawyers are expected to mount a vigorous counterattack against the evidence presented by the government.

For example, the defense lawyers are expected to attack the testimony made by many witnesses, especially those who are testifying in return for either immunity from prosecution or in hopes of getting a reduction in sentence.

Some of the pretrial motions have alleged that the federal death penalty statute is unconstitutional.

"The range of offenders potentially subject to capital punishment is so broad and irrationally defined that it fails to satisfy the statute's purpose and undermines it justification," Geary argued in one motion.

Pretrial sparring, however, has not dimmed the magnitude of the case, in the lawyers' view.

"This is the biggest criminal prosecution ever to hit this courthouse," White said recently.

KEYWORDS: DRUG    CRIME    MURDER
ENHANCER: 00010116

1-2393

# Gunshot hits auto carrying detectives

**BY BATTINTO BATTS
AND RANDOLPH GOODE**

TIMES-DISPATCH STAFF WRITERS

Two detectives involved in the Newtowne gang drug trial were shot Thursday night on East Main Street, sources confirmed yesterday.

C.T. Woody and T.P. Leonard, of the Richmond police narcocide unit, were riding on East Main Street about 6:30 p.m. when a shot was fired into a rear window of their car, according to sources.

■ The trial continues, page B6.

Woody and Leonard had gone to pick up the children of a protected witness in the trial, the sources said.

No one was injured. Police still are investigating the incident.

Immediately after the shooting, police protection was provided at the houses of Assistant U.S. Attorney Howard C. Vick Jr. and William H. Parcell III, the deputy commonwealth's attorney who is assisting in the prosecution.

Tight security continued yesterday for the prosecutors and witnesses as the trial of several alleged members of one of Richmond's most deadly gangs continued.

The sources also said that Woody had been a target of a "hit" contract from members of the gang several weeks before the trial began.

Several witnesses also had been targeted for death by the gang, which authorities say has been known to kill with "reptilian coldness."

Gang members from New York had been sent here in search of the witnesses, but federal authorities had scattered them throughout the country.

FRONT PAGE

22

E X H I B I T   7

An Introduction to the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III)

David S. Tulsky, Ph.D.

Jianjun Zhu, Ph.D.

Aurelio Prifitera, Ph.D.

The Psychological Corporation
San Antonio, TX

Paper presented during the Symposium: **Modernizing the WAIS-R - Implications for Clinical Practice** at the 104th Annual Convention of the American Psychological Association, Toronto, 1996.

Requests for reprints and other correspondence about this paper should be directed to: David S. Tulsky, The Psychological Corporation, 555 Academic Court, San Antonio, TX 78204.

Copyright © 1996 by The Psychological Corporation. All Rights Reserved. No part of this presentation may be reproduced or transmitted in any form or by any other means, electronic or mechanical including photocopy, recording, or any information storage and retrieval system, without permission in writing from the publisher, *The Psychological Corporation.*

## Abstract

In 1992, the revision of the WAIS-R to the WAIS-III began. The standardization edition contained all the 11 traditional subtests and 3 optional, experimental subtests. This paper will present a brief description of the three new experimental subtests that have been added to the WAIS-III. Also, this paper will outline the goals of the revision and highlight the major additions that will be made to this instrument. A description of the preliminary work (including item reviews, pilot studies, and a nationwide tryout study) as well as the research design for the standardization study will be reported.

2

The Wechsler Adult Intelligence Scale-Revised (WAIS-R) is one of the most popular IQ tests in the world, used by the vast majority of clinical and school psychologists. The WAIS-R is an individually-administered battery of 11 subtests which measure the intellectual ability of people who are between the ages of 16-74. It can be administered in 60-75 minutes, and it has sets of Verbal (6) and Performance (5) subtests. The subtests vary in content from tasks such as defining vocabulary words, stating abstract relations between two objects or concepts, repeating a string of digits, putting puzzles together, putting blocks together to match a pattern, and sequencing a set of pictures to tell a story. The following are subtests from the WAIS-R:

| Verbal Scale | Performance Scale |
|---|---|
| Information | Picture Completion |
| Vocabulary | Block Design |
| Similarities | Object Assembly |
| Comprehension | Picture Arrangement |
| Digit Span | Digit Symbol |
| Arithmetic | |

Several factors have contributed to the decision to update the WAIS-R. The most obvious factor is the outdated normative information. Work by James Flynn (1984, 1988) has indicated that there is a real phenomenon of IQ gains over time. Individuals appear to gain approximately 3-5 IQ points over a 10 year period. Since the WAIS-R was published in 1981 and the data was collected a year prior to the publication, this inflation factor could mean that the average IQ could be as high as 105 - 107 points rather than the accepted value of 100. While this

reason alone would be sufficient for a revision, there are several other goals for improving the WAIS-R.

First, the normative information could be improved upon. Individuals in the United States are living longer. Current estimates place the average life expectancy at birth to be 78 years for women and 71 years for men (La Rue, 1992). However, the WAIS-R only has normative information up to 74 years of age, and hence, it is becoming less sufficient for estimating intelligence in an older adult population. To make up for this deficit, two independent research teams have conducted studies to extend the norms upward into an older adult population. The first project was conducted by Ryan, Paolo, & Brungardt (1990) who received a grant from the American Association of Retired Persons/Andrus Foundation. The grantors were concerned that psychologists could use better information to assess the cognitive functions of older adults. These investigators selected a sample of 130 people (60 individuals who were between the ages of 75-79 and 70 who were 80 years old and up). Attempts were made to match the sampling stratification criteria of the WAIS-R as much as possible. The second research team was operating out of the Mayo Clinic, and collected normative data on 512 individuals between 56 and 97 years of age (Ivnik, Malec, Smith, Tangalos, Peterson, Kokmen, & Kurland, 1992). Ivnik et al. (1992) deviated from the WAIS-R scoring technique by developing "age-specific" raw score to scale score conversions rather than basing the conversion on the optimal functioning "reference" group. Using the 56-74 year-old sample as a reference point, the research group also spent a considerable amount of time investigating the similarities between the Mayo Older Adult

4

Normative Studies (MOANS) norms and the WAIS-R standardization sample norms so that they could make their norms as similar as possible to the WAIS-R.

In addition, Malec, Ivnik, Smith, Tangalos, Petersen, Kokmen, & Kurland (1992) present the MOANS data corrected for both age and education level (MOANS-E) scores. Another research group, lead by Heaton and his colleagues, have published demographic normative information on the WAIS[1] (Heaton, Grant, and Mathews, 1991) and WAIS-R (Heaton, 1992). This work illustrates the practical need in the field for education adjusted normative information. Hence, two perceived shortcomings of the WAIS-R are 1) that the WAIS-R sample does not include a large enough age range and 2) that the WAIS-R norms do not adjust for key demographic variables. The WAIS-III will eliminate these shortcomings. The normative sample of the WAIS-III will now include older adults (e.g., 74-89), and in addition to the basic norms, supplements will be provided allowing the clinician to adjust for education by age in cases where the examiner needs to predict premorbid IQ functioning.

A third goal is to improve the item content of each of the subtests. A number of items are outdated and should be replaced. The artwork on the WAIS-R is old and out of date. The new revision would improve the artwork and the materials. The size of the visual stimuli have been enlarged significantly, making them more appropriate for an older adult population. Additionally, some examiners have criticized the WAIS-R for containing some items that appear to be biased against certain groups. Extensive bias analyses and reviews have been conducted so that biased items could be replaced in the revision.

---

[1] The WAIS was included as part of an extended Halstead-Reitan Battery.

5

Another criticism of the WAIS-R is that some of the subtests are too dependent upon quick performance. For instance, on the Object Assembly subtest of the WAIS-R where subjects put puzzle pieces together, an examinee may earn up to 12 raw score points (e.g., 29% additional raw score points) as time bonus points for speedy performance. This could result in a difference of between 7 and 10 subtest scaled score points. Hence, another one of our objectives is to reduce the contribution of speed and bonus points to the Performance IQ wherever it is possible. To help achieve this goal, a new untimed performance subtest, Matrix Reasoning was developed. It was hoped that Matrix Reasoning would help extend the WAIS-III's ability to measure more fluid, abstract reasoning on the performance scales.

A fifth modification focuses on the composite scores. Some researchers have written about the limitations of the IQ score (Lezak, 1988, 1995). Others have suggested that the scale should measure a wider spectrum of domains of cognitive functioning (Malec et al., 1992). To incorporate some of the advances in the field, when the childrens' version, the WISC-III, was published in 1991, new factor based composite scores (e.g., Verbal, Perceptual Organizational, Attention, and Speed of Information Processing) were added in addition to the traditional IQ composite scores. The WAIS-III revision will include an alternate composite scoring system, in addition to the traditional IQ scoring system. New optional subtests were developed to assess abilities on a hypothesized 3rd factor (Attention/Working Memory) and a 4th factor (Speed of Information Processing). Specifically, two subtests, "Cancellation" and "Letter-Number Sequencing," were designed to measure "Attention and/or Working Memory", and a third subtest, "Symbol Search" was designed to measure "Processing Speed."

Additionally, the WAIS-R subtests do not accurately measure abilities more than 3 standard deviations below average, limiting measurement of individuals with very low or impaired intellectual functioning. Effort was made to increase the precision of measuring clinically relevant groups (e.g., people with mental retardation, people with neuropsychological impairment). This could be achieved in two ways, by extending the range of scores downward so that more reliable measurement could be made at the lower end of functioning and by including new diagnostic features to make the scale useful in the field of neuropsychology. To achieve the former, several "low end" items were created and added to the majority of subtests. To achieve the latter, several optional procedures (like testing incidental learning following the Digit Symbol administration - see Kaplan, Fein, Morris, & Delis, 1991) were added to the WAIS-III Standardization edition.

Another goal of the revision is to link the WAIS-III with other tests to help facilitate the clinical decision making process. Significantly, the standardization sample was co-normed with the WMS-III (the revision of the Wechsler Memory Scale - Revised). This linkage will allow clinicians to examine IQ/Memory discrepancy scores and will allow better interpretation of the domains of cognitive functioning that include both intelligence and memory assessment.

Finally, extensive work has been performed to validate the new instrument and to demonstrate comparability between the WAIS-III and WAIS-R. Correlations between the WAIS-III and the WAIS-R, WISC-III, WIAT, WMS-III, Progressive Matrices, and the Stanford-Binet, 4th Edition will be calculated to show the concurrent validity of the instrument. Furthermore, the WAIS-III and WMS-III will be tested in a series of clinical validity studies with more than 600 individuals with neuropsychological impairment (e.g., Alzheimer's Dementia,

7

Traumatic Brain Injury), psychiatric diagnosis (e.g., Schizophrenia, Depression), learning disabilities, mental retardation, or those who are deaf. From these studies, the construct validity and clinical utility of the WAIS-III will be demonstrated.

History and timelines of the WAIS-III:

Development of the WAIS-III officially began in September of 1992. The project can be divided into 5 main phases: 1) a review of the existing WAIS-R items and the development of new items and subtests; 2) pilot testing of the initial WAIS-III subtests to determine initial item difficulties and functioning; 3) a national tryout study to test item difficulty, item bias, and the WAIS-III factor structure; 4) a large national standardization study to collect normative information, test item difficulty and bias, and to make final item decisions; and 5) several studies to determine the reliability, concurrent validity, construct validity, and clinical utility of the test.

At the initial phases of the project, the existing WAIS-R items were reviewed for potential bias and datedness and new item pools were written for each subtest. To help evaluate the existing WAIS-R items, reviews related to content and potential bias were obtained from 12 experts in the field. Also, the item statistics from the WAIS-R Standardization study were reviewed, and an Item Response Theory (IRT) analysis and an IRT bias analysis on the existing WAIS-R items were performed. Simultaneous to the item review, new item pools were generated for the Comprehension, Similarities, Information, Picture Completion, Vocabulary, Picture Arrangement, and Block Design subtests. These new item pools were rated for content relevance and expected difficulty level and then, were narrowed considerably. For some subtests like Comprehension, the "ratings" were more formal; a mini-pilot study was conducted with

undergraduate students at a local university. Other subtests like Vocabulary did not warrant any pre-pilot testing. For Vocabulary, the preliminary items were rated based upon grade equivalents and familiarity as rated by Word Frequency Book (Carroll, Davies, & Richman, 1971) and A Revised Core Vocabulary (Taylor, Frackenpohl, & White, 1989). Still, for other subtests like Picture Completion, item ratings were performed by having members of the project team review and rank each item on a 5 point likert scale for relevance and on a 3 point scale for difficulty. Through these methods, the initial items for pilot testing were selected for each of the subtests. However, before the final decisions were made, the subtests were then carefully re-reviewed for their content representativeness to ensure that the items selected were roughly parallel in nature to those making up the WAIS-R. If parallelism was not found, then some items were dropped or added at this stage. In addition to modifying the existing subtests, work began on developing the new subtests. Early versions of Symbol Search, Matrix Reasoning, Cancellation, and Working Memory were developed (Zhu, Tulsky, Hilmer, Thomas, O'Donnell, & Nyugen, 1996).

The second phase of development consisted of formally testing each of the new items in 3 pilot studies. The subtests were administered with very liberal discontinue rules and several "additional" items were added to the majority of subtests. Some subtests had alternate forms (e.g., Cancellation). The sample sizes for each of these pilot study ranged from 113 to 168 examinees. The analysis centered around examining the item difficulties and the item correlation with the total score in order to select items to be tested in the nationwide Tryout study that would follow. In addition to the classical item analysis technique, in analyzing the speeded, attentional, and working memory subtests, the correlations with other subtests were analyzed to determine if

9

it was likely that a subtest would add to the measurement of the attentional, working memory, and/or speed of information processing domains of cognitive ability. Most of the new subtests appeared to be achieving their purpose (Zhu, Tulsky, Hilmer, Bow-Thomas, O'Donnell, & Nyugen, 1996). However, the Picture Ordering subtest, which was designed to test working memory, seemed to be too difficult to administer in a user friendly manner on the WAIS-III. Hence, this subtest was dropped and not included in the Tryout.

The third phase of the development consisted of a large national Tryout with 446 subjects, as well as additional smaller studies testing the psychometric properties of the scale (e.g., construct validity and test-retest reliability). The sample was stratified on several key variables: age, sex, education level, ethnicity, and region of the country. The sampling plan also included a large oversampling of African-American and Hispanic examinees to help us detect and remove items that were potentially biased against either of these minority groups. Traditional Mental-Hanszel Bias analysis and Item Response Theory bias analyses were conducted to help us detect potentially problematic items. Following these analysis, a sub-sample of our subjects was selected (N = 284) that roughly represented the census statistics for the general population. Using this sample, classical item analyses (such as computing item difficulties and item-total correlations) and IRT Rasch analysis were performed for each subtest so that the items sets for standardization could be selected. Detailed scoring studies of the four verbal subtests (e.g., Vocabulary, Similarities, Comprehension, and Information) were conducted on the 446 subjects with two trained scorers coding and comparing each response so that more refined rules could be developed. Exploratory factor analyses were also performed. The results of these latter analyses

10

suggested that a 4-factor solution was supported. Some subtests, such as Cancellation and Symbol Search, were modified based upon the Tryout results.

The fourth phase of development focused on the collection of the standardization data and began in July, 1995. The standardization sample is comprised of 2450 subjects spanning the ages 16-89. The sample was also stratified on sex, education level, ethnicity, and region of the country. For sex, an equal number of males and females were collected with subjects for age groups 16-64. For the older subjects, where the percentage of females is higher than the percentage of males, this variable was stratified on census proportions. Also, samples based on education level, ethnicity, and region of the country were collected stratified by demographic information provided in the 1993 census update. Included in the sampling design was a plan to jointly collect Standardization data on the Wechsler Memory Scale, Third Edition (WMS-III). Over 1500 individuals took both the WAIS-III and the WMS-III (in a counterbalanced order) allowing direct comparison of intelligence and memory and the provision of normative information of a combined set of expanded domains of cognitive abilities that include verbal and performance abilities, verbal and visual memory, working memory, speed of information processing, and learning acquisition.

In addition to the basic Standardization sample, 200 African-American and Hispanic individuals were tested without discontinue rules so that the item bias analysis could be repeated with sufficient observed item scores for both of these ethnic groups. Also, an additional 432 examinees were tested to ensure that there were at least 30 individuals in each education level within each age group so that age by education level normative data could be provided. These

11

latter cases were treated as "oversampled" data and were not included in the basic standardization sample.

The fifth phase of development began concurrently with the standardization data collection. It focused on the psychometric properties of the WAIS-III. To assess the stability of the instrument, a test-retest correlation coefficient was computed on 390 examinees who completed the WAIS-III within a range of a 3 to 12 week interval. Concurrent validity studies were performed to investigate the correlation between the WAIS-III and the WAIS-R (N=210), the WAIS-III and the WISC-III (N=200), the WAIS-III and the WIAT (N=100), the WAIS-III and the Stanford Binet - IV (N=30), and the WAIS-III and the Ravens Progressive Matrices (N=30). Test administrations are being counterbalanced for administration order. Finally, as an index of the construct validity and the clinical utility of the scale, the WAIS-III is being administered in several small studies to a wide variety of individuals with neuropsychological deficits (e.g., Alzheimer's Dementia, Traumatic Brain Injury), individuals with mental retardation, individuals with psychiatric disorders, individuals with learning disabilities, and individuals who are deaf. We plan to collect approximately 30 examinees in each of these clinical groups.

In summary, it should be reiterated that the WAIS-III will resemble its predecessors. All of the familiar subtests will be included in the kit and the verbal, performance, and full scale IQ scores may be obtained. The revised scale will also have several features that will assist diagnosticians in making complex clinical judgements about their examinees. Some of the improvements include:

12

1. Replacement of outdated norms and an extension of the normative sample to include older adults (e.g., 74-89). Additionally, when premorbid prediction of IQ is needed, supplemental normative data will allow clinicians to adjust scores for both age and education level.

2. Replacement of outdated and biased items. Also, improved quality of the artwork and the material. Enhancement of materials to make test administration easier.

3. Development of new factor based composite scores (in addition to the traditional ones). These new composite indices take advantage of some of the advancements in the measurement of cognitive abilities. New optional subtests will be developed to assess abilities on some of these factors.

4. Reduced emphasis on the speed and bonus points in the instrument. To help achieve this goal, a new subtest, Matrix Reasoning, was developed. Additionally, the reliance of bonus points on some subtests (e.g., Arithmetic) has been reduced in the revised version.

5. Extension of the floor of the subtests so that the test will provide more clinical utility when testing people with Mental Retardation. To achieve this goal, several "low end" items were created and added to the majority of subtests.

6. The WAIS-III was co-normed with the revision of the Wechsler Memory Scale - III (WMS-III) to allow clinicians to examine IQ/Memory discrepancy scores, as well as to allow for better assessment of multiple domains of cognitive functioning.

7.  Extensive validation studies that demonstrate the clinical utility and construct validity of the new scale.

8.  Similarity with the WAIS-R. People who are conversant with the administration and interpretation of the current instrument (WAIS-R) should be able to use the WAIS-III with minimal training.

14

## References

Carroll, J.B., Davies, P., & Richman, B. (1971). The American Heritage: Word Frequency Book. Boston: Houghton Mifflin Company.

Flynn, J.R. (1984). The Mean IQ of Americans: Massive gains 1932 to 1978. Psychological Bulletin. 95, 29-51.

Flynn, J.R. (1988). Massive IQ gains in 14 nations: What IQ tests really measure. Psychological Bulletin. 101, 171-191.

Heaton, R.K., Grant, L., & Matthews, C.G. (1991). Comprehensive Norms for an Expanded Halstead-Reitan Battery: Demographic Corrections. Research Findings. and Clinical Applications. Odessa, FL: PAR, Psychological Assessment Resources, Inc.

Heaton, R.K. (1992). Comprehensive Norms for an Expanded Halstead-Reitan Battery: Supplement for the Wechsler Adult - Revised. Odessa, FL: PAR, Psychological Assessment Resources, Inc.

Ivnik, R. J., Malec, J.F., Smith, G.E., Tangalos, E.G., Petersen, R.C., Kokmen, E., & Kurland, L.T. (1992). Mayo's older adult normative studies: WAIS-R norms for ages 56-97. The Clinical Neuropsychologist. 6 (Supplement), 1-30.

Kaplan, E., Fein, D., Morris, R., & Delis, D.C. (1991). WAIS-R as a Neuropsychological Instrument Manual. San Antonio: The Psychological Corporation.

La Rue, A. (1992). Aging and Neuropsychological Assessment. New York: Plenum Press.

Lezak, M.D. (1988). IQ: R.I.P. Journal of Clinical And Experimental Neuropsychology, 10, 351-361.

15

Lezak, M.D. (1995). Neuropsychological Assessment, Third Edition. New York: Oxford University Press.

Malec, J.F., Ivnik, R.J., Smith, G.E., Tangalos, E.G., Petersen, R.C., Kokmen, E., & Kurland, L.T. (1992). Mayo's older adult normative studies: Utility of corrections for age and education for the WAIS-R. The Clinical Neuropsychologist, 6 (Supplement), 31-47.

Ryan, J.J., Paolo, A.M., & Brungardt, T.M. (1990). Standardization of the Wechsler Adult Intelligence Scale - Revised for persons 75 Years and Older. Psychological Assessment, 2, 404-411.

Taylor, S.E., Frackenpohl, H., & White, C.E. (1989) A Revised Core Vocabulary. Columbia, SC: EDL.

Zhu, J., Tulsky, D.S., Hilmer, C., Bow-Thomas, C.C., O'Donnell, L., & Nyugen, C. (1996). New Experimental Subtests of WAIS-III. Paper presented during the 104th Annual Convention of the American Psychological Association, Toronto, 1996.

E X H I B I T   8

VI. Sentencing Closing Arguments

COPY

VIRGINIA:

IN THE CIRCUIT COURT OF FAUQUIER COUNTY

COMMONWEALTH OF VIRGINIA,        :

     Plaintiff,                :

v.                               : CRIMINAL NO. CR96-160
                       CR96-161, CR96-162
DAVID D. MATTHEWS, JR.,          :

     Defendant.                :

September 8, 1997

Day 15

The Jury Trial held in the above-captioned matter, which convened, pursuant to notice, at 9:00 a.m. at the Fauquier County Courthouse, Warrenton, Virginia.

BEFORE:

THE HONORABLE WILLIAM SHORE ROBERTSON

APPEARANCES:

For the Commonwealth:
JONATHAN S. LYNN, COMMONWEALTH ATTORNEY
J. GREGORY ASHWELL, DEPUTY COMMONWEALTH ATTORNEY

For the Defendant:
JUD A. FISCHEL, ESQUIRE

ALEXANDER N. LEVAY, ESQUIRE
MOYES & LEVAY

Robin Creswell, Court Reporter

MAUREEN MCMAHON REPORTING, INC.
(540) 347-1016

IV  Inmate Shifflett

70

they have to bring the next witness over from the jail.  He was apparently here and brought back.

THE COURT:  I would suppose that would take approximately 15 minutes, so we will have to take a short recess for that.

Ladies and gentlemen, we'll take another recess of about 15 minutes.

(A brief recess was had.)

THE COURT:  Counsel ready?

MR. LEVAY:  Yes, sir.

THE COURT:  Who will be your next witness?

MR. LEVAY:  Melvin Shifflett.

THE COURT:  All right.  Let's seat the jury and the witness can be brought in.

(Jury in at 11:15 a.m.)

- - -

Thereupon,

MELVIN SHIFFLETT

was called as a witness, and after being first duly sworn, was examined and testified as follows:

THE COURT:  Mr. Shifflett, please have a seat, sir, and please answer to Mr. Levay.

DIRECT EXAMINATION

71

BY MR. LEVAY:

Q    Good morning.

A    Good morning.

Q    Please state your name for the jury and the Court.

A    Melvin Shifflett.

Q    Mr. Shifflett, where do you currently reside?

A    Right now I'm at Loudoun County Adult Detention Center, but I was in Augustus Correction Center in Greenville, Virginia.

Q    And, Mr. Shifflett, can you tell the jury, please, how many maximum security prisons you have resided in?

A    Just about all of them.

Q    And could you give the names?

A    You have Buckingham Corrections Center, Ottawa, Brunswick, Greensville, King Mountain, Augustus, all of the road camps from No. 1 to 31. They're numbered.

Q    Now, in your maximum security prison cell, can you tell -- you have been transferred to Loudoun County temporarily; is that right?

72

A     Yes, sir.

Q     And where will you return to?

A     More than likely, back to King Mountain.

Q     And in King Mountain --

A     Yes.

Q     In King Mountain, can you tell the jury how big your cell is?

A     It's about 8 feet by 15 -- 8 by 15.

Q     And what is in that cell?

A     You got -- some cells have double bunks. Most of them have double bunks. You got a table that's bolted to the wall, your sink, commode, and a mirror.

Q     And what is the sink and commode made out of, sir?

A     Stainless steel.

Q     Any covers on that toilet?

A     No, sir.

Q     What is the mirror, is that stainless steel?

A     Stainless steel.

Q     How many hours do you spend in your cell in a day?

73

A    If you arrive at a major institution and they have a building called "dead heads." When you first get there, that's where you go. You are in your cell from nine o'clock at night to seven in the morning.

Q    How long do you spend each day in your cell, sir?

A    Nine o'clock at night to seven o'clock the next morning.

Q    And, Mr. Shifflett, can you tell the jury whether or not you have any control as to your movement in prison?

A    Maximum security prison you don't. It's all controlled movement. When you leave your building, say to go to the rec yard or something, you have to ask the officer to go, he gets on the radio and the officer outside sits there at the door and you can come outside. He escorts you to the rec yard or whatever. You are under control at all times.

Q    Is there generally two to a cell, sir?

A    Yes, sir.

Q    Do you have any choice in who that other inmate is?

74

A      Not necessarily.

Q      Do you have any privacy in prison, Mr. Shifflett?

A      No, sir.

Q      Are your showers taken in your cell, Mr. Shifflett?

A      No, sir. They send -- you are assigned to a pod. You have four showers to a pod. And when you walk in, you got a door that's like an old saloon door that swings open. It's half partition. All it does is cover you from your knees to here, and people can still see you; the guards can see you; inmates can see you.

Q      Is that controlled movement as well, sir?

A      Yes, sir.

Q      What is lockdown, Mr. Shifflett?

A      Lockdown consists of the whole institution on lock down. No movement whatsoever.

Q      And what are the reasons for lockdown?

A      Riots, disturbances, stabbings --

Q      Can -- I'm sorry, go ahead.

A      Fights.

Q      Can an individual be put in lockdown?

75

A    Yes, sir.

Q    Have you been put in lockdown?

A    Yes, sir.

Q    What are the reasons for you being put in lockdown?

A    When I got transferred from King Mountain to Augustus Correctional Center to go back to court in Loudoun, when I arrived at Augustus Correctional Center, two inmates there recognized me and claimed me as an enemy, so they went to administration and told them they were scared of me, so they locked me up, put me in lockdown.

Q    And how many hours did you spend in your cell in lockdown?

A    I'm there 23 hours a day.

Q    Mr. Shifflett, are inmates subject to searches in their cell?

A    Yes, sir.

Q    What kind of searches are conducted in their cells?

A    It all depends on what they are looking for.  If they are looking for, you know, wine or drugs or something like that, you know, you could be

76

stripsearched.

Q    What is a strip search?

A    Strip search consists of you being in your cell, strip you down naked, squat, cough, and get redressed and search the rest of your cell.

Q    Do these searches happen randomly or in order?

A    It could be any time.  If the officer suspects you have something in your cell or on your person, they can search you down.

Q    Mr. Shifflett, how are convicted child molesters treated in prison?

A    They're the lowest thing on earth.

Q    Have you, personally, observed violence upon convicted child molesters?

A    I have seen people get stabbed; I have seen people get killed; I have seen people get acid thrown on them, burnt up.  I have seen it all.

Q    Mr. Shifflett, did they take cereal away from the inmate's diet in prison?

A    The presweetened cereal, yes.

Q    Why is that?

A    So you couldn't make mash, homemade wine.

77

Q    And, sir, in maximum security prison or super maximum security prison, is it next to impossible to obtain alcohol?

A    Pretty much.  If the administration knows that you're an alcoholic or you like drinking, they keep a well good eye on you.  Like I said, they can search you any time, day or night.  Same way with drugs.  If you're a known drug addict, they do the same thing.

MR. LEVAY:  Thank you, Mr. Shifflett. That's all I have.

MR. LYNN:  I have no questions.

THE COURT:  Thank you, Mr. Shifflett.

MR. LEVAY:  My last witness will be James Aiken.

- - -

Thereupon,

JAMES E. AIKEN

was called as a witness, and after being first duly sworn, was examined and testified as follows:

THE COURT:  Have a seat and kindly speak into the microphone and answer Mr. Levay's questions.

DIRECT EXAMINATION

E X H I B I T   9

VII Sentencing Closing Arguments COPY

V I R G I N I A :

     IN THE CIRCUIT COURT OF FAUQUIER COUNTY

---

COMMONWEALTH OF VIRGINIA,    :

     Plaintiff,     :

v.     : CRIMINAL NO. CR96-160
          CR96-161, CR96-162

DAVID D. MATTHEWS, JR.,     :

     Defendant.     :

---

     September 8, 1997

     Day 15

     The Jury Trial held in the above-captioned matter, which convened, pursuant to notice, at 9:00 a.m. at the Fauquier County Courthouse, Warrenton, Virginia.

BEFORE:

     THE HONORABLE WILLIAM SHORE ROBERTSON

APPEARANCES:

     For the Commonwealth:
     JONATHAN S. LYNN, COMMONWEALTH ATTORNEY
     J. GREGORY ASHWELL, DEPUTY COMMONWEALTH ATTORNEY

     For the Defendant:
     JUD A. FISCHEL, ESQUIRE

     ALEXANDER N. LEVAY, ESQUIRE
     MOYES & LEVAY

     Robin Creswell, Court Reporter

77

Q    And, sir, in maximum security prison or super maximum security prison, is it next to impossible to obtain alcohol?

A    Pretty much.  If the administration knows that you're an alcoholic or you like drinking, they keep a well good eye on you.  Like I said, they can search you any time, day or night.  Same way with drugs.  If you're a known drug addict, they do the same thing.

MR. LEVAY:  Thank you, Mr. Shifflett. That's all I have.

MR. LYNN:  I have no questions.

THE COURT:  Thank you, Mr. Shifflett.

MR. LEVAY:  My last witness will be James Aiken.

- - -

Thereupon,

JAMES E. AIKEN

was called as a witness, and after being first duly sworn, was examined and testified as follows:

THE COURT:  Have a seat and kindly speak into the microphone and answer Mr. Levay's questions.

DIRECT EXAMINATION

78

MR. LEVAY:

Q    Good morning, Mr. Aiken.

A    Good morning.

Q    Mr. Aiken, please tell the jury your full name.

A    My name is James Evans Aiken, A-I-K-E-N.

Q    And Mr. Aiken, what is your occupation, sir?

A    I am a correctional expert in the field of criminal justice and have been practicing since September 1971.

Q    And could you give the jury a brief background of your educational background, sir?

A    I have an undergraduate degree and a bachelor of arts degree from Benedict College, Columbia, South Carolina.  I have a master's degree in criminal justice from the University of South Carolina in Columbia, South Carolina.

Q    Give the jury an outline of your positions that you have held in Department of Corrections settings?

A    I began my Department of Corrections career in 1971 as I just stated.  I was hired in the

79

capacity of a social worker working with substance abusers that had been convicted of crimes, and that was in a maximum as well as a medium security environment.

I also served as administrative assistant to the warden of a medium security prison in South Carolina.

I also served as a deputy warden of a maximum security state penitentiary in South Carolina.

I also served as warden of a women's prison which encompassed maximum security inmates, medium security inmates and minimum security inmates.

I also served as a warden of a maximum security state prison which enclosed about 1,800 inmates, between 1,200 and 1,800 inmates, to include death row population as well as mentally incapacitated population.

I also served as a deputy regional administrator in which I provided administrative function over 16 various institutions, to include maximum security, super maximum security, as well as medium security and minimum security inmate

80

population and facilities.

I served as commissioner of corrections for the state of Indiana which included male, female, adults; male, female juvenile; parole; as well as community corrections populations of those people that I indicated; maximum security, medium security, minimum security facilities, as well as having the overall function of that aspect of the criminal justice process in the state of Indiana.

I also served as director of corrections for the United States Virgin Islands. This included pretrial inmate population, posttrial inmate population, maximum security inmate population, medium security inmate population, minimum security inmate population, as well as those individuals that were being held under juvenile statutes.

I also served as deputy corrections coordinator for the Commonwealth of Puerto Rico. This I served in the capacity as a correctional expert to provide technical assistance to the government of Puerto Rico, as well as representing the United States District Court in civil litigation against the Commonwealth of Puerto Rico regarding the

81

proper management of inmate populations.

I have also served in the capacity of a private consultant assisting the United States Department of Justice National Institution of Corrections, as well as to the National Academy of Corrections in providing technical assistance to various correctional agencies throughout the United States, as well as other countries, to provide correctional leadership, development, stress management, as well as managing gangs, as well as insuring proper security of facilities, to include maximum security, single maximum security, minimum security, as well as other aspects of correctional inmate management.

Also, I served as an adjunct professor at the Midlands Technical College in Columbia, South Carolina. I also served as adjunct professor at Indiana University, Purdue University in Indianapolis. I also served as a member of the board of visitors for Indiana University, Bloomington, Indiana.

Q    Mr. Aiken, in your role as warden and director of corrections for the state of Indiana and

82

some of the other long and lengthy history and career that you had, what are the duties and tasks that you have performed related to prison corrections duties, responsibilities of that nature?

A     Well, just to answer that quickly, I have probably managed or dealt with every conceivable aspect of correctional operations.  That's inclusive of managing maximum, medium, minimum security inmate populations, as well as implementation of classification systems, evaluating inmates, thousands of inmates, on where they should be placed within the corrections environment.

Additionally, I had to deal with a number of issues as it relates to managing a correctional institution, as well as an agency, to include shakedown, inmates investigation of murders, investigation of rapes, to actually executing two inmates, managing death row population.  A number of hostage situations in which some inmates have ended up in death, to include staff assaults, to include contraband trafficking, to include weapons introduction to an institution and getting those out, riots, disturbances.  Every aspect, I have just about

83

involved myself.

Q      How many inmates have you supervised classification over?

A      I would literally say thousands.  In the state of Indiana I had at least 10,000 inmates, and I had indirect as well as direct supervision over every aspect of inmates in that system.

In the South Carolina Correctional System, I literally signed my name to classification documents on thousands of occasions, stating that I agreed, and I have reviewed and I state my professional judgment on the placement of this inmate in the correctional environment.

Q      Now, you have also been an author, have you not, on classification of inmates?

A      That's correct.  I authored or coauthored a document on classification management, a tool for managing today's offender, and that document is intended for other correctional agencies so that they can make sure that their purpose, on the classification purpose, is one of providing the maximum protection to the public, the staff, as well as other inmate populations, that's within the

84

context of constitutional requirements set by the Court.

Q     And these articles on classification have been published in Virginia in the American Correctional Association; is that right?

A     That's correct, sir.

Q     And with regards to your consultant work, have you not given consultant advice to the Virginia Department of Corrections?

A     Yes, I have.  I have assisted them in their development of managing of female inmate populations, as well as leadership development for their executors and administrators through the U.S. Department of Justice National Academy of Corrections.

Q     You have been to Virginia maximum security prisons, have you not?

A     Yes.  I've had an occasion to physically be at a maximum facility prison within the Virginia Department of Corrections.  The purpose of that particular visit is to evaluate and ascertain their death row as well as death penalty procedures on carrying out executions in the state of Virginia.

85

Q    Now, you professionally know the director of corrections for the state of Virginia, Mr. Angellone, do you not?

A    That is correct, sir.  We were coinvolved as commissioners of corrections.  I have attended many meetings with him; I've interacted with him; I have provided training, as well as received training together with him, and he's very knowledgeable of his correctional practice, yes.

Q    And you're also very knowledgeable of the classification criteria and process for the state of Virginia, sir?

A    Yes.  The classification processes of the state of Virginia, in my expert opinion, is outstanding.  And based on Mr. Angellone, as well as other individuals of the state of Virginia to insure that the maximum care for and protection to the public.

MR. LEVAY:  Your Honor, at this time, I would move Mr. Aiken in as an expert in prison operations and classifications.

MR. LYNN:  I have no objection.

THE COURT:  All right.  He may render

86

opinion within his area of expertise, preserving for the Commonwealth any objections to particular questions.

MR. LEVAY:  Thank you, Your Honor.

BY MR. LEVAY:

Q     Mr. Aiken, can you tell us, please, whether or not you reviewed Mr. Matthews' Department of Correction file?

A     Yes, I did.

Q     Can you tell us, please, whether or not you are aware that Mr. Matthews has been convicted of capital murder?

A     Yes.

Q     And based upon your review of his file and his conviction here today and your knowledge of the Virginia classification system, could you please tell the jury where Mr. Matthews will be classified or how Mr. Matthews will be classified?

A     Mr. Matthews will be placed in a maximum security environment.  A maximum security environment is one in which the inmate is in least control of his self and in maximum control by the staff and the structures of that facility.

87

That individual will be told when to get up and when to go to bed.  That individual is in constant, constant evaluation and supervision by staff.  The inmate will be placed with other predatorily, aggressive, dangerous, violent inmate population.

Q     Go ahead.

A     You will also note that in a maximum security environment, that when you mean -- when I say the comment like "in total control of staff", I mean strip searches at any time staff deems appropriate.  You cannot get medical attention until staff deems that appropriate.  You will not get visitors until staff deems that appropriate.  You are in constant evaluation of searches, of people going through your cell and going through all your personal items on a continual basis.

Also, you will understand that if you violate certain rules, it may result in your death. If you violate that perimeter, lethal force will be used against you, even if you get a chance to even get near that perimeter.  You are under constant evaluation.  You cannot go outside to get a breath of

88

fresh air until an officer allows you to do that, and you are in constant evaluation.

Q    Mr. Aiken, with regards to super maximum prisons, are you aware of the building and construction of those prisons in Virginia, sir?

A    Yes, I am aware that super maximum security facilities are being constructed, and I am very familiar with those type of designs as well as the operations of a maximum security, super max facility.

Q    Please tell the jury the difference with regards to the super maximum facilities being built in Virginia?

A    In a super maximum security facility, not only is there maximum evaluation of that inmate population by staff, there are also mechanical restraints when there's movement from point A to point B within that prison setting; that staff are there to escort you; you are handcuffed behind your back; you are -- everything that comes in contact with you is evaluated and searched, physically searched.

Also, that staff is especially trained and

equipped to use whatever force that is allowable by law to ensure that you are in constant compliance with rules, regulations, policies, and procedures, and that's everything from a written reprimand to being killed.

Q     What are the hours in cell for super maximum prisons?

A     A normal super maximum security environment requires that an inmate is locked up 23 hours a day.  And that one hour out of those 23 hours that individual is allowed out of the cell, and many of them, super maximum security environments, don't let you see sunshine.  The sunshine is indirect light.  The windows are often covered, and if they are not covered, they are so small that you cannot get a view of what the outside world is all about. And many of the facilities, when you do get a chance to look outside, all you see are gun towers or fences or patrols and people with weapons that would be used against you if you attempted to -- if you had an opportunity to attempt to violate anything.

Q     Once the super maximum prisons are completed in Virginia, do you have an opinion,

90

Mr. Aiken, with regard to the likelihood of Mr. Matthews taking residence at one of those facilities?

A       Based on his criminal activity, based on the thousands and thousands of records I have reviewed over my history, this individual will be incarcerated in a super maximum security environment and he will remain there for the remainder of his life.

Q       Now, based upon your review of Mr. Matthews' record and your knowledge of the system and prisons in general, can you assess whether or not Mr. Matthews will pose a risk in the future to the society in prison?

A       Mr. Matthews, in my candid opinion, number one, I have two opinions on that.

The first opinion is this:  I have been in prison work all of my adult career.  I have not collected a paycheck that I can remember outside of working in corrections.  I have dealt with, ate with, worked with, supervised, interacted with the criminal population like this for many, many years.  I can state without any reservations that I can house,

supervise, manage, interact on a daily basis for the rest of my career with an individual like this while not providing him -- while not providing an unusual risk of harm to myself, my staff, the community or other inmates. And I state that opinion based on the thousands of inmate population members that I have evaluated and supervised. I can put that person in my prison and supervise that person until his last breath without any hesitation that he will present an unusual risk or risk of harm to myself, my person, me.

Second opinion is this: He may be considered a predator in the community, but in prison, it's a different story. A person with his type of criminal history is not a kingpin in prison. In fact, he is the lowest of the lowest on the totem pole, so to speak. This individual has no sphere of influence over staff, no sphere of influence over inmates. In fact, inmates resent -- inmates -- in my career, I've had a difficult time making sure that this person lives out his natural life, and a constant evaluation and a constant security evaluation has to be conducted to ensure that this

92

individual is protected from real predators within a correctional environment.  He is the lowest of the lowest on the totem pole.

Q   Now, what is your confidence and opinion of the Virginia Department of Corrections ability to monitor, supervise and guard Mr. Matthews?

A   Based on my interaction with the individual who is the administrator of the system, based on my knowledge of being, personally, inside a correctional environment, a maximum security environment within the state of Virginia, based on my 25, 26 years of in and out of prison systems throughout the whole United States, as well as managing them, I have no reservation whatsoever that the state of Virginia Department of Corrections is a step above most.  It's a very, very efficient, well-trained, well-equipped agency to deal with this type of criminal behavior for an individual for the rest of his life without endangering the public.  And the public is inclusive of the community, the staff, as well as other inmates.  They have done it many times before, and I have no reservations in stating that they can do it in the future.

93

Additionally, I have no reservations at all in stating to you, based on the professionalism as well as the systems that are in place within the correctional agency, that this individual will never, never have an opportunity, never have an opportunity to inflict any harm against the public.

MR. LEVAY:  Thank you very much, Mr. Aiken.

THE COURT:  Cross-examination?

MR. LYNN:  Commonwealth has no questions.

THE COURT:  May Mr. Aiken be excused?

MR. LEVAY:  He may be, with my thanks.

THE COURT:  Thank you very much, sir.  You are free to go.

Will counsel approach on scheduling, please.

Did you contemplate any additional evidence?

MR. LYNN:  Just briefly, Your Honor.

THE COURT:  Do you want to start back at 1:00?

MR. LYNN:  We can probably get our evidence on very shortly if you just want to keep

E X H I B I T   10

USCA4 Appeal: 16-13    Doc: 2-11    Filed: 06/17/2016    Pg: 279 of 299

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

CORY JOHNSON,                         )
                                      )
          Petitioner,                 )
                                      )
     v.                               )     Crim. No. 3:92CR68
                                      )     Civil No. 3:97CV895
SAMUEL PRUETT, Warden,                )
  Mecklenburg Correctional            )
  Center, Boydton, Virginia           )
          Respondent.                 )

## DECLARATION OF CRAIG S. COOLEY

Craig S. Cooley, pursuant to 28 U.S.C. §1746, hereby declares that the following is true to the best of his knowledge, recollection, and belief:

1.      I served as one of Cory Johnson's two attorneys in his capital murder trial before this Court and his appeals after the trial.

2.      This declaration is submitted to address particular issues raised by Mr. Johnson's habeas counsel. It is not designed to be a complete statement of every fact that I may know that is germane to Mr. Johnson's habeas petition, and it is not designed to be a complete analysis of every aspect (including effectiveness of counsel, prosecutorial misconduct, and prejudice to Mr. Johnson) of the trial and appeals of Mr. Johnson's case.

3.      My recollection is that my co-counsel and I conducted no independent investigation of the facts or witnesses for the guilt phase of Mr. Johnson's case. Instead, my recollection is that we relied exclusively on disclosures received from the Government and on attempted (and generally uninformative) interviews with government witnesses held in the presence of the

prosecutors. We did not move for appointment of an investigator pursuant to 21 U.S.C. §848(q). Our failure to have a private investigator conduct an independent investigation was not the result of strategic or tactical decisions. I believe that this failure might have prejudiced Mr. Johnson.

4.    Mr. Johnson's case received media coverage prior to and during the trial. I recall that the media coverage was extensive and contained information that was inflammatory, prejudicial to Mr. Johnson, and inadmissible at trial. Voir dire demonstrated that many prospective jurors had prior knowledge about the case. I did not move for a change of venue of the trial. As best I can recall, this failure was not the result of strategic or tactical decisions. I believe that this failure might have prejudiced Mr. Johnson.

5.    I recall that I did not advise Mr. Johnson of his right to be present during jury voir dire. I *did* advise him to accept the conducting of voir dire in his absence. As a result of his exclusion, he was not present to hear any potential juror answer the questions put to them, or to observe them, during critical portions of voir dire. My failure to object to his exclusion during voir dire, my failure to advise him of his right to be present, and my advice to him that he accept the conducting of voir dire in his absence were all error. These failures were not the result of strategic or tactical decisions. I believe that these failures might have prejudiced Mr. Johnson.

6.    As I recall, I did not notice during jury selection that the Government used eight of its ten strikes to remove women. Because I did not notice this, I did not make a *Batson/J.E.B.* objection. If in fact the Government used eight of its ten strikes to remove women, my failure to make such an objection was an error; this failure was not the result of strategic or tactical decisions. I believe that this failure might have prejudiced Mr. Johnson.

7. In preparation for trial, the defense gathered a substantial amount of information concerning Mr. Johnson's severe intellectual deficits and susceptibility to the influence of others. I do not recall ever considering that this evidence should be used for Mr. Johnson's benefit during the guilt phase, even though one of the elements of a CCE is that the defendant affirmatively supervised at least five people. Such evidence could and perhaps should have been offered during the guilt phase for the purpose of demonstrating to the jury that Mr. Johnson was either not capable of such supervision or not likely to supervise. This failure was not the result of strategic or tactical decisions. I believe that this failure might have prejudiced Mr. Johnson.

8. A major theme of Mr. Johnson's defense was that he was not a supervisor, but that he merely sold drugs to other people, who then resold the drugs. I believe that I failed to support this defense with a requested jury instruction that would have informed the jury that the relationship of buyer and seller of drugs is insufficient to establish CCE supervision. The failure to so offer this evidence was error; this failure was not the result of strategic or tactical decisions. I believe that this failure prejudiced Mr. Johnson.

9. Based on my recollection, I believe that during the trial and on appeal I failed at various stages to raise the point that (1) the Government introduced evidence of a large number of individuals involved in various drug activities and argued to the jury that those individuals were CCE supervisees, when (2) many of those persons were, as a matter of law, incapable of counting as CCE supervisees. The failure to raise this point was error; this failure was not the result of strategic or tactical decisions. I believe that this failure prejudiced Mr. Johnson.

10. My recollection is that, during the trial and on appeal, I failed to challenge the Fourth Circuit's standard for CCE supervision, which differs from the standard applied in many

3

other circuits. The failure to challenge this standard was error; this failure was not the result of strategic or tactical decisions. I believe that this failure prejudiced Mr. Johnson.

11.    My recollection is that, during the trial, I and my co-counsel frequently failed to ask for cautionary instructions when defense objections were sustained. I believe that this failure might have prejudiced Mr. Johnson.

12.    My recollection is that I did not file a reply brief on appeal that responded to the Government's argument that specific aspects of the record demonstrated that Mr. Johnson supervised five individuals. The failure to do so was error; this failure was not the result of strategic or tactical decisions. I believe that this failure prejudiced Mr. Johnson.

13.    Upon my review of materials shown to me by habeas counsel, it appears that I failed on a number of occasions during the trial to object to (1) a number of improper arguments and tactics used by the prosecutor, (2) the Government's misleading, ambiguous testimony, (3) the Government's testimony that was unsupported by personal knowledge of the witnesses. The failure to do so was error; this failure was not the result of strategic or tactical decisions. I believe that this failure prejudiced Mr. Johnson.

14.    During the trial, I did not make any effort to introduce evidence of the harsh living conditions that Mr. Johnson would face if he were not given the death penalty. This failure was not the result of strategic or tactical decisions. I believe that this failure might have prejudiced Mr. Johnson.

15.    I was not aware, and was not advised by my expert, of the following: (1) that there is a phenomenon of IQ test score inflation caused by the delay between when the test was first constructed and when the test is actually administered, (2) that the age of the IQ tests taken by Mr.

4

Johnson probably caused Mr. Johnson's IQ test scores to be improperly inflated; and (3) that Mr. Johnson's IQ test score would probably have been lower, and within the level of mental retardation, if he had taken the IQ test when test was first created. Assuming that there was a basis to demonstrate and argue that Mr. Johnson's IQ test score was improperly inflated and that in reality his true performance was within the level of mental retardation, I would have brought this to the Court's and jury's attention, and I believe this might have caused Mr. Johnson to receive a life sentence, rather than the death penalty.

16.    I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge, recollection, and belief. Executed on June __11__, 1998.

Craig S. Cooley

E X H I B I T   11

Page 1

IN THE UNITED STATES DISTRICT COURT FOR

THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

-----------------------------)

UNITED STATES OF AMERICA )                15 PAGES

v.                           )

RICHARD TIPTON,              )

aka Whittey, et al.          )        GRAND JURY 92-1

-----------------------------)

    The testimony of HAUSSON C. JONES, taken on the
21st day of April, 1992, commencing at approximately
1:15 p.m.

FOREMAN:  CHRISTOPHER F. SNEAD

DEPUTY FOREPERSON: MARY A. McNULTY


ASSISTANT UNITED STATES ATTORNEY:

W. H. PARCELL, III, AUSA


Reported By:  Debra L. Johnson

ounces?

A    Yes.

Q    You sold it and he kept 60 percent and you got 40?

A    Yes.

Q    Where would you usually see him when you would obtain the cocaine?

A    I would either go see him where he was at, or he would come around and see me.

Q    Where would he usually be at?

A    He was staying in the West End during this time.

Q    Did you ever see him cook the cocaine or was it always in cook-em-up form when you got it?

A    Always in cook-em-up form.

Q    Do you know anyone else in this organization who he was partners with?

A    "CO".

Q    They were equal business partners?

A    Yes.

Q    What was J.R.'s relationship to them?

A    I think he was his cousin.

Q    Was he also in the cocaine business?

E X H I B I T   12

Page 1

IN THE UNITED STATES DISTRICT COURT FOR

THE EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION

------------------------------)

UNITED STATES OF AMERICA )                19 PAGES

v.                        )

RICHARD TIPTON,           )

aka Whittey, et al.       )           GRAND JURY 92-1

------------------------------)


The testimony of CHARLES TOWNES, taken on the 21st day of April, 1992, commencing at approximately 12:45 p.m.


FOREMAN:   CHRISTOPHER F. SNEAD

DEPUTY FOREPERSON: MARY A. McNULTY


ASSISTANT UNITED STATES ATTORNEY:

HOWARD C. VICK, AUSA


Reported By:   Debra L. Johnson


ACCU-BETA DEPOSITIONS, VIDEOS, & IMAGES, INC.
(804) 746-0746

Page 4

to your coming in here and testifying today?

A        Yes.

Q        And we've told you we're not going
to use anything you say against you.  We just want
your cooperation?

A        Right.

Q        You sold drugs with a guy by the
name of Hausson Jones.  Is that right?

A        Yes.

Q        In Central Gardens?

A        Yes.

Q        Both of you work for Whittey.  Is
that right?

A        Yes.

Q        You've had occasion to talk to
Whittey a number of times, haven't you?

A        Yes.

Q        Did Whittey tell you whether he had
partners in the drug business, people who worked on
the same level as him?

A        Yes, sir.

Q        Who were they?

A        J.R.

Q        Is that James Roane?

A        Yes.  "V".

ACCU-BETA DEPOSITIONS, VIDEOS, & IMAGES, INC.
(804) 746-0746

E X H I B I T   13



STYLE WEEKLY

Vol. XI, No 6/February 9, 1993 FREE

Don Dale sees 'Queen' as Shakespeare's NEXT GENERATION

REPUBLICAN shifts on gun control may signal strategy

New book dissects her CONFEDERATE VALHALLA Monument Avenue

# TRUE DETECTIVE

*How the Richmond police nabbed the Newtowne gang*

DEFENDANT'S EXHIBIT

USCA4 Appeal: 16-13   Doc: 2-11   Filed: 06/17/2016   Pg: 293 of 299

# BIG CITY BUST



Narcocide detectives J. Rod Rodriguez, R.T. Fleming (hidden), M.D. Scott, Cliff Jackson, Tom Leonard and C.T. Woody

PHOTOS BY JAY PAUL

The word has reached New York. Richmond isn't Mayberry anymore. Fool with the law, and the law will fool with you. Here's how the local cops brought in the Newtowne Gang.

**BY LISA ANTONELLI BACON**

**A** New York drug dealer recently confided to Richmond Narcocide Detective J. Rodney Rodriguez that easy gun purchases aren't the only things that draw big city dealers to Richmond.

When you lay your dope down, it's usually there when you come back for it, he said. And you get twice the weight for half the money. On top of all that, the dealer went on, "the cops is slow. At least, that's what we was told."

There's a new message on the drug- and gun-running circuit. And Newtowne Gang members are the poster boys for the cam-paign to get the word out. For the last four weeks, Richard "Whitey" Tipton, Cory "O" Johnson, James "J.R." Roane and Sandra Reavis have been making public appearances, attesting to the speed and dexterity of Richmond cops. Even though the appearances have all been in federal court, the print and TV coverage they've generated would cost in the hundreds of thousands of dollars, if anyone had to pay for the exposure.

The case might not have made the New York Times, but you can bet the news has reached those New Yorkers who Richmond cops want to reach. Tipton, Johnson and Roane went on trial and were found guilty on murder charges last week and prosecutors have asked for death penalties.

It's a landmark case: the largest number of defendants in a federal trial to be targeted for the death penalty since it was reinstated in 1989. So the word is out. In drugland parlance, Richmond *ain't* Mayberry R.F.D. If you fool with the law, the law will fool with you.

The Newtowne Gang had the cops stymied at first. *In fact, the bodies were three deep and two weeks into 45 days of violent retribution and murderous paranoia before police came to believe that one bunch of guys was responsible.*

It all became clear to the cops when a handful of homicide detectives teamed up with the narcocide squad, a hybrid team of street-savvy drug and murder investigators, to create a task force that would eventually knock the legs out from under the gang.

Before it was over, detectives, with the help of forensics and ballistics experts, traced nine murders to five guns, and the five guns to the handful of people that police and press now refer to as The Newtowne Gang. "The 11 they did in 45 days are the ones we can prove," says Narcocide Detective C.T. Woody. "We know they did others, but we can't prove it."

## THE NEW YORK BOYZ MOVE SOUTH

The seeds of the Newtowne gang sprouted in 1989, in Trenton, N.J., as a drug gang that deterred competition with razor blades and aluminum baseball bats—aluminum because they don't break on impact like wooden bats do. In Trenton, they called themselves The New York Boyz, according to gang member Greg Scott, "to let people know we were from out of town and were taking over." Scott testified in U.S District Court here on Jan. 15 that Tipton and Johnson were feared members of the New York Boyz, known for carrying razors in their mouths.

Tipton and Johnson came to Richmond in the last days of 1991 to muscle in on the drug trade here. Police say they were a new breed. Unlike the notorious Johnson-Brown gang that ruled Blackwell drug trade until they were locked up two years ago, Tipton and Johnson were not flashy. No gold chains, no fancy cars. "They didn't own anything, used cabs and never used their real names," says Woody. That's how they managed to stay on

the streets as long as they did, police say. "For a long time, all we had were nicknames," says Richmond Deputy Commonwealth's Attorney William H. Parcell III who, along with Assistant U.S. Attorney Howard C. Vick Jr., put the Johnsons and the Browns behind bars. "Nobody, not even the people working for them, knew their real names."

According to Woody, Tipton and Johnson rounded up between 15 and 20 people to sell drugs for them. "They hired local boys to take all the chances. If the boys messed up, they let people see 'em kill. That puts fear in people."

The Boyz had barely been in town a month when they made their first kill. In dramatic testimony on Jan. 19, 1993, Hussone Jones, who admits he sold crack for the gang, described the murder of Doug Talley, who Roane, a local gang recruit/leader, believed was "5-O," street talk for "police."

Jones testified that he was sitting in a car within 30 feet of Talley near the intersection of 13th and Stockton streets in South Side when Talley was killed in the early morning hours of Jan. 5, 1993. According to Jones, Roane, seated behind Talley, grabbed Talley around the neck. Then Tipton, who was in the front passenger seat, stabbed Talley repeatedly. Jones estimated the stabbing lasted between three and five minutes. An autopsy would reveal 84 stab wounds, two of which penetrated the skull and pierced the brain.

In one of the trial's most dramatic moments, Jones described how Tipton "had to push his foot off the door to get the knife out" of Talley's head. Then, he testified, Tipton kicked the car door against Talley's body, which had begun to slide out of the car. Jones said that when they got in his car to leave the scene, Tipton and Roane were laughing.

## NOBODY KNEW THEIR NAMES

When Detective J.J. Cox was assigned to the case, his best material evidence would turn out to be bogus. The killer had left an army fatigue jacket in The killer's car. In the pockets were a set of dog tags, reading glasses and some medication for a Johnny Lee Bond. It seemed too good to be true. And it was. By chance Talley's best friend. And he had had the coat he was wearing some time later. He didn't know the

said, "but he goes by 'Whitey.'"

About a week later, just after midnight on Jan. 13, "Little Doug" Moody was in a house at Harrison and Clay streets, discussing drug money with Tipton. According to Priscilla "Pepsi" Green, who did small jobs for gang members. 'O' and Whitey didn't want Little Doug and Peyton Maurice Johnson working that area.

Witnesses testified that Moody dove through a window and Roane followed Moody outside with a large, black-handled military knife. In the alley behind the house, Roane stabbed Moody 18 times in the back, face and chest. Then, as emergency teams raced to the scene, Pepsi

testified, Roane gave the knife to her to dispose of.

When Homicide Detective Steve Dalton took the case, some street names surfaced, but no one knew any real names. The murders of Talley and Moody went unconnected.

It would seem that even the least experienced criminal would keep some distance between himself and the fresh scene of his crime. And even if the old adage about the criminal returning to the scene is true, the Newtowne Gang breathed new life into its meaning. On Jan. 14, the very day after Moody was killed outside the house at Harrison and Clay, police found



# THE GOOD GUYS

**Narcocide Detective J. Rodney Rodriguez:** *Baby-faced narc who spent a year undercover as a Hispanic drug dealer.*

**Narcocide Detective C.T. Woody:** *"The 11 [murders the Newtowne Gang] did in 45 days are the ones we can prove. We know they did others, but we can't prove it."*

**Narcocide Detective Cliff Jackson:** *Stunning good looks for disarming female witnesses.*

**Narcocide Detective R.T. Fleming:** *Can break down killers using manners befitting the Prince of Wales.*

**Narcocide Detective M.D. Scott:** *Has worked so closely with Fleming for so long that they can communicate in blinks and shrugs.*

**Narcocide Detective Tom Leonard:** *Sharp shooter who gave the signal to raid the house at 1212 Moore St. that resulted in indictments of Thomas, Hardy, Roane and Reavis.*

**Homicide Detective J.J. Cox** *Soft-talking, slow-walking Southern boy.*

**Homicide detectives J.J. Cox, Ray. Williams and Billy Blaylock**

**Homicide Detective Billy Blaylock:** *Veteran cop with a good pipeline to the streets.*

**Street Crimes Detective Ray Williams:** *A former homicide detective who's been rerouted to street crimes. He helped bring in the South Side strangler.*

**Homicide Detective Steve Dalton:** *When he took the case, some street names surfaced, but no one knew any real names.*

**Homicide Detective Ray House:** *Brought valuable street information into the investigation.*

**Detective A.J. Reid:** *Came on board after the murders of Talley, Moody and Johnson were thought to be related.*

**Forensic detectives Paul Tuttle, Gary Brunelli, Wayne Hines, Dave Tweedie and Tom Searles:** *"The work those guys did made the case," said Richmond Deputy Commonwealth's Attorney William H. Parcell III.*

> **The shooter was so close to the children that shell casings rained down on them at the kitchen table.**

BE MINE

## Gift ideas that outlast candy and flowers

♡ unique gold earrings
♡ hand engraved rings
♡ custom pins
♡ vintage watches
♡ diamond engagement rings
♡ unusual rings
♡ colorful gemstones
♡ one-of-a-kind designs
✓ a ♡ and come 👁

*Dransfield* Jewelers

1310 East Cary St. / In Shockoe Slip
Richmond, VA 23219 / (804) 643-0171

# LSAT MCAT GMAT GRE SAT

*Prep classes forming*
*now for:*

March · GMAT & SAT
April · MCAT, DAT & GRE
June · LSAT

# KAPLAN
## 285-3414
*The answer to the test question*

# BIG CITY BUST



For the cops, the wait outside 1212 W. Moore St. seemed like an eternity.

the body of Peyton Maurice Johnson on a couch inside the same house, dead from several gunshots to the head and body. Roane and Johnson were later charged and convicted.

According to police sources, Maurice Johnson was a big-time dealer in the Newtowne area before the New York Boyz came to town. The Boyz had gotten word that Johnson and Moody wanted to move them out. "They got those guys before those guys could kill them," one source says.

With the Johnson killing, Detective A.J. Reid joined the list of detectives who kept hearing the names "Whitey," "C.O." or "O," and "J.R." Other names, like "Sandra Reavis" and "Pepsi" came up too. By Jan. 20, the light was coming on: The murders of Talley, Moody and Johnson were likely related.

That day, a Monday, detectives Billy Blaylock, Reid and Dalton met with Deputy C.A. Parcell. Parcell advised the team to plow through Newtowne and bring in for questioning anyone who was wanted for anything, from felonies to misdemeanors to failure to show up in court. For the next three days, police brought in three to four witnesses a day. Again, the same names surfaced. No one knew last names for Whitey or "O." But police gained a little ground when they put a last name to J.R. James Roane Jr. had been in trouble with police before. In fact, he'd just been released from prison in mid-November, 1991 for unlawful wounding.

Around 7 the next morning, Jan. 21, a man walking to work stumbled upon body No. 4 near an Interstate 95 overpass near Maggie Walker High School. Katrina Rozier, a known lesbian hooker, had been shot once between the eyes. When she fell forward, her assailant shot her again in the back of the head. Exactly one week later, on Jan. 28, an informant told police that Rozier owed the Boyz money, and that she was killed over the debt.

"We knew we had a problem," says Parcell, "and we'd heard there was a list of people they were going to kill."

Police barely had time to process that information before the body of the next victim turned up. The very next night after receiving the information, Jerry R. Gaiters testified, he and Sterling Hardy were smoking crack with Louis J. Johnson in a house off Kinney Street when Roane appeared. According to police sources, Hardy stepped outside to speak with Roane. When Roane left, Hardy, Gaiters and Johnson went to a neighborhood store to buy beer. As they walked toward the store, Roane drove up in a burgundy Buick Regal. Roane yelled for

Johnson to stop, then he shot Johnson once in the back of the head. He went down, face up. "O" followed and pumped several more shots into Johnson's head and body.

When information came in after Louis Johnson's death, police had a couple of new names to track. Gaiters and Hardy. And they'd been told that Roane and "O" were the shooters.

Two days later, on Jan. 31, police sources say, the homicide detectives assigned to the murders—Blaylock, Reid and Dalton and Ray House—met to share information. Narcocide, a six-man unit designed to track drug activity and drug-related murders, had begun hearing from their informants that the gang was getting scared and that they'd developed a hit list of people who knew too much about them. The newest information held that the guys were going "uptown," as they referred to New York, to pick up some dope. They'd be back Sunday and selling by Monday.

But the gang had a surprise for police. They came back early.

## FROM THE MOUTHS OF BABES

At 7:15 p.m. on Saturday, Feb. 1, Detective Ray Williams, a former homicide detective who's been rerouted to street crimes, was in his patrol car near Laurel and Broad when a transmission came over the radio. There had been a double shooting on Lynhaven Avenue in South Side.

When he got there, he found one victim, Torrick Brown, dead from more than a dozen bullet wounds. After being shot six times, Brown's sister, Martha McCoy, had

fished car keys out of Brown's pocket, gathered her three children and attempted to drive for help before collapsing behind the wheel of the car. She was on her way to MCV when Williams arrived.

The children, 7-year-old Montez, 2-year-old Janea and 4-year-old Janequetta were still at the scene. Montez was calm enough to talk to Williams. He told the detective that he and his sisters were sitting at the kitchen table when his mother answered the door. "She started backing up," he told Williams. "Then the guy came in shooting. He shot my uncle, then Mumma. Uncle went down, Mumma dove over the sofa. He came around the sofa and shot Mumma."

The shooter was so close to the children that shell casings, ejected from the murder weapon, rained down on them as they sat at the kitchen table.

Montez told Williams that the shooter had run to an apartment across the courtyard. When the woman at that apartment told Williams that Roane had just left, he knew the gang had struck again. Police would later tag this a domestic killing: Brown allegedly had kept company with Roane's girlfriend while Roane was in prison.

Prosecutor Parcell was at his Fan District home, preparing to have dinner with his wife, when Williams knocked on the door and told him to get in the car. While Blaylock and Williams were briefing Parcell on the Lynhaven Avenue shootings, another radio transmission stopped them in their tracks: Three people had been shot at the corner of 28th and Clay streets.

Williams says that when he arrived, the owner of the house, Bobby Lee Long, was lying between garbage cans and his garage. Inside, Anthony Carter sat at the

There's a sign that stands in the window of a house in Newtowne. "Trespassers will be shot," it reads. "Survivors will be shot again."

# BIG CITY BUST

## THE VICTIMS

**1**

Jan. 5: Doug Talley was stabbed more than 80 times inside a parked car. Gang members thought he was a police officer.

**2**

Jan. 13: "Little Doug" Moody, a rival drug dealer who was in a dispute about drug money, was shot and stabbed just after midnight.

**3**

Jan. 14: Peyton Maurice Johnson, a rival drug dealer killed the day after Moody in the same house, was found on a couch, dead from several gunshots to the head and body.

**4**

Jan. 21: Katrina Rozier, a known lesbian hooker, was shot between the eyes. Exactly one week later, on Jan. 28, an informant told police that Rozier owed the gang money and that she was killed over the debt.

**5**

Jan. 29: Louis J. Johnson, a gang member, was shot in the head and face.

**6 & 7**

Feb. 1: Torrick Brown, dead from more than a dozen bullet wounds, allegedly kept company with gang member James "J.R." Roane's girlfriend while Roane was in prison. Brown's sister, Martha McCoy, who was with Brown when he was shot, was wounded from six gunshots. She gathered her three children and attempted to drive for help before collapsing behind the wheel of the car.

**8-10**

Feb. 1: Three people shot at 28th and Clay streets: the owner of the house, Bobby Lee Long, was shot in the head. Anthony Carter had a bullet wound behind his ear. Long's sister, Dorothy "Mousie" Armstrong died from eight gunshot wounds. Armstrong was allegedly hiding out there because she owed drug money and knew the gang was looking for her.

**11-14**

Feb. 19: Linwood Chiles, the gang's driver, and associate Curtis Thorne were found shot in a car in Fulton Bottom. Critically injured were sisters Gwendolyn Green, Thorne's girlfriend, and Priscilla "Pepsi" Green. A bullet wound in Pepsi's left ear has left her deaf and paralyzed on that side. She walks with a cane and speaks with difficulty. Gwen will spend the rest of her life in a wheelchair.

kitchen table, head lolling to one side, blood draining from a bullet wound behind his ear. Dorothy "Mousie" Armstrong was on her way to MCV where she would die from eight gunshot wounds.

In court one year later, on Jan. 26, 1993, gang member Jerry Gaiters would recount the events that led to the first major crack in the case, an early dawn raid on a Moore Street dwelling the gang used as a safe house.

Early on the evening of Feb. 1, 1992, Gaiters testified, he met with "O," alleged gang member Lance Thomas, admitted conspirator Sterling Hardy (now a federal witness), and the gang's driver, Linwood Chiles, in a gang dwelling at 1212 W. Moore St. in Newtowne.

After Gaiters left, "O" told us J.R. was having trouble over in South Side," Hardy testified. The men loaded into two cars to drive to Lynhaven Avenue where Torrick Brown would be killed and Martha McCoy would be wounded.

Shortly after the Lynhaven Avenue carnage, "O" and Tipton asked Gaiters where Mousie's brother, Bobby Long, lived. Mousie, they believed, was hiding out there because she had "messed up a package," owed drug money, and knew the gang was looking for her.

On the ride to Long's cinderblock home on Clay Street, Gaiters said, Whitey (Tipton) drove, Gaiters sat in the front passenger seat with "O" behind him.

"I was worried 'bout the way 'O' kept playing with a Glock [semiautomatic weapon]," said Gaiters, indicating that he feared he was in danger. "Whitey said don't worry."

Gaiters said that Tipton drove up the alley behind Long's house, and "O" told him to "bring Mousie out here." Gaiters further testified when he knocked on the

## THE BOYZ

**Richard "Whitey" Tipton**
*Convicted of six murders*

**Cory "O" Johnson**
*Convicted of eight murders*

**James "J.R." Roane**
*Convicted of four murders*

**Sandra Reavis**
*Convicted of conspiracy to distribute crack cocaine*

**Jerry R. Gaiters**
*Plea bargained murder charges in exchange for testimony*

**Sterling Hardy**
*Plea bargained murder charges in exchange for testimony*

**Lance Thomas AKA "V" Mack**
*Will be tried for the murder of Louis Johnson later this year*

## Sweet Treats for Your Valentine

### The Ultimate Brownie

By Diana James

### Try Something **New** this Year!

| Delectable Cookie Bouquets | Fancy Gift Baskets | Delicious Brownie Tins |

Local Delivery     (804) 266-3288     Shipping Nationwide

---

**The Best in Seafood & Steaks**

*Byram's Lobster House*

Lunch Specials & Early Bird Specials
Mon. through Fri. 5:00 pm to 6:30 pm
Starting at $4.95 including soup and two side dishes. More specials after 6:30 pm!

Banquet facilities available

Mrs. Spanias Policy of 45 Years of Fresh Seafood, and fine service continues.

*Now Open*
Sunday to Thursday
11:30 a.m. to 10:00 p.m.
Fridays 11:30 a.m. to 11:00 p.m.
Saturdays 3:00 p.m. until.

Make your Reservations for Valentine's Day!

3215 W. Broad St.
Richmond 355-9193

---

# Final Winter Clearance
# SALE

February 11-15
(Thursday-Monday)

*Receive additional 50% off all current sales prices of fall & winter clothing.*

*40% OFF Selected Belts*
*10% OFF All Jewelry*



HIGH·COTTON

## Specialty Boutique for Women

The Shops at Innsbrook
**747-9996**

Mon.-Tues. 10-6,   Wed.-Thur. 10-7,   Fri. 10-6,   Sat. 10-5

## STRAWDERMAN CAMP



In the Shenandoah Valley of Virginia. Girls 6-17. Real mountain camping in the foothills of the Allegheny Mts. Riding, swimming, tennis, hiking, crafts, dramatics, nature study, Indian lore, dancing, music, archery.
We invite you to a video presentation depicting campfire on Sat., Feb. 20, at 2:00, at Edgewood Farm, Crozier, VA. Staff members will be present to answer questions.
Call Libby Smith, Richmond Representative

**784-3257**

---

## OUT OF SPACE?

**MAXIMIZE PRESENT OFFICE SPACE AND AVOID A COSTLY MOVE**

Offering 13 Years of Successful Experience in Business Optimization

COMPLETE ANALYSIS OF:
Building Space Utilization ▲
Workstation to Function Design ▲
Paperwork/Task Methodology ▲
Cost/Benefit Comparisons ▲
Office Overflow ▲

# SPACE CONCEPTS

**745-3534**

· Free Consultation ·

---

# Charles Schwarzschild, Inc.
## Jeweler
### 282-3724



## Intrepid Leopards Cuff Bracelet
18 Karat Gold with Burnished and Glossy Finish

282-3724
By Appointment Only
6000 River Road



Monday-Friday
10 AM - 4 PM
Mastercard/Visa

---



## We've got it!
for
# Valentine's Day

Get Your Q-94 Zoo Animal with $25 Purchase
(while supplies last)

# THE · SHOPS · AT
# WILLOW LAWN

GIFT CERTIFICATES AVAILABLE AT THE INFORMATION DESK.
OVER 100 WONDERFUL SHOPS AND RESTAURANTS ON BROAD STREET AT WILLOW LAWN DRIVE.
OPEN DAILY 10:00 A.M. TO 9:00 P.M., SUNDAY 12:30 TO 5:30 P.M., 804-282-5198.

---

door, Long asked "Who's there?" When Gaiters identified himself, he said, "O" pushed by him, entered the house and began shooting.

"Bobby tried to run out, but he fell, and 'O' shot him," Gaiters testified. After the shooting stopped, he and "O" ran to the alley where Tipton had the car running. When they got in the car, Gaiters said, "'O' and Whitey was laughin'."

Tipton drove "O" and Gaiters back to 1212 W. Moore St. where "O" turned on the TV. "'O' said he wanted to see if [the killings] were on the TV news." When the news was over and no mention had been made of the events on Lynhaven or on Clay, "O" told Gaiters, "We got to find out if Mousie's dead." So, according to Gaiters, "O," Thomas, gang driver Chiles, and Curtis Thorne, who also worked with the group, went back to scout the scene in Church Hill. Gaiters said he went home.

## THE SWAT TEAM STRIKES

While gang members were surveying the scene of their most recent shootout, Parcell and several detectives were using the darkest hours of the night to track the suspects. According to several officers involved, it was a night to remember. The six-man Narcocide squad had been called from their homes to join the investigation. Homicide cops had identified four houses in the Newtowne area used by the gang, and the detectives set up tight surveillance on all four locations. "We figured they all had to put their heads down somewhere," said Narcocide Detective Rod Rodriguez. The cops decided to squeeze the location where the most suspects had gathered.

Rodriguez and Narcocide Detective Tom Leonard were secretly posted in a building close to 1212 W. Moore St. While little was stirring at the other three locations, Rodriguez and Leonard saw people coming and going between the hours of 4 and 6 a.m. Meanwhile, the SWAT team was at the Mosque, site of the police academy, being briefed.

As the sun was coming up, the surveillance teams knew it was time to strike. They'd already gotten a search warrant which would lawfully allow them to gain entry and search the house and grounds.

To Parcell and Williams, stationed at another target house within blocks of 1212, the wait seemed like an eternity. Neither, in fact almost none of the detectives, had slept for 24 hours.

"How are we going to know which house?" a bleary-eyed Williams asked Parcell.

"We'll know," answered Parcell.

Minutes later, Parcell turned to Williams.

"How are we going to know when they enter?"

## BIG CITY BUST

"We'll know," said Williams.

By 7 a.m., everyone was in place, waiting for the right moment to storm the house. Then Leonard, who was providing sniper cover from his hiding place, saw someone look out a front window of the house. For Leonard, that was the trigger. He whispered over his radio that it was time to go.

Almost before the man inside had stepped away from the window, SWAT threw a light-sound device (they don't like to use the term "flash bomb") through a front window. Windows blew out into the yard, doors came off their hinges. SWAT members kicked in the front door and rushed in.

Police have a videotape of what happened when the smoke cleared. And it's safe to say the occupants of 1212 were surprised. Lance Thomas, Sterling Hardy and an unidentified juvenile were standing stunned in the front room of the house. Police found Roane and Sandra Reavis in bed in a back room.

"When she heard that explosion and saw that flash, she musta thought J.R. was one helluva lover," Williams said later.

A search of the house turned up nada. But in the backyard, Rodriguez found a tote bag full of guns and 120 vials of cocaine. Because of the testimony of little Montez McCoy, Roane was immediately charged with murder. Hardy, who would later turn federal witness, and Lance Thomas, who goes to trial later this year, were charged with drug and gun charges. By noon on Feb. 2, Thomas, Hardy and Roane were locked up. Reavis would later face federal conspiracy charges.

But killers were still on the loose. "We still didn't know who they were," says Parcell. "We only had street names and descriptions."

Over the next two weeks, police were able to determine a few of the names on the so-called hit list. So when Linwood Chiles and Curt Thorne turned up dead in a car in Fulton Bottom on Feb. 19, police believed the Newtowne group had struck again.

Walter Tuck was driving his pickup to work at Philip Morris when the radio announcer said it was 10:17 p.m. As he came around the bend on Stoney Run Drive, he saw "something fly up in the air."

"I thought someone had been hit by a car," he later told police. As he approached the car, he would later testify in court, he slowed down and saw a woman on the ground, bleeding. At that moment, he noticed a man walking down an embankment. "I saw that, I turned my headlights off and took off."

The "thing" he'd seen fly up in the air was Gwendolyn Green. Gwendolyn and her sister Pepsi thought they were on their way home when Linwood Chiles parked on a dark street in Fulton Bottom. Chiles routinely drove gang leaders to pick up dope, around Richmond or to New York, even drove them to some murder scenes. Pepsi was in the front seat with Chiles. Gwendolyn was in the back seat, with "O" on her left and boyfriend Curt Thorne on her right.

Pepsi testified that "O" told Chiles to rest his head on the steering wheel, then pumped a bullet into his head.

"Then 'O' shot me," she said.

Thorne died of gunshot wounds to both sides of the face. The Green women, the only witnesses police had, were hanging on at MCV. For the next several weeks, Parcell and Narcocide detectives R.T. Fleming and M.D. Scott visited them frequently. For the first several days, they gathered information by reading Gwen's lips, because a tracheotomy tube made it impossible for her to speak. According to Parcell, she remembered a lot of what happened that night. And Pepsi began to recall events, too, as she improved. Their testimonies would provide detectives the basis for murder warrants for Tipton and "O."

The bullet Pepsi says "O" put in her left ear has left her deaf and paralyzed on that side. She walks with a cane and speaks with difficulty. She doesn't know what happened after she was shot. But Gwen, who will spend the rest of her life in a wheelchair, remembers Tipton approaching the car. "He called my name, and I turned toward him. That's all I remember."

## ONE LAST BREAK

With the two ringleaders on the loose, Parcell and his men had to hustle. They started by matching guns found at the raid on 1212 W. Moore St. to casings found at the scenes. Eventually, ballistics expert Ann Jones determined that all nine shootings had been committed with the same five guns. Then detectives traced the paper trail that led to a Pam Williams as purchaser of the guns.

When they brought Williams in for questioning, she admitted that she had bought all the guns for some of the gang members in exchange for cocaine on Jan. 14.

By April, the cops had heard that Tipton had set up house in Blackwell. On April 8, an informant claimed to have spotted him, standing in front of a house on 15th Street.

Parcell says it was as if the whole cavalry responded to the tip, driving in droves into the Blackwell area to arrest Tipton.

"Now we had everybody locked up but 'O,'" remembers Parcell. "We knew he'd gone back uptown."

Nearly three months later, the break came. Police had located a girlfriend of "O's." The girlfriend, who is in the Federal Witness Protection Program, was reluctant to talk at first but, she said in testimony, her aunt worked on her. "She told me it was the right thing to do."

The girlfriend gave police the number she called when she wanted to reach "O" in New York. The number belonged to a woman who provided the gang a place to stay. The woman would arrange a time for the girlfriend to call a nearby phone booth, then tell "O" what time to wait there.

The day the girlfriend made the call for police, the woman told her to call the phone booth at 8 p.m. Then Detective Fleming got on a plane for New York. He arrived in plenty of time to plant himself across from the phone booth. But, when 8 p.m., then 8:15 came and went, Fleming thought they'd missed him again.

At 8:23, when "O" sauntered up, Fleming asked him his name. "Cory Johnson," he said...at which time, Fleming, Drug Enforcement Agency agents and N.Y.P.D. cops swarmed him.

• • • • • • • • • •

Case closed, testimony rendered. The jury took 11 hours to return guilty verdicts. Tipton was convicted of six murders, Cory Johnson with eight. Roane was found guilty of four counts. All three face the death penalty or life in prison. The jury also found Sandra Reavis guilty of conspiracy to distribute crack cocaine. Hardy and Guiters plea bargained their murder charges in exchange for their testimony. Lance Thomas, otherwise known as "V" or "Anthony Mack," will be tried for the murder of Louis Johnson later this year.

One would hope that the men of Narcocide could call it quits for a while. Just like they hoped they'd do after the Johnson-Brown gang was locked up. But the rest will be short. No matter that these guys are off the streets and their trial over, rumblings of new turf struggles are already being heard on the streets. There's a hand-lettered sign that stands in the window of a house in Newtowne. "Trespassers will be shot," it reads. "Survivors will be shot again."

It'll be a mighty short rest for the men of Narcocide.

Mighty short. ∎



You always have time to read it

Find out how your business can reach over 108,000 affluent readers, call us at 358-0825.



## To Help You Celebrate The 10TH Anniversary Of Our Breakfast Bar, Here's A Party Favor.

## $2.99

All You Care To Eat Breakfast and Fruit Bar.
*Monday-Friday 6:00 a.m. to 11:00 a.m.*




Cary St., Fairfield Commons, 177 E. Belt Boulevard, Dumbarton Square, Skipwith & Broad, Glenside & Broad, Ashland/Hanover Shopping Center

<u>CERTIFICATION</u>

I hereby certify that one copy of the attached Memorandum In Support Of Initial Petition For Writ Of Habeas Corpus Pursuant To 28 U.S.C. Section 2255 was mailed on June 15, 1998, to counsel for the Respondent:

> Robert J. Erickson
> United States Department of Justice
> Room 6102, Patrick Henry Building
> 601  D. Street, N.W.
> Washington, DC  20530
> (202) 514-2841

Barbara L. Hartung